# EXHIBIT B7

Dennis J. Stewart (SBN 99152)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

*Additional Plaintiff's Counsel Appear on the Signature Page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

MIKULA WEB SOLUTIONS, INC.,
individually and on behalf of all others
similarly situated,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

COMPLAINT

Plaintiff Mikula Web Solutions, Inc. brings this action against Defendant Google LLC ("Google" or "Defendant") individually and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of similarly situated publishers that sold digital Display Ad inventory through Google's AdSense targeting consumers in the United States since March 11, 2008. Plaintiff seeks treble damages and injunctive relief for Google's longstanding and continuing violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2. Plaintiff alleges as follows based on its personal knowledge, the investigation of Plaintiff's counsel, and on information and belief.

## I.   NATURE OF THE ACTION

1.      This is a civil antitrust action under sections 1 and 2 of the Sherman Act for treble damages and other relief arising out of Google's exclusionary and anticompetitive campaign to obtain and maintain monopolies in several distinct, but closely related, relevant markets, including (a) publisher ad server services ("Publisher Ad Servers"); (b) display ad network services ("Ad Networks"); (c) display ad exchanges ("Exchanges"); and (d) display ad buying tools ("Ad Buying Tools") (collectively, the "Relevant Markets"). These markets constitute what is referred to as the "Display Ad Stack."

2.      While Google got its start in Search, today it is an advertising company. Google makes billions of dollars a year by collecting information about individual Internet users and then using that information to help advertisers find suitable persons to whom they can send direct, targeted ads. Google obtains user information from a number of sources, including through its Google Search service and Chrome web browser. Thanks to these and other Google offerings, Google knows when individual users log on, the websites they visit, the things they search for, the products they buy, and other valuable information.

3.      Google has engaged in anticompetitive conduct that created and entrenched its market power at all levels of the Display Ad Stack. As described further below, three events in particular are key to Google's dominance in these markets, and the resulting harms to publishers: (1) Google's acquisition of DoubleClick, which allowed Google to be a fully integrated player spanning the entire Display Ad Stack; (2) the introduction of "header bidding" in 2015, which

COMPLAINT

1  allowed Google's rivals to bid simultaneously against each other for publisher impressions; and

2  (3) Google's subsequent introduction of Open Bidding in 2018, which was Google's response to

3  the competition created by header bidding.

4       4.    Google used each of these events, along with other actions described herein, to

5  leverage its monopoly in Search into other markets, to exclude rivals, allocate markets, and

6  otherwise extend and defend its dominance in the Relevant Display Ad Markets.

7       5.    As a result, Google has control over a dominant share of the Display Ad inventory

8  on which advertisers will bid as well as over which advertisers can participate in the most

9  significant auctions and how publishers prioritize and compare different sources to identify the

10 advertiser that will ultimately "win" the right to place an ad in a particular ad slot.

11 Google's exclusionary conduct has had substantial anticompetitive effects in the Relevant Markets

12 and has harmed publishers. Plaintiff and members of the proposed Class accordingly seek

13 compensatory and injunctive relief for violations of the Sherman Act, 15 U.S.C. §§ 1 & 2.

14 **II.    JURISDICTION AND VENUE**

15      6.    Plaintiff brings this action under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§

16 1, 2.

17      7.    Plaintiff has been injured, and is likely to continue to be injured, as a direct result

18 of Google's unlawful, anticompetitive conduct.

19      8.    The United States District Court for the Northern District of California has subject

20 matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and section 4 of

21 the Clayton Act, 15 U.S.C. § 15(a)(2).

22      9.    The United States District Court for the Northern District of California also has

23 subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). The amount in

24 controversy exceeds $5,000,000 exclusive of interests and costs, and Plaintiff and a significant

25 proportion of the members of the proposed Class are citizens of states different from Google.

26      10.    Venue is proper in this District under sections 4 and 12 of the Clayton Act, 15

27 U.S.C. §§ 15, 22. Google is headquartered in this District and its principal business operations are

28

1    based in this District. Moreover, Google's anticompetitive conduct was directed and carried out in

2    this District. Venue also is proper pursuant to 28 U.S.C. § 1391 for the same reasons.

3        11.    Plaintiff and members of the Class also have contracts with Google that contain a

4    forum selection clause requiring all claims between the parties to be resolved "exclusively in the

5    federal or state courts of Santa Clara County, California," which includes this District.

6

7    **III.    PARTIES**

8        12.    Plaintiff Mikula Web Solutions, Inc. is a small business incorporated in

9    Pennsylvania with its principal place of business in Doylestown, Pennsylvania. Plaintiff assists

10   small and medium sized business with complete website development solutions including website

11   design, e-commerce, database applications, online marketing solutions, and website hosting. As

12   part of that, Mikula Web Solutions, Inc. sells digital Display Ad inventory through Google. As a

13   direct result of Google's unlawful, exclusionary conduct, Mikula Web Solutions, Inc. has been

14   paid lower-than-competitive rates for its digital Display Ad inventory.

15       13.    Defendant Google is a Delaware corporation with its principal place of business in

16   Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company

17   incorporated and existing under the laws of the State of Delaware and headquartered in Mountain

18   View, California. Google engages in, and its activities substantially affect, interstate trade and

19   commerce. Google provides a range of products and services that are marketed, distributed, and

20   offered to consumers throughout the United States and internationally.

21

22   **IV.    DISPLAY ADVERTISING**

23       14.    Display Ads are ads that appear on a website, often in a side window or some other

24   designated space on the page. The suppliers of that ad space—usually the owner of the website—

25   are generally referred to as "publishers." Because many publishers rely on Display Ads as an

26   important source of funds for their businesses, the price at which they can sell space on their pages

27   is critical.

28

15.     When an Internet user visits a publisher's website where ad space is available, a process is initiated to solicit and organize bids through various sources of advertiser demand to fill that space. Once the winning bid has been identified, in a process that typically takes less than a second, the Display Ad is placed on the publisher's website. The intermediaries providing these services receive compensation in a form of a share of the payments from advertisers for their Display Ads to appear on the website.

16.     The Display Ad intermediation industry has four main layers: Sell-side Tools (Publisher Ad Servers and Ad Networks), Exchanges, Ad Buying Tools, and Advertiser Ad Servers. Together, these four layers are called the "Display Ad Stack."

17.     Sell-side tools include Publisher Ad Servers and Ad Networks, which are used by publishers selling space on their websites ("impressions") to assist them in choosing which ads to place on their sites. Generally, larger publishers use Publisher Ad Servers, and smaller publishers use Ad Networks to sell space on their website.

18.     Exchanges, or "Supply-Side Platforms" ("SSPs"), run auctions of impressions. Bidders in these auctions, who represent advertisers, use Ad Buying Tools, also called "Demand-Side Platforms" ("DSPs"). These Ad Buying Tools help advertisers run ad campaigns and manage bids on Exchanges. The DSPs also run their own auctions for impressions in which their advertiser clients are the bidders.

19.     The winner of each DSP auction advances to one or more auctions run by the Exchanges. The winner of each Exchange's auction is then shown to the Publisher Ad Server or Ad Network, which then selects and places an ad on the publisher's site. Figure 1 provides a visual representation of the industry.



FIGURE 1. DISPLAY AD STACK



20.     To provide an example based on this diagram, assume that Publisher 1 puts an impression up for sale through DoubleClick for Publishers ("DCFP"), which is Google's Publisher Ad Server.[1] DCFP will alert the three Exchanges, including Google's AdX, that the impression is up for sale. The Exchanges subsequently alert the DSP/Ad Buying Tools that the impression is for sale. The advertisers on each of the DSPs then bid for the impression.

21.     The winning bids on each DSP will then compete among each other on the Exchanges.  For example, in the figure above, the advertiser with the highest bid on Buy-Side/Ad Buying Tool 1 will compete with the winners from Google Ads and DV360, as well as the advertiser that won the auction on Buy-Side/Ad Buying Tool 2 on various Exchanges. Each Exchange that received bids will present each Publisher Ad Server its winning bid, which then selects the winning bid from the three offered by the Exchanges. Once the winner is selected by the publisher ad server, the advertiser sends the ad to be placed on the publisher's website.

22.     Publishers using Google's sell-side Publisher Ad Server, DCFP, or those that sell impressions through AdSense and Google's Ad Network pay Google a fee for the use of those

_____

1 Google's products underwent a rebranding in 2018. Its buy-side Ad Buying Tools, Google AdWords (for non-premium advertisers) was rebranded as Google Ads, and DoubleClick Bid Manager ("DCBM") (for premium advertisers) was rebranded as DV360. Google's sell-side tool for non-premium publishers was left as Google AdSense. Its sell-side tool for premium publishers, DCFP was rebranded as Google Ad Manager ("GAM"), which also absorbed DoubleClick's Ad Exchange ("AdX") and integrated it into a single platform.

services. In the case of DCFP, the fee is based on a constant "cost-per-mile" or "cost per 1000 impressions."

23. Exchanges such as AdX (prior to rebranding) charge on the basis of a revenue share with publishers. That is, an Exchange keeps a portion of the closing price of the auction it runs related to the sale of the publisher's inventory.

24. Google's buy-side tools, Google Ads and DV360, are used by advertisers directly and indirectly. Google Ads tends to be used directly by smaller advertisers, whereas DV360 is often used indirectly by advertisers that contract with media buying firms to run ad campaigns on DV360. DV360 charges a fee to advertisers for its services, while Google Ads makes money by keeping the difference between what the advertiser pays for an ad and what Google Ads bids into the Exchange.

25. A common metric used in digital advertising is the "take rate," which is the difference (in percentage terms) of the spending incurred by the advertiser and the amount received by the publisher as the money flows through the Display Ad Stack. So, for example, if the advertiser pays $100 and the publisher receives $60, then the take rate is 40%. Figure 2 provides an illustration of take rates for 2019 in the United Kingdom as reported by the Competition & Markets Authority ("CMA").

FIGURE 2. TAKE-RATE AT EACH LAYER OF THE DISPLAY AD STACK IN THE UK (2019)



Source: CMA analysis of intermediary data.

COMPLAINT

26.     The CMA found that Google has high market shares in all layers of the Display Ad Stack, as set forth in Figure 3.



FIGURE 3. GOOGLE'S SHARE OF IMPRESSIONS
AT EACH LAYERS OF AD INTERMEDIATION IN THE UK

Source: CMA: We include Google AdX, Google Ad Sense and Google AdMob in our definition of SSPs and Google DV360 and Google Ads in our definition of DSPs.

## V.     RELEVANT MARKETS

### A.     Google Has Market Power in the Publisher Ad Server Market in the United States

27.     Publisher Ad Servers for Display Ad inventory in the United States is a relevant antitrust market. Publisher Ad Servers are inventory management systems that publishers use to manage their online display ad inventory. They provide features such as: (1) reservation-based sales technology to support a publisher's direct sales efforts; (2) inventory forecasting technology to help a publisher determine what inventory will be available to sell; (3) a user interface through which a publisher's sales team can input directly sold campaign requirements; (4) co-management of direct and indirect sales channels; (5) report generation of ad inventory performance; (6) invoicing capabilities for a publisher's direct campaigns; and (7) yield management technology.

28.     Most publishers "single home" and use one ad server to manage all their web display inventory. When a publisher sells more than one type of inventory (e.g., web display, in-app, or video), they may then use one ad server product for their display inventory and a second ad server for their in-app or video inventory or an ad server that manages more than one format. Were a publisher to use multiple ad servers for the same format, they would have to resolve conflicts between ad servers, thereby defeating the point of an ad server's inventory management functions.

29.     Publisher Ad Servers are unique. They are not interchangeable with Exchange, Ad Network, or Ad Buying Tools for large or small advertisers. Those tools do not similarly manage a publisher's direct sales channel or offer the reporting, invoicing, or forecasting functions that publishers need to holistically manage inventory and optimize yield.

30.     The customers of Publisher Ad Servers are generally large publishers who need to manage both direct and indirect sales channels.

31.     With respect to the Publisher Ad Server Market, the relevant geographic market is the United States. Publisher ad servers available in other countries are not a reasonable substitute for ad servers available in the United States. Therefore, the United States is the relevant geographic market.

32.     Google's monopoly power in this market is confirmed by its high market share. More than 90 percent of large publishers use Google's publisher ad server, Google Ad Manager (formerly known as "DoubleClick for Publishers"), according to published reports. Google internal documents also measured that Google Ad Manager served the vast majority-percent-of all online display ad impressions in the United States in the third quarter of 2018.

33.     According to a complaint filed by the State of Texas and others, Google's monopoly power in the Publisher Ad Server Market is further confirmed by direct evidence, including charged supra-competitive fees and degraded quality in the publisher ad server market, defying the existence of any competitive restraints whatsoever.

34.     Google's market power in the publisher ad server market is also protected by significant barriers to entry. One barrier to entry is switching costs. Switching online ad servers is risky and resource intensive. Some publishers have inventory on hundreds of thousands, or even hundreds of millions, of webpages, which makes switching ad servers exceedingly expensive, difficult, and time consuming. Moreover, the switching process also entails significant revenue risk.

**B.      Google Has Monopoly Power in the Ad Networks Market in the United States**

35.      Ad Networks in the United States constitute a relevant antitrust product market. Ad Networks are marketplaces that match small publishers' ad inventory with advertisers without providing impression-by-impression price transparency to the sell or buy sides of the transaction.

36.      Ad Networks are not interchangeable with Publisher Ad Servers, Exchanges, or Ad Buying Tools. While Ad Networks are marketplaces for advertising inventory, they are not interchangeable with Exchanges (discussed below) because they operate in a different manner and serve a different type of publisher.

37.      Ad Networks do not offer the same type of impression-by-impression price transparency to publishers and advertisers that Exchanges do. Ad Networks also typically serve much smaller publishers that do not have sufficient traffic to sell their inventory through exchanges. Ad Networks require little to no upfront spending by publishers, and publishers can join networks to sell their inventory even if they do not have much inventory to sell. For example, AdSense publishers on the Google Ad Network do not have monthly page view or impression requirements. These types of publishers typically include local newspapers, niche websites, blogs, and more.

38.      With respect to Ad Networks, the relevant geographic market is the United States. Ad Networks available in other countries are not a reasonable substitute for display ad networks available in the United States. Therefore, the United States is a relevant geographic market.

39.      Google has monopoly power in the Ad Network Market in the United States. Google's Ad Network, Google Display Network ("GDN") reaches more user impressions and websites than any other display network, including over 2 million small online publishers globally. Google has immense scale amongst the long tail of small online publishers.

40.      According to the State of Texas, direct evidence also confirms the monopoly power of Google's Display Ad Network, with GDN charging very high double-digit percent commissions on advertising transactions. Google reportedly acknowledges that its fees are very high and that Google can demand high fees because of its market power.

41. The market power of Google's Ad Network is protected by barriers to entry. Google imposes a significant barrier to entry by using its Publisher Ad Server to preferentially route trading to its Ad Network through a host of anticompetitive conduct addressed below. Google also generates a further barrier when its ad buying tool Google Ads preferentially routes trading to GDN through a host of anticompetitive conduct discussed below. Finally, Ad Networks need scale on both the supply and demand sides; natural network effects make it difficult for any new networks to enter and achieve scale.

**C.      Google Has Monopoly Power in the Exchange Market in the United States**

42. Exchanges in the United States constitute a relevant antitrust product market. These exchanges are marketplaces that auction multiple publishers' display inventory to multiple end-advertisers through advertisers' middlemen on an impression-by-impression basis and in real time. On the sell side, Exchanges generally interface with publishers through publishers' ad servers such as Google's ad server. On the buy side, they interface with advertisers through ad buying tools, including ad buying tools for large advertisers, ad buying tools for small advertisers, such as Google Ads, and sometimes, even networks.

43. Exchanges are not interchangeable with Publisher Ad Servers, Ad Networks, or Ad Buying Tools. Publishers cannot sell their display ad inventory on an impression-by-impression basis or in a real-time marketplace to end-advertisers using publisher ad servers, networks, or ad buying tools. Moreover, unlike Ad Networks, Exchanges are designed to integrate with multiple ad buying tools so that advertisers can optimize trading across exchanges; networks are more restricted. Reflecting the fact that exchanges and networks offer different feature sets, exchanges require publishers to commit to a large monthly volume of impressions or revenue, whereas networks typically do not. Publishers that use Google's ad server to sell their display ad inventory through ad marketplaces primarily sell their inventory in exchanges, not networks. As an example, one major online publisher in the United States sold over 80 percent of their indirect display inventory to exchanges, not networks.

44. Exchanges are also not interchangeable with the direct sales channel, for publishers and advertisers. For publishers, selling inventory directly requires that they develop expertise

around managing, selling, and serving campaigns, which requires a specialized skill set and is expensive to do. For advertisers, buying inventory directly from publishers also requires an additional skill set and ongoing investment. For direct deals, publishers and advertisers must typically hire and maintain internal staff to manage these one-to-one relationships. As a result, the direct sales channel tends to be reserved for high-value publisher-advertiser transactions.

45.     With respect to display ad exchanges, the relevant geographic market is the United States. Exchanges available in other countries are not a reasonable substitute for display ad exchanges available in the United States. Therefore, the United States is a relevant geographic market.

46.     Google has monopoly power in the United States in the Exchange market. Despite an early competitive landscape, Google's Display Ad Exchange, historically called AdX, has been the top exchange in the United States since at least 2013. Additionally, publisher and exchange data reportedly shows that Google's share of the Display Ad Exchange Market has substantially increased since 2019. Finally, for online publishers reaching high-value users, Google's Display Ad Exchange transacts an even greater share of publishers' exchange impressions.

47.     Google's market power in the Exchange market is also protected by significant barriers to entry. New entrants must achieve sufficient scale and network effects to attract publishers and advertisers to use their exchange. In addition, Google's anticompetitive conduct has created artificial barriers to entry. One significant Google-created barrier arises due to Google's Publisher Ad Server preferentially routing trading to Google's exchange through a host of anticompetitive conduct addressed below. Google creates another barrier to entry by exclusively and preferentially routing the bids of advertisers using DV360 and Google Ads to its ad exchange through a host of other anticompetitive conduct discussed below.

### D.    Google Has Monopoly Power in the Market for Ad Buying Tools for Small Advertisers

48.     The Market for Ad Buying Tools for Small Advertisers in the United States is a relevant antitrust market. These tools provide an interface that smaller advertisers can use to bid on and purchase the display ad inventory trading on ad exchanges and in ad networks. In this

respect, these tools allow advertisers to optimize for their own interests, including purchasing quality display ad inventory for the lowest prices.

49.     Ad Buying Tools for Small Advertisers are not interchangeable with ad buying tools for large advertisers, which are sometimes called demand-side platforms (or "DSPs"). The two sets of tools serve different types of advertisers, exhibit different pricing and entry levels, and offer different feature sets.

50.     Ad Buying Tools for Small Advertisers are also not interchangeable with Publisher Ad Servers, Display Ad Networks, or Ad Exchanges, as none of these provide small advertisers with a buying interface to bid on and purchase ad inventory in exchanges or networks.

51.     The relevant geographic market for Display Ad Buying Tools for small advertisers is the United States. Display Ad Buying Tools for small advertisers available in other countries are not a reasonable substitute for the tools available in the United States. Therefore, the United States is a relevant geographic market.

52.     Google's ad buying tool, "Google Ads," has monopoly power in the United States in the Display Ad Buying Tool Market for Small Advertisers. The market power of Google Ads is evidenced by the fact that Google's exchange charges supra-competitive fees for exclusive access to Google Ads advertisers.

53.     Google Ads also has market power over the small advertisers it serves because most rely on a single ad buying tool for a given advertising format (e.g., display ads) and have switching costs. Using multiple ad buying tools imposes additional costs on advertisers because of the additional time, effort, training, and expense needed to manage campaigns across tools; Google Ads also does not let small advertisers completely export the data they need to easily switch to another tool. As a result, while very large advertisers might be able to absorb the costs of using more than one tool at a time, small advertisers almost always use just one ad buying tool at a time

54.     Google's market power with Google Ads is protected by various critical barriers to entry.

a. First, Google Ads charges opaque fees and does not let advertisers readily audit the ad inventory Google purchases on their behalf, both of which act as a barrier to entry because they impede advertisers from switching to a low-cost provider.

b. Second, Google's practice of withholding YouTube video inventory from rival ad buying tools locks small advertisers who use one tool at a time into Google's ad buying tool.

c. Third, other providers of buying tools cannot compete with Google Ads for small advertisers, because they cannot achieve sufficient scale with smaller advertisers who want to buy display, YouTube, and even search ads, through just one tool.

d. Fourth, advertisers use ad buying tools to keep track of the users they have targeted with ads, the users that have made purchases, and the users that they want to keep targeting with more ads. Google Ads limits advertisers from accessing and taking this data with them to another tool. As a result, advertisers are locked in and have high switching costs.

## VI. GOOGLE'S EXCLUSIONARY CONDUCT TO CREATE AND EXTEND ITS MARKET POWER IN THE RELEVANT DISPLAY AD MARKETS

### A. Google Has Monopoly Power in the Market for Ad Buying Tools for Small Advertisers

55. In 2009, Google began a series of acquisitions that allowed it to participate in every level of the Display Ad Stack. The most significant of these acquisitions was DoubleClick, which was vertically integrated across the entire ad tech supply chain. See Figure 4. DoubleClick offered sell-side tools in the Publisher Ad Server Market (DoubleClick for Publishers, or "DCFP"), buy-side tools in the Ad Buying Tools Market (DoubleClick Bid Manager, or "DCBM"), and ran an exchange between buyers and sellers in the Exchange Market (DoubleClick Ad Exchange, or "AdX").

FIGURE 4. DOUBLECLICK'S VERTICAL INTEGRATION



56.     Google used the DoubleClick acquisition to exploit cross-side externalities between publishers and advertisers (i.e. "network effects"). With the acquisition of DCFP (the dominant Publisher Ad Server), Google instantly acquired a large, installed base of publishers to help attract advertisers. The DoubleClick acquisition also included a technology called Dynamic Allocation, which gave Google's AdX an advantage over other Exchanges bidding for impressions from DCFP.

57.     In 2010, Google acquired AdMob, which gave Google the ability to efficiently serve ads in mobile apps; this allowed Google to extend its monopolistic reach into the mobile markets. These, along with other acquisitions, expanded Google's presence in the Display Ad Stack while enabling Google to exclude others, thereby increasing Google's market power in the Relevant Display Ad Markets.

58.     After acquiring DoubleClick, Google required small advertisers bidding through Google's buy-side (Ad Buying Tools Market) Google Ads to transact in both Google's Ad Network and AdX in the Display Ad Exchange Market. Google also made it so that large publishers who wished to receive bids from the "fire hose" of advertisers who used Google's Ad Buying Tools had to license DCFP in the Publisher Ad Server Market and trade in AdX in the Exchange Market.

59.     In other words, Google demanded that it represent buyers, sellers, and run the exchange in which they traded. This essentially tripled Google's opportunity to extract fees (one fee from the buy side in the Ad Buying Tools Market, another fee from the sell-side in either the Publisher Ad Server Market or Display Ad Network Market, and a third for running the exchange in the Exchange Market).

1    **B.    Google Leveraged its Market Power in Search to Lure Advertisers to Use**
2         **Google's Ad Buying Tools**

3         60.    Because of its dominance in the Search Market, Google's Search is considered a
4    mandatory advertising channel for most advertisers.

5         61.    Google requires advertisers placing Search Ads to use only Google's Ad Buying
6    Tools, which automatically default to tools for the Google Display Network (a group of publisher
7    sites in the Ad Networks Market that are affiliated with Google due to their use of ad
8    intermediation tools). This tying of Search and Search Ads with Google's Ad Buying Tools
9    reduces the incentive for advertisers to consider and choose other platforms in the Ad Buying
10   Tools Market.

11        62.    In addition, Google does not share data regarding Search Ad campaigns on Google
12   Search with rival Ad Buying Tool/DSPs. Advertisers therefore can only access and compare
13   complete results from advertising campaigns that include Search Ads and Display Ads by using
14   Google's Ad Buying Tools. This further reduces the incentives of advertisers to multi-home.

15        63.    One antitrust concern specifically raised by lawmakers and regulators in connection
16   with Google's acquisition of DoubleClick was that the deal would allow Google to combine user
17   data it collected from DoubleClick with user data collected from Google Search and other Google
18   properties (e.g., Google Chrome, Google Maps, Gmail, YouTube) to create individual user "super-
19   profiles." The fear was that Google could use these to obtain an unfair advantage in the Relevant
20   Display Ads Markets.

21        64.    Despite its promise not to do so, Google has been bundling user data from across
22   its entire eco-system since at least 2017 and selling that data to advertisers through its Google Ad
23   Buying Tools. Because rival DSPs are not privy to this large trove of user data, Google has an
24   unfair advantage in attracting advertisers to its Ad Buying Tools. This advantage is expected to
25   grow even stronger once Google implements its announced plan to eliminate cookies on the
26   Chrome browser.

27

28

**C.**     **Google Misused its Market Power in Video Display Ads to Expand its
Presence in the Ad Buying Tools Market**

65.     Google leveraged its vast YouTube ad inventory to entice advertisers to use
Google's Ad Buying Tools by making YouTube exclusive to Google's offerings.

66.     Prior to 2016, advertisers could bid on YouTube ad inventory using any Ad Buying
Tool/DSP. Since 2016, however, Google has refused to offer YouTube inventory to be auctioned
on AdX in the Exchange Market and has instead required that advertisers buy YouTube
impressions solely through Google's DV360 platform in the Ad Buying Tools Market. This biases
advertisers into using Google's Ad Buying Tools and reduces the incentive to multi-home across
various tools in that market.

**D.**     **Google Sent Bids Generated Through its Ad Buying Tools to Google's
Exchange, AdX, Instead of Non-Google Exchanges**

67.     Google engaged in self-preferencing by sending most of its Google Ads bids to
Google's Exchange, AdX, rather than competing Exchanges.

68.     This form of vertical foreclosure denied non-Google Exchanges the demand
coming from Google's collection of advertisers and created an incentive for advertisers to use
Google Ads and other Google Ad Buying Tools. Google's self-preferencing also created an
incentive among publishers to use DCFP in the Publisher Ad Server Market as it works best with
AdX. Both of these effects reinforced the use of Google products at both ends of the Display Ad
Stack.

**E.**     **Google Misused its Sell-side Dominance as Leverage to Provide AdX a
Competitive Advantage in the Exchange Market**

69.     Google has used a number of sell-side programs to extend and maintain its market
power in the Exchange Market.

70.     For example, Google's DoubleClick acquisition included a technology called
"Dynamic Allocation" (later, "Enhanced Dynamic Allocation") in which Google's Publisher Ad
Server, DCFP, gave preferential treatment to Google's AdX Exchange. Dynamic Allocation
established a minimum "floor price" made available only to AdX. This effectively gave AdX a

right of first refusal that AdX used to secure impressions by submitting bids only slightly above the floor price.

71.     DCFP allowed AdX to compete for publishers' impressions by returning live bids, while requiring non-Google Exchanges to compete for the same impressions with static non-live bids. This enabled AdX to obtain impressions for vastly less than advertisers were willing to pay, and pocket the difference. If AdX could not secure the impression (i.e., its bid was lower than the floor price), the impression was offered to the Exchange associated with the floor price. Thus, Dynamic Allocation gave AdX an advantage over other Exchanges because it was allowed to pass on impressions that were not high quality.

72.     Moreover, this process led to AdX, and no other Exchange, being able to bid on every impression. This process was inefficient and resulted in publishers not getting the best prices for their impressions.

73.     Google's DCFP Publisher Ad Server, like financial trading intermediaries, was supposed to act in the best interests of its customers by maximizing publishers' revenue and inventory yield. Consequently, Google concealed the nature of its conduct to publishers and falsely told them that Dynamic Allocation and other publisher programs would help them maximize revenue. In fact, all of these complex programs were designed by Google's quantitative analysts to serve a simple purpose: use Google's information and access advantage in ways that no other Exchange could replicate.

**F.     Google Misused its Superior Data and Greater Demand Volume to "Cream Skim," to the Detriment of Publishers and Advertisers**

74.     As alleged above, because Google's AdX Exchange only had to bid one penny above the price floor set by Google's DCFP Publisher Ad Server, Google could win impressions at a bargain and at a price below that which advertisers were willing to pay.

75.     The reason for this is that the price floor set by Google's Publisher Ad Server was based on the highest estimated price based on average historical price performance. If an impression was worth more to a buyer (i.e. advertiser) than the historical average, Google could

win the impression at a deep discount and keep the difference for itself. Thus, Google "cream-skimmed" relatively high-quality impressions at bargain-basement prices, and left lower-quality impressions for its Exchange rivals to bid on.

**G.      Google Used Dynamic Allocation with "Waterfalling" to Foreclose Competition with Other Exchanges**

76.      Google restricted its ad server DCFP from selling publishers' inventory in more than one Exchange at a time, a restrictive practice called "waterfalling." Google used waterfalling to block other Display Ad Exchanges from competing simultaneously for impressions. Then, through Dynamic Allocation, Google's Publisher Ad Server passed inside information to AdX and permitted it to purchase valuable impressions at prices that were artificially depressed by Google's actions.

77.      Publishers were deprived of competitive bids, and competing Exchanges were outbid on valuable impressions and left with the low-value impressions passed over by Google's exchange. Google thus foreclosed Exchange competition and dramatically increased the cost of transacting on Exchanges, which helped enable Google's Exchange, AdX, to obtain supra-competitive fees and profits.

**H.      Google Prevented Publishers from Using Their Advertising Data with Other Exchanges**

78.      Google further foreclosed competition by blocking publishers' ability to access information about their heterogenous inventory and share that information with Exchanges.

79.      Google's Publisher Ad Server manages publishers' heterogenous inventory and maximizes inventory yield. However, the Publisher Ad Server is what also identifies the readers and visitors associated with online publishers' inventory, assigning to publishers user IDs. In 2009, Google's Publisher Ad Server, DCFP, started hashing or encrypting publishers' ad server user IDs and giving publishers and advertisers different IDs for the same user. Thus, Google strategically prevents the user from being easily identified with one critical caveat: Google is able to use that very same information for its own trade decisions.

80.     In stark contrast to representations made to the Federal Trade Commission and Congress, Google trades on what was previously insider information. At a high level, the encryption of publishers' user IDs forecloses competition for publishers' inventory from non-Google Exchanges and Ad Buying Tools.

81.     Publishers, and the Exchanges that sell inventory on their behalf, need to know the identity of users associated with publishers' impressions in order to sell those impressions for competitive prices. When Exchanges cannot identify users in auctions (e.g., through cookies), the prices of impressions on exchanges reportedly can fall by about 50 percent, according to one Google study.

82.     In 2009, Google started restricting publishers' ability to access and share the user IDs that Google's new Publisher Ad Server associated with publishers' impressions. Google accomplished this by encrypting unique user IDs for each publisher and for each advertiser bidding through Google's Ad Buying Tools. As a result, publishers and advertisers could not easily know when two different user IDs actually belonged to the same user.

83.     While Google blocked publishers from accessing and sharing the user IDs with Exchanges and Ad Networks, Google shared the same raw IDs with Google's Ad Network and Exchange, as well as Google's advertising middlemen, DV360 and Google Ads. Thus, for Google's Ad Network, Exchange, and Ad Buying Tools, a user has only one ID, regardless of whether the user is a buyer or a seller in the transaction. In other words, publishers and advertisers could not easily determine that two different user IDs actually belonged to the same user unless they used Google's Ad Buying Tools and AdX.

## I.   Google Engaged in Anticompetitive Conduct Intended to Undermine Header Bidding

### i.   Google refused to participate in header bidding

84.     In 2015, a company called AppNexus came up with a way to bypass AdX and hold a competitive auction in real time in the user's browser.

85.     AdX refused to participate in header bidding auctions. As a result, when the winner of the header bidding competition was sent to Google's Publisher Ad Server, the ad server used the winning bid price as the price floor offered to AdX.  AdX then had a "last look" and could outbid the winner of the header bidding auction or pass on the impression. This refusal to interoperate with header bidding solutions gave Google an advantage in bidding for impressions. Moreover, it was inefficient in that it allowed Google to win impressions at prices below that of which some of its own advertisers would be willing to pay.

### ii. **Google made anticompetitive agreements with Facebook to stave off header bidding and allocate markets**

86.     In March of 2017, Facebook publicly announced it would support header bidding. By doing so, Facebook would enable web and mobile app publishers and advertisers to bypass the fees associated with transacting through Google's Publisher Ad Server. When bidding into Google's ad server, networks, such as Facebook's network ("FAN"), had to bid into exchanges and pay exchange fees. Because header bidding cost nothing, Facebook would let web publishers, mobile app publishers, and advertisers save on these fees altogether.

87.     Google feared that Facebook's support of header bidding would crack Google's Publisher Ad Server monopoly and unlock Exchange competition. The wider industry also thought that Facebook was prepared to challenge Google's monopoly.

88.     The same day as Facebook's March 2017 header bidding announcement, industry publication AdAge wrote that Facebook was poised to execute a "digital advertising coup against rival Google and its DoubleClick empire." A Business Insider headline the same day read, "Facebook Made an Unprecedented move to Partner With Ad Tech Companies—Including Amazon—to Take on Google."

89.     Facebook was helping publishers and advertisers match two to three times more users in auctions and increasing third-party publishers' revenue by 10-30 percent, according to metrics posted in Facebook's public blog. Such cost efficiencies for publishers and advertisers were not welcome news to Google. Even before Facebook's March 2017 announcement, Google

1  was concerned about large entrants supporting header bidding. Therefore, Google took steps to
2  neutralize the threat.

3      90.    After lengthy negotiations, in September 2018, Facebook and Google agreed that
4  Facebook would significantly curtail its header bidding initiatives, and bid through Google's
5  Publisher Ad Server instead. In return, Google agreed to give Facebook numerous competitive
6  advantages such as (a) increasing the "timeouts" for Facebook bidders (but no other non-Google
7  bidders) before they were excluded from auctions; (b) providing Facebook with valuable user
8  information not available to other non-Google exchanges; and (c) increasing buy-sell spreads for
9  Facebook's FAN Ad Network.

10     91.    As noted above, Google already manipulated publishers' auctions by giving Google
11  bidders information and speed advantages. Google offered Facebook information advantages,
12  speed advantages, and other prioritizations, to the detriment of other auction participants.

13     92.    Google and Facebook did not disclose the fact that Facebook and Google receive
14  preferential treatment that advantages the bidders they represent, and disadvantages other bidders
15  in the same auctions. Indeed, Google publicly misrepresents that all bidders in publishers' auctions
16  "compete equally for each impression on a net basis." This false statement was intended to conceal
17  Google's market allocation agreement with Facebook, as well as the other unlawful conduct
18  alleged in this complaint.

19  **J.    Google Used Open Bidding to Continue to Provide Unfair Advantages to**
20  **its Display Ad Products.**

21     93.    Increasing complaints from publishers over Google's refusal to participate in
22  header bidding, and its practice of giving AdX the "last look" before closing on a bid, led Google
23  to introduce a proprietary server-side version of header bidding called "Open Bidding." DCFP and
24  the AdX Exchange were combined and rebranded as "Google Ad Manager," and a real-time
25  "Unified Auction" was introduced within Google's Publish Ad Server that is open to all bidders
26  (Exchanges and Ad Buyer Tools/DSPs). This change in the operation of Google's ad
27  intermediation products is illustrated in Figures 5 and 6.

28



FIGURE 5. AD INTERMEDIATION PRIOR TO OPEN BIDDING

FIGURE 6. AD INTERMEDIATION AFTER OPEN BIDDING

94.     Even with Open Bidding, however, Google continues to engage in conduct that provides it with significant competitive advantages.

a.      First, Google imposes an additional fee on non-Google winners of Open Bidding auctions, which raises the costs of rival Exchanges and Ad Buying Tools/DSPs. This creates a

disincentive for DSPs to use rival Exchanges, as DSPs have to pay twice if their Exchange ultimately wins an impression.

      b.   Second, Google does not share "minimum bid to win" data from the last Open Bidding auction with header bidding winners. This information, which is provided to all other bidders, can be used in planning future auctions. Google's refusal to provide this data to the winners of header bidding auctions hampers that as an avenue for bidding on impressions.

      c.   Third, in Open Bidding, publishers are no longer able to link bid and bidder information directly with information about impressions (such as final prices). In particular, publishers cannot merge the new Bid Data Transfer (BDT) file with the impression data files (Google Ad Manager Transfer files). This limits their ability to efficiently analyze the performance of Google's Open Bidding auctions.

      d.   Finally, prior to Open Bidding, publishers using Google's Publisher Ad Server (DCFP) were able to set different minimum price floors for each Exchange. Under the new Unified Pricing Rules, however, Google removed this feature so that now there is a single minimum price floor applicable to all Exchanges. As Google's Ad Buyer Tools tend to generate the highest prices for impressions, the inability to set Exchange-specific price minimums means that Google has even more opportunity to engage in "cream skimming" than it did before Open Bidding.

## K.    Other Actions by Google Threaten to Diminish Competition in the Relevant Display Ad Markets

### i.    Planning the retirement of third-party cookies from Chrome

95.    Google has announced that it plans to retire cookies from Chrome, allegedly beginning around 2022. This will significantly hinder non-Google Ad Buyer Tools as it will limit their ability to identify the user behind an impression. Google will not suffer this limitation because it already collects so much information about the user through its Google login ID.

### ii.    Developing Accelerated Mobile Pages as a way to Impede Header Bidding

96.     Accelerated Mobile Pages ("AMP") is a technology developed by Google that allows for fast load speeds of mobile ads. In order to speed up ad loading, AMP requires that the mobile site be entirely pre-loaded in Google's own servers. That means that the ads would be placed not on the user's browser directly but on Google's servers and then shown to the user.

97.     Although Google claims that AMP was developed as an open-source collaboration, AMP is actually a Google-controlled initiative. Google originally registered and still owns AMP's domain, ampproject.org.

98.     Header bidding is only possible if publishers can insert JavaScript code into the header section of their webpages. To discourage header bidding, Google made AMP essentially incompatible with JavaScript and header bidding. Thus, publishers must bypass header bidding if they want to take advantage of AMP.

99.     Google coerces publishers to use AMP by claiming that the faster site load speed improves the publishers' positions in Google Search. Given the importance of appearing high on the Google Search Engine Result Page (SERP), publishers are highly incented to adopt AMP in the mobile space to the detriment of header bidding.

100.    Google used AMP to restrict competition in numerous other ways.

   a.  First, to limit AMP's compatibility with header bidding, Google restricted the code to prohibit publishers from routing their bids to, or sharing their user data with, more than a few Exchanges a time. At the same time, Google made AMP fully compatible with routing to Exchanges through Google's sell-side tool.

   b.  Google also designed AMP to force publishers to route rival Exchange bids through Google's Publisher Ad Server, so that Google could continue to peek at rivals' bids and use the information to refine its own algorithms.

   c.  Third, Google designed AMP so that users loading AMP pages would make direct communication with Google servers, rather than publishers' servers. This enabled Google's access to publishers' inside and non-public user data. AMP pages also limit the number of ads on a page, the types of ads publishers can sell, and the amount of enriched content that publishers can have on their pages.

101.    In sum, Google offered publishers a no-win proposition: (1) publishers could forego exchange competition in header bidding, use AMP, and pay supra-competitive fees to Google, or (2) publishers could instead use header bidding and lose even more money, because Google Search would suppress their search rankings and send traffic to competing AMP-compatible publishers.

**L.    Excluding Exchange Competition Through Opaque Pricing**

102.    When marketing its Exchange to publishers and advertisers, Google has explained that an Exchange is "just like a stock exchange, which enables stocks to be traded in an open way." Google, however, purposefully keeps auction mechanics, terms, and pricing, opaque and "nontransparent" to impede Exchange competition.

103.    Google's non-transparent pricing strategy includes obfuscating the take rate that publishers and advertisers pay Google. Google tells small advertisers using Google Ads the price they pay Google for ad space, but not the price the inventory actually cleared for in Google's Exchange, the revenue the publisher receives, or the markup Google keeps.

104.    The lack of transparency decreases competitive pressure at different points in the supply chain and increases opportunities for rent-seeking and arbitrage. In other words, Google can charge higher fees at points in the supply chain where there is little competition and the lack of transparency around fees impedes other firms from coming in and competing with Google by offering the same services at lower prices.

105.    The lack of transparency also prevents Google's potential and actual competitors from assessing a possible return on investment if they enter or as they compete in the market.

**VII.    GOOGLE'S ANTICOMPETITIVE CONDUCT FORECLOSED COMPETITION AND HAD ANTICOMPETITIVE EFFECTS IN THE RELEVANT MARKETS**

106.    As a result of the anticompetitive conduct described above, Google has foreclosed other firms from competing in the Relevant Markets to the detriment of publishers like Plaintiff and member of the proposed Class.

107.    Google then further reinforces its market position by impairing potential competing Display Ad Stack service providers by using its market power in other markets (e.g., Search) to prevent potential rivals from collecting rival datasets that could make the potential rivals viable

1  alternatives to Google for advertisers (which could, in turn, loosen Google's hold on those
2  Markets).

3          108.    With Facebook, the one provider Google could not foreclose from the Relevant
4  Display Ad Markets due to Facebook's ability to amass user data and a substantial number of
5  clients, Google entered into an unlawful market allocation and bid-rigging agreement. The
6  agreement turned Facebook from a potential challenger to Google's market dominance in the
7  Relevant Display Ads Markets into a structural support of such dominance.

8          109.    Finally, Google foreclosed competition by steering auctions to Google's services
9  and away from the other service providers, and taxing/raising such rivals' costs when the rivals
10 managed to win auctions for Google's ad inventory notwithstanding the hurdles Google imposed.
11 Because of this conduct, potential rivals lack the ability to generate scale sufficient to compete
12 with Google.

13         110.    The foreclosure caused by Google's conduct in the Publisher Ad Server Market can
14 be seen by the exit and limited entry of competitors over the past decade or so. Today, few
15 Publisher Ad Server competitors remain in the United States.

16         111.    Moreover, entry into the Publisher Ad Server Market has been weak over this same
17 period. This lack of entry is a result of the artificial barriers arising from Google's anticompetitive
18 conduct.

19 **VIII.    GOOGLE'S ANTICOMPETITIVE CONDUCT HARMED PLAINTIFF AND THE**
20 **          CLASS**

21         112.    As a direct and proximate result of Google's anticompetitive conduct, Plaintiff and
22 members of the proposed Class suffered substantial losses to their business or property.

23         113.    Revenues for publishers who sold Display Ads through Google's Ad Networks and
24 Exchanges were artificially suppressed during the Class Period due to Google's unlawful conduct.
25 Absent Google's anticompetitive conduct, Plaintiff and members of the Class would have received
26 more revenue for advertising on their content. The full amount of such damages will be calculated
27 after discovery and upon proof at trial.

28

114.    Moreover, because of the reduced revenues publishers can generate due to Google's unlawful conduct, Plaintiff and similarly situated publishers have been forced to reduce output, and many have gone out of business altogether.

115.    Thus, as a direct and proximate result of this anticompetitive conduct, Google reaps more revenue, suppresses publishers' revenues, and forces publishers to reduce the content they produce causing further reductions in revenues.

116.    Google's anticompetitive conduct is continuing and so are the damages suffered by members of the Class.

**IX.    INTERSTATE COMMERCE**

117.    Google engages in interstate commerce and in activities substantially affecting interstate commerce including, without limitation, (1) providing consumer services, such as Search, Gmail, YouTube, and Android OS, to consumers throughout the United States and globally, (2) providing advertiser buying platforms, Google Ads and Google Display & Video 360, to advertisers targeting consumers throughout the United States and globally, and (3) providing Google Ad Manager, Google AdSense, and Google AdMob to Publishers based throughout the United States and globally. Publishers use Google's services in the Relevant Markets to buy and sell Display Ad inventory targeted at users across the United States.

**X.    CLASS ALLEGATIONS**

118.    Plaintiff brings this class action under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All Publishers that sell digital display advertising inventory through Google's AdSense targeting consumers[DS1] in the United States between March 11, 2008 and the date the Court certifies the Class.

Excluded from the Class are: (1) any Judge or Magistrate presiding over the class action and members of their families; (2) Defendant and its subsidiaries, parents, successors, predecessors, or any entity in which Defendant has a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors, or assigns of such excluded persons.

119. Membership in the Class is so numerous that joinder of all members in one action is impracticable. The Class is reasonably estimated to include many hundreds (if not thousands of) participants.

120. The objective facts are the same for all members of the Class in that, inter alia, Google's conduct in monopolizing the Relevant Markets was the same, e.g., Google's conduct outlined herein vis-à-vis publishers, its tying of separate products, its market allocation agreement with Facebook, and its other conduct impairing other companies' abilities to compete in the Relevant Markets.

121. For each Claim for Relief asserted below, the same legal standards govern resolution of the same operative facts existing across all members of the Class' individual claims. If Defendant is liable to one member of the Class, Defendant is liable to all members of the Class.

122. Because the claims of each member of the Class have a common origin and share a common basis in terms of Google's systematic misconduct, there are common questions of fact and law which exist and which are susceptible to common answers as to each Class member under Federal Rule of Civil Procedure 23(a)(2), and which predominate over any questions affecting only individual members under Federal Rule of Civil Procedure 23(b).

123. Substantial questions of fact and law that are common to all members of the Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, inter alia, the following:

        a. whether the Relevant Markets alleged above are relevant markets in this case;

        b. whether Google possesses monopoly power in one or more of the Relevant Markets;

        c. whether, through the conduct alleged herein, Google willfully acquired, maintained, and/or enhanced its monopoly power in one or more of the Relevant Markets;

        d. whether Google's conduct, as alleged herein, is anticompetitive;

e.     whether Google's conduct, as alleged herein, had anticompetitive effects in one or more of the Relevant Markets;

f.     whether Google's conduct caused Plaintiff and members of the Class antitrust injury;

g.     the appropriate measure of damages; and

h.     the propriety of declaratory and injunctive relief.

124.   Plaintiff's claims are typical of the claims of the Class and arise from the same course of conduct undertaken by Google against the Class. There are no conflicts between the interests of the named Plaintiff and the interests of the members of the Class that Plaintiff seeks to represent. The relief Plaintiff seeks is typical of the relief sought for members of the Class.

125.   Plaintiff will fairly and adequately represent and protect the interests of the Class because of the common injury and interests of the members of the Class and the uniform conduct of Google that is, and was, applicable to all members of the Class. Plaintiff has retained counsel competent and experienced in antitrust class action litigation that will adequately represent and protect the interests of the members of the Class.

126.   Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) not only because common questions of fact and law predominate, but also because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Google and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. Class action status, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

127.   Plaintiff is not aware of any management difficulties which should preclude maintenance of this litigation as a class action. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

1  **XI.  CAUSES OF ACTION**

2      **COUNT I: Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

3      128.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were

4  fully set forth herein.

5      129.    Google possesses market power in the Relevant Markets, including the Ad Network

6  Market. Google has obtained, enhanced, and maintained dominance in these markets through the

7  anticompetitive conduct alleged herein to impair and foreclose competition in these markets.

8      130.    As a direct and proximate result of Google's continuing violation of Section 2 of

9  the Sherman Act, Plaintiff and members of the Class have suffered injury and damages in the form

10  of artificially suppressed advertising revenues in amounts to be proven at trial.

11      131.    Plaintiff, on behalf of itself and other members of the Class, seek money damages

12  from Google for these violations. These damages represent the amount of Google's overcharges

13  and additional advertising revenues the Class would have received absent Google's

14  anticompetitive conduct alleged herein. Damages will be quantified on a class-wide basis. These

15  actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

16      132.    Plaintiff, on behalf of itself and other members of the Class, seek injunctive relief

17  barring Google from engaging in the anticompetitive conduct alleged herein. The violations set

18  forth above, and the effects thereof, are continuing and will continue unless injunctive relief is

19  granted.

20      133.    Plaintiff's and Class members' injuries are of the type the antitrust laws were

21  designed to prevent, and flow directly from Google's unlawful, anticompetitive conduct.

22      **COUNT II: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

23      134.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were

24  fully set forth herein.

25      135.    As described above, Google and Facebook, Inc. entered into and carried out an

26  unlawful market allocation and bid-rigging agreement in violation of Section 1 of the Sherman

27  Act, 15 U.S.C. § 1.

28

136.   Facebook's agreement not to compete with Google by supporting "header bidding" reinforced Google's market dominance in the Relevant Markets, thereby lowering auction revenues for publishers.

137.   In addition, by guaranteeing that Facebook would win a fixed percentage of auctions, Google's agreement with Facebook suppressed auction revenues publishers received for their Display Ad inventory.

138.   As a direct and proximate result of Google's unlawful agreement, Plaintiff and members of the Class have suffered injury and damages in the form of artificially suppressed advertising revenues in amounts to be proven at trial.

139.   Plaintiff, on behalf of itself and other members of the Class, seeks money damages from Google for these violations. These damages represent the additional advertising revenues the Class would have received absent Google's anticompetitive conduct alleged herein. Damages will be quantified on a class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

140.   Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from Google's unlawful, anticompetitive conduct.

## XII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully asks the Court for a judgment that:

a.   Certifies this case as a class action on behalf of the proposed Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and appoint Plaintiff as class representative and its attorneys as class counsel;

b.   Awards Plaintiff and each member of the Class treble the amount of damages actually sustained by reason of Google's antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

c.   Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by Google's unlawful conduct; and

d.   Awards such other relief the Court deems reasonable and appropriate.

## XIII.    JURY TRIAL DEMAND

Plaintiff requests a jury trial for all issues so triable.

DATED:   February 2, 2021                  Respectfully submitted,

*/s/ Dennis Stewart*
Dennis Stewart (SBN 99152)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com

Marc H. Edelson, Esq.
**EDELSON LECHTZIN LLP**
3 Terry Drive
Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
medelson@edelson-law.com

Joshua H. Grabar
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
Fax: (267) 507-6048
jgrabar@grabarlaw.com

E. Powell Miller
Sharon S. Almonrode
Emily E. Hughes
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com


Simon Bahne Paris, Esquire
Patrick Howard, Esquire
**SALTZ, MONGELUZZI & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

Kenneth A. Wexler
Kara A. Elgersma
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
kae@wexlerwallace.com


Dianne M. Nast
Daniel N. Gallucci
Joseph N. Roda
**NASTLAWLLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19106
dnast@nastlaw.com
dgallucci@nastlaw.com
jnroda@nastlaw.com


*Counsel for Plaintiff MIKULA WEB SOLUTIONS, INC.*