# EXHIBIT B8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HD MEDIA COMPANY, LLC**

        Plaintiff,

vs.

CIVIL ACTION NO. __3:21-cv-00077__

**GOOGLE, LLC** and
**FACEBOOK, INC**.

        Defendants.

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.     "The basis of our governments being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter." Thomas Jefferson, Letter to Edward Carrington, Paris, Jan. 16, 1787, PrC (DLC), Published in PTJ, 11:48–50.

2.     The U.S. House Judiciary Committee, Subcommittee on Antitrust, Commercial, and Administrative Law, recently concluded its antitrust investigation into the **digital advertising market** with a 470-page report entitled "*Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations*" ("House Judiciary Report") on October 6, 2020. See also Hearing, "*Stacking the Tech: Has Google Harmed Competition in Online Advertising?*," U.S. Senate Judiciary Committee, Antitrust, Competition Policy, and Consumer Rights Subcommittee (September 15, 2020).

3.     As set forth in the House Judiciary Report, Defendants' anticompetitive and monopolistic practices have had a profound effect upon our country's free and diverse press, particularly the newspaper industry. Since 2006, newspaper advertising revenue, which is critical

{00222429-2}

for funding high-quality journalism, fell by over 50%. Newspaper advertising has declined from $49 billion in 2006 to $16.5 billion in 2017. As a result of these falling revenues, the existence of the newspaper industry is threatened. Nearly 30,000 newspaper jobs disappeared—a 60% industrywide decline — from 1990 to 2016, according to the Bureau of Labor Statistics. Almost 20% of all newspapers have closed in the past 15 years, and "countless others have become shells — or 'ghosts' — of themselves," according to the recent report by the University of North Carolina. The reduction in revenues to newspapers across the country, including Plaintiff, were directly caused by Defendants' conduct as set forth herein and went directly into Google's coffers:



See David Chavern, Written Statement, *Online Platforms and Market Power, Part 1: The Free and Diverse Press*, Committee on the Judiciary Subcommittee on Antitrust, Commercial, and Administrative Law, United States House of Representatives (June 11, 2019).

4.　　These hearings launched antitrust complaints filed by the Federal Trade Commission, the Department of Justice, and more than forty State Attorneys General against Google, LLC and Facebook, Inc. See U.S. et al. v. Google LLC, U.S. District Court for the

District of Columbia (Case 1:20-cv-03010) (Filed 10/20/20) ("DOJ v. Google case"); State of Texas et al. v. Google LLC, U.S. District Court for the Eastern District of Texas, Sherman Division (Case 4:20-cv-00957) (Doc. 1) (Filed 12/16/20) ("AGs v. Google case"); State of New York et al. v. Facebook, Inc., U.S. District Court for the District of Columbia (Case 1:20-cv-03589-JEB) (Filed 12/09/20) ("AGs v. Facebook case"); FTC v. Facebook, Inc, U.S. District Court for the District of Columbia (Case 1:20-cv-03590-JEB) (Filed 12/09/20) ("FTC v. Facebook case").

5.      The allegations set forth herein are taken from the public record in the proceedings referenced above. If proven to be true, Google and Facebook have monopolized the digital advertising market thereby strangling a primary source of revenue for newspapers across the country. This antitrust action is brought to seek all remedies afforded under law.

## PARTIES

6.      Plaintiff, HD MEDIA COMPANY LLC ("HD Media" or "Plaintiff"), is a West Virginia limited liability company with its principal office address at 946 Fifth Avenue, Huntington, Cabell County, WV 25701. HD Media owns and operates several newspapers in West Virginia, including *The Herald-Dispatch* in Huntington and Cabell County, the *Charleston Gazette-Mail*, *The Wayne County News*, *The Putnam Herald*, the *Williamson Daily News*, *The Logan Banner*, the *Coal Valley News* in Boone County, and *The Independent Herald* in Pineville.

7.      These newspapers have roots dating back to the 1870s and serve as the primary source of news journalism throughout West Virginia covering such events as the Monongah coal mine disaster (1909) (the deadliest in America), Mother Jones and the coal wars including the Matewan Massacre and Battle of Blair Mountain, the Great Flood of the Ohio River (1937), the

Marshall University plane crash (1970), the Buffalo Creek Disaster (1971), and the Sago Mine disaster (2006), as well as the statewide opioid epidemic which won The Pulitzer Prize for Investigative Journalism (2017).

8.      Plaintiff has the largest newspaper circulation in the State of West Virginia under one ownership. Plaintiff's newspapers provide an important and integral function of reporting and publishing news to the citizens of West Virginia.  In many instances, Plaintiff's papers are the major source of news for the West Virginia citizens they serve and are a primary source of community news and commentary. As a direct result of the Defendants' antitrust violations described herein, and as set forth in more detail below, the newspapers in West Virginia are currently under a very real existential threat to their existence. Without redress, these newspapers, and hence the citizens of West Virginia, may well end up in the "news desert" described below.

9.      Defendant, GOOGLE LLC ("Google"), is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is an online advertising technology company providing internet-related products, including various online advertising technologies, directly and through subsidiaries and business units it owns and controls. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.[1]

10.      Defendant, FACEBOOK, INC. ("Facebook"), is a Delaware corporation with its principal office or place of business situated in Menlo Park, California. At all times relevant to

---

[1] See DOJ v. Google case at ¶18; AGs v. Google case at ¶21.

this Complaint, Facebook has operated its social-networking service through its website, www.facebook.com, and mobile applications that connect users with Friends on Facebook.[2]

## NATURE OF THIS ACTION

11.     H.D. Media, and other newspapers across the country, compete for revenue in the ***digital advertising market***. Google monopolizes the market to such extent that it threatens the extinction of local newspapers across the country. There is no longer a competitive market in which newspapers can fairly compete for online advertising revenue. Google has vertically integrated itself, through hundreds of mergers and acquisitions, to enable dominion over all sellers, buyers, and middlemen in the marketplace. It has absorbed the market internally and consumed most of the revenue. Google's unlawful anticompetitive conduct is directly stripping newspapers across the country, including Plaintiff, of their primary revenue source.

12.     The freedom of the press is not at stake; the press itself is at stake. Plaintiff has suffered an "antitrust injury" under Sections 1 and 2 of the Sherman Act. 15 U.S.C. § 2.

13.     Google and Facebook, archrivals in the digital advertising market, conspired to further their worldwide dominance of the ***digital advertising market*** in a secret agreement codenamed "Jedi Blue." The two archrivals, who are sometimes referenced as operating a duopoly in the market, unlawfully conspired to manipulate online auctions which generate digital advertising revenue. Facebook and Google agreed to avoid competing with another in September 2018. The quid-pro-quo was as follows—Facebook would largely forego its foray into header bidding and would instead bid through Google's ad server. In exchange, Google agreed to give Facebook preferential treatment in its auctions.

---

[2] See AGs v. Facebook case at ¶21; *Complaint*, U.S. et al. v. Facebook Inc., United States District Court for the District of Columbia (Case 1:19-cv-02184-TJK) (Doc. 1) (Filed 07/24/19).

14. This agreement closed a growing threat to Google's primacy and has since further cemented its stranglehold on the marketplace. These actions are illegal and directly caused newspapers across the country, including the Plaintiff, enormous financial harm in the form of loss of revenue sources. This is a *per se* violation of Section 1 of the Sherman Act which declares "[e]very . . . conspiracy, in restraint of trade or commerce among the several States" to be illegal. 15 U.S.C. § 1.

15. The Clayton Act, 15 U.S.C § 12, *et seq*., operates in conjunction with the Sherman Act to create private causes of action for violations of federal antitrust laws. See Blue Shield of Va. v. McCready, 457 U.S. 465, 471, 102 S. Ct. 2540, 2544 (1982); Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 311-13, 98 S. Ct. 584, 586-88 (1978).

16. There is a direct causal connection between these antitrust violations and the harm to the Plaintiff. The harm was intentional and intended. The harm is of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws. The loss of revenue streams can be directly tied to the antitrust conduct of the Defendants. Plaintiff is a direct victim of the alleged antitrust injury as a competitor in the digital advertising market. Damages can be quantified and apportioned among those directly and indirectly harmed.

17. In its Complaint, Plaintiff does not allege a breach of any contract, nor a dispute regarding the performance of a contractual term, with Defendants. Plaintiff alleges two distinct antitrust causes of action: (1) Google unlawfully exercised monopoly power of the digital advertising market (both search advertising and display advertising) which is a Sherman Act §2 violation and a violation of W.Va. Code § 47-18-4; and (2) Google and Facebook unlawfully conspired to engage in anticompetitive conduct which is a *per se* Sherman Act §1 violation (including the sealed Jedi Blue agreement) and a violation of W.Va. Code § 47-18-3. Nothing

herein should be construed to allege a breach of, nor arise out of, any terms of use governing any contractual agreement between Plaintiff and Defendants.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337; Section 2 of the Sherman Act, 15 U.S.C. § 2, *et seq.*; and Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26 because plaintiff alleges violations of federal law. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiff's claims under federal law that they form part of the same case or controversy.

19.     This Court also has jurisdiction over this action under statutory authority of 28 U.S.C. § 1332 in that Plaintiff is a citizen of West Virginia and all Defendants are citizens of states other than West Virginia and the amount in controversy well exceeds $75,000.00 exclusive of interest and costs.

20.     Venue and jurisdiction are proper in this District pursuant to 15 U.S.C. § 22 because Defendants transact business in this District.

a)     At all times material herein, Google engaged in regular, practical, everyday business of a substantial character in this District, including Cabell County. Upon information and belief, Google is the largest provider of digital advertising in this District, including Cabell County, and Google regularly directs commercial activity to this District by targeting and supplying consumers within this District with directed advertisements. Google operates its products within this District on a regular and everyday basis, which are used by thousands and thousands of consumers within this District each day. These products include Google Search,

Chrome, YouTube, Gmail, Android, Google Maps, Good Drive, and Google Play Store. Google is ubiquitous across the digital economy in this District. Its contacts with this district are regular and continuous; they are not isolated and sporadic. Google also derives substantial revenue from the operation and use of its products within this District.

b)    Facebook is the largest social networking platform in this District. Each day, thousands and thousands of consumers within this District access Facebook and its family of products, including Facebook Blue, Instagram, Messenger, and WhatsApp. Facebook also regularly directs commercial activity to this District by serving directed and targeted advertisements to consumers within this District. Facebook derives substantial revenue from its commercial activities in this District. Its contacts in this District are regular, constant, and of a substantial character. Facebook's activities are not isolated or sporadic.

21.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

22.    This Court also has personal jurisdiction over each of these Defendants in that, at all times material herein, they transacted business in West Virginia; contracted to supply services or things in West Virginia; and/or committed acts and/or omissions in or outside West Virginia which caused tortious injury to Plaintiff.

23.    Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.  At all material times, Google and Facebook participated in the conduct

set forth herein in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

## FACTUAL ALLEGATIONS

### A. The Importance of a Free and Diverse Press and the Decline of Local Newspapers.

24.     A free and diverse press is essential to a vibrant democracy. Whether exposing corruption in government, informing citizens, or holding power to account, independent journalism sustains our democracy by facilitating public discourse.

25.     Newspapers have played a key role in our democracy since its founding. "Journalism is said to be the first rough draft of history. . . . The Federalist Papers were first published in newspapers in New York in 1787-88 to promote the ratification of the United States Constitution. The fact that policy debates today are informed by the public forum offered by newspapers in the past is a reminder that the media have been intertwined with and integral to democracy since the founding."[3]

26.     "The liberty of the press ought not to be restrained." Alexander Hamilton, THE FEDERALIST PAPERS: NO. 84 (1791).

27.     Congress has declared: "In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter." 15 U.S.C. §§ 1801, *et seq.*

28.     In 1995, Microsoft CEO Bill Gates circulated an internal memorandum to executive staff which concluded: "The Internet is a tidal wave. It changes the rules. It is an incredible opportunity as well as incredible challenge[.]"[4] As a result, newspapers have seen a steady decline in circulation.[5] According to the Pew Research Center, U.S. newspaper circulation fell in 2018 to its lowest level since 1940, the first year with available data.[6]

29.     Since 2006, newspaper advertising revenue, which is critical for funding high-quality journalism, fell by over 50%. Despite significant growth in online traffic among the nation's leading newspapers, print and digital newsrooms across the country are laying off reporters or folding altogether. As a result, communities throughout the United States are increasingly going without sources for local news. The emergence of platform gatekeepers—and the market power wielded by Google and Facebook—has contributed to the decline of trustworthy sources of news.

30.     Since 2006, the news industry has been in economic freefall, primarily due to a massive decrease in advertising revenue caused by Defendants' anticompetitive and unlawful conduct. Both print and broadcast news organizations rely heavily on advertising revenue to support their operations, and as the market has shifted to digital platforms, news organizations

---

[3] Sandra Feder, *Stanford Report*, Interview with James Hamilton, Hearst Professor of Communication at Stanford University's School of Humanities and Sciences, February 27, 2020: https://news.stanford.edu/2020/02/27/journalism-and-democracy/
[4] https://www.justice.gov/sites/default/files/atr/legacy/2006/03/20.pdf. Microsoft proceeded to monopolize internet access resulting in a consent decree with the U.S. Department of Justice to resolve antitrust claims. *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 149 (D.D.C. 2002).
[5] Penelope Muse Abernathy, *News Deserts And Ghost Newspapers: Will Local News Survive?*, The Center for Innovation and Sustainability in Local Media, Hussman School of Journalism and Media, University of North Carolina at Chapel Hill (2020) (2020_News_Deserts_and_Ghost_Newspapers.pdf (usnewsdeserts.com).
[6] Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes, and trends shaping the world. It does not take policy positions. The Center conducts public opinion polling, demographic research, content analysis, and other data-driven social science research. It studies U.S. politics and policy; journalism and media; internet, science, and technology; religion and public life; Hispanic trends; global attitudes and trends; and U.S. social demographics and trends.

have seen the value of their advertising space plummet steeply. For newspapers, advertising has declined from $49 billion in 2006 to $16.5 billion in 2017. National and local news sources alike have felt this decrease.

31.     As a result of falling revenues, newspapers are steadily losing the ability to financially support their newsrooms, which are costly to maintain but provide immense value to their communities. A robust local newsroom requires the financial freedom to support in-depth, sometimes years-long reporting, as well as the ability to hire and retain journalists with expertise in fundamentally local issues, such as coverage of state government.

32.     Budget cuts have also led to a dramatic number of newsroom job losses. This decline has been primarily driven by a reduction in newspaper employees, who have seen employment fall by half over a recent eight-year period, from 71,000 in 2008 to 35,000 in 2019. In 2019 alone, 7,800 media industry employees were laid off. The Bureau of Labor Statistics estimates that the total employment of reporters, correspondents, and broadcast news analysts will continue to decline by about 11% between 2019 and 2029.

33.     Researchers at the University of North Carolina School of Media and Journalism found that the United States has lost nearly 1,800 newspapers since 2004 either to closure or merger, 70% of which were in metropolitan areas. As a result, the majority of counties in America no longer have more than one publisher of local news, and 200 are without any paper.

34.     According to a recent article published by the University of North Carolina, many citizens across the country now live in a "news desert" as a result of these closures and layoffs:

---

and demographic trends. All of the Center's reports are available at www.pewresearch.org. Pew Research Center is a subsidiary of The Pew Charitable Trusts, its primary funder.



**DO YOU LIVE IN A NEWS DESERT?**

No newspapers
One newspaper

In the U.S. 200 counties do not have a local newspaper. Half of all counties - 1,540 - have only one newspaper, usually a weekly.

Source: UNC Hussman School of Journalism and Media

35.     In order to survive in the digital marketplace, newspapers were forced to transition revenue sources from traditional print advertisements to digital advertising. Unfortunately, the illegal monopolization of digital advertising by Google, along with private agreements with Facebook, have prevented newspapers from competing on the merits in the digital advertising market.

36.     Local journalism is essential for healthy communities, competitive marketplaces, and a thriving democracy. Unfortunately, the local news industry is being decimated in the digital age. This is due both to the rapid proliferation of online news content as well as unfair market practices by some of the world's largest technology companies that reuse local news' content, data, customers, and advertisers. Report, "*Local Journalism: America's Most Trusted News Sources Threatened,*" U.S. Senate Committee on Commerce, Science, and Transportation (October 2020).

**B.     Digital Advertising Market**

37.     There are two principal forms of digital advertising: search advertising and display advertising.

38.    *"Search advertising"* refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. Search advertising is often bought and sold via real-time bidding (RTB) auctions among advertisers, where advertisers set the price they are willing to pay for a specific keyword in a query.

39.    *"Display advertising"* refers to the delivery of digital ad content to ad space on websites and mobile apps, which is referred to as "inventory." Within display advertising, there are two separate "ad tech" market platforms: first-party and third-party.

40.    "*First-party display ad tech platforms*" sell ad space on their own platforms directly to advertisers. For example, Facebook sells ad space on its platform to advertisers. Google sells display ads on its own properties such as YouTube.

41.    "*Third-party display ad tech platforms*" are run by intermediary vendors and facilitate the transaction between third-party advertisers and third-party publishers. Here, specialized software automates the buying and selling of digital ads through an ad exchange.

### C.    The Third-Party Ad Tech Suite



42.    Sell-side software includes publisher ad servers. The primary function of a publisher ad server is to fill ad space on a publisher's website that is personalized to the interests

of a specific website viewer. Sell-side software also includes ad networks, which aggregate ad inventory from many different publishers and divide that inventory based on user characteristics—such as age or location. Ad networks sell the pool of inventory through ad exchanges or demand-side platforms (DSPs).

43.     Buy-side software includes advertiser ad servers, that is, software that stores, maintains, and delivers digital ads to the available inventory. Advertiser ad servers facilitate the programmatic process that makes instantaneous decisions about which advertisements to display on which websites to which users and displays the ad on that site. Ad servers collect and report data, such as ad impressions and clicks, for advertisers to monitor ad performance and track conversion metrics. Buy-side software also includes demand-side platforms, software that allows advertisers to buy advertising inventory from a range of publishers. Demand-side platforms use data to create targeted ad audiences and engage in purchasing and bidding.

44.     Approximately 86% of online display advertising space in the U.S. is bought and sold in real-time on electronic trading venues, which the industry calls "advertising exchanges."[7] Ad exchanges refer to the ad trafficking system that connects advertisers looking to buy inventory with publishers selling inventory. Sales on ad exchanges occur primarily through: (1) open real-time bidding auctions; (2) closed real-time bidding auctions; or (3) programmatic direct deals. The ad tech suite also includes analytics tools that allow advertisers and publishers to measure ad campaign efficiency, including consumers' interactions with an ad. Similarly, data management platforms aggregate and store consumer data from various sources and process the

---

[7] Dina Srinivasan, *Why Google Dominates Advertising Markets Competition Policy Should Lean on the Principles of Financial Market Regulation*, 24 Stan. Tech. L. Rev. P55, 58 (2020).

data for analysis. Advertisers and publishers use data management platforms to track, partition, and target consumer audiences across websites.

45.     The Ad Exchange connects advertisers looking to buy inventory with publishers selling inventory. With intermediaries that route buy and sell orders, the structure of the digital advertising market is similar to the structure of electronically traded financial markets. In digital advertising, a single company, Google, simultaneously operates the leading trading venue, as well as the leading intermediaries that buyers and sellers go through to trade. At the same time, Google itself is one of the largest sellers of ad space globally. Google ***monopolizes*** advertising markets by engaging in conduct that lawmakers prohibit in other electronic trading markets: Google's ad exchange shares superior trading information and speed with the Google-owned intermediaries, Google steers buy and sell orders to its own exchange and websites (for example, Google Search & YouTube), and Google abuses its access to inside information.[8]

46.     The digital advertising market is highly concentrated, with Google and Facebook controlling the majority of the digital advertising market in the United States, capturing nearly all of its growth in recent years.

47.     Over the last decade, the digital advertising market has experienced double-digit year-over-year growth. The market, however, has become increasingly concentrated since the advent of programmatic trading. In 2017, *Business Insider* reported that Google and Facebook accounted for 99% of year-over-year growth in U.S. digital advertising revenue. Today, advertisers and publishers alike have few options when deciding how to buy and sell online ad space.

---

[8] Id.

48.     This concentration likely exists in part due to high barriers to entry. Google and Facebook both have a significant lead in the market due to their significant collection of behavioral data online, which can be used in targeted advertising. Additionally, Google and Facebook do not provide access to this unique data in open data exchanges. Advertisers only access to this information is indirect—through engagement with Google and Facebook's ad tech suite.

49.     This significant level of concentration in the online advertising market—commonly referred to as the digital ad duopoly—has harmed the quality and availability of journalism. As a result of this dominance, there has been a significant decline in advertising revenue to news publishers, undermining publishers' ability to deliver valuable reporting and "siphon[ing] revenue away from news organizations." House Judiciary Report, p. 70.

50.     There is a clear correlation between layoffs and buyouts in the newspaper industry with the growth in market share for the duopoly—Google and Facebook. The internet distribution systems distort the flow of economic value derived from good reporting. The effects of this revenue decline are most severe at the local level, where the decimation of local news sources is giving rise to local news deserts.

###    D.    Google's Digital Advertising Market Monopoly.

51.     All roads lead through Google. See Fiona Scott Morton & David Dinielli, *Roadmap for a Digital Advertising Monopolization Case Against Google* (May 2020); Fiona Scott Morton & David Dinielli, *Roadmap for a Monopolization Case Against Google Regarding the Search Market* (May 2020). These two papers together show how Google monopolized general search and used that dominance as a springboard to build and maintain dominance in the digital display advertising market as well.

52.     Google was launched in 1998 as a general online search engine. Founded by Larry Page and Sergey Brin, the corporation got its start by serving users web results in response to online queries. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it. In contrast with the technology used by rival search engines, PageRank enabled Google to improve the quality of its search results even as the web rapidly grew. While Google had entered a crowded field, by 2000 it had become the world's largest search engine. Later that year Google launched AdWords, an online advertising service that let businesses purchase keywords advertising to appear on Google's search results page—an offering that would evolve to become the heart of Google's business model.

53.     Today, Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings. Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google Photos, Google Play Store, and YouTube—have more than a billion users each.

54.     Google established its position through acquisition, buying up successful technologies that other businesses had developed. In a span of twenty years, Google purchased well over 260 companies.

55.     Google is now one of the world's largest corporations. For 2019, Google reported total revenues of $160.7 billion—up 45% from 2017—and more than $33 billion in net income.

56.     Although Google has diversified its offerings, it generates the vast majority of its money through digital ads, which accounted for over 83% of Google's revenues in 2019.



57.     Google is a prominent player in both search advertising and display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place advertisements. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms on the exchange.

58.     Publicly available data suggests Google captured around 73% of the search advertising market in 2019. Search advertising, in particular, is critical to Google, accounting for approximately 61% of its total sales. Google overwhelmingly dominates the market for general online search. Publicly available data suggest the firm captures over 87% of U.S. search and over 92% of queries worldwide.

59.     For businesses that depend on Google to reach users, these trends amount to a toll hike, as traffic that firms could previously draw through organic listings is now increasingly pay-

for-play. Instead of competing for users by offering high-quality webpages and services that should lead to better organic search listings, these businesses must now compete for users based on how much money they pay Google.

60.     In September 2020, the Senate Judiciary Committee held a hearing on the effects of Google's dominance in digital ads, where members expressed bipartisan concern that Google's market power across the ad tech stack was enabling anticompetitive conduct and harming publishers and advertisers alike.

61.     One key factor that market participants and industry experts cite when accounting for why Google is likely to maintain its dominance in digital ads is its conflict of interest. With a sizable share in the ad exchange market and ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself. This demonstrates a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits. In this electronically traded market, Google is pitcher, batter, and umpire, all at the same time.

62.     In June 2020, the News Media Alliance published a white paper examining the relationship between news publishers and Google based on interviews with its members over the course of more than a year. As it notes, "Google has exercised control over news publishers to force them into several relationships that benefit Google at the publishers' expense." In the context of Google's placement of news on accelerated mobile pages (AMP)—a format for displaying web pages on mobile devices—publishers raised concerns that "Google effectively gave news publishers little choice but to adopt it, requiring the creation of parallel websites that are hosted, stored and served from Google's servers rather than their own."

63. The House Judiciary Report concludes that "Google has a monopoly in the markets for general online search and search advertising. Google's dominance is protected by high entry barriers, including its click-and-query data and the extensive default positions that Google has obtained across most of the world's devices and browsers. A significant number of entities—spanning major public corporations, small businesses, and entrepreneurs—depend on Google for traffic, and no alternate search engine serves as a substitute."

64. Google maintained its monopoly over general search through a series of anticompetitive tactics. These include an aggressive campaign to undermine vertical search providers, which Google viewed as a significant threat. Documents show that Google used its search monopoly to misappropriate content from third parties and to boost Google's own inferior vertical offerings, while imposing search penalties to demote third-party vertical providers. Since capturing a monopoly over general search, Google has steadily proliferated its search results page with advertisements and with Google's own content, while also blurring the distinction between paid advertisements and organic results. As a result of these tactics, Google appears to be siphoning off traffic from the rest of the web, while entities seeking to reach users must pay Google steadily increasing sums for advertisements. Numerous market participants analogized Google to a gatekeeper that is extorting users for access to its critical distribution channel, even as its search page shows users less relevant results.

65. Since capturing the market for online search, Google has extended into a variety of other lines of business. Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. Through Chrome, Google now owns the world's most popular browser—a critical gateway to the internet that it has used to both protect and promote its other lines of business. Through Google Maps, Google now captures over 80%

of the market for navigation mapping service—a key product over which Google consolidated control through an anticompetitive acquisition and which it now leverages to advance its position in search and advertising. And through Google Cloud, Google has another core platform in which it is now heavily investing through acquisitions, positioning itself to dominate the "Internet of Things," the next wave of surveillance technologies.

66.    Each of its services provides Google with an aggregation of user data, reinforcing its dominance across markets and driving greater monetization through online ads. Through linking these services together, Google increasingly functions as an ecosystem of interlocking monopolies.

**E.    Google Conspires with Facebook to Further Its Monopolization of the Digital Advertising Market.**

67.    The U.S. House Judiciary Committee has determined that "Facebook has monopoly power in the market for social networking" holding "an unassailable position in the social network market for nearly a decade, demonstrating its monopoly power."

68.    Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. The House Judiciary Report concludes that "[m]ore recent documents produced during the investigation by Facebook show that it has tipped the social networking market toward a monopoly, and now considers competition within its own family of products to be more considerable than competition from any other firm."

69.    Facebook has also maintained its monopoly through a series of anticompetitive business practices. The company used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms. Once dominant, Facebook selectively enforced its platform policies based on whether it perceived other

companies as competitive threats. In doing so, it advantaged its own services while weakening other firms.

70. Facebook has also maintained and expanded its dominance through a series of acquisitions of companies it viewed as competitive threats, and selectively excluded competitors from using its platform to insulate itself from competitive pressure. Together, these factors have tipped the social networking market toward a monopoly.

71. In July 2020, the United Kingdom's Competition and Markets Authority found that Facebook is dominant in the markets for social networks and digital display ads, and that its market power "derives in large part from strong network effects stemming from its large network of connected users and the limited interoperability it allows to other social media platforms." In July 2019, Germany's Federal Cartel Office, Bundeskartellamt, found that "Facebook is the dominant company in the market for social networks," and that in Germany's social network market, "Facebook achieves a user-based market share of more than 90%." And in June 2019, the Australian Competition & Consumer Commission found that "Facebook has substantial market power in a number of markets and that this market power is unlikely to erode in the short to medium terms." The conduct of Facebook as set forth in these international reports is consistent with Facebook's actions here in the United States.

72. Since its founding in 2004, Facebook has acquired at least sixty-three companies. Facebook's internal documents indicate that the company acquired firms it viewed as competitive threats to protect and expand its dominance in the social networking market.

73. Facebook monetizes its platform through the sales of digital advertising. Facebook garnered over $70 billion in revenue in 2019, a nearly 27% increase from 2018. It generates over 98% of this revenue from selling digital advertisements.

74.     Facebook has monopoly power in digital advertising in the social networking market. Notwithstanding Google's dominance, Facebook also has a significant share of revenue and growth in digital advertising with many market participants referring to them as duopolies in this broad market.

75.     The House Judiciary Report concludes that digital markets tend to be characterized by strong network effects, making them prone to concentration and monopolization. As for Google, the value of online platforms that facilitate advertising increases with the number of users, as advertisers gain access to a larger consumer base and, therefore, to a larger trove of consumer data. Facebook exhibits powerful direct network effects because it becomes more valuable as more users engage with the social network—no person wants to be on a social network without other users. Strong network effects serve as a powerful barrier to entry for new firms to enter a market and displace the incumbent. When combined with other entry barriers such as restrictions on consumers or businesses easily switching services, network effects all but ensure not just market concentration but durable market power.

76.     According to the Attorneys General for the States of Texas, Arkansas, Idaho, Indiana, Kentucky, Mississippi, Missouri, North Dakota, South Dakota, and Utah, Google and Facebook entered into an illegal agreement to preserve and protect their respective positions in the digital advertising market. See AGs v. Google case at ¶ 171.

77.     Google faced an emerging threat to its world dominance in the bidding process of the digital advertising market. Google competes in the digital advertising market as well as representing both the buyers and the sellers. Google also operates the largest Ad Exchange.

78.     In an attempt to reinject competition in the marketplace, publishers devised a new innovation called "header bidding." Header bidding routed ad inventory to multiple neutral

exchanges each time a user visited a web page in order to return the highest bid for the inventory. At first, header bidding bypassed Google's stranglehold. By 2016, about 70% of major online publishers in the United States had adopted the innovation, increasing competition on the merits. Advertisers also migrated to header bidding in droves because it helped them to optimize the purchase of inventory through the most cost-effective exchanges.

79.     Google quickly realized that this innovation substantially threatened its exchange's ability to demand a very large cut on all advertising transactions. Header bidding also undermined Google's ability to trade on inside and non-public information from one side of the market to advantage itself on the other—a practice that in other markets would be considered insider trading or front running. As a result, and as Google's internal communications make clear, Google viewed header bidding's promotion of genuine competition as a major threat.

80.     Google responded to this threat of competition through a series of anticompetitive tactics. One way that Google took aim at header bidding was by introducing an alternative it called "Open Bidding," which was integrated into Google's ad tech stack. Yet again, Google's response was designed to suppress competition on the merits and favor itself over its competitors. When advertisements are sold through Google's "Open Bidding," there was an additional charge imposed by Google, usually 5% of the supply-side platform's bid. This raised rivals' costs, lowered payments to publishers, and advantaged Google.

81.     Another way in which Google sought to blunt this competitive threat and force "Open Bidding" adoption was through its design of Accelerated Mobile Pages ("AMP"). AMP, however, was technically designed to render websites built on the framework with header bidding incompatible with its applications, which created a de facto requirement for publishers to use AMP and forgo the more competitive header bidding. Google also dropped the PageRank of

sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business. As a result, publishers could not utilize header bidding without being penalized for doing so (both financially and through the inability of users to see/reach their sites), which substantially removed the financial benefit of competition on the merits that header bidding had provided to publishers.

82.     Google's technical disablement of header bidding struck at the heart of competition on the merits and thwarted publishers' ability to garner the highest bid for their inventory and thus to fairly compete for online advertising revenue. The anticompetitive tactics employed by Google undermined publishers' ability to offer their inventory to multiple ad exchanges simultaneously before making calls to their ad servers, disallowing and disabling multiple demand sources from bidding on the publishers' inventory at the same time. This resulted in decreased control by publishers, decrease in yield or fill rate, and significantly decreased revenue to publishers. Whereas header bidding had allowed publishers to bypass the favorable relationship that Google had set up between its own ad server and ad exchange, technological disabling of header bidding placed publishers back at the mercy of Google.

83.     Google took additional steps to undermine header bidding and ensure that publishers increasingly relied on Google-controlled programmatic channels including the "minimum bid to win" feature, which Google implemented in 2019. This feature allowed buyers using Google's software (as opposed to header bidding offered by its rivals) to receive extra information that allowed them to adjust their bidding strategy and potentially buy the same inventory at a cheaper price. The natural result was that buyers were driven to directly interact with and shift their budget to Google's Ad Manager rather than another ad exchange.

84.     In March 2017, Facebook—Google's largest Big Tech rival—announced that it would throw its weight behind header bidding. Like Google, Facebook brought millions of advertisers on board to reach the users on its social network. In light of Facebook's deep knowledge of its users, Facebook could use header bidding to operate an electronic marketplace for online ads in competition with Google. Facebook's marketplace for online ads is known as Facebook Audience Network. Google understood the severity of the threat to its position if Facebook were to enter the market and support header bidding. To diffuse this threat, Google made overtures to Facebook. Facebook decided to dangle the threat of competition in Google's face and then cut a deal to manipulate the auction. The details of the secret agreement are under seal.

85.     According to the States Attorney General, Google unlawfully excluded competition from head header bidding by getting its largest rival, Facebook, to stop supporting the header bidding technology. After months of signaling, then drawn out negotiations, the two giants reached an illegal agreement. As the Complaint filed by the States Attorney General explains:

> In the end, Facebook curtailed its involvement with header bidding in return for Google giving Facebook information, speed, and other advantages in the [REDACTED] auctions that Google runs for publishers' mobile app advertising inventory each month in the United States. In these auctions, Facebook and Google compete head-to-head as bidders. Google's internal codename for this agreement, signed at the highest-level, was [REDACTED]—a twist on the character name from Star Wars. The parties agree on [REDACTED] for how often Facebook would [REDACTED] publishers' auctions—literally manipulating the auction with [REDACTED] for how often Facebook would bid and win.

See AGs v. Google case at ¶ 14.

86.     As part of the agreement, Google and Facebook agreed to cooperate and assist one another if either were to ever face an investigation into the agreement. As part of the deal, Facebook would spend at least $500 million per year in Google-run auctions, and Google agreed that Facebook would win a fixed percentage of those auctions. Facebook believed the deal was "relatively cheap" as compared with direct competition.

87.     This bid rigging agreement allowed Google to further manipulate auctions. Google already manipulates publishers' ad auctions by giving Google bidders information and speed advantages. In 2019, these advantages helped them to win the overwhelming majority of publishers' ad auctions. Now, Google offered Facebook information advantages, speed advantages, and other preferential treatment, conduct constituting harm to other auction participants.  And yet Google falsely claims that all bidders in publishers' auctions compete on an equal footing: "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis." As alleged above and herein, that statement is incorrect.

88.     Plaintiff incorporates by reference each of the averments set forth in the preceding paragraphs in each Count of this Complaint.

### Count I:  Section 2 Sherman Act: 15 U. S. C. §2
### Google's Monopolization of the Digital Advertising Market

89.     Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U. S. C. §2.

90.     The offense of monopolization has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).

### A.     Relevant Market:  Digital Advertising Market

91.     The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377, 404 (1956).

92.     The market here is aptly described as the ***Digital Advertising Market***. House Judiciary Report, p. 129. There are two principal forms of digital advertising: search advertising and display advertising. Search advertising refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. As discussed, search advertising is often bought and sold via real-time bidding (RTB) auctions among advertisers, where advertisers set the price they are willing to pay for a specific keyword in a query. Display advertising refers to the delivery of digital ad content to ad space on websites and mobile apps, which is referred to as "inventory." Like search advertising, buying and selling display ads often involves real-time bidding. *Id.*; see also David C. Dinielli, Written Statement, *Stacking the Tech: Has Google harmed competition in online advertising*? Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the United States Senate Judiciary Committee (September 15, 2020); Dina Srinivasan, *Why Google Dominates*

*Advertising Markets Competition Policy Should Lean on the Principles of Financial Market Regulation*, 24 Stan. Tech. L. Rev. P55, 58 (2020).

93.     There is no reasonable substitute for digital advertising. Digital advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard. Each of these forms of advertising reaches a distinct group of potential customers, and advertisers and advertising agencies view each of these forms of advertising as complementary rather than as potential replacements for each other. Digital advertising also is different in kind from traditional forms of advertising because it is delivered differently and in a manner that targets the specific individual end user. Additionally, digital advertisements can be continuously tracked, updated, and improved based on data showing how consumers are responding. Likewise, the component markets, search advertising and display advertising, are not substitutable for the other as they serve a distinct function and different audiences and are reachable by consumers in a different manner. Search advertising (which is pulled) is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase. Display advertising, including video (which are pushed), are suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.

94.     This durable market has significant barriers to entry, including, but not limited to, network effects that make platforms more valuable as they gain more users; the advantages of big data, which enable platforms and companies to use the treasure trove of data they collect from users to improve the effectiveness of their products and services; and lock-in effects that cause users to avoid switching platforms or companies so as not to lose their personal contacts, history of searches, photos, apps, and other information. For general search, additional barriers to

entry include economies of scale in developing a web index; access to click-and-query data at scale; and Google's extensive implementation of default positions.

95.     The United States is the relevant geographic market for the market defined above.

**B.      Google Has Monopoly Power in the Digital Advertising Market.**

96.     Google has monopoly power in the digital advertising market which is durable and its lead insurmountable. House Judiciary Report, p. 180. Google's monopoly power is exercised through its dominance of 86% of the search engine market share in the United States as well as its ownership of the digital display advertising marketplace.[9] *Id* at 176, 206. Google has restrained competition on the merits in digital advertising market, has controlled prices in fact, and has in fact diminished and excluded competition.

**C.      Google Willfully Acquired and Maintained Its Monopoly Power of the Digital Advertising Market by Using Exclusionary Acts.**

97.     Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad. The challenge for an antitrust court lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it. United States v. Microsoft Corp., 346 U.S. App. D.C. 330, 253 F.3d 34, 58 (2001).

---

[9] Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings. Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google Photos, Google Play Store, and YouTube—have more than a billion users each.1043 Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online ads. House Judiciary Report, p. 174.

98. Google willfully acquired its monopoly power through acquisition of "well over 260 companies" achieving vertically integration, and the elimination of all competition, in the search engine market. House Judiciary Report, p. 174. Google then created a "walled garden" to retain its captured audience through acquisition, merger, and elimination of threats to its platform. The market behind the garden wall devours most of the digital advertising revenue in the marketplace. Google maintains its monopoly power through its ownership and control of every aspect of the digital advertising pipeline, including running the leading ad exchange while also running buy-side and sell-side intermediary platforms trade on the exchange and using it to give priority to its own products and services. (*id.* at 206).

### D. Plaintiff Suffered an Antitrust Injury.

99. Section 4 of the Clayton Act permits parties to recover injuries to their "business or property" resulting from violations of the antitrust laws. 15 U.S.C. § 15(a). In Hawaii v. Standard Oil Co. of Cal., the Supreme Court explicitly interpreted "business or property" under Section 4 to limit recoverable injury to "commercial interests or enterprises." 405 U.S. 251, 264 (1972). A Section 4 injury must be caused "by reason of" conduct that violates the antitrust laws. 15 U.S.C. § 15(a). Courts have interpreted this language as imposing a standing requirement, incorporating notions of proximate causation, for recovery of antitrust damages. Blue Shield of Va., Inc. v. McCready, 457 U.S. 465, 476-477 (1982). Here, Plaintiff's injury is a direct result of its antitrust violations as set forth and acknowledged by the House Judiciary Committee, pp. 57-73.

100. Newspapers across the country are dependent upon display advertising for revenue and economic viability. However, as a result of Google's anticompetitive conduct, newspapers have been foreclosed from competing on the merits for advertising revenue. As a

direct and proximate result of the anticompetitive conduct alleged herein, Plaintiff suffered substantial losses to its business or property insofar as its revenues from selling digital advertising space were artificially suppressed. Google was able to extract a supracompetitive share of Plaintiff's advertising revenues. This reduction in advertising revenues reduces news output and affects the quality and content of the products that Plaintiff can offer to consumers, which, in turn, causes further reductions in revenue. Moreover, the reduction in revenues siphoned away from Plaintiff went directly into Google coffers. [10]

101.    The transition from print media to online media is necessary for the survival of newspapers. Fair competition on the merits in the digital advertising market is not possible given the market power exercised by Google. As a result, newspapers are attempting to adapt by placing content behind a paywall with access only through a digital subscription. This is an insufficient revenue replacement resulting in increased costs to the consumer which, in turn, results in fewer readers. Fewer readers result in diminished digital advertising revenue in the search engine marketplace. Google's dominance of the digital advertising marketplace threatens the extinction of local news journalism across the country and has resulted in harm to Plaintiff's commercial interests, the decimation of local news sources giving rise to news deserts, and a profoundly negative effect on American democracy and civic life.

102.    Google's anticompetitive and unlawful conduct as described herein has also harmed Plaintiff's ability to effectively monetize its original content.

103.    With the advent on the Internet, the news industry has undergone a continuous shift toward online and mobile news consumption, and newspapers have rapidly evolved from

---

[10] See David Chavern, Written Statement, *Online Platforms and Market Power, Part 1: The Free and Diverse Press*, Committee on the Judiciary Subcommittee on Antitrust, Commercial and Administrative Law, United States House of Representatives (June 11, 2019).

providing content solely in print to offering digital access across a range of mediums and devices. In doing so, newspapers have reimagined the ways in which they report news and distribute content. However, these major shifts in the news industry have allowed for increasing engagement of emerging technology players at the expense of newspapers who had traditionally relied on news subscriptions and print advertisement to subsist.

104.    Google is the dominant gateway for consumers to access news digitally and has positioned itself as a monopolistic intermediary between newspapers and their online readers. In 2011, Google Search combined with Google News accounted for the majority (approximately 75%) of referral traffic to top news sites. Since January 2017, traffic from Google Search to news publisher sites has risen by more than 25% to approximately 1.6 billion visits per week in January 2018.

105.    Google relies and depends upon the original content created and published by newspapers and benefits significantly by this content. By way of example:

a)    Google News was founded in 2002 and was officially released in January 2006, with the goal to "encourage readers to get a broader perspective by reading ten articles instead of one." Google News was one of the first products that Google launched beyond its core search engine product, implying the significance of news to Google even in the early stage of the company. Google News collects news from various sources including newspapers and provides an aggregated view of news from around the world. At its inception, Google News was crawling information from 4,000 news sources worldwide. The number had grown significantly to 50,000 news sources by 2012. As of May 2018, Google News had

approximately 150 million unique monthly visitors in the United States, superseding top news publisher sites such as *The New York Times* (70 million). Google News and the distribution of news content on Google's platforms has provided tremendous financial benefits to Google. In 2008, Google estimated that Google News, a product without ads, brought in $100 Million in yearly revenue. A 2019 economic study conducted by the News Media Alliance concluded that news content generated approximately $4.7 Billion for Google in annual revenue.

b)  Original news content from newspapers also provides significant value to Google by enabling Google Search to drive greater user engagement. News content from newspapers not only contributes to Google Search's freshness and quality of the search results, but also helps inform the emerging keywords that were not previously searched on Google. As new search queries continue to emerge, Google continuously improves its Search to return fresher and more relevant search results in response to the trending queries. News content plays an irreplaceable role in informing improvement areas for Google Search, which ultimately helps Google build trust in its products from users and thus keep users within Google's ecosystem of products. Indeed, according to a study conducted by the News Media Alliance, approximately 40% of clicks on "Trending Queries" and 16% on high-volume queries in Google Search are news content.

c)  Google extracts, mines, and captures unique user data and information of online readers of newspapers' content, which it then uses to offer targeted and directed ads to the newspapers' online readers and customers, thereby directly competing with newspapers for digital advertising.

106.     As a result of Google's monopoly in the digital advertising market and its actions described herein, Google has significantly monetized the content produced by newspapers while impeding newspapers' ability to effectively monetize their own original content and/or effectively excluding newspapers from the digital advertising market.  Google's practice of appropriating content from newspapers impedes rivals and deters innovation, as it removes any incentive for the newspapers to continue to develop their product (the delivery of news and information in an up-to-date factual manner), therefore harming competition.  At bottom, Google is driving newspapers' customers to itself, using the newspapers' investment, without incurring the costs necessary to gain those customers. This strategy harms competition rather than benefitting consumers.

107.     Google's monopoly power in the digital advertising market creates a fundamental bargaining power imbalance between newspapers and Google that has prevented newspapers from being able to effectively bargain for fair compensation for the utilization and/or distribution of their original content and/or has otherwise forced newspapers to accept less favorable terms for the inclusion of news on Google's platforms and the distribution of their content than they would otherwise agree.

## Count II:  Section 1 Sherman Act: 15 U. S. C. §1
## Google and Facebook Conspired in Restraint of Trade

108.     Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Although this prohibition is literally all encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition. N. Pac. Ry. Co. v. United States, 356

U.S. 1, 5 (1958); *accord* <u>Leegin Creative Leather Prods. v. PSKS, Inc.</u>, 551 U.S. 877, 885 (2007).

109. Restraints subject to this prohibition are generally categorized as "horizontal" or "vertical." Horizontal restraints are imposed by agreements between actual or potential "competitors on the way in which they will compete with one another." <u>NCAA v. Bd. of Regents</u>, 468 U.S. 85, 99 (1984); *accord* <u>Rothery Storage & Van Co. v. Atlas Van Lines, Inc.</u>, 792 F.2d 210, 229 (D.C. Cir. 1986) (Bork, J.). To determine whether a challenged agreement is a horizontal restraint, a court should evaluate whether the agreement (1) is among participants who are "either actual or potential rivals at the time the agreement is made," and (2) "eliminates some avenue of rivalry among them." Phillip E. Areeda (late) & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1901b1; accord, e.g., <u>Rothery Storage & Van Co. v. Atlas Van Lines, Inc.</u>, 792 F.2d 210, 229 (D.C. Cir. 1986) ("All horizontal restraints . . . eliminate some degree of rivalry between persons or firms who are actual or potential competitors."). "Horizontal agreements . . . as a class provoke harder looks than any other arrangement" because "they pose the most significant dangers of competitive harm." ANTITRUST LAW ¶ 1902a.

110. Concerted action may be adequately alleged—and later proved—either through direct or indirect evidence. *See* <u>Monsanto Co. v. SprayRite Serv. Corp.</u>, 465 U.S. 752, 764 (1984). Plaintiff is of the information and belief that direct evidence exists that Google and Facebook unlawfully entered into an agreement(s) to unreasonably restrain trade. The details of the agreement are currently under seal in the Complaint filed in the AGs v. Google case. *The Wall Street Journal* reported some of the redacted details, including a September 2018 arrangement in which Facebook and Google agreed that Facebook would get special treatment

and the parties would share information in the event of an antitrust lawsuit. Google reportedly referred to the deal as "Jedi Blue," a nod to Star Wars. Facebook COO Sheryl Sandberg signed the agreement, the WSJ reported, calling it a "big deal strategically" in an email to CEO Mark Zuckerberg.

111.    Section 1 encompasses two different rules for determining whether a particular restraint is illegal: per se violations and the "rule of reason."

112.    The **"per se rule"** recognizes that some types of restraints are illegal in and of themselves "because of their actual or potential threat to the central nervous system of the economy." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n.59 (1940). Examples of per se illegal restraints include agreements among actual or potential competitors to fix prices, e.g., Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647 (1980); rig bids, e.g., United States v. Koppers Co., 652 F.2d 290, 294 (2d Cir. 1981); or divide or allocate markets, e.g., Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50 (1990).

113.    "The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). It condemns a category of conduct without an "elaborate inquiry as to the precise harm [agreements or practices] have caused or the business excuse for their use." Northern Pacific Ry. v. United States, 356 U.S. 1, 5 (1958) (explaining that per se rule "avoids the necessity for an incredible complicated and prolonged economic investigation into the entire history of the industry involved . . .").

114.    Plaintiff alleges, as described *supra*, that Google and Facebook engaged in per se violations of Section 1 wherein the rivals entered into a quid-pro-quo scheme wherein Facebook

agreed not to challenge Google's advertising business in return for a very special treatment in Google's ad auctions.

115.    The elimination of rivalry between the two leviathans of the digital advertising market directly resulted in the strangulation of the market to the detriment of the newspaper industry and Plaintiff.

### Count III: Violation of W.Va. Code § 47-18-4
### Google's Monopolization and Monopoly Maintenance

116.    Under W.Va. Code § 47-18-4, the establishment, maintenance, or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within West Virginia, by any persons for the purpose of excluding competition or controlling, fixing, or maintaining prices is unlawful.

117.    As detailed above, Google has unlawfully established, maintained, and/or attempted to establish a monopoly in the digital advertising market, which is durable and its lead insurmountable, for the purpose of excluding competition or controlling, fixing, or maintaining prices. Google has monopoly power in the digital advertising market and has restrained competition on the merits in the digital advertising market, has controlled prices in fact, and has in fact diminished and excluded competition. The relevant geographical market of the digital advertising market which Google has monopolized is the United States, which encompasses and includes, in part, West Virginia.

118.    There is no business necessity or pro-competitive justification for Google's conduct.

119.    The conduct of Google as set forth herein and above is violative of W.Va. Code § 47-18-4.

120.     As a result of Google's unlawful conduct and violations of W.Va. Code § 47-18-4, Plaintiff has been injured, and will continue to be injured, in its business or property as described herein, including at ¶¶ 99-107.

### Count IV: Violation of W.Va. Code § 47-18-3
### Google and Facebook Contract and Conspire in Restraint of Free Trade

121.     Under W.Va. Code § 47-18-3, every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in West Virginia shall be unlawful.

122.     The following are deemed to be per se violations of § 47-18-3, and deemed to restrain trade or commerce unreasonably: A contract, combination or conspiracy between two or more persons (1) for the purpose or with the effect of fixing, controlling, or maintaining the market price, rate, or fee of any commodity or service; or (2) Fixing controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service.

123.     As set forth in detail above, Plaintiff asserts that Google and Facebook engaged in *per se* violations of § 47-18-3 when they entered into a quid-pro-quo scheme wherein Facebook agreed not to challenge Google's advertising business in return for a very special treatment in Google's ad auctions. This unlawful agreement restrained trade or commerce unreasonably in West Virginia.

124.     The elimination of rivalry between Google and Facebook, by and through contracts, combinations, and/or agreements in violation of W.Va. Code § 47-18-3, resulted in the strangulation of the market to the detriment of the newspaper industry and Plaintiff. As a result,

Plaintiff was—and will continue to be—injured in its business or property as described herein, including at ¶¶ 108-115.

**Count V: Unjust Enrichment**
**Google Has Been Unjustly Enriched**

125.    The original news content created by Plaintiff and other newspapers across the County provides a significant benefit to Google as detailed above, including ¶¶ 101 - 106. In a 2019 economic study, the News Media Alliance found that news content generated an estimated $4.7 Billion in annual revenue for Google in 2019. Plaintiff's original content further benefits Google, *inter alia*, by improving Google's search results and algorithms thereby creating trust in its products; causing users to stay longer within Google's ecosystem of products; and enabling Google to extract user data and information which it utilizes to deliver targeted ads.

126.    Despite the benefits conferred upon Google by Plaintiff, Google does not pay Plaintiff for its original content or share with Plaintiff the profits it generates from Plaintiff's original content. This result is intended by Google and has been caused by Google's unlawful and tortious conduct described herein.

127.    Plaintiff has incurred substantial costs; hired journalists; paid for infrastructure; and invested time, money, and resources to create its content.

128.    Despite benefitting from Plaintiff's content, Google maintains no responsibility or liability for the accuracy or quality of Plaintiff's content, whereas Plaintiff maintains full responsibility and liability.

129.    Google has knowingly accepted the benefits conferred upon it by Plaintiff to which it is not entitled and has been unjustly enriched by its monopolist and unlaw practices.

130.    Google's acceptance and retention of these benefits under these circumstances is unjust and inequitable.

131.    As a matter of equity and West Virginia common law, Google should be disgorged of all unjust enrichment and Plaintiff should be made whole by the application of the doctrine of unjust enrichment.

## PRAYER

132.    **WHEREFORE**, Plaintiff requests the Court to enter judgment in its favor against Defendants, jointly and severally, awarding all such relief as the Court deems appropriate and just, including:

a)      That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the law;

b)      That the Court award Plaintiff treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

c)      That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct alleged herein, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d)      That the Court award Plaintiff pre- and post-judgment interest;

e)      That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

f)      That the Court award any and all such other relief as it may deem proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues herein.

**DATED**: January 29, 2021                    Respectfully submitted,

**HD MEDIA COMPANY, LLC**, By Counsel:

/s/ Paul T. Farrell, Jr.
Paul T. Farrell, Jr.
(WV Bar # 7443)
Michael J. Fuller, Jr.
(WV Bar #10150)
**FARRELL & FULLER, LLC**
1311 Ponce De Leon, Suite 202
San Juan, PR 00907
Telephone: (939) 293-8244
Fax: (939) 293-8245
paul@farrellfuller.com
mike@farrellfuller.com

John C. Herman
(*Pro Hac Vice to be filed*)
Serina M. Vash
(*Pro Hac Vice to be filed*)
**HERMAN JONES LLP**
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone: (404) 504-6500
Fax: (404) 504-6501
jherman@hermanjones.com
svash@hermanjones.com

/s/ Paul J. Geller
Paul J. Geller
(*Pro Hac Vice to be filed*)
Stuart A. Davidson
(*Pro Hac Vice to be filed*)
**ROBBINS GELLER
RUDMAN& DOWD LLP**
120 East Palmetto Park Road,
Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Fax: (561) 750-3364
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com

David W. Mitchell
(*Pro Hac Vice to be filed*)
Steven M. Jodlowski
(*Pro Hac Vice to be filed*)
**ROBBINS GELLER
RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
davidm@rgrdlaw.com
sjodlowski@rgrdlaw.com

/s/ Clayton J. Fitzsimmons
Robert P. Fitzsimmons
(WV Bar # 1212)
Clayton J. Fitzsimmons
(WV Bar # 10823)
Mark A. Colantonio
(WV Bar #4238)
**FITZSIMMONS LAW FIRM
PLLC**
1609 Warwood Avenue
Wheeling, WV 26003
Telephone: (304) 277-1700
Fax: (304) 277-1705
bob@fitzsimmonsfirm.com
clayton@fitzsimmonsfirm.com
mark@fitzsimmonsfirm.com