1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3   THE STATE OF TEXAS, et al,         §
                                       §
4                                      §
                                       §
                    Plaintiffs,        §
5                                      §      Case No.:
       vs.                             §      4:20-cv-00957-SDJ
6                                      §
   GOOGLE, LLC,                        §
7                                      §
                    Defendant.         §
8

9

                    MOTION TO TRANSFER VENUE
10                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE SEAN D. JORDAN
11               UNITED STATES DISTRICT JUDGE

12          Thursday, March 18, 2021; 10:34 a.m.
                        Plano, Texas
13

   APPEARANCES OF COUNSEL:
14   (Continued on page 2.)

15   FOR THE PLAINTIFF
   THE STATE OF TEXAS:
16

       W. Mark Lanier
17     THE LANIER LAW FIRM
       6810 FM 1960 West
18     P. O. Box 691448
       Houston, Texas 77269-1448
19

       Zeke DeRose, III
20     THE LANIER LAW FIRM, PC - Houston
       10940 W. Sam Houston Parkway, N., Suite 100
21     Houston, Texas 77064

22       ******************************************

23               GAYLE WEAR, RPR, CRR
              Federal Official Court Reporter
24                 7940 Preston Road
                  Plano, Texas 75024
25                   214.872.4867

```
 1    FOR THE PLAINTIFF
      THE STATE OF TEXAS:
 2    (Continued from page 1.)

 3         Ashley C. Keller
           KELLER LENKNER LLC
 4         150 N. Riverside Plaza, Suite 4270
           Chicago, Illinois 60606
 5
           Shawn Cowles
 6         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
           214 W. 14th Street
 7         Austin, Texas 78701

 8         Grant Dorfman, Deputy First Assistant Attorney General
           ATTORNEY GENERAL KEN PAXTON
 9         P. O. Box 12548
           Austin, Texas 78711

10

11    FOR THE DEFENDANT:

12         R. Paul Yetter
           YETTER COLEMAN, LLP - Houston
13         811 Main Street, Suite 4100
           Houston, Texas 77002
14
           Eric Mahr
15         FRESHFIELDS BRUCKHAUS DERINGER US LLP
           700 13th Street NW
16         Washington, DC 20005

17

18    ALSO PRESENT:

19         Roger P. Alford
           UNIVERSITY OF NOTRE DAME
20         3119 Eck Hall of Law
           Notre Dame, Indiana 46556 USA

21
                              *    *    *
22

23

24

25
```

```
 1   FOR THE PLAINTIFF
     STATE OF TEXAS
 2   VIA VIDEO CONFERENCE:

 3        Warren D. Postman
          KELLER LENKNER LLC
 4        1300 I Street, N.W., Suite 400E
          Washington, DC 20005
 5
          Brooke Clason Smith
 6        KELLER LENKNER LLC
          150 N. Riverside Plaza, Suite 4270
 7        Chicago, Illinois 60606

 8        David Matthew Ashton
          TEXAS ATTORNEY GENERAL
 9        P. O. Box 12548
          Austin, Texas 78711
10
          Nicholas G. Grimmer
11        TEXAS ATTORNEY GENERAL
          300 W. 15th Street
12        Austin, Texas 78701

13
                              *    *    *
14
     FOR THE PLAINTIFF STATES
15   VIA VIDEO CONFERENCE:
     (Continued on page 4.)
16
     FOR THE STATE OF IDAHO:
17
          Brett DeLange
18        OFFICE OF THE IDAHO ATTORNEY GENERAL
          945 W. Jefferson Street, Second Floor
19        P. O. Box 83720
          Boise, Idaho 83720
20
     FOR THE STATE OF INDIANA:
21
          Matthew Michaloski
22        OFFICE OF THE INDIANA ATTORNEY GENERAL
          302 W. Washington Street
23        IGCS 5th Floor
          Indianapolis, Indiana 46234
24

25
```

```
 1    FOR THE PLAINTIFF STATES
      VIA VIDEO CONFERENCE:
 2    (Continued from page 3.)

 3    FOR THE COMMONWEALTH OF KENTUCKY:

 4         John Christian Lewis
           KENTUCKY OFFICE OF THE ATTORNEY GENERAL
 5         1024 Capital Center Drive, Suite 200
           Frankfort, Kentucky 40601
 6
      FOR THE STATE OF MISSISSIPPI:
 7
           Hart Martin
 8         MISSISSIPPI ATTORNEY GENERAL'S OFFICE
           P. O. Box 220
 9         Jackson, Mississippi 39205

10    FOR THE STATE OF ARKANSAS:

11         Johnathan R. Carter
           OFFICE OF THE ARKANSAS ATTORNEY GENERAL
12         323 Center Street, Suite 200
           Little Rock, Arkansas 72201
13

14                           *    *    *
15
      FOR THE DEFENDANT
16    VIA VIDEO CONFERENCE:

17         Bryce L. Callahan
           YETTER COLEMAN, LLP - HOUSTON
18         811 Main Street, Suite 4100
           Houston, Texas 77002
19
           John D. Harkrider
20         AXINN VELTROP & HARKRIDER, LLP - NY
           114 West 47th Street
21         New York, New York 10036

22         Daniel S. Bitton
           AXINN VELTROP & HARKRIDER, LLP - San Francisco
23         560 Mission Street
           San Francisco, California 94105
24

25                           *    *    *
```

1   **ALSO PRESENT**
    VIA VIDEO CONFERENCE:
2
          Gabriella Gonzalez, TEXAS ATTORNEY GENERAL
3         Ralph Molina, TEXAS ATTORNEY GENERAL
          Floyd Walker, TEXAS ATTORNEY GENERAL
4         Zina Bash, TEXAS ATTORNEY GENERAL
          Seth Meyer, TEXAS ATTORNEY GENERAL
5         Nanette Dinunzio, TEXAS ATTORNEY GENERAL
          Charles Eldred, TEXAS ATTORNEY GENERAL
6         Shauna Rogers, TEXAS ATTORNEY GENERAL
          Jason Zweig, TEXAS ATTORNEY GENERAL
7

8
                          *    *    *
9
    PLAINTIFF STATES
10  VIA TELECONFERENCE:
    (Continued on page 6.)
11
          Brad Schuelke, TEXAS ATTORNEY GENERAL
12
    FOR THE STATE OF MISSOURI:
13
          Kimberley Biagioli
14        MISSOURI ATTORNEY GENERAL'S OFFICE
          615 E. 13th Street, Suite 401
15        Kansas City, Missouri 64106

16        Stephen M. Hoeplinger
          MISSOURI ATTORNEY GENERAL'S OFFICE
17        P. O. Box 899
          Jefferson City, Missouri 65102
18
    FOR THE STATE OF NORTH DAKOTA:
19
          Elin S. Alm
20        Parrell D. Grossman
          OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA
21        1050 East Interstate Avenue, Suite 200
          Bismarck, North Dakota 58503
22

23

24

25

```
 1    PLAINTIFF STATES
      VIA TELECONFERENCE:
 2    (Continued from page 5.)

 3    FOR THE STATE OF SOUTH DAKOTA:

 4         Yvette K. Lafrentz
           OFFICE OF ATTORNEY GENERAL
 5         1302 E. Highway 14, Suite 1
           Pierre, South Dakota 57501
 6
      FOR THE STATE OF UTAH:
 7
           Tara W. Pincock
 8         UTAH OFFICE OF ATTORNEY GENERAL
           160 E. 300 S, 5th Floor
 9         Salt Lake City, Utah 84114

10
           Mark Mattioli, STATE OF MONTANA
11         David Dewhirst, STATE OF MONTANA

12
                              *    *    *
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    PROCEEDINGS:                                    PAGE

3    ARGUMENTS BY COUNSEL:

4        By Mr. Mahr                              10, 53
         By Mr. Keller                                26
5        By Mr. Yetter                                64
         By Mr. Lanier                                78
6

7                          *     *     *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    March 18, 2021                              10:34 a.m.

2                         ---o0o---

3                  P R O C E E D I N G S

4                         ---o0o---

5         THE COURT:  Good morning.  Please be seated.

6         All right.  We are on the record in cause number

7    4:20-cv-957, State of Texas, et al versus Google, LLC.  And

8    before we get counsel's introductions, I will note again for

9    the record, as with our last hearing, we do have an

10   audio-only feed right now that is going for the public and

11   the press for this hearing on Google's 1404(a) motion.  So I

12   want to make counsel aware of that.

13        And we can have announcements made for counsel for

14   the plaintiffs and for Google.  And since we have a list of

15   everyone who's present, if you all just want to confirm that

16   the list we received yesterday is who's appearing, that would

17   be fine.

18        MR. LANIER:  Your Honor, Mark Lanier.  I will

19   confirm, on behalf of the State of Texas, that the list we

20   sent in is accurate and up to date.

21        THE COURT:  Thank you.

22        MR. YETTER:  Your Honor, good morning.  Paul Yetter

23   for the defendant, Google.  And the list we sent to Ms. Wear

24   yesterday is correct.

25        THE COURT:  All right.  Thank you, counsel.
```

1          And today we do have Google's 1404(a) motion, and

2     that is going to be our primary purpose today.  I think after

3     we have heard counsels' arguments on the 1404(a) motion, we

4     may talk a little bit about the OGP.  I did receive the

5     parties' filing yesterday on that issue.  And I will also

6     want to get an update on the protective order issue from

7     counsel, but we'll start with the 1404(a) motion.

8          I will remind all of our counsel and everyone who

9     is coming in by video or audio, to please keep yourself on

10    mute unless for whatever reason you're going to be addressing

11    the Court.

12         So from a housekeeping standpoint, two things I

13    want to get out of the way.  The first is because we have the

14    audio-only feed for the press and the public, and because we

15    also have folks here in the courtroom, if there is anything

16    that may be confidential or that might be under seal that

17    needs to be discussed, which I don't anticipate, but if it

18    happens, I will visit with counsel -- we can do a bench

19    conference -- and we will need to make arrangements of how to

20    handle that.  That's one.

21         Two is just from a standpoint of how your

22    presentations will go.  So let me ask counsel for both sides

23    if what I'm about to propose sounds reasonable.  My plan

24    would be to have Google begin -- it's Google's motion -- and

25    have about 30 minutes to make its presentation, and I'll have

```
 1    any questions for followup; and then allow the States to

 2    respond for 30 minutes; and then allow Google five minutes on

 3    rebuttal.  And if I have any follow-up questions, we'll

 4    complete that portion of the hearing at that time.

 5              Is that going to be sufficient time for both sides

 6    on this motion?

 7              MR. LANIER:  Your Honor, it will be for plaintiffs.

 8    Mr. Keller will be arguing that for the Court, and I'll do

 9    the rest of the discussion of anything else you've got

10    afterwards.  But the motion to transfer does seem fine to us.

11              MR. MAHR:  Your Honor, Eric Mahr on behalf of

12    Google.  That's fine with us, too.  I think we can do it

13    under 30 minutes.

14              THE COURT:  All right.  And I would ask if counsel,

15    when you're doing your presentations and when we're

16    discussing the motion, can use the podium simply because our

17    acoustics are better from the podium and I think everyone is

18    going to want our record to be as clear as possible for this

19    motion.

20              So with that, unless there's any other housekeeping

21    matter, I'll let Mr. Mahr present Google's motion.

22              MR. MAHR:  Thank you, Your Honor, and good morning.

23    May it please the Court, my name is Eric Mahr from the firm

24    of Freshfields Bruckhaus Deringer, here on behalf of Google.

25              We appreciate that you're well familiar with the
```

1    briefing in this case and with the requirements of the 1404

2    standard more broadly, so we appreciate your indulgence in

3    giving us the time to present our thoughts on this.

4             Rather than rehash the briefing and the elements of

5    the test, I really just want to take some time to focus on

6    what we believe the three really most compelling drivers for

7    transfer are in this case.  And the first and the single most

8    compelling driver for transfer is the fact that there already

9    have been eight different complaints filed in the Northern

10   District of California, several of which have already now

11   been consolidated, and at least three of which were filed

12   prior to the complaint in this case, months and months

13   before.

14            Those Northern District of California cases present

15   the came core claims arising out of the same alleged conduct

16   concerning the same Google products and services on behalf of

17   the same parties, publishers and advertisers.

18            Having these cases litigated in two different

19   federal courts at the same time really undermines judicial

20   efficiency and poses a very real risk of inconsistent

21   judgments.  And duplicative litigation is the most compelling

22   driver for transferring this case because it really

23   transcends the convenience of the parties and witnesses in

24   any particular case.  It transcends arguments over whether a

25   flight from Boise or Bismarck is more or less convenient to

1    Plano than it is to San Francisco.

2            Instead, this duplicative litigation consideration

3    goes right to the harm that -- the harm to the efficiency and

4    the effectiveness of the federal judiciary overall, as well

5    as the harm that inconsistent rulings and judgments would

6    pose not just to Google, but to all of the tens, if not

7    hundreds, of thousands of publishers and advertisers who rely

8    on Google's products and services every day.

9            And it's just for these reasons that courts, when

10   evaluating 1404(a) motions in the context in which there are

11   multiple cases involving the same issues, have held that

12   avoiding duplicative litigation takes precedent over the

13   narrower interests in the typical 1404 case where there's

14   only a single case pending.

15           As we cite in our briefs, in the *In re Volkswagen*

16   *of America* case the federal circuit explained that when

17   addressing the 1404(a) motion in the context of multiple

18   lawsuits in different districts, the avoidance of duplicative

19   litigation becomes a, quote, "paramount consideration when

20   determining whether a transfer is in the interests of

21   justice," end quote.

22           Now, while the federal circuit in that case was

23   interpreting Fifth Circuit law, it didn't rely on any

24   circuit's law to come to that conclusion; it relied on a

25   Supreme Court case, the *Continental Grain* case, where the

1   Supreme Court explained, and I'll quote again, "to permit a

2   situation in which two cases involving precisely the same

3   issues are simultaneously pending in different district

4   courts leads to the wastefulness of time, energy and money

5   that § 1404(a) was designed to prevent," end quote.

6        So with that authority, not surprisingly, the

7   district courts across Texas and in this district have

8   embraced this principle when facing the prospect of

9   duplicative litigation.

10        For example, in the *ExpressJet* case, the Southern

11   District of Texas, the Court said that it could not conceive

12   of an arrangement more expensive, time-consuming, or

13   exhaustive of judicial resources than keeping this single

14   suit in Texas while all of the other suits against the

15   defendants are litigated.  And in that case, it was the

16   Southern District of New York.

17        Further, while this risk of conflicting judgment is

18   a serious concern in any case, I suggest it's an even more

19   serious concern in this case because the theories of harm

20   that the plaintiffs assert and, maybe more importantly, the

21   remedies that they seek, have a nationwide and really global

22   implication; and again, not just for Google, but for all of

23   the advertisers, publishers, and end users who use and

24   benefit from Google's ad tech products.

25        Plaintiffs' counsel has already declared to the

1   media that their goal in this case is to, quote, "bust up

2   Google," end quote.  And even short of measures as radical

3   and as unprecedented as that, any of the structural and

4   injunctive relief plaintiffs are seeking in this case could

5   not be limited to the Plaintiff States' orders, but would

6   affect advertisers, publishers, and end users around the

7   country and around the world.

8        Whether plaintiffs seek to bust up Google or to

9   force it to redesign its products and services to benefit its

10  competitors, or any of the other sweeping relief sought in

11  the complaint, none of it could be limited to the borders of

12  the Plaintiff States.  You only have to look at plaintiffs'

13  own complaint to see that.

14       Paragraph 4, both of the original complaint and in

15  the amended complaint, alleges that, quote, nearly every

16  customer -- "nearly every consumer goods company, e-commerce

17  entity, and small business now depends on Google for

18  purchasing display ads in order to market their goods and

19  services to consumers."

20       Now, that might be a bit exaggerated, but it's

21  certainly no exaggeration to say that the rulings in these

22  cases will affect thousands and thousands of consumer goods

23  companies and small businesses far beyond the borders of the

24  Plaintiff States.

25       So, thus, that means the harm that would arise from

1    inconsistent ruling, which is always of paramount concern

2    when there are multiple cases pending, is even greater in a

3    case like this.  And that alone, we would submit, is a

4    compelling reason to transfer this case to the Northern

5    District of California.

6            And just to orient the Court, I provided your clerk

7    with two exhibits, handouts, which I've also provided to the

8    plaintiffs; it just lists the cases that are pending around

9    the country concerning these same ad tech issues.

10           THE COURT:  Well, one question for you before you

11   move on to the next, as you've put it, driver for transfer.

12           This issue of duplicative litigation, as you know,

13   your friends on the other side have pointed out some

14   differences in this litigation and in pending litigation in

15   the Northern District of California, including some

16   significant procedural differences with regard to the fact

17   that you have class actions that are proposed in those cases.

18           And your colleagues on the other side have also

19   noted that there are other actions pending in other

20   jurisdictions besides the Northern District of California,

21   and at least one of them I believe that has been referenced,

22   the Georgia action, has been pending since 2019.

23           So I'm sure that Mr. Keller will be talking about

24   that, but I would like to hear your response to those

25   arguments which are raised in the briefing.

1          MR. MAHR:  Thank you, Your Honor.  I appreciate the

2     opportunity.

3          So the class action issue first.  In cases of

4     duplicative litigation, the fact that some of the cases might

5     be private cases with classes proposed hasn't dissuaded

6     courts from enjoying the benefits of transfer, the efficiency

7     benefits of transfer, in other cases.  The one that easily --

8     most easily comes to mind for me is one I handled in

9     2008-2009, *Cephalon*, it's cited in the briefs, but there, the

10    FTC filed an enforcement action in the District of Columbia,

11    and my client moved to transfer it to the Eastern District of

12    Pennsylvania where a number of class actions were pending.

13         And in that case, the Federal Trade Commission made

14    all of the same arguments:  We're seeking different relief;

15    we are -- we're an enforcement agency; and we deserve special

16    deference to our choice of forum; and class certification is

17    going to hold us back.  And the district court there held

18    that none of those factors trumped the importance of avoiding

19    inconsistent judgments.

20         And I think there's a number of other cases that

21    are cited in our briefs where, you know, courts are used to

22    managing these kind of issues, and there is certainly enough

23    to do in these cases that both a case without class

24    certification issues can move along in parallel or with a

25    case with class certification issues.  But all that will

1    happen more efficiently and fluidly if it's all managed by

2    one judge.

3           The second question you asked was the other

4    actions.  And maybe I'll start with the Georgia action inform

5    case.  That case is different here both procedurally and

6    substantively, and both those differences kind of explain why

7    we haven't moved to transfer that.

8           First of all, it was filed in January of -- it was

9    in late 2019.  And in January of 2020, Google successfully

10   moved to dismiss the claim.  So before any of these other ad

11   tech cases came along -- the first one was filed I think in

12   May 2020 -- that case had already been dismissed.

13          The plaintiffs in the inform case in Georgia

14   subsequently amended their complaint, and Google has filed a

15   motion to dismiss that as well and that's pending.  But it

16   didn't make a whole lot of sense to seek to transfer a case

17   that had been dismissed and that we expect will be dismissed

18   again on the amended complaint.  That's the procedural

19   difference there.

20          The substantive difference there is, unlike all of

21   these other cases we're talking about which are on behalf of

22   publishers and advertisers, that case was on behalf of a

23   competitor.  And while there are a lot of allegations in the

24   complaint, both Google and the -- Google argued, and the

25   Court agreed, that the real core complaint that the

1    competitor had was that Google's decision to move from Flash

2    to HTML5, I think it was, disadvantaged the competitor.  They

3    wanted Google to stay on Flash.  And I don't know the

4    technology that well.  I know that these are two technologies

5    that allow use of video and audio in advertisements.

6          And so it was a different question about a

7    competitor arguing that Google's decision to change a

8    particular technology it used disadvantaged it, and it wanted

9    it -- it wanted Google to use the technology that the

10   competitor preferred.  Different issue completely than the

11   kind of publisher and advertising issues we see here.

12         As for the other cases, there are three in the

13   District of Columbia and one in the District of West --

14   Southern District of West Virginia.  And in those cases, it's

15   just a simple question of this case came up first in terms of

16   our obligation to answer.  We were served earlier in this

17   case, and we moved as quickly as we could to file a motion to

18   transfer because it's in Google's interest -- Google wants to

19   move these cases along as much as anybody else.  Google is

20   not in the business of litigation, it's in the business of

21   innovation.

22         And so we, as soon as we were served, first thing

23   we did before answering was move to transfer.  I think as a

24   practical matter, we think that this case and Your Honor's

25   ruling in here will have an effect on both our strategy, but

1    likely the other courts as well, as to whether they transfer

2    their cases as well.  But we just haven't reached a point of

3    having to answer or file our motion to transfer in those

4    cases yet.

5         If Your Honor were to transfer this case as we

6    suggest you should, my expectation is that those other courts

7    will follow suit.  If Your Honor were to deny transferring

8    this case, it wouldn't make much sense for us to seek

9    individual transfer of those cases, and perhaps we would be

10   in the situation with the JPML, perhaps not; we haven't

11   crossed that bridge yet.

12        THE COURT:  All right.  Thank you, counsel.  You

13   can move on to, I think you had two more drivers that you

14   wanted to talk about.

15        MR. MAHR:  I do, I do.  Thank you.  The second

16   point I would like to make, and it's a bit related to the

17   first, but the harm that results from having the same claims

18   arising from the same conduct litigated in two different

19   federal courts isn't limited to just this idea of judicial

20   efficiency and the risk of inconsistent judgments; although,

21   that's more than sufficient, as I said, to justify transfer.

22        But redundant litigation really implicates all of

23   the other, many of the other, considerations under 1404, most

24   especially the convenience of third-party witnesses.  Keeping

25   this case in the Eastern District of Texas would basically

1    guarantee that the parties, the witnesses, the third parties,

2    and the Court will suffer the very inefficiency burdens and

3    risks that 1404(a) was designed to help courts avoid.  And

4    that's because our motion doesn't present the simple question

5    of whether the issues presented in this case should be

6    litigated in the Northern District of California or they

7    should be litigated in the Eastern District of Texas.

8           The issue that our motion presents for Your Honor

9    is whether the issues in this case should be litigated in the

10   district -- in the Northern District of California or in the

11   Northern District of California and in the Eastern District

12   of Texas.  Those eight California cases, and Judge Freeman

13   has said she expects more to be filed, they're staying put,

14   there's no motion to move them here or anywhere else.

15          So the witnesses in this case, both Google

16   witnesses, key third-party witnesses, whether from Facebook

17   or from any of the other competitors cited in the complaint

18   that are based in the Northern District of California, they

19   are going to be subject to the litigation burdens in the

20   Northern District of California, no matter what.  So the only

21   question is whether they will also be subject to the same

22   burdens here in a case that involves the same core claims and

23   conduct.

24          That being the case, we think it's clear that the

25   litigation burdens of two districts are going to be far, far

1    greater than litigation burdens in a single district.

2            So moving on to my third point, unless Your Honor

3    has questions.

4            THE COURT:  I can follow up at the end if I have

5    more.

6            MR. MAHR:  Thank you.  So my third and final point

7    is that even if we were to ignore the first two points and

8    even if we were to pretend we just had the one case here, and

9    it was the typical case under 1404 where the only

10   consideration is that this single case, is it more

11   conveniently located in the Eastern District of Texas or in

12   the Northern District of California, we submit that still,

13   Your Honor, the clearly more convenient venue in the

14   interests of justice will be the Northern District of

15   California.  And that's because none of the factors

16   recognized under the Fifth Circuit's 1404 test point

17   decisively towards the Eastern District of Texas.

18           There is no unique and meaningful connection

19   between this case in the Eastern District of Texas, while at

20   least five point decisively in favor of the Northern District

21   of California.  And, as I said, I'm not going to rehash those

22   individual factors because they're well briefed by both sides

23   in the papers, but I did want to focus, for this final point,

24   on what seems to be the main reason that the plaintiffs filed

25   in the Eastern District of Texas, or at least one of the main

1    reasons.

2         The plaintiffs have made no secret of the fact that

3    they filed here because they want to get this case to trial

4    as fast as they can.  Of course, the Eastern District has a

5    reputation for being able to move cases fastly -- quickly.

6    But plaintiffs' desire to rush their case to trial is not, in

7    our view, a reasonable basis for denying transfer when

8    there's so many other compelling considerations in favor of

9    transfer.

10        Now, the closest the Fifth Circuit's 1404(a)

11   factors come to recognizing this question of speed is the

12   first public interest factor which is, quote, "the

13   administrative difficulties flowing from court congestion."

14   So three responses or points on that.

15        As a threshold matter, I think it's important to

16   point out that the cases in this circuit have identified this

17   factor, the first public interest factor, as the most

18   speculative of all factors and one that can't alone outweigh

19   other factors.  That principle was most notably articulated

20   in the *Genentech* case in 2009, but has since been cited in

21   scores of Eastern District cases involving transfer.

22        The second goes back to this idea of duplicative

23   litigation.  Congestion is not served by having the same

24   issues litigated in two courts.  This is a big, complex case

25   involving complex issues of market definition and a complex

1    technology.  And having two courts work through that alone,

2    that creates congestion, that doesn't solve congestion.

3         And third, and maybe most importantly, plaintiffs'

4    desire to rush this particular case to trial shouldn't be

5    given any weight under 1404(a) because the dangers of rushing

6    a case like this are great, especially where it has the

7    potential to affect so many.

8         Importantly here, I think we've already seen

9    several ill effects of the Plaintiff States rushing this

10   case.  For one, this complaint was filed right in the middle

11   of the Plaintiff States' investigation.  In fact, the States

12   seem to have abandoned their fact finding and investigating,

13   and just skipped ahead to the suing part this summer, in a

14   way I haven't seen before.

15        Last summer, the States served a massive document

16   demand on Google, and the parties were beginning to negotiate

17   compliance with that demand when the AG's office went quiet.

18   There was no followup on the document demand.  And more

19   significantly, there was never any engagement with Google in

20   which Google was given an opportunity to understand what the

21   Plaintiff States' concerns were, to get its view of it,

22   before the litigation was launched.

23        And I recognize the States certainly don't need me

24   to tell them how to run a case, but I've been doing antitrust

25   enforcement for 30 years, including on the prosecution side

1    for the Department of Justice Antitrust Division, and I at

2    least haven't seen a government investigation in which the

3    government did not engage substantively with the subject of

4    the litigation and, instead, just fired off a complaint.

5           And again Plaintiff States can proceed however they

6    choose, that's up to them, but as we had pointed out in this

7    answer, this kind of shoot-first-and-ask-questions-later

8    approach has resulted in plaintiffs' complaint containing a

9    number of factual areas -- errors that still haven't been

10   resolved in the amended complaint.  I think, in fact, the

11   fact of the amended complaint is evidence of this rushed

12   filing.

13          It's only been three months into the case.  We

14   haven't fired a shot yet, just answered the complaint.  And

15   yet, we got an amendment on Monday with 29 new pages, 99 new

16   paragraphs, significantly revising every single section of

17   the complaint, if not every paragraph.

18          And again, I would expect that a case that's the

19   result of kind of sober, deliberative government

20   investigation effort on a -- following an 18-months

21   investigation, would have been able to address some of these

22   issues before it filed, and certainly would have been able to

23   determine which Plaintiff States were onboard or not before

24   filing.  But that wasn't the case.  So three months into the

25   litigation, we're served with an amended complaint and kind

1    of back at square one.

2            Another consequence, the third consequence, of

3    plaintiffs' rush to file this case in December is the

4    confidentiality breach.  And we'll probably get into this

5    with my colleague, Mr. Yetter, when we talk about some of the

6    protective order issues.  But I think one thing neither side

7    can contest is that in the course of plaintiffs' rush to file

8    the complaint in December, an unredacted draft of the

9    complaint was passed on to the New York Times and Wall Street

10   Journal where it was reported on by both papers.

11           Now, it's difficult for us not to believe that had

12   plaintiffs not been for whatever reason rushing to file in

13   December, that additional confidentiality measures couldn't

14   have been taken that would have avoided the leak.

15           So in our view, Your Honor, the rush, so far, has

16   got us off to a bit of a poor start, and the idea that that

17   should be a factor in the Court's 1404 analysis, we think, is

18   misplaced.  Again, no one's looking to delay this case,

19   especially Google, but neither are we looking to rush it.

20           I'll conclude by saying the Texas Attorney General

21   has stated publicly that he thinks this is the largest

22   antitrust case potentially in the history of the world.  And

23   we certainly contest that and we hope to persuade the Court

24   that there's no antitrust case here at all and no case at all

25   here.

1          But just sticking with the transfer issue for

2     today, if this is the largest antitrust case in the history

3     of the world, we see no sense at all in litigating it twice,

4     once in the Northern District of California and another time

5     in the Eastern District of Texas.  Thank you, Your Honor.

6              THE COURT:  All right, Mr. Mahr.  I may have

7     follow-up questions for you, but I'll let Mr. Keller go ahead

8     with his presentation.

9              MR. MAHR:  Thank you, Your Honor.

10             MR. KELLER:  Good morning, Your Honor.  And may it

11    please the Court, Ashley Keller on behalf of Texas.  And I'm

12    also proud to say that Mr. Lanier and I now represent North

13    Dakota, South Dakota, and Idaho as well.

14             Can you see me and hear me okay?

15             THE COURT:  Yes.

16             MR. KELLER:  Very good.  As Your Honor is aware,

17    Google is a repeat player in the Eastern District of Texas,

18    and its filed many 1404 motions before.  And so I think it's

19    useful to take a step back and just remind the Court of what

20    it has told Google in the past, most recently in *Seven*

21    *Networks* and in *Rockstar*, which is when conducting the 1404

22    analysis, it's important to be specific and not talk in

23    generalities.  It's also important not to use carefully

24    parsed language to shade over the *Volkswagen* factors.

25             But, unfortunately, I think Google has ignored that

1    admonition with respect to this motion and, to quote Yogi

2    Berra, *it's kind of déjà vu all over again*.  And I think

3    you're going to see that throughout the public and private

4    interest factors as we walk through the analysis.

5         So let me start with the first private interest

6    factor in that regard.  As this court, again, said in *Seven*

7    *Networks*, the first private interest factor is focused on

8    documentary and physical evidence, the location of

9    documentary and physical evidence.  Google is not supposed to

10   talk about the location of witnesses with respect to this

11   factor; that's double counting, those are factors 2 and 3.

12   But if you look at Google's motion, they're talking about the

13   location of witnesses when they are attempting to identify

14   the location of physical evidence and sources of proof.

15        Furthermore, they don't provide any specificity

16   with respect to the location of physical evidence and sources

17   of proof.  They note that they have their headquarters in the

18   Northern District of California, and so it would be some

19   other companies that might be relevant to this case.  But

20   headquarters are not physical evidence, they're not

21   documents.

22        So why is Google not being specific?  Because they

23   know perfectly well that the overwhelming majority of

24   physical evidence in this case is electronic, and that means

25   it's stored in Google's data centers.  Where are those?

1   Google doesn't tell you, but none of them are located in

2   California.  The 13 data centers that Google has located

3   throughout the country, zero in California; only two of them

4   are located closer to the Northern District of California;

5   one of them is right here in Texas, 50 miles away.

6          And just this morning, the CEO of Google announced

7   that they're going to spend $7 billion increasing the size of

8   these data centers.  They didn't announce that they're

9   opening any in California, but they're increasing their

10  investment right here in the State of Texas.

11         And so on Google's side of the ledger they've

12  identified no documents or other physical evidence.  And if

13  you look behind the curtain, you'll see that most of the

14  physical evidence is going to be located closer to the

15  Eastern District of Texas.

16         Meanwhile, on our side of the equation, we've

17  pointed to ten declarations that identify specific physical

18  evidence that's located closer to the Eastern District of

19  Texas.  And we further point out that as a result of the

20  18-month investigation that Your Honor is aware has been

21  ongoing, we now have access to physical documents that are in

22  Austin.  Google says, well, that's not relevant because

23  Austin's not in the Eastern District of Texas.  But again,

24  that's shading over the actual inquiry under this factor.

25         It's not where the documents are in this Court

1   versus in the Northern District.  It's the relative ease of

2   getting the documents to the courthouse that Google's

3   proposing.  Where is it easier to get documents from Austin?

4   To the Eastern District or to San Francisco?  We all know the

5   answer to that question.  And so, to my eyes, the first

6   factor overwhelmingly tilts in favor of the Eastern District

7   of Texas; certainly on the record that Google has created,

8   that is the case.

9        If I could, let me jump to the third private

10  interest factor which in *Seven Networks* and *Volkswagen*, this

11  court and the Fifth Circuit respectively says is the most

12  important, which is the convenience to witnesses.  Now, you

13  are supposed to look at all witnesses, party and nonparty.

14  But of course, the convenience to nonparty witnesses weighs

15  the most heavily, and that just makes logical sense.

16       This is a big case.  It's important to all of the

17  parties.  It's certainly important to the sovereign Plaintiff

18  States and Puerto Rico.  It's important to Google; they're

19  going to make their witnesses show up when it serves their

20  interests.  It's the nonparty witnesses who are being

21  burdened the most when they have to testify, and so that's

22  why the Fifth Circuit says you give significantly more weight

23  to the nonparty witnesses.

24       But let's start with the party witnesses.  Google

25  identifies 151 party witnesses that it says may be called to

1    testify in this case, but they bury the lead; 57 percent of

2    those witnesses are located closer to the Eastern District of

3    Texas and not to the Northern District of California; they're

4    in New York.  And so even for Google's witnesses, it's more

5    convenient, it's less costly, for them to come to this

6    district as opposed to going to San Francisco.

7            And, obviously, our group of sovereign states has

8    recently expanded, but the overwhelming majority of plaintiff

9    witnesses are going to be located -- party witnesses are

10   going to be located closer to this courthouse.  And,

11   obviously, the State of Texas took an important role in this

12   investigation and in filing this lawsuit, and they're right

13   here at home.  Austin is a lot closer to this courthouse than

14   it is to the Northern District of California.  So when you

15   talk about the convenience to the party witnesses, less

16   important, it points to this courthouse.

17           What about the nonparty witnesses?  Again, Google

18   provides zero in its opening brief, zero specific witnesses

19   that are nonparties that they think need to testify who are

20   located closer to the Northern District of California.  Then

21   in reply, if you even choose to consider arguments and

22   evidence first raised on reply, they point to two witnesses

23   from Facebook, one of those witnesses located closer to the

24   Eastern District of Texas.  So even the arguments that they

25   raise for the first time in reply don't really point to the

1    Northern District of California.

2          Meanwhile, Texas has identified a baker's dozen of

3    witnesses who are located -- for nonparties, who are located

4    closer to the Eastern District of Texas, and have submitted

5    declarations that they would be willing to testify in this

6    courthouse.  So the evidence overwhelmingly points in favor

7    of the Eastern District of Texas.

8          Now, what does Google say in response to that?

9    Google's reply says, well, we're a big company.  We do

10   business everywhere.  We've got customers all over the place.

11   And so, of course, Texas was able to locate some people who

12   they allege were harmed by our anticompetitive conduct, who

13   would be willing to say they could testify in the Eastern

14   District of Texas.  But pay attention to the

15   aggregate statistics, again not specifics, not naming anybody

16   by name, but we've got something like 40,000 customers in

17   California, and there's only 14,000 or so customers in Texas.

18         Respectfully, Your Honor, I think my friends are

19   making a completely inaccurate argument.  And I know they're

20   going to agree with me at a future phase of this case, and

21   here's why.  We have a lot of respect for this Court's

22   Article III authority and the Supreme Court's admonition that

23   you can only issue relief for the parties who are actually in

24   front of you.

25         I know that Google is going to say, at a later

```
 1    phase of this proceeding when you're fashioning injunctive
 2    relief -- assuming we win on the merits, you have to fashion
 3    it in a narrow way to provide relief to the actual parties to
 4    the case or controversy.  For good or for bad, the Attorney
 5    General of Texas doesn't speak for the people of California.
 6    Texas is here in parens patriae on behalf of its own citizens
 7    for harm that occurred in its own state.  And the same is
 8    true for the other sovereigns.  We don't speak for
 9    California.
10            And so all of the harm that allegedly occurred for
11    customers in California, who none of the sovereigns here
12    represent, is irrelevant; those aren't relevant witnesses.
13    You would never call somebody and say I've been injured, even
14    though you can't grant me relief, Your Honor, but let me tell
15    you all about what Google's done to me.  You would call the
16    actual parties who have been injured who you can fashion
17    relief for.
18            And so the 14,000 customers that are in Texas are
19    absolutely relevant.  The 40,000 customers in California,
20    where the attorney general has not chosen to join this
21    lawsuit, they are completely irrelevant.  So the third-party
22    witnesses factor, again where we've identified specifically
23    parties who are actually harmed and who this Court can
24    fashion relief for, that's relevant, that gets the most
25    weight in the analysis, and it tilts sharply again in favor
```

1    of the Eastern District of Texas.

2            So let me toggle from that to the compulsory

3    process problem, which is technically the second private

4    interest factor, but I thought it was more logical and flowed

5    better to address it in this order.

6            Once again, in *Seven Networks*, the Court held, and

7    in *Quest Med Tech* as well, this factor is most relevant for

8    unwilling witnesses.  Those who have to be subpoenaed and you

9    have to use compulsory process to bring in front of the

10   court, that that's where this comes into play.  Once again,

11   Google has identified zero, not a single specific nonparty to

12   this case, who they say is unwilling to testify but would be

13   within the subpoena power of the Northern District of

14   California.  And so on this evidentiary record, it can't

15   point to anybody that supports them on this factor.

16           And again on the other side of the coin, logic

17   simply dictates where you have parties who are injured in

18   Texas, there are going to be some that are within a hundred

19   miles of the Eastern District of Texas.  And so to the extent

20   any of them would be unwilling to testify in California but

21   would be willing to testify here, or they would be unwilling

22   to testify here but you could compel them to do so, this

23   factor once again tilts in favor of the Eastern District of

24   Texas.

25           Let me spend a moment on the final factor, Your

1    Honor, which is normally just a catchall category.  If the

2    first three factors go our way, I think both sides agree in

3    their papers that this factor goes our way as well; and they

4    would say if all three go their way, this factor goes their

5    way as well.  But this is where I want to respond to some of

6    the points that my friend made, because they shoehorned

7    judicial economy into the fourth factor, and there's a lot to

8    unpack here.

9            First, let's talk about the differences between

10   this action and the other actions that are pending in

11   California, which was the thrust of Your Honor's question to

12   my colleague.  First, with respect to the class action nature

13   of those cases, the procedural nature of going through a

14   class certification motion, as Your Honor is aware, is highly

15   complex, it's completely irrelevant for the 15 Sovereigns who

16   are in front of you.

17           And I would predict, from a judicial economy

18   perspective, they are still going to be dealing with class

19   certification before this case is tried in front of a jury,

20   based on the statistics but normally obtained, in the Eastern

21   District of Texas.  And so throwing the sovereign States, who

22   are not subject to a class action and want to have nothing to

23   do with a class action, into that procedural morass does not

24   improve judicial economy.

25           But there is another procedural point, a threshold

procedural point, that I think is extremely important.
Google has moved to compel arbitration in the ad tech case in
California, and they have every right to say that their
contracts with their clients provide an arbitration clause --
an arbitration clause, by the way, that requires individual
arbitration.

          And so you heard a lot from my friend about how
there is a risk of inconsistency and we don't want to
duplicate proceedings.  But what has Google done?  Like a lot
of big companies with arbitration clauses, it has effectively
said you must conduct thousands upon thousands of individual
arbitrations before individual arbitrators if you want to get
relief from us.  That's what the contract says and we're
sticking by it.  The Federal Arbitration Act embodies a
strong public policy in favor of arbitration, and we're going
to exercise our contractual rights.

          I don't begrudge them from doing so.  It's their
contract and they have a right to do it.  But when they come
before this Court and they say they're so concerned about
duplicative proceedings and we can't have the risk of
inconsistency, they're inviting precisely that.  They want
thousands of individual proceedings.

          I promise Your Honor -- this is a complex case, the
issues are important, the law in antitrust is often not
crystal clear -- if you impanel thousands of individual

1   arbitrators to decide the merits, they're not all going to go

2   one way or the other.  And so with respect, I think given

3   that Google has moved to compel arbitration and is

4   essentially inviting thousands of individual proceedings, the

5   notion that they're all that concerned about inconsistency

6   strikes me as a little bit pretextual.

7       Now let's talk about the Georgia case which again

8   Your Honor specifically asked my friend about.  My friend

9   gave a couple of answers that again I find puzzling when it

10  comes to the 1404 analysis.  The first answer he gave for why

11  that case wasn't transferred, and Google never made any

12  effort to, is they won a motion to dismiss; and then the

13  plaintiffs did what plaintiffs often do when there is a

14  dismissal without prejudice, they re-file.

15      And so Google is effectively saying, well, we don't

16  care about all that efficiency stuff as long as it seems like

17  we might have a good judge and we might win; when the outcome

18  goes our way, we're fine to not to move to transfer.  But

19  that's not relevant to the 1404 analysis.

20      The next thing they said is, well, that case was on

21  behalf of a competitor as opposed to a customer.  And I would

22  say, okay, the identity of the plaintiff matters.  This case

23  is on behalf of 15 sovereigns, and so that too should counsel

24  in favor of this action being treated differently.

25      We have 15 sovereign entities, 14 states and Puerto

1    Rico, in this case.  This isn't just a single action, when
2    you look at my friend's demonstrative that he prepared this
3    morning.  And so to my mind, this is the case that has the
4    center of gravity behind it, this is the case that is going
5    to be moving forward that is going to be attracting most of
6    the attention.  Everybody else ought to come here if they
7    want to do a JPML, which they reserved their right to do in
8    the future, as opposed to sending things to California.

9            Let me quickly turn to the public interest factors,
10   Your Honor.  The first one, I don't think there is actually
11   disagreement between us, which is that this Court moves more
12   efficiently than the Northern District of California.  The
13   most that my friends on the other side could say is, well,
14   this factor is the most uncertain, and so don't give it that
15   much weight.

16           But the statistics right now are just
17   overwhelmingly in favor of the Eastern District of Texas.
18   The Northern District is significantly backlogged.  I think
19   the average time to trial here would be something like 12 to
20   18 months; it's 44 months in California right now.  And we
21   don't have to speculate here.  There's been a stay of
22   discovery issued in some of the cases in the Northern
23   District of California, where the trial at the earliest is
24   slated for 2023.  And so if this district follows anything
25   remotely approaching its ordinary course, this is going to be

 1    an even more efficient forum, and so this factor clearly

 2    tilts sharply in favor of the Eastern District of Texas.

 3              And then the final point I'll just cover on the

 4    local interests, Your Honor.  We're here with the State of

 5    Texas as a sovereign entity, obviously, as a plaintiff.  Of

 6    course, when exercising its parens patriae authority on

 7    behalf of customers who have been harmed by Google's

 8    anticompetitive conduct, there is a strong local interest.

 9              This is not just, you know, the jury being asked to

10    be impaneled, which is what the Fifth Circuit is concerned

11    about, for something that has nothing to do with the

12    locality.  There are people in the Eastern District of Texas,

13    businesses within the Eastern District of Texas, who have

14    been meaningfully harmed by the conduct that we allege in the

15    complaint.  And so the notion that this factor goes against

16    us because Google is headquartered in California, I'm not

17    sure that it passes the straight-face test.

18              Let me just conclude with something that I'm not

19    sure was really one of the public or private interest

20    factors, but it goes to some of the comments that my friend

21    made at the end.  I take exception, and I'll use a kind word,

22    to the notion that this has been rushed and that we jammed

23    through our complaint and that it was riddled with factual

24    errors, and we're already off on the wrong foot here.

25              We take our obligations to this Court, as officers

1    of the court, extremely seriously.  The public officials who

2    are involved in this case similarly take their obligations to

3    their own citizens extremely seriously.  This would not be

4    the first time in U.S. litigation history where a defendant

5    said that a complaint wasn't accurate factually.  That's why

6    they get to answer, and we have discovery, and we have a

7    civil justice system where the facts get sorted out.  But it

8    shouldn't come as a surprise to anybody that we have

9    different perspectives on that.

10         But the idea that we're jamming through documents

11   to this Court and rushing the process is incorrect.  We are

12   in a hurry, though.  We do want this case to go to trial.

13   And we agree, of course, with Attorney General Paxton and

14   others that this is a meaningful antitrust case.

15         The reason that we're in a hurry is because Google

16   is so large and has its tentacles spread throughout the

17   entire U.S. economy in such a pervasive way that the harm

18   that they are doing, based on the facts we allege, occurs

19   every nanosecond of every day.  So, yes, we want to get

20   redress expeditiously and, guilty as charged, that is part of

21   the reason that we proudly chose the Eastern District of

22   Texas.  We don't apologize for that for one second.

23         But there is a huge difference between plaintiffs

24   wanting to get access to justice expeditiously and sloppy

25   tactics which we were accused of, and we frankly resent the

1    implication.  I'll close there, Your Honor.

2              THE COURT:  You know, Mr. Keller, before I have

3    Mr. Mahr give his rebuttal, I did want you to respond a bit

4    further to the point that he made regarding duplicative

5    litigation.  You've talked about it a bit.  I note that

6    Mr. Mahr referenced some of the language in case law talking

7    about duplicative litigation being a paramount consideration.

8              And I'm curious, your response, on how that

9    consideration plays against all of the public and private

10   interests factors.  I've heard and understand your argument

11   regarding just how duplicative the litigation is, let me put

12   it that way, in terms of issues, in terms of parties, but I'm

13   interested in your take on the case law with regard to that

14   being of paramount consideration, how does that compare if

15   you are looking at all the other factors also?

16             MR. KELLER:  Sure.

17             THE COURT:  If the other factors were pointing

18   against transfer or the other factors did not establish that

19   it was clearly more convenient to move something, would that

20   consider -- could that consideration nonetheless trump those,

21   the typical private and public interest factors?

22             MR. KELLER:  I'll do the best I can to answer your

23   question, Your Honor.  But as you are familiar, this is

24   clearly operating in the realm of standards as opposed to

25   bright-line rules.  Courts have said repeatedly the factors,

1    no one of which is dispositive, they're not even exhaustive;

2    you can consider other things; the facts and circumstances of

3    any particular situation can be different.  And so with that

4    as the rubric, it's sometimes difficult to sort of say, well,

5    aha, this one factor can trump everything else.

6            I certainly don't think, on the facts and

7    circumstances of this situation, the judicial economy

8    argument that my friend made, even if you took it on its own

9    terms, would trump all of the other factors that we say go

10    our way based on this evidentiary record.  But as you heard

11    me say before, and I'm happy to expound if I didn't provide a

12    sufficient answer, we don't think that there's going to be a

13    great deal of judicial economy considerations that would be

14    paramount in this case, just given the procedural

15    differences.

16            And I do agree with my friend.  The cases don't

17    have to be identical before you take into account judicial

18    economy, but class actions are a different beast.

19    Arbitrations are certainly a different animal than what we're

20    pursuing here.

21            And one final point that I think is worth noting.

22    A lot of the reason the cases in the Northern District of

23    California are pending there is because again Google, well

24    within its contractual rights, has put in a forum selection

25    clause, and so plaintiffs there had no choice but to sue in

1    Google's backyard.  The sovereign States and Puerto Rico here

2    should not be held to the contract that Google hoists upon

3    its customers when, of course, Google has no right to do that

4    to sovereign entities.

5              THE COURT:  All right.  Thank you, Mr. Keller.  And

6    finally -- I'm going to ask Mr. Mahr the same question along

7    these same lines -- recognizing that these factors are all

8    looked at together in the analysis of 1404(a), are you aware

9    of any cases where you've seen a court say notwithstanding

10   the fact that if we took the other factors together, it would

11   indicate one thing, but this paramount consideration of

12   duplicative litigation leads us in another direction; in

13   other words, a court that said even looking at all the

14   factors together, this particular consideration is so

15   significant that even though the other factors cut against

16   it, we think the result should be transfer?

17             MR. KELLER:  A one-word answer:  No.

18             THE COURT:  All right.  Thank you.

19             MR. KELLER:  Thank you, Your Honor.

20             THE COURT:  Mr. Mahr, you can -- I have a couple of

21   questions for you, and I'll let you do your rebuttal, as

22   well.

23             So my first question is, just to get your answer to

24   the last question I asked Mr. Keller, you have emphasized,

25   and it seems to me that Google's argument depends very

```
 1    heavily, on the duplicative litigation argument.  And so I am
 2    curious if you have any case law where that factor, in the
 3    context of a court's consideration of all the factors, the
 4    private and public interest factors, has weighed in a
 5    dispositive manner, notwithstanding the fact that maybe the
 6    other factors would not have supported transfer.
 7              MR. MAHR:  Well, I think in -- one is the Cephalon
 8    case I mentioned.  You know, I don't know a case where every
 9    single factor went against it and the judge said forget it,
10    it doesn't matter, paramount consideration.  But I would say
11    that the Supreme Court's language, the -- in the language of
12    the courts that have addressed this issue, have -- calling it
13    paramount is an indication that it outweighs those other
14    factors.  But certainly Cephalon, there were another -- a
15    number of factors.
16              THE COURT:  Well, the reason -- part of the reason
17    I raise that is that as your friend on the other side,
18    Mr. Keller, was mentioning, one of the other factors -- and
19    this has to do with convenience of witnesses -- you will see
20    any number of court opinions that talk about as the most
21    important factor that a court will look at is convenience of
22    witnesses.  So we have courts using language to convey the
23    importance of certain factors.
24              The factor that you are relying on, the duplicative
25    one, falls under that -- generally speaking, falls under the
```

1    all-other-practical-problems factor, at least in the cases

2    that I see, and in this district it's often referenced

3    immediately under that factor, the possibility of duplicative

4    litigation.

5         And so part of the reason I ask you this question

6    is because you do have language with regard to at least one

7    of the other factors the Court is looking at, and that has to

8    do with the convenience of witnesses that say that is the

9    most important thing the court is looking at, and then you

10   also have your language with regard to duplicative

11   litigation.

12        So I think you've answered my question, but I did

13   want to see if you had a case where this duplicative

14   litigation issue was so significant that it trumped other

15   factors.

16        MR. MAHR:  Well, *ExpressJet* is an interesting case

17   for that purpose.  *Cephalon* is an interesting case, as I was

18   saying.  And in the D.C. Circuit test -- case -- test under

19   1404, unlike here, the plaintiffs' choice of venue is given

20   substantial deference, and yet it was overruled in favor of

21   paramount -- the paramount consideration of the duplicative

22   litigation.

23        But here's why that issue doesn't I think come out

24   as in sharp relief as you're asking.  It's because when you

25   have duplicative litigation, by definition those other

1    factors are going to go towards the transfer of district,

2    also.  I agree many of the cases say convenience of the

3    witnesses is also the most important factor, at least of the

4    eight.  But when you have duplicative litigation, if you're

5    talking about a witness who is actually material to a case,

6    having two cases is never going to serve the convenience of

7    the witness because they're going to have to testify in two

8    cases.

9            So say you're talking about one of the competitors

10   here, or a truly material meaningful witnesses in this case.

11   If there are two cases going on and that witness is truly a

12   unique and meaningful witness in the case, they're going to

13   have to testify in two.

14           So I don't think it will be that often where you'll

15   see, well, duplicative litigation stands alone, but it would

16   be more convenient to the witnesses for it to be litigated in

17   two jurisdictions at once, or it would be better in terms of

18   court congestion to have two courts wrestling with these

19   issues at once.  So you don't get that everything going one

20   way, and duplicative litigation going the other way.

21           THE COURT:  Well, and that, your answer, may be a

22   good segue to the second question I have for you, which is

23   admittedly a broad question, but it's raised by Mr. Keller's

24   presentation and I did notice it in the briefing, which is

25   the 1404(a) analysis is an analysis that needs to drill down

on these issues.  It needs to drill down, for example, with
regard to the compulsory process factor, to name one, of what
witnesses have you identified that are nonparty witnesses
that are unwilling witnesses.  I'm not aware of any that
Google has pointed out.

It needs to drill down on who the nonparty
witnesses are who it would be not convenient to testify here
in the Eastern District as opposed to the Northern District
of California.  As your friend on the other side pointed out,
I don't recall seeing any in the original motion and I only
recall seeing a couple in the reply, one of whom it didn't
necessarily appear it would be more convenient to appear in
the Northern District of California.

And I won't go into all the other specifics, but I
do -- I feel like Google's filings have a lot of broad
statements, for example, about documents and access to
sources of proof, and broad statements about witnesses, but
not a lot of drilling down in detail and support in the way
that the plaintiffs have.  And that's why I say I feel like
you've relied very strongly on the duplicative litigation
issue.

Your friend on the other side has pointed that out
in his presentation, and so I would like to get your response
on those issues and where that proof is that, as you put it,
there are five factors that work in favor of transfer.

1           MR. MAHR:  Certainly.  And so I'll focus on

2  witnesses, and maybe start with the Fifth Circuit's --

3  another *Volkswagen* case, this is the 2008 *Volkswagen* case by

4  the Fifth Circuit.  Footnote 12 of that case, they made clear

5  that there is no kind of blanket rule requiring affidavits

6  and specific people.  And I think that's particularly

7  appropriate in a case like this where you have this massive

8  complaint; we're moving the beginning of this litigation; and

9  the idea that, for example, we can go out and get affidavits

10  from unwilling witnesses, unwilling witnesses are not great

11  candidates for getting affidavits from to support a venue

12  motion.  But I think more importantly, at this stage of

13  litigation, there are enough indications of where the

14  witnesses are, and it's also clear that there are none here

15  that would suffice in this kind of case, and I'll explain

16  why.

17           The witnesses -- and to do this, I would like to

18  contrast the witnesses identified by the plaintiffs versus

19  the witnesses identified by Google.  After an 18-month

20  investigation and collecting 3,000,000 documents, and

21  interviewing 64 third-party witnesses, the plaintiffs were

22  not able to show that one of those witnesses, not one of

23  those witnesses, of the 64 is located in the Eastern District

24  of Texas.  Now, they argue, oh, about half are closer to the

25  Northern District of California, many of them in the Northern

1    District of California, and half are closer to Texas, but

2    that's closer.  We have witnesses that they interviewed in

3    the Northern District of California, and none in the Eastern

4    District of Texas.

5         Mr. Keller referred to the baker's dozen of

6    affidavits.  These are affidavits handpicked for this motion.

7    And even out of the 13 affidavits created for this motion,

8    only 4 of them are even in the State of Texas; and again, not

9    one of them is mentioned in the complaint; the other 9 are

10   spread around the world, including in France and in the UK.

11        And there's a number of cases, *Fujitsu*, *Genentech*

12   and *Rizvi* -- *SEC v. Rizvi*, that says once you're traveling a

13   significant distance, the additional hour or two from --

14   between one plane flight and another isn't material compared,

15   when weighed, against witnesses that are in one of the two

16   districts.

17        And, third, with respect to these 79 companies who

18   the plaintiffs say they think may be Google customers, only

19   one of which is named in the complaint, none of them are

20   unique.  And that was our point about the fact that there are

21   a 198 publishers based in the Northern District of

22   California, and just 6 in the Eastern District of Texas.

23   There are 40,000 advertisers based -- these are Google

24   customers -- based in the Northern District of California,

25   and a third of that in Texas.  They're using broad numbers

1    and we're using broad numbers, but it's not -- it's to show

2    where the weight of the evidence is in the case.

3            But so out of all of the different ways the

4    plaintiffs have come up with to support the jurisdiction in

5    terms of witnesses, they still haven't come up with one who

6    is actually material to the investigation, who is identified

7    in the complaint, and who is in the Eastern District of

8    Texas.

9            Now, what did we do?  Again, I don't think we were

10   in a position to be able to go around and get affidavits from

11   our competitors and any of the, again, tens, if not hundreds,

12   of thousands of publishers and advertisers.  That's going to

13   take a lot of funneling in the course of discovery to find

14   which ones are material.  But what we did do is use the

15   plaintiffs' complaint, and that's where we based our

16   identification of witnesses on; we didn't make it up.

17           We didn't make up 151 current or former Google

18   employees.  Those are documents -- those are Google employees

19   whose documents were identified in the complaint plaintiffs

20   filed.  Of those 151, 67 are in New York, 60 were in

21   California, 16 were in other countries or other states, and

22   not one was even in the State of Texas, much less the Eastern

23   District of Texas.

24           And then there are 9 current or former Google

25   employees identified in the complaint, 7 in New York, 2 in

1    California, not one in the State of Texas, not -- in

2    particular, the Eastern District of Texas.

3           We looked at the 13 competitors who are referenced

4    in the complaint who are likely to be critical third-party

5    witnesses in an antitrust case.  Again, none of them are in

6    the Eastern District of Texas, and all of them have offices

7    in the Northern District of California.

8           And finally, we looked at the 10 current or former

9    Google employees whose depositions the Office of Attorney

10   General of Texas attended; 6 were in California, 3 in New

11   York, 1 in Colorado, and not one in Texas or in the Eastern

12   District of Texas.

13          So our point is that there is not a single witness,

14   material witness, that they've identified with a unique

15   connection to this case in the Eastern District of Texas, and

16   there are a plethora of them in the Northern District of

17   California.

18          THE COURT:  How do you respond to Mr. Keller's

19   argument that, you just noted it yourself, of the I guess

20   it's party witnesses that you identify that a large number of

21   which are in New York?  This is a case that you, yourself,

22   today have said is a national and, arguably, international

23   reach.  In a case like that and given the number of party

24   witnesses that you have that are even party witnesses that

25   are not in the Northern District but are elsewhere in the

1       United States, how does that play out for your motion?

2              MR. MAHR:  Well, I would go back to the -- those

3       cases, the trio of cases -- and there are many more, I just

4       picked three -- *Rizvi*, *Fujitsu*, and *Genentech*.  *Rizvi*, in

5       particular, this Court, the Eastern District of Texas, said

6       they don't see a material difference flying -- I think in

7       that case it was from Philadelphia or Washington to the

8       Eastern District of Texas versus the Northern District of

9       California; and that that distance, I don't think that's a

10      material consideration, especially again when weighed against

11      the existence of witnesses who are in one of the two

12      candidate jurisdictions.

13             THE COURT:  All right.  And your response -- I

14      would like to hear your response regarding the duplicative

15      litigation issue that you raised, and that Mr. Keller noted,

16      you have the arbitration provision being enforced.  You've

17      talked about the class action issue.  You and I didn't talk

18      about the arbitration issue that was raised, and that in and

19      of itself would generate potentially a lot of different

20      results, according to what your colleague has said.  And

21      what's your response to that?

22             MR. MAHR:  Well, first of all, there's a factual

23      element to it that only two out of twelve class

24      representatives in the California cases are arbitrating in

25      the case.  And so it is not going to be that every class

1    representative -- and I don't know the details of who signed

2    what or how, who it's enforceable against and who it's not

3    enforceable against, but the fact is there are only two out

4    of twelve, and that's just the class representatives.  So

5    it's not a case where this case is going to go to the

6    Northern District of California, and then all of the class

7    actions are going to disappear because everyone's going to be

8    going into thousands and thousands of arbitrations.  That's

9    just not the case.  There's two.

10          But second, I'm not sure that the defenses that

11   might be lodged in the eventual case are a proper basis to

12   make a determination as to whether those defenses are

13   based -- handled by a single judge or by two judges at the

14   same time.  But again, I think the real fact is that it's

15   just two out of ten at this point.

16          THE COURT:  All right.  The last item I wanted to

17   ask you about, before I let you make any other remarks on

18   this, are two items with regard to the standard that

19   courts go on to apply the motion.  The first is that, I take

20   it, you would agree that the burden here is on the movant to

21   show under this analysis that it is clearly more convenient

22   to be in the Northern District of California; in other words,

23   not that it may just be just as convenient to go to the

24   Northern District of California, but that it is clearly more

25   convenient to be in the Northern District of California.

1    Would you agree with that, Mr. Mahr?

2            MR. MAHR:  We agree with that and we embrace that

3    both, whether you're looking again at the individual criteria

4    or this paramount issue.  I just would note, if I may, Your

5    Honor, clearly -- you could say clearly or you could say

6    clearly, and the emphasis -- it's important to note that the

7    outer bound of it is the forum non conveniens where it's

8    substantially more convenient, and 1404 is specifically

9    designed by the legislature to have a, the courts found, to

10   have a standard below that.

11           THE COURT:  I'm aware of that.

12           MR. MAHR:  Okay.

13           THE COURT:  Yes.

14           The other is that when deciding this motion, the

15   Court can consider undisputed facts outside of the pleadings,

16   such as affidavits and declarations, but it must draw all

17   reasonable inferences and resolve factual conflicts in favor

18   of the nonmoving party.  Would you agree with that?

19           MR. MAHR:  Yes, Your Honor.

20           THE COURT:  All right.  Any other rebuttal that you

21   would like to make?  I've kind of peppered you with a few

22   questions here.

23           MR. MAHR:  No, I appreciate your questions.

24           Just three points.  First, my friend represented --

25   referenced the Google cases as if we've been told this

1    before.  These motions aren't decided on the identity of the

2    party.  But it's interesting, if you look at the cases that

3    Google has tried to transfer previously -- because sometimes

4    they've been transferred and sometimes they have not -- the

5    cases that have not been transferred, some of which were

6    mentioned by Mr. Keller, *Seven Networks*, the Court in that

7    case, in addition to looking at the other factors, said that

8    it had already spent significant resources keeping the case

9    on track in this district and coordinating with a similar

10   pending case in the Northern District of Texas.  So there you

11   have the consideration of having the same -- the same cases

12   in the same -- at least the same state in that case.

13          In the *Smartflash v. Google* case, same thing, there

14   was a significant factual overlap between that case, the

15   Court found, and another case within the same district, the

16   Eastern District of Texas.

17          *Content Guard*, same thing, the instant case and the

18   co-pending Amazon action before this case, the courts

19   substantially overlap.

20          And then *Rockstar Consortium* was also mentioned.

21   *Rockstar* is based in Plano, Texas.  There was -- there was an

22   obviously material witness with a unique and meaningful

23   connection to this district; something that's absent here.

24          So Google did learn from those cases, and it's that

25   when there are efficiencies that come from having cases that

1   are similar in the same jurisdiction, that jurisdiction is

2   the preferred venue.

3            THE COURT:  Well, let's talk about *Seven Networks*

4   for a moment because that came up in your colleague's

5   discussion, and one of that is the items that the district

6   court discussed in *Seven Networks* was on access to sources of

7   proof.  And it seems that there were maybe a similar,

8   arguably a similar, disconnect in that case, and it seemed in

9   that case that Google generally referred to where its

10  headquarters was in terms of where its sources of proof were.

11           But the district court, along the lines of what's

12  been alleged by your friends on the other side, said, well,

13  there is actually, where these materials are stored are

14  actually in -- it was a lesser number of centers across the

15  country than what are identified in this case.  Yet, your

16  colleagues on the other side have identified 13 data storage

17  centers across the country, and you heard your colleague's

18  argument on that.  And from what I've seen on Google's

19  filings, again I haven't seen anything specific in your

20  filings to contradict that.

21           MR. MAHR:  Well, there are 13 data centers across

22  the country, and there's one in Texas, there is also one in

23  Nevada and one in Oregon.  But, I mean, I think this is an

24  interesting factor, the first private interest factor,

25  because now that we're -- everything is digitized, on the one

1    hand, all of this is accessible anywhere.  On the other hand,

2    courts have made clear this is still a relevant factor.

3          But the fact that a particular 1 out of 13 data

4    centers happens to be here doesn't tell us anything about

5    what data is stored at that center, and I couldn't begin to

6    tell you.  And data centers are not a place where there are

7    employees sitting there and you knock on the door and say *I*

8    *would like some data.  Can you please put it in the back of*

9    *the car and I'll drive it to the courthouse*.

10         So I don't think data centers which are generally

11   stated -- generally located in places where real estate is

12   available at a lower cost than say in the middle of Dallas or

13   the middle of San Francisco, and so I'm not sure that they --

14   I guess I would disagree with the court in *Seven Networks*

15   that that was -- should have been such an emphasis.

16         THE COURT:  All right.  Well, I think this is an

17   area where I think specificity helps because I think the test

18   is where data is stored.  But there's a reason why a party

19   thinks that shouldn't be meaningful, then I need an

20   explanation as to why it isn't meaningful.  I think just a

21   general reference to where your headquarters is, standing

22   alone and in the context of having data being stored in other

23   locations, you would need more explanation as to why that's

24   not significant or that shouldn't be considered significant.

25         But let me ask you a different question which has

1    to do with your -- the point you just made about some of
2    these cases involved a local -- you know, local businesses in
3    Plano or elsewhere in the district.  We do have the State of
4    Texas as a plaintiff in this case, and the State of Texas is
5    here a cross sovereign, but it also has asserted it's here in
6    a parens patriae capacity.  And so that suggests that the
7    State is representing the interests of individuals and
8    businesses across the state, including in this district.  And
9    this state as a plaintiff, in any case, presents a different
10   kind of plaintiff.  I'm curious what your, you know, how your
11   response regarding plaintiffs in the district or representing
12   interests in the district plays out, given that you have the
13   State here both as a sovereign and a parens patriae role.
14            MR. MAHR:  Yes, Your Honor.  And we certainly
15   respect the sovereignty of the State and recognize its
16   interest in its citizens.  Here, I think in this question of
17   weighing that in the 1404(a) analysis, you have to consider
18   that as kind of one-tenth of what it would normally be on the
19   regular complaint; and now in the amended complaint,
20   one-fifteenth.  There's just one of many sovereigns in this
21   case and they each have those same interests, and not all of
22   them are in Texas, obviously, just one-fifteenth of them.
23            THE COURT:  Have you seen cases where the fact that
24   there is more than one sovereign in a case undercut that
25   plaintiff's -- the fact that a lead plaintiff had chosen a

 1    particular forum?

 2              MR. MAHR:  I haven't seen that, but I've also --

 3              THE COURT:  I can tell you I've seen a case where

 4    it didn't, out of the Northern District of California.  I

 5    don't know if you're familiar with the case of *California v.*

 6    *United States Bureau of Land Management*, it's at 2017 Westlaw

 7    8294171.  In that case, you had the State of California, the

 8    State of New Mexico, and a group of environmental

 9    organizations that had filed a lawsuit, and there was a

10    1404(a) motion.  And the Court, in that case -- now, this is

11    in the context of talking about deference to the plaintiff's

12    choice of forum.

13              And the Northern District of California in that

14    case said there's some substantial deference, may be even

15    more, given that you have the sovereign State of California

16    in that case.  And as far as I can recall, I don't see a word

17    about the State of New Mexico and the fact that the State of

18    New Mexico in that case would undercut somehow that choice.

19              And so I'm wondering if you have other cases where

20    the fact that there is more than one sovereign would undercut

21    the fact that a lead state or that at least one of the states

22    in a case plainly has an interest in the subject matter.

23              MR. MAHR:  I don't have a case that says that, Your

24    Honor.  But I would suggest that different tests in different

25    jurisdictions have different ways of treating the choice of

1    the plaintiff in terms of venue, period, as well as the

2    plaintiff's choice of venue when the plaintiff is a

3    government enforcement agency.  And as I was mentioning, the

4    *Cephalon* case earlier.  In the D.C. Circuit's case, it's

5    given substantial deference -- I think they even use the word

6    "paramount" -- in that district, the plaintiff's choice of

7    forum, and that's because that's what that particular test

8    is.

9            And as we know in the Fifth Circuit, there is no

10   deference given to the plaintiff's choice of forum whether a

11   government entity or not, but that is baked into the test,

12   that's where we get to clearly demonstrate, and the Fifth

13   Circuit has said that's where the respect for the choice

14   goes.

15           THE COURT:  Well, I suppose that case just makes me

16   wonder whether it should get less deference in this

17   context -- do you see what I'm saying -- that you have at

18   least one state that clearly has an interest, but I think

19   you've suggested in your briefing and here today that it

20   should get less, that should have less importance, because

21   there are other sovereigns.  And I'm not sure that that's

22   accurate.

23           MR. MAHR:  Well, I think -- and I don't have a case

24   for you, but I wouldn't say that the deference comes out in

25   the case whichever way you would decide that issue.  If you

1    would decide the issue that full deference goes to Texas,

2    it's still a clearly demonstrate test.  And if it was only

3    one-fifteenth, it would still be the clearly demonstrate

4    because the Fifth Circuit says that that deference to the

5    choice is reflected in the test.

6             THE COURT:  All right.  Thank you.

7             MR. MAHR:  Do I have time for one more?

8             THE COURT:  Yes, you can.

9             MR. MAHR:  I did want to address the question of

10   similar issues because maybe we haven't put enough stress on

11   that, but the Supreme Court even says the identical issues,

12   the *Continental Grain* case from 1960.  And that has been

13   relaxed a bit by other courts who have said the same or

14   similar issues in the last 60 years.  But we're comfortable

15   with the identical issues because there are many identical

16   issues that will have to be resolved in this case that will

17   also have to be resolved in the Northern District of

18   California case; they include, at the outset, market

19   definition.

20             There are multiple markets in this case.  And

21   markets in this case are dynamic and evolving; they're

22   different today than they were ten years ago, and they'll be

23   different tomorrow than they are today.  That makes -- not

24   that -- you obviously can handle that and so can Judge

25   Freeman, but having two judges do that at the same time I

1     think is a real -- a problem.  Also, some of these markets

2     involve two-sided transaction platforms which requires a

3     somewhat different analysis.

4            Under the Supreme Court's case in *Ohio v. American*

5     *Express*, relatively new case and not that many courts have

6     dealt with it yet, having two do it at the same time under

7     the same facts for the same markets, I think also presents

8     really big issues.

9            Once the markets are defined and properly

10    understood as antitrust markets, the question is does Google

11    have monopoly power; that's an identical issue in both cases.

12    Monopoly, as we know, is not illegal.  Justice Scalia

13    explains that in depth in *Verizon v. Trinko*.  So it has to be

14    conduct, it's the conduct -- is there anticompetitive conduct

15    as opposed to just vigorous competition, on the merits, that

16    will have to be decided in both cases.

17           And as you can see in plaintiffs' complaint, there

18    is a lot of conduct alleged there, and that conduct will have

19    to be evaluated by this Court and the other court, if you

20    choose to keep the case, both for the antitrust claims, but

21    also for any of the state law claims where it's the same

22    conduct, whether the vehicle it's challenging is a state law

23    statute or antitrust laws.

24           And so all of these I think -- that's just a few of

25    them, that's just getting through the earliest part of the

1    case, but there are many identical issues, and we think for

2    that reason that Your Honor should transfer this case.

3              THE COURT:  All right.  The last question for you.

4    Can you remind me of the cases that you said you thought were

5    the most on point with regard to transfers that involve going

6    into another pending action where there were class

7    allegations and class certification issues?  Was that the

8    *Cephalon* case you referenced?

9              MR. MAHR:  *Cephalon* is one of them.  There are a

10   host of enforcement actions, the *FTC v. Watson*

11   *Pharmaceuticals*, which is 611 F.Supp.2d 1081, *SEC v. Captain*

12   *Crab*, 655 F. Supp. 615 -- there are some others, I don't want

13   to list them all here, I think they're in our brief -- but

14   these are cases where there were enforcement actions that

15   were transferred under 1404(a) into jurisdictions where there

16   were -- where there were already pending class actions.

17             THE COURT:  Right.  The similar litigation was

18   litigation that involved class certification issues.

19             MR. MAHR:  I know that for a fact in the first two

20   I mentioned, and that's why I didn't want to read all the ten

21   because I'm not sure in every one.

22             THE COURT:  All right.  Thank you, Mr. Mahr.

23             MR. MAHR:  Thank you.

24             THE COURT:  Well, I spent more time with Mr. Mahr

25   than I thought I might.

```
 1            Oh, one moment.  I'll wait.

 2            (Pause in the proceedings.)

 3            THE COURT:  All right, Mr. Keller, if you -- if you

 4  would like to make any additional remarks, I'll give you a

 5  few minutes because I spent more time with Mr. Mahr than I

 6  thought I would.

 7            MR. KELLER:  I don't need any more time, Your

 8  Honor.  If you have questions, I'm pleased to go back to the

 9  podium.  But otherwise, I'm happy to rest.

10            THE COURT:  No.  I think I've had all my questions

11  answered.  Thank you.

12            Thank you to both counsel.  The presentations have

13  been very helpful.

14            MR. KELLER:  Thank you, Your Honor.

15            THE COURT:  So I think before we break today, I had

16  a couple of other issues that it made sense to discuss

17  briefly.  So the first is the where you stand on the

18  protective order.  You will recall that when we met the last

19  time for our conference, the aspiration was that we would

20  have a protective order in place before an OGP went out.  And

21  I understand the parties have been working on the protective

22  order, but maybe you can tell me where that process is right

23  now.

24            MR. YETTER:  I'm happy to give it a try.

25            MR. LANIER:  As am I.  We'll both give it a try,
```

1    Your Honor.

2              THE COURT:  All right.  Mr. Yetter, you're at the

3    podium.  You can start.

4              MR. YETTER:  All right, Your Honor.  When we were

5    last together on February the 4th, as the Court will recall,

6    we had already been discussing the protective order for some

7    time.  There was two issues that had come up, and those were

8    issues that are Google had raised that we believe are

9    important additional protections to the template that they

10   have we've already agreed on.  The parties have agreed on the

11   protective order largely, the protective order that was

12   entered in the Search case in D.C.

13             And the two additional protections that we were

14   asking for that we had raised and we were in the midst of

15   discussing were additional disclosures.  And the disclosures

16   were as to out -- third parties, essentially agents,

17   consultants, and experts of either side, that would have

18   access to confidential information of the producing party or

19   a third party, first just their identities, and second -- and

20   that would be reciprocal; and, second, what Google was

21   proposing was that the experts and consultants for the

22   Plaintiff States would also disclose their affiliations with

23   competitors or complainants of Google.

24             And as we told the Court we would, we have had many

25   discussions about this.  We have not been able to reach

1   agreement.  So those two issues are outstanding.  I can go

2   into them if you would like.  I can go into each one of them

3   briefly.

4           There is now a third issue, however, and I'll let

5   counsel take that up, which the Plaintiff States after the

6   last hearing have now asked us about, proposed to us, which

7   we do not agree with.  And essentially the Plaintiff States

8   have asked for a provision in the protective order that we

9   believe essentially is a do-not-break-the-law provision that

10  isn't appropriate for a protective order that doesn't have

11  any basis for it and that we think is unwarranted.

12          But if the Court would permit it, I can briefly go

13  into the two issues and our position on those two issues, and

14  then counsel will certainly give the plaintiffs' position.

15          So the two issues we have, we think, as the Court

16  commented at the last hearing, the disclosures to -- right

17  after this lawsuit was filed -- to the national media,

18  counsel for a robust -- in fact, I think in the Court's

19  words, a quite robust protective order here.  And so what we

20  have is an additional provision that we think would be

21  preventive, that would discourage recipients of confidential

22  information from thinking about, for whatever reasons they

23  may have, breaching the terms of the protective order.

24          The significance of that, especially in a situation

25  like this, is there is going to be a tremendous amount of

1    highly confidential information exchanged between the

2    parties, and it's not just going to be Google, so there will

3    be third parties.  This is an antitrust case, and competitive

4    information will be exchanged that needs to be -- that will

5    be produced voluntarily in some situations, involuntarily in

6    others, that needs to be produced with the utmost care and

7    with the certainty that there will not be further

8    disclosures.  This is not about what happened in December, as

9    much as what's going to happen over the next 12 to 24 or

10   36 months.

11           And this provision of identifying the recipients

12   before they get confidential information is hardly a new one,

13   as we -- I believe the Court may recall, at the last hearing,

14   I explained that what we were proposing was a template

15   provision in the Western District.  Every case, every civil

16   case, patent or otherwise, has a provision that says before

17   you give your outside experts and consultants highly

18   confidential information from the other side, you have to

19   identify that person to the other side.

20           And every one of these -- and that Western District

21   provision, and every other type of protective order that has

22   this, does it for a reason.  It's because the producing party

23   is in the best position to raise a concern, an objection,

24   ahead of time before the recipient, before that outside

25   consultant or expert, receives this confidential information,

1    so that extra steps could be taken.  It could be nothing more

2    than simply making sure that that expert or consultant has no

3    question about the strictures of the confidentiality, or even

4    maybe have -- potentially has to have additional

5    confidentiality commitments made.

6           But the reason why that disclosure to the

7    adversary, to the producing party, is made is because that

8    party is in the best position to know where there's going to

9    be concerns.  It's not just the Western District, as the

10    Court may have seen this morning.  And I know the Court is

11    very diligent about reading your filings.  I don't know how

12    you could have read it this morning, but we actually filed

13    something this morning that lays out both sides.

14           So when the Court gets back to your chambers and

15    you have an easy 45 minutes to read, which I know you don't

16    normally have, both sides filed a joint status report on the

17    protective order.  And so what we have teed up is these very

18    issues that counsel and I will talk about, so that you can

19    give us your guidance because we have reached an impasse.  We

20    can't work this out.  So what you are getting now, Your

21    Honor, is a preview of what you're going to read.

22           THE COURT:  Well, I have not had time to read it,

23    and so you anticipated what I would likely have been asking

24    the parties to submit, so I'm glad it's already been

25    submitted.  So we can review that and then potentially, if

1    needed, have further discussion with the parties before

2    making a call on what the protective order is going to look

3    like.

4            MR. YETTER:  And so with that, Your Honor, if I

5    might make a suggestion, because I know the Court's schedule

6    is always very busy.  Both sides -- this is a joint status

7    report.  We've been working for a couple of weeks now on it.

8    Our -- the Google position is there, the States' position is

9    there on these three issues that I have been talking about.

10   I'm happy to deal with them all.  But maybe you don't need as

11   much of a preview as a chance to read the submission, and

12   then maybe you call us back in, Your Honor, at your

13   convenience, and we will have this very discussion again and

14   we can get into the details.  But at that point, you'll be up

15   to speed on where we're at.

16           So I'm happy to give you more of a preview, or we

17   can let you read and then we'll come back and argue it.  It's

18   up to the Court.

19           THE COURT:  Well, I wouldn't mind a preview at this

20   point, but let me just see if our court reporter needs a

21   break here before we do that.

22           (Court conferring with the court reporter.)

23           THE COURT:  All right.  So I think what we may do,

24   because I think it might be helpful in terms of just

25   efficiency, if you will both be able to give me a preview,

1   then between that and reviewing what's been submitted today,

2   I may not need to call you back.

3          So let's just take like about a ten-minute break,

4   and come back and we'll hear more on this.

5          MR. YETTER:  Thank you, Your Honor.

6          THE COURT SECURITY OFFICER:  All rise.

7          (Recess taken.)

8          THE COURT:  All right.  Please be seated.  We're

9   back on the record in 4:20-cv-957, State of Texas, et al

10  versus Google.

11         When we left off, Mr. Yetter, I think you were

12  going to lay out Google's position on a couple of these

13  points regarding the proposed protective order.

14         MR. YETTER:  Yes, Your Honor.  I believe the filing

15  this morning is Docket 81, so it should be the newest filing

16  in --

17         THE COURT:  Docket 83.

18         MR. YETTER:  83, excuse me.

19         So the two points that Google has raised is, one --

20  they're both disclosure points -- one, identity; and, two,

21  affiliation.  So for the identity point, what Google is

22  proposing is that this protective order have in it all --

23  already it has it in by agreement that all outside

24  consultants and experts have to sign essentially a

25  certification; it's an appendix that says I've read the

protective order, I agree to abide by it, I'm subject to

enforcement by this Court of any breaches.  That's already in

the protective order; that's agreed.

What we're proposing is that each side exchange

those signed certifications before they allow confidential

information to be provided to that outside expert or

consultant.  And the reason for that, Your Honor, by giving

an identity, then the producing party has an ability -- and

this would be the same for third parties -- they have the

ability to speak up to say I have a concern; and if it's a

serious concern, to even bring it before the Court.  I have

an objection to this particular person because I, as the

producing party of confidential business information, happen

to know or strongly suspect that that particular individual

who is about to get my confidential information works for a

competitor or works for a litigant against us, or some -- has

some reason that they -- that would increase the risk of

misuse of the information.

And that is not something that we made up, frankly.

Google didn't propose it in the Search cases because when

that protective order was negotiated, there had been no

disclosures to the New York Times and to the Wall Street

Journal; that happened literally days after the Search order

in D.C. was signed.  But we're proposing it here because we

think it will have the preventive effect, it will have a

1    prophylactic effect.  And as I said, it's not our idea.  This

2    is common.  It's common in the Western District for all civil

3    cases, and it's common in this district, Your Honor.

4          Chief Judge Gilstrap, as the Court probably knows,

5    in patent cases, has a standard template protective order,

6    and everybody in patent cases in his courts and in a number

7    of other courts in this district, including many of the

8    magistrate judges, have an obligation to get that what they

9    call an undertaking.  The certification is signed by the

10   outside expert or consultant.  And before giving that

11   consultant or expert confidential information, they have to

12   identify it, provide it to the other side, the producing

13   party, along with some other things that I'll get to in a

14   minute.

15         Now, the State of Texas has said, oh, wait a

16   minute, there are rules for when a litigant has to disclose

17   their testifying experts and there are rules that allow a

18   litigant to keep secret their nontestifying consulting

19   experts.  And so by proposing -- making this proposal, we,

20   the Plaintiff States, would be hamstrung, our litigation

21   strategy would be compromised if we have to tell Google, or

22   Google has to tell them, about the outside consultants or

23   experts before they get confidential information.

24         The reality is, yes, in that respect, that

25   disclosure would mean you have to identify testifying experts

1   earlier, and identify consulting experts if the party wants
2   them to get highly confidential or confidential information.
3          And the tradeoff, Your Honor, is because in some
4   situations, there is such important competitive information,
5   like I think most practitioners would agree, in all patent
6   cases there is a concern that patent information could be
7   used by an adversary's patent prosecutors to -- for business
8   reasons.  And in certain commercial cases, competition
9   cases -- antitrust cases being, at least I would submit, high
10  on that list -- there is a concern that competitive
11  information could be misused either by the plaintiff or third
12  parties or by some other parties in the case.
13         So the States have pushed back very vigorously that
14  they're not prepared to waive their right to keep their
15  consultants secret and to delay disclosing their testifying
16  experts.  The reality, though, Your Honor, is that this --
17  these very States, including the State of Texas just a couple
18  of years ago, have entered into exactly this kind of
19  protective order.
20         And what we provide in the update, in the status
21  report to the Court, are the forms, really three basic
22  precedents that we provided to the Court:  The Western
23  District template, Chief Judge Gilstrap's patent protective
24  order template; and by the way, this Court and Judge Mazzant
25  have entered protective orders in this division that have an

1      advance disclosure requirement as well; and then thirdly, a

2      protective order that the State of Texas and other states in

3      a multi-district litigation against the United States

4      Government entered into just two years ago -- two years and

5      three or four months ago, in the Northern District of

6      California.  And in that protective order, which we summarize

7      for the Court on an exhibit to the status report -- well, we

8      excerpt it, we take out this particular clause -- it has the

9      very same advance notice.

10             The second objection or the second compromise that

11     the Plaintiff States have emphasized is they said, well, it

12     really shouldn't be the producing party who polices these

13     certifications, it should be the Court and the Court staff to

14     police it.  And our response to that was that's not feasible

15     because the Court and the Court's staff has neither the

16     resources, nor the time, nor frankly the interest, to be

17     figuring out, from these certifications, does this disclosed

18     expert or consultant present a risk of misuse of confidential

19     information.

20             The Plaintiff States have said, we'll provide all

21     of the signed certifications to the Court, to Your Honor,

22     under in camera so that Google doesn't see them.  And then at

23     that point, the Court would do nothing with them except keep

24     them there.  And if there's a breach, we at least would be

25     able to go to Your Honor and have you give us the signed

1    certifications, presumably.  Although, the Plaintiff States

2    today are objecting to that very relief that we asked for

3    from the December disclosures.

4         The problem with that is that that's relief once

5    the cows are out of the barn.  And what we're looking for is

6    a provision that helps us prevent future disclosures.  And so

7    while remedying a breach is important, we prefer to prevent

8    them in the future.  And we do believe that if both sides

9    have the ability to police, to monitor, to speak up, if there

10   is an issue with a potential disclosure to a potential

11   outside expert or consultant, then that would be another step

12   forward in ensuring that this highly confidential information

13   produced by the parties and by third parties is kept

14   confidential as everyone agrees they should be.

15        One last point that the States have brought up that

16   I should mention before I move to the next disclosure request

17   that we're making is that, respectfully, reflects the problem

18   that we have.  So in December, when the draft Texas complaint

19   was disclosed -- a portion of the unredacted complaint was

20   provided to the New York Times and the Wall Street Journal,

21   both of which are very big publishers that had been adverse

22   to Google in the past -- everyone agreed it was a significant

23   issue and that it had come from the investigative side of the

24   investigating States.

25        Google never saw the draft complaint, they never

1  had access to it.  We still have never seen it, so it

2  couldn't have been from us.  And despite that, we got push

3  back from the Plaintiff States as we tried to investigate it.

4        One simple question we asked was who, Texas, did

5  you allow to see the draft complaint?  And Texas simply said

6  we're not going to tell you.  We're not going to tell you who

7  the states or territories are that we gave access to.  They

8  did say there was 35 of them out of 51.  But we're not going

9  to tell you who.  We're not going to tell who the outside

10  consultants or experts were; that's not for you to know.

11        Today -- and we still don't know, even today.  And

12  we've asked again, would you tell us who those were.  So we

13  sent letters, two letters, to every one of the 51 states or

14  jurisdictions that were in the multi-state investigation.  We

15  got responses from many, but not all of them.  In fact, we

16  didn't get responses from some of the Plaintiff States in

17  this case, from three of them, until last night after we

18  circulated our draft status report.

19        But what has now come up and what the States are

20  now suggesting, which as I said reflects our problem here,

21  Your Honor, and why we think this protective order needs to

22  be robust, is that the States are now suggesting that it

23  wasn't them at all; it wasn't anyone on the investigating

24  States' side; and that it was perhaps some sort of a

25  SolarWinds-type hack; that some Russian hacker, for whatever

1    reason, would go in and find the State Texas draft complaint,

2    and take ten pages out of the middle of the complaint and

3    send it to two major publishers, the Wall Street Journal and

4    New York Times.  And so it's not the States' faults -- fault

5    at all; and for that reason, the protective order needs no

6    further protections of confidential information.

7            The information that was disclosed in December

8    wasn't just Google's, it was also third-party information.

9    So with respect, we don't think there's any -- we don't think

10   this new approach of denying that the disclosures even

11   happened, that the breaches even occurred, is an answer to

12   the fact that we need protections.  And we're asking for two

13   reasons.

14           The second one, very briefly, Your Honor, as I

15   already mentioned, first, the identities, and then second --

16   that would be reciprocal -- and then, second, for the experts

17   and consultants that the Plaintiff States retain, that they

18   disclose whether they have an affiliation with a defined list

19   of Google competitors or complainants in the ad tech,

20   advertising technology, business focused on what we believe

21   is the relevant scope of this case, so that we will know, as

22   they provide those disclosures, who the person is and whether

23   they have -- for example, whether they are working for one of

24   the ad tech competitors of Google.  We can say, then, Your

25   Honor, we have a concern.  We would like to raise an

1    objection or we need extra protections or, frankly, we don't

2    think that person should get access to our data at all, given

3    the risks.  We've suggested that.

4           We will say that other courts have similar

5    requirements.  Chief Judge Gilstrap's template protective

6    order in patent cases requires that a curriculum vita, a

7    resume, of each of the potential recipients of confidential

8    information be provided, and others have similar

9    requirements.  And all it simply does, Your Honor, is it

10   helps the recipient, the producing party, to understand is

11   there a particular concern here with this expert.

12          We think if identities are disclosed, which is a

13   very simple level of disclosure, that the extra affiliation,

14   which we would narrow down to a very defined list that can

15   simply be read and checked off by the potential expert or

16   consultant, would not be particularly onerous.

17          Last point on these two issues, and then I'll let

18   counsel raise their issue, is that these -- this is not meant

19   to limit who the Plaintiff States can hire.  This is meant to

20   make sure that we don't have further disclosures in the

21   future.  This is designed to make sure that if there are

22   risks, that we raise them beforehand so that we don't have a

23   disclosure, we don't have misunderstandings, so that

24   confidential information in this case can be shared promptly

25   and with confidence that it's going to be kept confidential.

```
 1              If plaintiffs wish to have a secret consultant that
 2      they never tell a soul about, they simply have -- they simply
 3      need to make the choice not to provide them confidential
 4      information of Google or third parties.  This is as much of a
 5      protection for Google as it is for third parties and as it is
 6      for the States, assuming that the States have confidential
 7      information to propose.
 8              In this situation, I don't think the States believe
 9      that their ox is being gored, because they're not providing
10      confidential information, they're gathering it from others.
11      And so their interest in protecting it perhaps is less, and
12      their interest in litigation, strategic litigation
13      advantages, perhaps is more.  Thank you, Your Honor.
14              THE COURT:  Thank you, Mr. Yetter.
15              Mr. Lanier?
16              MR. LANIER:  Thank you, Your Honor.  I think it's
17      good afternoon at this point.
18              Your Honor, I listen to this and I'm concerned.
19      I'm concerned because the idea that an unredacted complaint
20      was leaked, which is the way it was first vocalized today and
21      has been repeated, is itself not anything that we're certain
22      is true.  What is true is that there was an unredacted screen
23      shot of a page of a complaint, and we know about that from
24      the New York Times and the Wall Street Journal.  And we
25      discussed that before you last time.
```

1          We've continued our investigation.  We certainly

2     did not leak it.  No State of Texas employee has leaked it

3     that we've been able to determine or even reasonably think

4     of.

5          But what Google has done is tried to use that as a

6     lever to get an unfair advantage not just in this litigation,

7     but in broader litigation throughout the United States.

8     Because if you listen in detail and look in detail at what

9     they're asking for, they're asking for any expert that we may

10    use to consult simply as a consulting expert, to look at

11    code, to look at whatever they may -- at analytics, to look

12    at whatever they may need to look at.

13         If that expert is also consulting in an

14    investigatory action where another governmental entity is

15    looking at an investigation, or a private plaintiff is

16    looking at an investigation or, heavens, a foreign nation is

17    looking at an investigation -- if that person is consulting,

18    Google wants that consultant to have to disclose to Google

19    that they're consulting on other potential litigation that

20    may one day be filed or not be filed, that they're consulting

21    on investigations that may or may not be ongoing, to which

22    Google has no right to know.  And it either intrudes upon

23    those other cases unfairly and unjustly or it limits the

24    field of experts that we're allowed to consult with.

25         To wear the guise of there was an unredacted leaked

1    page, therefore, Google's entitled to this information, is an

2    attempt to lever something which just isn't proper.  To wit,

3    I offer the following responses.

4           Number one, on the Western District protective

5    order form, there is a difference.  And I would urge this

6    Court, if the Court is going to be persuaded by the Western

7    District, there is a difference between Western District form

8    and Western District practice, at least so far as I've ever

9    been involved, and I believe with others, based upon our due

10   diligence work that we've done to this point in time.

11          Both the Western District and the Fifth Circuit

12   have said that parties need not disclose the identity or

13   opinions of nontestifying or consulting experts.  And I think

14   that's true and accurate.  So the idea that the Western

15   District should dictate this simply off of their form, then I

16   would say look to their practice if you are so inclined to be

17   persuaded by them.

18          Point number two.  Judge Gilstrap does have a

19   patent order which has in its standard form a disclosure of

20   experts, not with all of the extra data per se.  But that's

21   only in his patent order, it's not in his nonpatent order.

22   It would not apply to this case, if we were in Judge

23   Gilstrap's court, unless he chose to extend it.

24          Now, I haven't had an antitrust case in his court

25   before.  The last antitrust case I had in the Eastern

1    District was back when Judge Folsom was on the bench.  But

2    certainly in Judge Folsom's court, we weren't required to do

3    this.  That reference of that case was Becton Dickinson --

4    actually, it was *Retractable Technologies v. Bectin*

5    *Dickinson*.  And we certainly didn't have this requirement in

6    that court.

7            Point number four, or three.  We have suggested an

8    in camera tender of whatever you think is important.  And

9    while Mr. Yetter says that an in camera tender isn't adequate

10   because you don't have enough manpower to do the policing

11   job, he says it in the same time where he says this won't

12   take any big deal, it's just check off a list and see if

13   there's a concern.

14           Now, is his concern an improper leak or is his

15   concern getting insight into who the experts are?  Because if

16   his concern is an improper leak, you've got all the power and

17   authority there is.  And, ultimately, it's not going to be

18   anything that Google can do; they have no authority and no

19   power over an improper leak.

20           If they see our experts that are consulting only

21   and they get that insight into them, or if you read it as

22   they've written it, they find out, oh, Lanier's going to mock

23   try this case or he's going to have a jury consultant who is

24   going to look at this, that, and the other, and they get that

25   data, what are they going to do?  Are they going to tell me

1   I'm not allowed to hire that person?  Well, they can't do

2   that.  Are they going to come to you and say, don't let

3   Lanier hire this person?  And you're supposed to be in a

4   position then of saying, oh, wait a minute, maybe Google

5   doesn't like this person's other work, so you can't hire him,

6   Mark?  Or are they going to come to you and say, we're real

7   suspicious about this person, so will you really put the

8   hammer on 'em and put something really restrictive down like

9   a computer tracer on their computer?  You're not going to do

10  that either.

11      All the enforcement is yours.  You've got the only

12  enforcement power, but you've got it.  And if you find

13  someone's violating your protective order you've signed, you

14  can send them to jail, you can fine them out the wazoo.

15  You've got all the power in the world, but it's yours.

16      And so we offered, as a compromise, to avoid this

17  hearing, that we will submit in camera to you signed, sealed,

18  and delivered CVs; as much, as little, data as you want with

19  anybody who is going to see anything confidential or highly

20  confidential.  And we think that resolves everything without

21  giving an undue advantage to either side, because both sides

22  can do the same thing.

23      So we believe the solution to be the power of the

24  Court.  We think that everything else is unfair, unnecessary,

25  and is a levered attempt to get an advantage in the

1   litigation that they shouldn't get.

2              THE COURT:  Let me ask you two quick questions --

3              MR. LANIER:  Yes, sir.

4              THE COURT:  -- before you wind up.  The first is,

5   as I understand what Mr. Yetter is suggesting, the purpose

6   would be that the information on an expert or whoever that is

7   going to get the information, is going to be disclosed to the

8   other side, I suppose, with some sort of sufficient time

9   built in that if they had a concern, they would raise it with

10  you.  And if you couldn't resolve it, they would raise it

11  with the Court, and I suppose the request would be, please

12  prevent plaintiffs from sharing this information with this

13  individual or this entity for X, Y, and Z reasons.  Is that

14  generally -- is that your understanding of what's being

15  proposed?

16             MR. LANIER:  I think that's exactly what's being

17  proposed.

18             THE COURT:  All right.  And so the second question

19  is you've talked about some of the justifications that Google

20  provided for entering that type of protective order,

21  including the Western District practice, and the Eastern

22  District or other districts, but he also mentioned that he

23  felt the State of Texas had entered similar agreements in

24  other cases.  And I wanted to get your response on that.

25             MR. LANIER:  Your Honor, I think he's suggesting

1  the *Affordable Care Act* case that Texas agreed to disclose

2  experts, and that's certainly a different case.  It's

3  certainly got different parties.  It's -- and by that, I

4  don't mean the State of Texas is different, we are not, but

5  what I mean is the defendants are quite different.

6         Google is a data mining company.  We google things

7  because they have mined data.  Their Gmail accounts are set

8  up with an ability to mine data.  Judge Koh expressed great

9  concern, in the Northern District of California, at a hearing

10  just a few weeks ago that was reported in Law360 -- I wasn't

11  at the hearing, but she quoted that she was, quote, deeply

12  disturbed by the Google lords tracking her court site.

13         And this is a different situation which calls for a

14  different approach by the State of Texas.  I mean, I've

15  probably got a boatload of cases where I may not mind a

16  mutual disclosure of experts.  But in a case like this, we

17  absolutely oppose that.

18         Now, the other side of the coin, though -- you

19  asked me a very good question, but there is another side to

20  it.  And the other side to it is why didn't Google require

21  this in the DOJ case?  They negotiated that protective order.

22  They didn't require it there.  They didn't require it in the

23  Colorado case, though that was a negotiated protective order,

24  also.  And their answer is, well, but we didn't have the

25  leak.

1          This is not about a leak when they're making the

2   argument Mr. Yetter's made to you of let's find out who the

3   experts are because if we don't like that expert having

4   access to our information, we want to be able to strike the

5   expert.  That's why I say that the leak is a lever to try to

6   get you to enter a protective order that they've said they

7   don't need in the DOJ case, that they don't need in Colorado.

8          So I think that it's an issue of looking at Texas.

9   Texas did agree to it in the *Affordable Care Act* case, but

10  those are different parties and a different case.  And if the

11  parties agree to waive that confidentiality, God bless them,

12  let them go straight.  But we won't make that agreement here

13  because we think here, in this case, against the data mining

14  company, it gives them a substantially unfair advantage

15  against us.

16         We believe it will also inhibit a number of our

17  experts from even working in the case.  Because if an

18  expert's working in another investigation, let's say there is

19  a case looming out there -- and I've got one that comes to

20  mind, simply because they've asked if we can share an

21  expert -- and that case I won't even say, give a hint of,

22  what it is.  But I'll tell you that if the expert has to

23  disclose, oh, yes, I'm also working in another case on behalf

24  of these plaintiffs and investigating Google for this, that,

25  or the other, that expert will flat shut the door to us.  And

1   yet, we need that expert to help us navigate through the

2   labyrinth of data and information and processes that make

3   Google what it is, and that form the basis of this complaint.

4         And so I think in short, this is an unfair

5   advantage.  I think it's an advantage they don't need.  I

6   think it's an advantage that is hiding under the illusion of

7   some unfortunate wrongful disclosure of a screen shot of

8   confidential information in a case, in a complaint.  But I

9   don't think anybody's insinuating that an expert did that.

10  And I don't think that even the investigation that Google's

11  done has been very in depth, because we know there are a

12  number of names we've given them that have not been

13  investigated by them, of people who saw the complaint.

14        And the three that didn't answer until late last

15  night is because -- those three Plaintiff States is because

16  Google didn't tell us until recently that those had not

17  answered.  And so we sent out an email, please answer.  You

18  had asked us to put together a network to deal with these

19  issues.  We've done that, and this was part of the network.

20  And we got them the answer almost immediately once they told

21  us they had not heard from those states.

22        So the last point that Mr. Yetter left for me to

23  cover was what we had asked for in this case, and we had

24  asked for a protective order that stops Google from

25  data-mining anybody associated with the plaintiffs' team.

1    And Mr. Yetter previewed his argument to that by saying that

2    basically Mr. Lanier is just saying, um, don't do something

3    illegal.

4         But I will tell you that the argument that Google

5    made in the Northern District case that I was referencing

6    before, in front of Judge Koh, that as written by Law360,

7    quotes Google's counsel in that case, Stephen Broome of Quinn

8    Emanuel, argued that Google tracks users in order to serve

9    clients who use Google analytics on their websites; and,

10   therefore, Google's activity is shielded from Wiretap Act

11   violations under the ordinary course of business exemption.

12        So if Google data-mines and believes they're

13   shielded from the wiretapping clause because of that, as

14   represented by counsel reported by Law 360, but put it in

15   quotation marks, if in fact that is the position of Google,

16   then all we're asking for is please say that you will not

17   data-mine on any of the plaintiffs in this case, or any of

18   the witnesses in this case, or any of the experts.  And

19   that's our request, and it's one that they won't agree to do.

20        And so those are the issues as seen from the State

21   of Texas.  And I thank you for giving me this time.

22        THE COURT:  I have -- Mr. Lanier, I have one more

23   question for you, and I'm going to follow up with Mr. Yetter

24   on this briefly.

25        Coming back to the disclosures with regard to

 1    individuals receiving confidential information and this

 2    affiliation issue, I want to make sure I understand what that

 3    additional requirement looks like.  It is a disclosure of

 4    affiliations.  I understood Mr. Yetter to be talking about

 5    affiliations with competitors or something like that, as

 6    opposed to people affiliated with investigations from their

 7    governmental entities.

 8              MR. LANIER:  Your Honor, they've asked for signers

 9    to disclose three things.  Number one, competitive relations,

10    which is what you've understood Mr. Yetter to say.

11              Number two, any involvement in adverse litigation;

12    that would include as a consultant that doesn't have to be

13    listed, for example, under the DOJ protective order.  So if a

14    consultant's working for us here, they've agreed DOJ doesn't

15    have to disclose it.  But if that consultant's also working

16    for the DOJ, then it will have to be disclosed here, and it's

17    a way around that DOJ protective order.

18              And then the third are people involved in any

19    investigation.  So it doesn't have to be active litigation,

20    it can be pre-litigation stage, and that will give them

21    insight into that.

22              Those are the three areas that they have asked the

23    signers to disclose, Your Honor.

24              THE COURT:  And so the last followup I have for

25    you, and for Mr. Yetter, is that he had also mentioned what I

1  suppose is an alternative in terms of that additional

2  information.  He spoke about individuals who would be

3  receiving that information providing a CV.  Now, a CV might

4  very well not have that kind of information included in it,

5  it would have the things we typically see in a CV included in

6  it.

7          I suppose I know the answer to this.  I know that

8  the States generally are still not comfortable with that,

9  but -- or would the States be more comfortable with that?

10          MR. LANIER:  Your Honor, I guess, I mean, that's --

11  would we be more comfortable if it would be a number 10 on

12  the FBI's most-wanted list than number 5?  Yes.  But we would

13  not be very comfortable with it regardless.  I guess it would

14  be more comfortable.  We would certainly love to give that in

15  camera to you.  That would not be any problem at all.

16          We'll give you anything in camera on any of these

17  people in any way, shape, form or fashion they want, as long

18  as it's in camera.  And if you deem it one where you believe

19  it's important that Google have it, and we look at it in

20  detail, then we can have a hearing, we will argue -- you have

21  all the power in the world, and we have all the confidence in

22  the world.

23          THE COURT:  All right.  Thank you, Mr. Lanier.

24          MR. LANIER:  Thank you, Judge.

25          THE COURT:  So, Mr. Yetter, I have a follow-up

1    question for you that's raised by what your friend on the

2    other side was just saying, which is that if there had been

3    no leak in this case, in this case would Google be seeking

4    these protections regarding this order?

5            MR. YETTER:  Your Honor, I think absolutely we

6    would not, because we negotiated a protective order in the

7    Search case without these protections, but it was literally

8    days later that there was a leak here.

9            And if I could correct the very able arguments of

10   my -- of my colleague, it wasn't just a screen shot.  And

11   we've never seen what the New York Times or Wall Street

12   Journal got, but what they published in the newspaper was far

13   more than just one page.  It was, as best as we could tell,

14   ten pages out of the middle of the draft Texas complaint that

15   had confidential information on both Google and third parties

16   in there.

17           Now, what I didn't hear counsel say, and maybe

18   they're not pursuing that argument anymore, is that this

19   somehow was a Russian hacker that got in there.  This had to

20   have come -- this disclosure had to have come from someone on

21   the investigating States' side, and it had to be from one of

22   the 35 states or territories that Texas had told us had

23   access to the draft complaints.

24           Now, what the State hasn't told us, and what we

25   don't know, is that how many of the consultants got access to

1    the draft Texas lawsuit.  And we have to believe -- that's

2    why they hired them -- that many of them, if not all of them,

3    have it.  And that's the issue here, Your Honor.

4         So what counsel's talking about, why are we focused

5    on experts and consultants, well, they're the ones that can

6    have mixed agendas, mixed allegiances.  The employees of

7    the -- I'll just pick Texas as an example -- the Office of

8    the Attorney General, their allegiance is just to the State

9    of Texas, their job is to work for them, but consultants can

10   work for lots of people.

11        And one of the things we know in this case, Your

12   Honor, and this is in the report, you'll see more detail on

13   it, one of the consultants that Texas hired worked at length

14   and very publicly for News Corp, the parent company of the

15   Wall Street Journal, which has been over the years a very

16   vocal, publicly vocal, opponent and a very big publisher

17   against Google.  And that is exactly the sort of consultant

18   that we would have raised a flag and said this is a problem.

19        So what we're suggesting -- and I agree a

20   hundred percent with what counsel just said -- is this Court

21   holds all the power to punish a breach, but we would much

22   prefer to prevent a breach than punish one.

23        And so the alternative that they suggest that

24   somehow this, Your Honor and your staff would have to be

25   sifting through resumes of experts and consultants to see if

1    something bothers you about that consultant, that that

2    consultant may have a mixed allegiance, a mixed loyalty, that

3    could raise the risk of misuse, is not a workable

4    alternative.

5           Now, if the Court wants to limit this to outside

6    counsel for -- on both sides so that counsel can raise

7    concerns, that would probably be a fine compromise there.

8    But it doesn't make sense for the Court to have to police

9    issues that the Court just doesn't have background on.

10          Now, as a producing party -- now, these protective

11   orders are protective orders in the Eastern and Western and

12   Northern District, they protect the third parties as well.

13   And so if you're going to give third party data, you have to

14   give them advance notice.  And so the protective orders are

15   more -- this advance disclosure is more than just protecting

16   Google; although, that's what we're here on behalf of.

17          Now, as the Court asked the question, you give some

18   advance notice, in the Eastern District it's ten days; in the

19   Northern District, that *Affordable Care* case that Texas

20   agreed to the very advanced disclosure that we're asking

21   about just two years ago, it was five business days; in the

22   Western District it just says advance, prior to disclosure

23   you have to provide the notice.

24          And the point of that is simply this.  The

25   producing party is in a better position to raise an

1    objection.  Raising an objection, the Court could say I'm not

2    concerned about that objection, or impose some additional

3    restrictions.  But the point is let's prevent disclosures,

4    not punish breaches, and that's what we're trying to --

5    that's what we're suggesting here, Your Honor.

6            Just, if I may, a couple of responses to what

7    counsel argued.  This is not about jury consultants.  If we

8    want to take jury consultants off the list, I'm fine with

9    that.  We can -- this is not who we're worried about.  I

10   don't believe jury consultants is the issue; it's outside

11   experts and consultant who work for others in the industry.

12           Now, one of the things that counsel brought up that

13   these consultants may be working for someone else that's

14   about to bring a lawsuit against Google, that's exactly the

15   situation that would warrant heightened protections.  Because

16   one of the things that the -- we agree on a lot.  One of the

17   things the parties agree on is that whatever information is

18   disclosed and exchanged in this case stays in this case and

19   cannot be used for other cases or other matters, or certainly

20   for business matters.

21           And so if one of these experts or consultants that

22   the State of Texas or the Plaintiff States decides to hire is

23   working for another potential litigant against Google, that

24   raises exactly the risk of misuse that we're focused on; and

25   at a minimum, that expert or consultant should disclose that

1    we believe, to Google or to the producing party so that we

2    can raise it with the Court if we have a concern.

3            But it's the additional risk that we're focused on

4    here, Your Honor.  If a consultant or expert has another

5    agenda or loyalty that could raise the risk of misuse, this

6    would show it, this would -- maybe not perfectly, but this

7    would be a step in the right direction.  That's why we're

8    asking for it, Your Honor.

9            And this, counsel's suggestion that this is all

10   about somehow compromising the Plaintiff States' litigation

11   strategy is off the mark because this is a mutual exchange of

12   information.  They would learn about our outside consultants

13   and experts just like we would learn about theirs.  They

14   would have the ability to object to ours just like we would

15   have the ability to object to theirs.  Neither side gets an

16   advantage, certainly not an unfair advantage.  No more than

17   when the State of Texas agreed with the DOJ in the *Affordable*

18   *Care Act* case that they would exchange experts and

19   consultants.  No more than in every one of Judge Gilstrap's

20   patent cases does one side get an unfair advantage over the

21   other.

22           And the reason I would suggest that patent cases

23   have it as a standard in the template is because of what I

24   mentioned earlier.  Patent cases have this very important

25   inside technical information, source code, things like that

1   that could be misused.  Not every civil case has that.  A

2   breach of contract case doesn't raise that risk.  A

3   competition case, an antitrust case, which involves discovery

4   from competitors and potential competitors and other parties,

5   involves that very risk.  And that's why in this case it's a

6   reasonable, limited, and appropriate additional protection

7   given the what was once an admitted breach that has already

8   occurred.

9            Counsel raised the one last issue.  And I wasn't

10  entirely clear what he was suggesting, but he criticized

11  Google as some sort of a data mining company.  And we've seen

12  lots of references to that by the Plaintiff States in the

13  media in the weeks since this case has been filed.  And as

14  such, counsel seemed to suggest, well, we would agree to an

15  advance disclosure provision in a protective order with other

16  litigants but not with Google, as if the disclosure of the

17  breaches in this case came -- that have already occurred were

18  from Google's side and not the Plaintiff States' side.  And

19  that couldn't be farther off the mark.

20           There is no question that Google has privacy

21  policies and disclosures that it gives to all of its

22  customers, and tells them exactly what information Google

23  collects, for the customers' use or the customers'

24  protection, or for advertising purposes, or to make their

25  products better.  There not a single reference anywhere,

```
 1   and the plaintiffs do not provide this, that Google has any

 2   right to somehow gather -- target, gather, and use

 3   confidential communications of their adversaries in

 4   the courtroom.  And that's what the request that the States

 5   have now made, we believe not for out of their own legitimate

 6   concerns, but really to -- perhaps for media concern, media

 7   efforts, to aggrandize their position, to denigrate Google,

 8   to make a splash.

 9           One of the things that the Court will see in the

10   status report is after the last hearing where this whole

11   issue of data mining was first broached by counsel, State of

12   Texas had a series of press conferences right after the

13   hearing ended, and this topic of Google data mining and

14   searching emails of litigation adversaries, and how the State

15   of Texas has told its lawyers don't use Gmail during this

16   case, they went over and over it again.  And respectfully,

17   Your Honor, they have given no evidence to the Court or to

18   us.

19           Because we've asked them over and over again where

20   does this come from?  Why are you demanding this?  Now that

21   there's been a breach that came from your side, now that

22   we've got a protective order and you're trying to avoid

23   additional disclosures, why are you asking for this provision

24   that essentially accuses Google of spying on its litigation

25   adversaries?  On what basis do you have?  And we've gotten
```

1   none.  And, respectfully, we don't think it's a legitimate --

2   frankly, it's an outrageous request.  We don't think there is

3   any basis for it, and we've responded to it in the papers.

4        So to boil it down, Your Honor, what we think, this

5   is the kind of case, given the stakes, given what the

6   plaintiffs themselves have said are the importance of this

7   case, the competitively sensitive information that's going to

8   be exchanged, we need a robust protective order, we need more

9   than the standard protective order which we already had in

10  place before the last disclosures and breaches.  And these

11  two provisions, whether it's a resume or disclosure

12  affiliations, these two provisions are both reasonable and

13  targeted and help -- and we believe will help prevent

14  disclosures and breaches in the future.

15       If the Court has any questions, I'm happy to answer

16  them.

17       THE COURT:  No.  Thank you, Mr. Yetter.

18       Mr. Lanier, if you have any last comments, you can

19  make those at this time.

20       MR. LANIER:  Thank you, Your Honor.  I'll be brief.

21  I appreciate your patience.

22       Number one, it's important the Court know, and

23  we'll put it on the record, the breach that's been alleged

24  and apparently happened was not a breach from a consulting

25  expert.  Our experts had not been provided Box reader.  So it

1   had to be one of the States that were provided it to see if

2   they had come into it, or some type of a hacker.

3          I don't know all of the mysteries of hacking, and

4   it seems almost TV-ish, but I do know that Jones Day has been

5   reportedly recently hacked and that a number of their

6   briefing ended up on the web.  It's not unheard of.  It

7   happens all the time.  I have no clue.

8          This is Google's situation, but this is not a

9   situation where an expert leaked anything at all.  Experts

10  didn't have that Box reader, which is what the screen shots

11  evidently came from.

12         Second point, heightened protection.  You cannot

13  get any greater protection than this Court and the criminal

14  justice system.  And this is not a situation where there must

15  be all of these rogue consulting experts out there who are

16  looking to disseminate to the press or to competition, in

17  violation of a sworn commitment to keep confidential

18  information.  I think most consulting experts take those

19  oaths and that verification extremely seriously, because if

20  the consulting expert is found derelict or unfaithful to that

21  affirmation, it destroys their business.  I mean, they'll

22  never get to work again.  So I think again that's just a

23  lever, that's just an explanation.

24         Point number three.  Mr. Yetter keeps saying that

25  this doesn't give them an unfair advantage because they're

1    willing to do the same thing.  Well, it absolutely does.

2    They don't have experts to designate to us, consulting

3    experts, that are investigating whether or not the State of

4    Texas might be guilty of this, that, or the other.  And so it

5    doesn't restrict their access to the small pool of experts

6    that are truly available out there.

7         But if this burden is put on us, it will restrict

8    our ability to get experts, because there will be a number of

9    experts, several I know of, that will say we're not going to

10   disclose, we're not allowed to disclose, under

11   confidentiality agreements.  We're not allowed to disclose

12   that we're doing investigatory work for plaintiff --

13   potential plaintiff A, B, or C.  So it's not, ah, this is

14   equal playing field for each side; it is not even remotely.

15        And then my last point, and I appreciate your

16   patience as I say, is on the data mining.  The terms of

17   service agreement that Google's entered into with everybody

18   who opens up those accounts and uses Google, give them

19   permission to do it.  And if they don't want to do it -- this

20   isn't about a press conference.  We do -- we're the State of

21   Texas.  We are here on parens patria, and we are a --

22   patriae.  We are here for all of that.  And there are going

23   to be press conferences because that needs to be reported

24   out.

25        But what happens is those press conferences are

1    questions asked by the media.  We don't dictate what they

2    write or what they ask about.  And I'm sure everybody's very

3    interested in this and why Google will not just readily

4    agree:  No worries, no data mining, we'll put it in writing.

5              Thank you, Judge.

6              THE COURT:  All right.  Thank you, counsel.  I'm

7    going to look at the filing in docket 83, and appreciate your

8    arguments on that issue.

9              The last item I want to cover today briefly is

10   related to the protective order in the sense that it is the

11   OGP.  I have a filing that is document 80 from counsel that

12   I've requested concerning your positions on any alterations

13   that might need to be made on our dates or substance of the

14   OGP.  So I have that and appreciate it.  I will say that I'm

15   glad to see that you've agreed on the lot, including dates in

16   the near term.

17             I have reviewed the position of both parties

18   concerning Google's request that there be somewhat of a

19   delay, I suppose, in Google's disclosures or that Google's

20   disclosures come after the State has delivered to Google

21   these investigative materials.

22             MR. YETTER:  We're actually not asking for a delay,

23   Your Honor.  Sorry.

24             We are -- we, Google, are perfectly fine to have

25   our initial disclosures on April 23.  But the Plaintiff

1  States told the Court on February the 4th that they would

2  move with all expediency as quickly as they can to get us all

3  that they have on their investigative materials.  As the

4  Court knows, the States have about an 18-month head start on

5  us.  That's a substantial lead.  And what we're asking is

6  that both sides get to the starting point together.  If I

7  have that much of a lead, I would want the race to be short.

8            And so all we're saying is we ask the States to

9  give us what they said they would, which is their

10  investigatory file.  If they do that this coming week, then

11  we can be on target by April 23rd to file our initial

12  disclosures.  They haven't given us anything so far.  And if

13  they continue to delay, all we're asking the Court is to have

14  our initial disclosures timed 30 days after the States give

15  us the promised investigatory materials so that we can start

16  to cut into that 18-month head start that the States have,

17  and we can get closer to getting to the starting line

18  together.  That's our request, Your Honor.

19            THE COURT:  Right.  And I will hear from

20  Mr. Lanier.

21            Mr. Yetter, one question I had for you is, as I

22  read your position and as you've stated it today, you note

23  that the States have been doing this investigation for some

24  time and so they have, I guess you put it, an advantage on

25  you in terms of starting out of the gate.

1          But two things that struck me are, number one, both

2    sides are going to be able to supplement your initial

3    disclosures.  And my anticipation would be that Google will

4    able to supplement and might have good reason to supplement

5    as and when you receive all of those investigative materials.

6    That was the first thing that struck me.

7          The second is that, and I think your colleague

8    pointed it out earlier this morning, you know, the amended

9    complaint is 450 paragraphs, it's 145 pages, and it's quite

10   detailed.  So from where I sit, it seems like you have a lot

11   of information from the other side regarding the kinds of

12   materials that you would need to make in your initial

13   disclosures, and you will be able to supplement.

14         Now, I agree with you that the State had said it

15   would produce expeditiously all materials that you've

16   referenced, but I do wonder whether we need to necessarily

17   delay these anticipated deadlines if it is taking the State

18   longer or if what we anticipate is Google may need to do more

19   supplementing as it receives more material.

20        MR. YETTER:  Both very good points, Your Honor.

21   Two responses.  Perhaps what we can get from the State -- on

22   February 4th, and I thought very forthrightly, counsel said

23   we are going to go as quickly as we can, we're going to

24   expeditiously give to Google all the investigatory materials,

25   and offered *I want you to follow up with me at every hearing.*

1    So I'm following up with him at every hearing.

2           Perhaps what we can get from the State is a

3    deadline.  We will get you the investigatory materials on X

4    date.  What they have proposed to us is they'll give them to

5    us on their initial disclosures date, which is April

6    the 23rd, which would be ten weeks after they told the Court

7    they were going to give them to us as quickly as possible,

8    and about four and a half months after filing the lawsuit.

9           THE COURT:  Mr. Yetter, have you received any of

10   their investigative file materials at all?

11          MR. YETTER:  Nothing, Your Honor.  Zero.  The

12   reason why we're asking for them now -- and the Court is

13   exactly right.  We could do initial disclosures based on the

14   new complaint, which is different, it is different from

15   the -- they changed a whole bunch of things.  But what we

16   were trying to do is give more helpful, targeted, useful

17   initial disclosures that we felt better about that might be

18   more useful to the other side.

19          Now, again, without the investigatory materials, we

20   will do the best we can.  And if that is what the States

21   insist upon and if that's what the Court thinks is

22   appropriate, we definitely would supplement in the future,

23   and we would do it that way.  But what we're trying to do is

24   get the States to give us that information.  We don't want to

25   be 18 months behind the entire case.

```
 1              I have a very strong suspicion that once this case

 2      gets started, the States will be pushing for discovery very

 3      quickly, and we'll be then dealing with digesting the

 4      investigatory materials, 18 months of them, 3,000,000 pages

 5      of them -- some of which is our material, admittedly -- 64

 6      third-party witnesses, at the same time we're dealing with

 7      what the State has said their first request is going to be,

 8      which was this very broad CID from last summer.

 9              So we would like to just get caught up.  We would

10      like the States to give us that material as quickly as they

11      can.  We're ready to do our initial disclosures.  We think

12      they're going to be more productive and more useful, more

13      efficient, if we at least have time to digest the

14      investigative materials beforehand.  Thank you, Your Honor.

15              THE COURT:  Thank you, Mr. Yetter.

16              So, Mr. Lanier, Mr. Yetter has correctly quoted

17      from our -- from the transcript of the last hearing.  I know

18      that the State had promised to expeditiously produce these

19      materials.  So if it's accurate that none of it has been

20      produced yet to the other side, I will say I'm a bit

21      surprised.

22              MR. LANIER:  I don't think it's accurate, Your

23      Honor.  It has not been produced by us.  It has been produced

24      by DOJ.  DOJ has given them gazillions of the documents at

25      this point in time.  They are the same basic documents that
```

1    we've gotten.  These are the documents that come from Google

2    that Google has given to us and to DOJ.  We haven't turned

3    around and said -- you know, send an email that says, *yeah,*

4    *what they said*.  But we recognize the DOJ has been doing

5    that, was in the process of doing that, and we've been

6    communicating with DOJ about that to make sure that those

7    documents were being provided to Google.  And so Google's

8    gotten the benefit of that.

9            To the extent that not wanting to rehash anything

10   in 1404, but if this is supposedly duplicative litigation of

11   everything going on everywhere else, they already ought to

12   have a good handle of what's going on enough to make their

13   initial disclosures.  The problem that we've had is twofold.

14   Number one, we can't get a protective order in place such

15   that we're able to give certain sets of documents because

16   we've got those protections in place.  And so we're still

17   waiting for that from them.  But we're able to still give

18   them back their documents, and that's been done by DOJ; and,

19   frankly, that's 90 percent of the discoverable investigatory

20   materials.

21           If they want a list of the people that we've taken

22   some statements from and things of that nature, we can try to

23   compile that as well, but that's really small.

24           In the conference we had over this, Mr. Yetter and

25   I discussed it, and I said please explain to me what you need

1    and why you need it now before initial disclosures, because

2    it seems to me that we're going to give you the names of

3    everybody in the initial disclosures.  Does it make any

4    difference if we need to cobble that together right now?

5           And his reply was -- if I understood him right, his

6    reply was, well, we want to tailor our initial disclosures

7    down narrowly to where you've done your investigation.  And I

8    said, no, no, no, no, no, no.  Your initial disclosures are

9    based upon our pleadings.  You know, we don't investigate and

10   then narrow the field so that now you only disclose off of

11   our investigation; that will necessarily quench the need to

12   full disclosure.  And he said, well, you know, we think that

13   it would be better for you if we didn't give you everything,

14   if we just gave you the stuff that's relevant to what you

15   were investigating.  And I said no, no, no, please, we want

16   full initial disclosures.  And so that's part of the issue as

17   well.

18           But in short, we're glad to give them what they're

19   entitled to.  If they want us to reproduce what the DOJ has

20   given them on their documents, I think we can probably do

21   that within a week or ten days and I'm glad to do that.  But

22   it's just going to be a, *yeah, what they said*.  And we're

23   prepared to move forward with initial disclosures pretty

24   quickly.

25           THE COURT:  Let me stop you for a moment --

1          MR. LANIER:  Yeah.

2          THE COURT:  -- because I do want to make sure that

3     I understand this point.  And it's where you began,

4     Mr. Lanier, which is that what I hear you saying is much of

5     what is being referenced as the investigative file of the

6     State of Texas is comprised of documents that you're saying

7     DOJ has already produced to Google.  And so it sounds like

8     your suggestion, number one, they already have a lot of these

9     materials; and, number two, I suppose do we need to have a

10    duplicative production, a full duplicative production, or can

11    the parties work out something along those lines where you

12    wouldn't have a duplicative production.

13         MR. LANIER:  That's -- you hit the nail on the

14    head.  That's true.  And these are also, by and large, most

15    of the documents are documents Google gave us to start with,

16    but there are some additional documents.

17         THE COURT:  All right.  So, Mr. Yetter, is -- so

18    from Google's standpoint, it sounds like you do have at least

19    some body of materials that are part of the investigative

20    file, or would you say that's incorrect.

21         MR. YETTER:  Unfortunately, Mr. -- counsel is

22    mistaken on that.  What he's talking about is the DOJ, which

23    is in the Search case, has produced its investigative file on

24    the Search case to Google in D.C.  That is a different file

25    than -- that's Search and Search advertising up in D.C.  That

1    is not the investigative file for the ad tech case, at least

2    that's not what Texas has led us to believe, which is the

3    3,000,000 pages, 64 third-party witnesses; and we've gotten

4    none of that.

5         So, yes, I would agree some of that we presume is

6    information that Google provided to the State.  But we've

7    gotten nothing from the third parties on their 18-month ad

8    tech investigation, the case that we're here about now.  So I

9    think counsel is just flat wrong that the DOJ has been

10   producing the Texas investigatory file; it hasn't.

11        Second, counsel said, well, we've been waiting for

12   a protective order.  Well, as the Court will recall, we've

13   already got an outside-counsel-only arrangement as to the

14   unredacted complaint, and we could -- we're certainly happy

15   to get the investigative file on an outside-counsel-only

16   basis, today or any day.

17        And lastly, counsel mentioned that on Monday when

18   we met and conferred about this issue, that he said, why do

19   you want the investigative file?  And we said, well, we want

20   it -- and I absolutely agree -- we said we would like to

21   tailor our initial disclosures to what's relevant in this

22   case.  And as of Monday, we were dealing with the original

23   complaint.  In fact, in that same conversation we asked the

24   States' lawyers, are you filing an amended complaint today

25   and can you give us a heads up on what's in it?  And they

1    said it's not finalized yet, so we can't give you that heads

2    up.

3              So it is, yes, the amended complaint has been

4    changed in many ways and it's been supplemented and added.

5    We -- none of us knew that on -- at least on the Google side,

6    on Monday.  And absolutely we want to provide initial

7    disclosures that are focused on the relevant issues.

8              As the Court has pointed out, the amended complaint

9    is very long and very detailed.  We could do our very best to

10   do initial disclosures on that.  But as to whether we have

11   the Texas investigatory file, we do not.  As to whether we

12   need -- and we would love to get the protective order files,

13   we definitely do, but is it holding it up?  Not at all

14   because we can take these materials on an

15   outside-counsel-only basis.

16             THE COURT:  All right.  Well, it does sound to me

17   like at least where you stand right now, for both sides, is

18   that whatever was produced in the Search case, there is a

19   concern that there needs to be production -- there may be

20   similar, some -- at least some similar materials produced in

21   the Search case, and even though the subject matter here is

22   not the same, but I can see similar materials being produced,

23   some amount of similar materials being produced.  But

24   regardless, it sounds like we would need to do a production,

25   it sounds like, of the State investigative file to Google,

1    again for the reasons I've stated.

2         And I'm going to consider the joint advisory in

3    terms of an OGP, but I do think that the amended -- the

4    complaint and now the amended complaint are quite extensive,

5    quite detailed, and Google will be able -- both sides will be

6    able to supplement; and needless to say in this context, the

7    Court will understand that a lot of supplementation may be

8    necessary as investigative file materials are delivered, and

9    that that may be happening over time because whatever part of

10   that investigative file may need to be held until there is a

11   protective order in place, could delay some of the necessary

12   supplementation.

13        So unless -- do the parties have anything else you

14   think we need to discuss today?

15        MR. YETTER:  Happily, no, Your Honor --

16        MR. LANIER:  Not for plaintiffs, Judge.

17        MR. YETTER:  -- from the defense side.

18        THE COURT:  All right, counsel.  I think, most

19   likely, I will probably go ahead and try and get the OGP done

20   and in place, even if we haven't quite gotten the protective

21   order done.  We'll try and get the protective order done

22   quickly.

23        If there is a delay in the protective order and we

24   need to look at making an adjustment on the OGP, we can do

25   that after the OGP goes out.

1          All right.  Thank you, counsel.  We stand in

2    recess.

3          MR. YETTER:  Thank you, Your Honor.

4          MR. KELLER:  Thank you, Your Honor.

5               (Adjourned at 1:18 p.m.)

6               *    *    *    *    *

7

8          CERTIFICATE OF OFFICIAL REPORTER

9

10

11          I, Gayle Wear, Federal Official Court Reporter, in

12   and for the United States District Court for the Eastern

13   District of Texas, do hereby certify that pursuant to Section

14   753, Title 28 United States Code, that the foregoing is a

15   true and correct transcript of the stenographically reported

16   proceedings held in the above-entitled matter and that the

17   transcript page format is in conformance with the regulations

18   of the Judicial Conference of the United States.

19

20               Dated 22nd day of March 2021.

21

22

23          /s/ Gayle Wear
           GAYLE WEAR, RPR, CRR
24         FEDERAL OFFICIAL COURT REPORTER

25