# EXHIBIT A



CONFIDENTIAL

# Network Bidding Agreement

This Network Bidding Agreement (this "**Agreement**") is entered into by Google LLC and Google Ireland Limited (collectively, "**Google**") and Facebook, Inc. and Facebook Ireland Limited (collectively, "**Facebook**") as of the Effective Date (as defined below). This Agreement governs Facebook's participation in the Network Bidding Pilot program and any successor services (collectively, the "**Program**").  Any use of the term "including" in the Agreement will mean "including, but not limited to."  For clarity, any and all references to AdX, DoubleClick for Publishers, AdMob, AdSense, DoubleClick Bid Manager, the Google Display Network, or the Audience Network Service in this Agreement includes all successor products to the foregoing (such as, for example, Google Ad Manager and Google Ad Manager 360, which is the successor product to AdX and DoubleClick for Publishers, and Display and Video 360, which is the successor product to DoubleClick Bid Manager).  Any use of the term "including" in this Agreement means "including, but not limited to."  In consideration of the foregoing, the Parties agree as follows:

1   **Certain Definitions.**

   1.1   "**Ads**" or "**Creative**" means advertising content.

   1.2   "**Ad Inventory**" means for a specific Ad request the Ad space on Publisher Properties that has been made available for the placement of Ads via the Program.

   1.3   "**Advertiser**" means a third-party advertiser on whose behalf Facebook buys Ad Inventory via the Program.

   1.4   "**Affiliate**" means, with respect to a Party, an entity that directly or indirectly controls, is controlled by or is under common control with such Party.

   1.5   "**Aggregate**" means data that: (a) is not broken out by individual Ad impression; and (b) has been combined with other data in a manner that ensures that such data does not identify any individual user, computer, or device.

   1.6   "**Annual Minimum Spend Commitment**" has the meaning set forth in Exhibit B.

   1.7   "**Antitrust Action**" means any administrative or judicial complaint, statement of objections or similar charge (whether seeking fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures) filed, issued, or initiated by any Governmental Authority and alleging a violation of any Antitrust Law relating to the Agreement, or any litigation or proceeding initiated pursuant to Antitrust Law and relating to the Agreement, including any appeal from a judgment enjoining or declaring the Agreement unlawful pursuant to Antitrust Laws.



1.8    **"Antitrust Law"** means the Sherman Antitrust Act, as amended, the Clayton Antitrust Act, as amended, the Hart-Scott-Rodino Act, the Federal Trade Commission Act, as amended, and any and all other applicable laws, rules, or regulations of any jurisdiction that are designed or intended to prohibit, restrict, or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade.

1.9    "**Applicable Publisher**" means either (a) the Publisher on whose Publisher Property the Ad Inventory for a Bid Request is located or (b) the Publisher that is managing a third party Publisher Property where the applicable Ad Inventory is located.

1.10    "**Audience Network Service**" means Facebook's service that facilitates the sale and placement of Ads from Facebook and Facebook's third-party advertisers on third-party publisher properties.

1.11    "**Audience Network-Related Information**" means non-public information that Facebook discloses to Google that is related to the Audience Network Service.  For clarity, Audience Network-Related Information excludes Google Data, Google Program-Related Information, Bid Response Data, Facebook Data, and information Google has collected or received independent of Facebook's participation in the Program.

1.12    "**Beta Features**" means Program features that are identified as "Beta", "Alpha", "Experimental", "Limited Release" or "Pre-Release" or that are otherwise identified by Google as unsupported.

1.13    "**Bid Request**" means a notification to Facebook through the Program of the availability of Ad Inventory on Publisher Properties.

1.14    **"Bid Response"** means a non-zero bid on Ad Inventory.

1.15    "**Bid Response Data**" means any data provided by Facebook in response to a Bid Request, including any bid amounts.  For clarity, Bid Response Data excludes Facebook Data, Google Data, and data that Google has collected or received independent of Facebook's participation in the Program.

1.16    **"Bid Response Rate"** has the meaning set forth in Exhibit A.

1.17    **"Brand Features"** mean each Party's trade names, trademarks, logos and other distinctive brand features.

1.18    "**Confidential Information**" means information that one Party (or an Affiliate) discloses to the other Party under the Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances.  It

2



does not include information that is independently developed by the recipient, is lawfully given to the recipient by a third party without confidentiality obligations, or becomes public through no fault of the recipient.  For clarity, (x) Google Data and Google Program-Related Information are considered Google's Confidential Information and (y) Facebook Data, Bid Response Data and Audience Network - Related Information are considered Facebook's Confidential Information.  In addition, for clarity, the terms and conditions of this Agreement are considered Confidential Information under the Agreement.

1.19    "**Covered Governmental Authorities**" means one or more of the following Governmental Authorities (with respect to (a) through (n) solely when acting pursuant to an Antitrust Law): (a) The European Commission; (b) The United States Department of Justice; (c) The United States Federal Trade Commission; (d) Competition Bureau of Canada, (e) Korea Fair Trade Commission, (f) Japan Fair Trade Commission, (g) Competition Commission of India, (h) Australian Competition and Consumer Commission, (i) United Kingdom Competition and Markets Authority, (j) Competition Authority of France, (k) Federal Cartel Office of Germany, (l) Administrative Council for Economic Defense (CADE) of Brazil, (m) Taiwan Fair Trade Commission, (n) state attorney generals in the United States, or (o) any competent national data protection authority solely when acting pursuant to applicable national data protection law.

1.20    "**Data Protection Action**" means any administrative or judicial complaint, statement of objections or similar charge (whether seeking fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures) filed, issued, or initiated by any competent national data protection authority acting pursuant to, and alleging a violation of, national data protection law relating to the Agreement, or any litigation or proceeding initiated by any competent national data protection authority acting pursuant to national data protection law and relating to the Agreement, including any appeal from a judgment enjoining or declaring the Agreement unlawful pursuant to national data protection law.

1.21    "**Destinations**" mean Properties to which Creative directs viewers (e.g., landing pages) and the redirect (e.g., URLs).

1.22    "**Disclosing Party**" means the Party disclosing Confidential Information.

1.23    "**Discrepancy**" means any discrepancy between Facebook's billing metrics and Google's billing metrics used to measure Ad impressions and/or revenue.

1.24    "**End User Interaction Data**" means the following data that Facebook discloses to Google in connection with the Program:  data related to an End User's interaction with an Ad provided by Facebook.  For clarity, End User Interaction Data excludes the identity of the advertiser and the content of the Ad.

3

GOOG-TEX-00144515



1.25 "**End Users**" means individual human end users.

1.26 "**Facebook Data**" means the following data that Facebook discloses to Google in connection with the Program: (a) data related to Facebook provided Ads, including the identity of the advertiser, the content of the Ad, and any Facebook provided targeting specifications or parameters, (b) End User Interaction Data, and (c) the identification of an End User as a Facebook End User.  For clarity, Facebook Data excludes Bid Response Data, Google Data, and data that Google has collected or received independent of Facebook's participation in the Program.

1.27 "**Fee**" has the meaning set forth in Exhibit B.

1.28 "**Final Clearinghouse Auction**" means the final auction conducted by Google for Ad Inventory between Facebook, network bidders, exchange bidders, and the winner of the AdX auction. For clarity, this does not refer to the AdX auction, which submits a bid to the final auction.

1.29 "**Google Data**" means the following data that Google discloses to Facebook in connection with the Program: (a) Google Proprietary Data, (b) Google User Data, and (c) Google Platform Data.  For clarity, Google Data excludes Bid Response Data, Facebook Data, and data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Data.

1.30 "**Google Platform Data**" means the data identified in Exhibit E as "Google Platform Data" that Google discloses to Facebook in connection with the Program.  For clarity, Google Platform Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement. In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Platform Data.  After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google Platform Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

4

GOOG-TEX-00144516



1.31   "**Google Policies**" has the meaning set forth in Section 3.1(a).

1.32   "**Google Policy Change**" has the meaning set forth in Section 3.1(a).

1.33   "**Google Privacy Policy**" means https://www.google.com/policies/privacy/ (as may be updated from time to time).

1.34   "**Google Program-Related Information**" means non-public information that Google discloses to Facebook that is related to the Program.  For clarity, Google Program-Related Information excludes Google Data, Bid Response Data, Facebook Data, Audience Network-Related Information, and information that Facebook has collected or received independent of Facebook's participation in the Program.

1.35   "**Google Proprietary Data**" means the data identified in Exhibit E as "Google Proprietary Data" that Google discloses to Facebook in connection with the Program. For clarity, Google Proprietary Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement.  In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google Proprietary Data.  After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google Proprietary Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.36   "**Google User Data**" means (a) header data in an HTTP(S) request initiated by Google for the purpose of cookie matching and (b) the data identified in Exhibit E as "Google User Data" that Google discloses to Facebook in connection with the Program.  For clarity, Google User Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement.  In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer, or browser in connection with serving such Ad would not be considered Google User Data.  After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Google User Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.37   "**Governmental Authority**" means any (a) foreign, federal, state or local court, administrative agency, commission, official board, bureau, self-regulatory agency,

5

HIGHLY CONFIDENTIAL

GOOG-TEX-00144517



officer, official, tribunal, mediator, governmental department, governmental authority or instrumentality, in each case solely when acting pursuant to an Antitrust Law, or (b) competent national data protection authority solely when acting pursuant to national data protection law.

1.38 **"Governmental Communication"** means any written or oral communication relating to Antitrust Law or any national data protection law received from or given to any Governmental Authority.

1.39 **"Gross Spend"** has the meaning set forth in Exhibit B.

1.40 "**Impression Count**" means the measurement of the number of Ad impression(s) that are filled.

1.41 "**Indemnified Party**" has the meaning set forth in Section 15.

1.42 "**Indemnifying Party**" has the meaning set forth in Section 15.

1.43 "**Initial Term**" has the meaning set forth in Section 17.

1.44 "**Intellectual Property Rights**" means all copyrights, moral rights, patent rights, trademarks, and any other intellectual property or similar rights (registered or unregistered) throughout the world.

1.45 "**Match Rate**" has the meaning set forth in Exhibit A.

1.46 **"Material Adverse Regulatory Effect"** means any substantial adverse effect on either Party relating to any pending or on-going filing, inquiry, investigation, litigation, statement of objections or similar charges, fines, penalties, decisions, orders, injunctions, decrees, judgments or any other corrective measures initiated by Covered Governmental Authorities.

1.47 **"Material Document Request"** means any demand or request from a Governmental Authority relating to the Agreement requiring production of documents, data or other information that the receiving Party reasonably concludes, in good faith, would be unduly burdensome to comply with, or would require production of documents, data or other information that the receiving Party reasonably concludes, in good faith, would include highly confidential trade secrets that are substantially unrelated to the Agreement and the production of which would threaten to cause material economic harm to the receiving Party.  If the receiving Party is able to reach agreement with the Governmental Authority to reduce the scope of the demand or request such that it, in the receiving Party's reasonable and good faith judgment, would not cause or threaten to cause the receiving Party undue

6

GOOG-TEX-00144518



burden or material economic harm, then the request or demand would not qualify as a Material Document Request.

1.48 "**Minimum Fee**" has the meaning set forth in Exhibit B.

1.49 "**Parties**" mean Google and Facebook collectively and "**Party**" means either Facebook or Google.

1.50 "**Phase 1**" has the meaning set forth in Exhibit A.

1.51 "**Phase 2**" has the meaning set forth in Exhibit B.

1.52 "**Phase 3**" has the meaning set forth in Exhibit B.

1.53 "**Program**" has the meaning set forth in the first paragraph of this Agreement.

1.54 "**Property**" means site(s), app(s) or other propert(ies) made available through the Program.

1.55 "**Publisher**" means a third-party publisher that makes its Propertie(s) available via the Program.

1.56 "**Publisher-Specific Data**" means the data identified in Exhibit E as "Publisher-Specific Data" that Google discloses to Facebook in connection with the Program. For clarity, Publisher-Specific Data excludes data that Facebook has (a) collected or received independent of Facebook's participation in the Program, or (b) collected or received independently via a direct integration with a Publisher Property (including via Facebook's SDK) in connection with the Program in accordance with this Agreement.  In addition, for clarity, if Facebook wins an auction via the Program and therefore serves an Ad on applicable Ad Inventory, then the data Facebook directly receives from an End User's device, app, computer or browser in connection with serving such Ad would not be considered Publisher-Specific Data.  After the Effective Date, if Google shares additional data with Facebook, then Google may update the definition of Publisher-Specific Data upon written notice to Facebook (including via e-mail) in accordance with Section 6.10 of this Agreement.

1.57 "**Quarter**" means each three-month period of the calendar year (i.e., January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31).

1.58 "**Real-Time**" means the period of time between the time when a Bid Response is received by Google and the time when the Final Clearinghouse Auction in which this Bid Response participates is completed, and either a winner is determined or it is determined that there is no auction winner.

HIGHLY CONFIDENTIAL

GOOG-TEX-00144519



1.59   "**Receiving Party**" means the Party receiving Confidential Information.

1.60   "**Renewal Term**" has the meaning set forth in Section 17.

1.61   "**Structured Negotiation**" will be the following process:  if the Parties cannot resolve the issue specified in this Agreement within ten (10) business days after the Parties begin discussing the issue, the Parties will escalate to their first-level executives identified in the table below, who will negotiate in good faith to determine a mutually-acceptable resolution.  If the executives in the first escalation level are unable to come to agreement within ten (10) business days from when they first begin discussing the issue, they will each escalate to the second level of executives identified in the table below, who will negotiate in good faith to determine a mutually-acceptable resolution within ten (10) business days from when they first begin discussing the issue.  If the Parties are still unable to determine a mutually-acceptable resolution after such ten (10) business days have lapsed, then either Party may terminate this Agreement in accordance with the notice period set forth in this Agreement.  Either Party may update its respective list of executives listed below upon written notice (including via e-mail) to the other Party.

| Table 1– Structured Negotiation Contact Information | | |
| --- | --- | --- |
| **Escalation Level** | **Executive for Facebook** | **Executive for Google** |
| **First Level** | ██████████ | ██████████ |
| **Second Level** | ████████ | ████████ |

1.62   "**Subcontractors**" mean a subcontractor, consultant, third-party service provider or agent engaged by either Party in connection with its use or provision of the Program.

1.63   "**Targets**" mean Ad trafficking decisions and targeting decisions.

1.64   "**Term**" has the meaning set forth in Section 17.

1.65   "**Three-Month Minimum Spend Commitment**" has the meaning set forth in Exhibit B.

1.66   "**Win Rate**" has the meaning set forth in Exhibit A.

8

GOOG-TEX-00144520



## 2  Program.

### 2.1  Program Operation.

(a)  Facebook authorizes Google and its Affiliates to place Facebook's or its Advertiser's Ads on any Publisher Property made available through the Program in accordance with the terms of this Agreement.  Facebook acknowledges that Google or its Affiliates may participate in Program auctions in support of its own services and products.  Subject to each Publisher's configuration in the AdX and DoubleClick for Publishers user interface or AdMob user interface (*i.e.,* if a Publisher has a configuration (or has set its settings) that prioritizes Google, Facebook, or another third party, the following will not apply), when competing for an Ad impression under the Program for the Final Clearinghouse Auction between Google, Facebook, or other third parties that are participating in the Program, Google will not advantage itself or any other third party demand source vis-a-vis Facebook in such Final Clearinghouse Auction.  If Google provides written notice to Facebook that the Program no longer operates as stated in the immediately preceding sentence or if Facebook provides Google written notice that it has reasonably determined that the Program no longer operates as stated in the immediately preceding sentence, then Facebook may initiate the Structured Negotiation Process.  If the Parties are unable to resolve the issue following the Structured Negotiation Process, then Facebook may, as its sole remedy, immediately terminate this Agreement upon written notice to Google.  For clarity, Google's failure to comply with the obligation(s) set forth in the third sentence of this Section 2.1(a) will not be considered a breach of this Agreement.

(b)  Google acknowledges and agrees that the Final Clearinghouse Auction will be the final auction for Ad Inventory made available via the Program.  In addition, for clarity, Google will use Facebook's Bid Response Data in accordance with Section 6.5 (for example, it will not use Facebook's Bid Response Data to, in Real-Time, adjust Google's or a third party's bid in the auction for Ad Inventory made available via the Program).

(c)  All Publishers that are enabled so that such Publisher(s)' Properties are available via the Program to Facebook Advertisers will be mutually approved by the Parties.  For clarity, Publisher(s) that are not mutually approved, while not being made available to Facebook Advertisers, may be made available to other third-party bidders or other demand sources in the Program.

(d)  For each Facebook Ad placed through the Program, Google will only share information (for example, impression, click and price paid information, or information which lists the associated Advertiser and Facebook as the campaign buyer) regarding a Facebook Ad with an applicable Publisher if Google shares the same or substantially same information to Publishers

9



regarding Ads sourced from similarly situated third parties that participate in the Program.  As of the Effective Date, Google will provide Facebook with the information fields it currently shares with Publishers regarding Facebook Ads placed through the Program.  If, during the Term, Facebook requests a written update (including via e-mail) on the information fields that Google shares with Publishers regarding Facebook Ads placed through the Program, then Google will (i) provide Facebook with such updated information fields shared with Publishers, provided that failure of such updated information fields to be complete and accurate will not violate this Section 2.1(d) as along as Google has used commercial reasonable efforts in accordance with clause (ii) below, and (ii) use commercially reasonable efforts to ensure that such information provided to Facebook under (i) is complete and accurate.

(e)   Without limiting other restrictions in this Agreement related to the use of Facebook Data, Facebook authorizes Google and its Affiliates to automate retrieval and analysis of Destinations and Ads provided by Facebook under the Program, as long as Google only uses such data for the following purposes: (a) detecting violations of and enforcing the Google Policies (as defined in Section 3.1(a)), the Common Advertiser Policies (as defined in Section 3.1(c)), or, if technically feasible, the Google Ad content-related policies available at the following link: https://support.google.com/platformspolicy/answer/3013851?visit_id=1-636652013674218141-3820337190&hl=en&rd= (the "**Google Ad Content Policies**") (including, without limitation, detection of illegal content or content that violates the Google Policies, the Common Advertiser Policies, or the Google Ad Content Policies), (b) complying with applicable laws, rules, and regulations, (c) detecting malware, (d) classifying Ads into categories, (e) reporting statistics in accordance with the second and third sentences of Section 6.4 of this Agreement, or (f) troubleshooting functionality of Facebook's integration with the Program (which, for example, includes identifying problematic Ads, removing such Ads from Publisher Properties, and communicating the foregoing to Facebook).  With respect to the purposes set forth in (a) in the first sentence of this paragraph, if Google detects any violations in connection with any Facebook-provided Ads, then Google will use commercially reasonable efforts to provide Facebook with the reason for the violation for each such Ad (*i.e.*, the identifier of each Ad and the associated violation code).  With respect to the purposes set forth in (d) in the first sentence of this paragraph, (i) Google will only disclose data obtained via the automated retrieval process set forth in the first sentence of this paragraph in accordance with the second and third sentences of Section 6.4 of this Agreement, (ii) Google will use commercially reasonable efforts to provide Facebook with the category for each Ad (i.e., the identifier of each Ad and the associated category code), provided that such Ads category information will be deemed Google Proprietary Data subject to Section 2.1(f) below, and (iii)

10

GOOG-TEX-00144522



Google will not block Ads sourced from Facebook via the Program based on the classification set forth in (d) in the first sentence of this paragraph without mutual written approval (including via e-mail) of the Parties.  With respect to the purposes set forth in (f) in the first sentence of this paragraph, Google will only disclose data obtained via the automated retrieval process set forth in the first sentence of this paragraph to the Applicable Publishers for purposes of troubleshooting Facebook's integration with the Program.

(f)     In connection with Section 2.1(e), when Google automatically retrieves and analyzes Destinations and Ads, Facebook will use commercially reasonable efforts to provide Google with (a) each creative asset, the ID that represents a specific creative asset and Destinations and (b) for each Bid Response that results in an Ad being served to an End User, the ID of the creative asset and Destinations that actually served to an End User.  Facebook will also use commercially reasonable efforts to collaborate with Google on the development of a unified classification structure to support eventually offering unified reporting and blocking functionality to Publishers; provided, however, that neither Party will be required to commit engineering or other technical resources to any such collaboration until the Parties reach mutual agreement on the data categorization (e.g., Google Proprietary Data, Google Platform Data, or a new category) for the Ads category information shared with Facebook in connection with such unified classification structure under the third sentence, subsection (ii) of Section 2.1(e).

(g)     Upon Google's request, Facebook will use commercially reasonable efforts to either reject or remove itself or assist Google in rejecting or removing (if technically feasible) a specific Ad at any time (i) to enforce the Google Policies or the Common Advertiser Policies (including, without limitation, suspending an Ad due to illegal content or content that violates the Google Policies or the Common Advertiser Policies), (ii) to comply with applicable laws, rules, and regulations, (iii) due to an Ad containing malware, or (iv) at a Publisher's request.  For clarity, Google may, if technically feasible, either reject or remove a specific Ad for the reasons set forth in the immediately preceding sentence (or to reject or remove a specific Ad to enforce the Google Ad Content Policies).

(h)     Google may modify Ads (i) to make non-material changes (for example, (a) to watermark an Ad with a non-visible overlay, (b) to resize or similarly modify an Ad to fit a screen or otherwise improve user experience, or (c) to insert parameters into an Ad html returned to a device in cases where Facebook has used one of Google's macros) or (ii) as described in this Agreement.  Any other modification to Ads may be requested by Google but requires Facebook's approval or authorization (including such approval being provided via e-mail).

11



(i)   **Change in Measurement.**  At any time during the Term, if Google materially changes how it measures an Ad impression such that Google reasonably anticipates that such change will create a greater than 5% Discrepancy against Google-attributed measurement for all Ad impressions in the aggregate for the 3 months prior to the change, then Google will use commercially reasonable efforts to provide Facebook with written notice (including via e-mail) 6 months prior to such material change, but such notice will be provided no less than 60 days prior to such material change.  If Facebook demonstrates that any change in measurement attributable to Google (i.e., such change is not attributed to any measurement change made by Facebook) creates a greater than 10% Discrepancy against Google-attributed measurement for all Ad impressions in the aggregate for the 3 months prior to the change, then Facebook may initiate the Structured Negotiation Process.  If the Parties are unable to resolve such issue after the Structured Negotiation Process, then Facebook has option of (i) excluding that specific Ad Inventory (and any applicable minimum spend commitment will be reduced accordingly with respect to that particular percentage of Ad Inventory) or (ii) Facebook can continue with that specific Ad Inventory included (and any applicable minimum spend commitment will remain the same).  If Facebook's annualized Gross Spend via the Program (with such annualized Gross Spend estimated based on the Gross Spend for the 1 month following such measurement change multiplied by 12) declines by more than 75% due to such measurement change as measured against the annualized Gross Spend estimated based on the Gross Spend for the 1 month prior to such measurement change multiplied by 12 (for example, Facebook's annualized Gross Spend declines from $2 billion to $400 million due to such measurement change), then Facebook has the right to initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, Facebook may immediately terminate the Agreement upon written notice to Google.

(j)   **Experiments.**  Each Party may run limited experiments designed, with respect to Google, to optimize the Program auction, and with respect to Facebook, to optimize its performance in the Program auction, that may violate the terms and conditions of this Agreement, as long as those experiments: (i) do not violate Sections 6.4 to 6.10, Section 11, and Section 13(c) of this Agreement; and (ii) solely if such experiments run on no greater than 2% of Ad Inventory.

**2.2   Mutual Responsibilities.**

(a)   To participate in the Program, Publishers will be required to enter into separate agreements with both Facebook and Google.  With respect to Google, such agreement will permit Publisher Propert(ies) to be made available via the Program and with respect to Facebook, such agreement will allow for Facebook to pay such Publisher the applicable revenue share due to such

12

GOOG-TEX-00144524



Publisher directly (subject to Section 5.2(a) of this Agreement, where Google may make certain payments owed to Publisher(s) under this Agreement upon mutual agreement of the Parties).

(b)   The Parties will comply with each of their respective Program commitments set forth in Exhibit A.

(c)   Google and Facebook will collaborate in good faith to build a product solution that allows signals that Facebook collects for mobile app Ad Inventory via the Program to be passed to its bidder via real-time bidding Bid Requests.

(d)   The Parties will use commercially reasonable efforts to enable video, app, and web Publisher Ad Inventory for the Program in the Ad formats specified in Section 2.3(b) below (*i.e.*, the Publisher Ad Inventory formats that are generally made available via the Program to other similarly situated third parties).  In addition, the Parties intend to make the Program available to Publishers located in all countries where Google ordinarily operates, **provided that**, a failure to launch the Program in any particular country (other than the United States) would not be considered a breach of this Agreement.

(e)   Other than as necessary to conduct mutually agreed upon (including agreed via e-mail) Ad testing for the Program, each Party will not, and will not authorize any third party to, (a) generate fraudulent or otherwise invalid impressions, inquiries, clicks or conversions, or (b) conceal conversions.

(f)    For clarity, if either Party is troubleshooting functionality related to Facebook's integration with the Program and such Party unintentionally violates the terms and conditions of this Agreement while performing such troubleshooting (excluding Section 11 or Section 13(c)), then such violation would not be considered a breach of this Agreement, provided that such Party remedies such violation promptly upon discovery.

**2.3    Google Responsibilities.**

(a)   Google and its Affiliates may make available to Facebook certain Program features (*e.g.*, geographic targeting) to assist with the selection of Targets. Facebook is not required to use these features and, as applicable, may opt-in to or opt-out of usage of these features, but if Facebook (or its Advertiser(s)) use these features then Facebook will be responsible for the Targets that are provided or used by Facebook (and, for clarity, the foregoing does not apply to Targets provided by Google and used by Facebook in accordance with this Agreement).

(b)   Google will, with respect to Publishers that have opted-into the Program, make available all (a) Publisher Ad Inventory formats that are generally made available via the Program to other similarly situated third parties and (b)

13

HIGHLY CONFIDENTIAL

GOOG-TEX-00144525



auctions that are generally made available via the Program to other similarly situated third parties.

(c) Google will not use Facebook's Confidential Information to develop or enhance a product or service that competes with the Audience Network Service; for clarity, the foregoing does not restrict Google from developing or enhancing a product or service that competes with the Audience Network Service without Facebook's Confidential Information.  In addition, Google will not use Audience Network-Related Information to build or enhance equivalent products to the Audience Network Service; for clarity, the foregoing does not restrict Google from developing or enhancing a product or service that competes with the Audience Network Service without Audience Network-Related Information. Google will not sell, disclose, or transfer any Audience Network-Related Information to any third party, provided that the disclosures or transfers permitted under Section 11 (Confidentiality) will also apply to Google's transfer or disclosure of Audience Network-Related Information.

## 2.4    Facebook Responsibilities.

(a) Facebook will use commercially reasonable efforts to provide a user interface for Publishers that allows such Publishers to identify the types of Ads that will or will not be allowed to be displayed against Publisher Ad Inventory via the Program.

(b) Google acknowledges that in connection with the Program, Facebook will integrate its Software Development Kit (SDK) into Publisher's mobile applications for purposes of Creative rendering, measurement, Ad delivery, and any other functionality that may be provided by Facebook.  For clarity, this Section 2.4(b) does not impose any obligation on Google with respect to Facebook's SDK.  For additional clarity, this Section 2.4(b) does not preclude the Parties from collaborating on a solution that would enable Facebook to integrate similar tools into Publisher's websites for the same purposes as Facebook's SDK.

(c) Facebook may utilize an Ad server with respect to the Program solely for serving or tracking Ads.  For the avoidance of doubt, the foregoing sentence does not in any way limit any functionality related to Facebook's SDK.

(d) Some Program features may be offered to Facebook as Beta Features. Facebook may not disclose any information from Beta Features or the terms or existence of any non-public Beta Features.

(e) Facebook will not use Google's Confidential Information to develop or enhance a product or service that competes with the Program; for clarity, the foregoing does not restrict Facebook from developing or enhancing a product or service that competes with the Program without Google's Confidential Information.  In

14

GOOG-TEX-00144526



addition, Facebook will not use Google Program-Related Information to build or enhance equivalent products to DoubleClick for Publishers, AdX, or AdMob; for clarity, the foregoing does not restrict Facebook from developing or enhancing a product or service that competes with DoubleClick for Publishers, AdX, or AdMob without Google Program-Related Information.  Facebook will not sell, disclose, or transfer any Google Program-Related Information to any third party, provided that the disclosures or transfers permitted under Section 11 (Confidentiality) will also apply to Facebook's transfer or disclosure of Google Program-Related Information.

## 3   Policies.

### 3.1   Policy Mechanism.

(a)   In connection with the Program, Facebook will comply with the Google policies set forth on Exhibit C ("**Google Policies**").  If Google changes the Google Policies after the Effective Date (each, a "**Google Policy Change**"), Google will provide written notice to Facebook of such Google Policy Change and Facebook must accept such Google Policy Change in writing (including via e-mail) prior to the Google Policy Change applying to Facebook and (ii) any such Google Policy Change will apply to all similarly-situated demand sources in the Program.

(b)   If Facebook is unwilling or unable to accept any Google Policy Change upon provision of notice by Google, then Google may initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then, as its sole remedy, either Party may terminate the Agreement upon written notice to the other party following a 12-month wind-down period.  During such wind-down period, the Google Policy Change would not apply to Facebook, unless the Google Policy Change is the result of a change in law, rule or regulation or due to a material negative event that occurs with respect to the Program (**e.g.**, significant malware or data leakage), in which case the Google Policy Change would immediately apply to Facebook.  If Facebook objects to the immediate application of such Google Policy Change to Facebook, Facebook may initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then, as its sole remedy, Facebook may terminate the Agreement upon 30 days' written notice to Google.

(c)   Facebook will require all Facebook Advertisers to contractually agree to comply with the then-current version of the Facebook Advertising Policies, the current version of which is available at https://www.facebook.com/policies/ads/ ("**Facebook Advertising Policies**") and Facebook will use commercially reasonable efforts to enforce the Facebook Advertising Policies, provided that

HIGHLY CONFIDENTIAL

GOOG-TEX-00144527



if Facebook changes any of the Facebook Advertising Policies set forth on Exhibit D (each, a "**Common Advertiser Policy**") after the Effective Date (each, a "**Facebook Policy Change**") for all Facebook Advertisers at https://www.facebook.com/policies/ads, Facebook will provide written notice to Google of such Facebook Policy Change as it relates to the Program and if Google objects to any Facebook Policy Change upon provision of notice by Facebook, then Google may initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then, as its sole remedy, Google may immediately terminate the Agreement.  For clarity, nothing in this Section 3.1(c) limits Facebook's ability to enforce the Facebook Advertising Policies.

3.2    In connection with the Program, Facebook will comply with Facebook's data policy located at:  https://www.facebook.com/policy.php.

3.3    In connection with the Program, Google will comply with the Google Privacy Policy.

3.4    Google and Facebook will work in good faith to agree to a mutually agreed upon Code of Conduct, **provided that** such Code of Conduct will not be contractually binding on either Party and will not result in additional obligations on either Party.

4    **Ad Cancellation**.  Unless a Google Policy or the Program user interface (the "**UI**") provides otherwise, either Party may cancel any Ad; provided that Google may only cancel an Ad for the purposes set forth in Section 2.1(g).  Cancelled Ads will generally cease serving within 8 business hours or as described in a Google Policy or UI, and Facebook remains obligated to pay all charges resulting from served Ads.

5    **Payment.**

5.1    **Payments to Google.**

(a)    Google will invoice Facebook for the Fee (as set forth in Exhibit B) on a monthly basis.  Facebook will pay Google the Fee, in immediately available funds or as otherwise approved by Google, within thirty (30) days after the date of invoice (the "**Payment Due Date**").  All payments will be made in U.S. dollars.  Late payments that are not disputed in good faith bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less); provided that interest will not begin to accrue until 30 days following the Payment Due Date.  If Facebook does not pay Google the Fee (other than any charge(s) disputed in good faith) within 10 days following the Payment Due Date, Google may suspend Facebook's participation in the Program on 10 days' prior notice to Facebook, provided, however, that in the event of a suspension pursuant to this Section 5.1(a), without limiting any of Google rights and remedies under this Agreement, Google will reinstate the provision and use of the Program to Facebook promptly following payment.  Google is responsible for paying all taxes and government charges associated with the Fee paid to Google.

16

GOOG-TEX-00144528



(b) Charges to Facebook are solely based on Google's measurements for the Program and its applicable billing metrics (e.g., impressions). If there is a greater than 3% Discrepancy in aggregate across all Publishers between Facebook and Google's billing metrics during a particular month of the Term (the "**Discrepancy Period**"), then the Parties will work in good faith to identify the reason for and resolve the Discrepancy. If the Parties are unable to resolve the Discrepancy within 30 days, then Google's billing metrics will apply for the Discrepancy Period.

(c) Facebook is required to spend the minimum amount of Gross Spend as set forth in Exhibit B.

(d) Any portion of a charge not disputed in good faith must be paid in full. Other than as set forth in the immediately following sentence, neither Party may offset any payment due under this Agreement against any other payment to be made under this Agreement. Subject to Section 6 of Exhibit A, Google may offset any charges invoiced in the immediately subsequent invoice, to account for adjustments in Google's measurement of revenue and impression figures. Facebook will be able to calculate such adjustment via the mechanism described in Section 5.2(d).

(e) If applicable, Facebook will not exceed its aggregate credit line as determined by Google in its reasonable discretion (and made available if requested) and Google will not be obligated to provide the Program to Facebook in excess of such credit line. For clarity, the credit line will be based on Fees, and not on Gross Spend (as such capitalized terms are defined in this Agreement). Google reserves the right to reduce such credit line in its reasonable discretion. If a reduction in such credit line will materially impede Facebook's ability to participate in the Program, then Google will provide Facebook with the rationale for such reduction prior to such reduction and Facebook will have a meaningful, good faith opportunity to discuss and dispute such reduction with Google.

**5.2    Payments to Publisher.**

(a) Facebook will make all payments owed to Publisher(s) under this Agreement in accordance with the agreement entered into between such Publisher(s) and Facebook except as otherwise set forth in this Agreement. If Facebook charges any incremental fee to Publisher(s), excluding any buy-side fees that Facebook may charge its Advertisers, Facebook will disclose such fee to such Publisher(s). In addition, Facebook may not restrict Publisher(s) from disclosing to Google the amount paid by Facebook to such Publisher(s) or any incremental fee that Facebook charges to such Publisher(s). As between the Parties (except as set forth in the immediately following sentence), Facebook will be responsible for all taxes and other government charges in connection with such payments to Publisher(s). If mutually agreed upon by the Parties, Google will make certain payments owed to Publisher(s) under this Agreement in accordance with the agreement entered into between such Publisher(s) and

HIGHLY CONFIDENTIAL

GOOG-TEX-00144529



Google; solely if Google makes such payments, Google will be responsible for all taxes and other government charges in connection with such payments to Publisher(s).

(b) Payments made by Facebook to Publisher(s) under this Agreement will be made based on Google's measurements for the Program and its applicable billing metrics (e.g., impressions), **provided that** for each applicable month of the Term that Facebook makes payment to Publisher(s), Google will provide Google's measurements for the Program and its applicable metrics (e.g., impressions and amount payable to each Publisher) by no later than the second of the following calendar month.  If Google provides Google's measurements and its applicable metrics to Facebook after the second of any month of the Term as set forth in the foregoing sentence, then Facebook's payment to Publisher(s) for such month will be based on Facebook's measurements for the Program, **provided that** if there is a Discrepancy greater than 3% for a specific Publisher and Google or the Publisher initiates a dispute with Facebook based on such Discrepancy within 60 days of the applicable impression activity, the Parties will work in good faith to identify the reason for the Discrepancy.  If the Parties are unable to resolve the Discrepancy within 30 days, then Facebook will pay the Publisher based on Google's measurements as the system of record, **provided that** Facebook reserves the right to not request refunds from Publishers in the event that Google's measurements will be to an applicable Publisher's detriment.  If Google notifies Facebook of invalid traffic on Publishers' Proper(ties), then Facebook may, in its discretion, issue refunds to its Advertisers due to invalid traffic on Publishers' Propert(ies) (and clawback revenue from such Publishers).

(c) Google will have no liability for any discrepancy between Google's Impression Count under the Program and the Impression Count produced by Facebook's Ad server.

(d) For Ad impressions won by Facebook under the Program, solely for the purpose of enabling Facebook to bill Publishers or identifying and minimizing Discrepancies, both Google and Facebook will provide a mechanism that provides the other Party with (1) aggregate data that allows the other Party to validate billable impressions used to determine the amount to be paid to Publishers, with such reporting to be updated daily, and (2) the amount payable to Publishers.

**6.  Privacy and Data.**

6.1.  Facebook must maintain, and will require that all third parties that collect data through Ads maintain a publicly available online privacy policy that provides notice of data collection practices related to its Ad campaigns booked through the Program, including without limitation use of a cookie, web beacon, or other tracking mechanisms.

18

HIGHLY CONFIDENTIAL

GOOG-TEX-00144530



6.2.   Facebook will not alter, and will prohibit third parties from altering, any Ad tags to pass information to Google that Google could use or recognize as personally identifiable information.

6.3.   Google will take reasonable steps to ensure that an End User is provided with clear and comprehensive information about, and gives consent to, the storing and accessing of cookies and other information on the end user's device where such activity occurs in connection with the Program and where providing such information and obtaining such consent is required by law.

6.4.   **Restrictions on Google's use of Facebook Data and Bid Response Data.**  In addition to the obligations set forth in Section 2.1(e), Google will not use Facebook Data or Bid Response Data to: (a) build, create, or enhance End User profiles or advertising segments, (b) retarget End Users, (c) categorize an End User as a Facebook End User, or (d) sell, transfer, or disclose any Facebook Data or Bid Response Data to any third party (other than transfers or disclosures permitted under this Agreement).  Google may disclose to the Applicable Publishers, for reporting (including, for clarity, benchmarking) purposes or troubleshooting functionality of Facebook's integration with the Program, Facebook Data and Bid Response Data (both in non-aggregated form) that does not identify and does not intend to identify any Advertiser or any Ad creative (except, Google may disclose an Ad creative to an Applicable Publisher to the extent required for troubleshooting functionality of Facebook's integration with the Program, provided that the number of Ad creatives disclosed for troubleshooting does not exceed 5% of all Ad creatives provided by Facebook during the period of troubleshooting); provided that if Google provides reporting of such data that associates Facebook's bid amounts with ad categories, then such data will only either be in the data transfer file shared with the Applicable Publishers or otherwise be in Aggregate form at the ad category-level.  Additionally, Google may disclose to third parties, for reporting (including, for clarity, benchmarking) purposes, Facebook Data and Bid Response Data that: (i) is in Aggregate form, (ii) does not identify and does not intend to identify any Advertiser or any Ad creative, and (iii) does not identify and does not intend to identify Facebook as the source.  The disclosures or transfers permitted under Section 11 (Confidentiality) will also apply to Google's transfer or disclosure of Bid Response Data or Facebook Data.  Google will not use Facebook Data (excluding End User Interaction Data) to build or enhance an equivalent product to the Audience Network Service; for clarity, (x) the foregoing does not restrict Google from developing or enhancing a product or service that competes with the Audience Network Service without Facebook Data and (y) without limiting any other non-competing uses, any optimization of the auction on Ad Inventory made available under the Program using Facebook Data (as long as such Facebook Data is used in accordance with this Agreement) will not be deemed to be an enhancement of an equivalent product to the Audience Network Service for purposes of this Agreement.  Google may retain Facebook Data (including any derivatives of Facebook Data) for no longer than 18 months (excluding End User

19

GOOG-TEX-00144531



Interaction Data (including any derivatives of End User Interaction Data), where Google may retain such data except as set forth in the immediately following sentence).  With respect End User Interaction Data, Google may retain event-level End User Interaction Data (including any derivatives of event-level End User Interaction Data) for no longer than 18 months; except for certain event-level End User Interaction Data which may be kept indefinitely as required by Google's reasonable and standard business practice solely for archival and record-keeping purposes (e.g., financial reporting, audit purposes, or dispute resolution).

6.5.   **Additional Restrictions on Google's use of Bid Response Data.**  Google will not use Bid Response Data to: (a) transfer or otherwise disclose in Real-Time such Bid Response Data to any Google system other than the system conducting the auction for the applicable Ad Inventory; (b) adjust or otherwise influence in Real-Time the bid response of another bidder (including Google) in the auction for the applicable Ad Inventory; (c) adjust or otherwise influence in Real-Time the computation of any price floor, price reserve, or other pricing parameter for the applicable Ad Inventory; (d) reverse engineer, or otherwise derive the underlying algorithms, strategies, models, or approach of Facebook's bidding logic (e.g., Google will not use Bid Response Data to improve Google's own bidding strategy as a bidder); or (e) associate any Bid Response Data (including any bid amounts) with any data related to Ads or Creatives (other than for the purposes set forth in second sentence of Section 6.4 or (d) of the first sentence of Section 2.1(e)).  Notwithstanding the foregoing, the immediately preceding sentence does not apply to the following data, as long as such data is not preferentially shared with DoubleClick Bid Manager or the Google Display Network as compared to all other bidders or other demand sources in an auction: (a) the amount of the second-highest bid (which may be disclosed to the winning bidder or other demand source) or (b) the amount of the highest bid (which may be disclosed to all bidders or other demand sources in the same auction).  Google may retain event-level Bid Response Data for no longer than 18 months, except for certain event-level Bid Response Data (*e.g.*, buyer identity, bid price, trading location, time stamp, etc.) which may be kept indefinitely as required by Google's reasonable and standard business practice solely for archival and record-keeping purposes (e.g., financial reporting, audit purposes, or dispute resolution).

6.6.   Restrictions on Facebook's use of Google User Data.  Facebook will not use Google User Data (including any derivatives of Google User Data, but excluding derivatives of IP address and user_agent, as such terms are referred to in Exhibit E, solely from Facebook Users, as such term is defined in Exhibit C (such derivatives of IP address and user_agent solely from Facebook Users, the "**Specified Derivative Data**")) to bid or inform bidding on any platform or channel other than the Program.  In addition, Facebook will not use Google User Data (including any derivatives of Google User Data, but excluding Specified Derivative Data) to: (a) build, create, or enhance Publisher End User profiles or advertising segments, (b) retarget Publisher End Users via other platforms or channels, or (c)

20

HIGHLY CONFIDENTIAL

GOOG-TEX-00144532



categorize an End User as a Publisher End User.  Facebook will not store or retain Google User Data (including any derivatives of Google User Data), provided that, for clarity, Facebook may store, retain and use (a) Specified Derivative Data (as long as Facebook does not store or retain the actual IP address and user-agent) for no longer than 18 months and solely if such data is otherwise used and disclosed in accordance with this Agreement and (b) any bidding models specifically for the Program trained or optimized with Google User Data in accordance with this Section 6.6.

6.7.    **Restrictions on Facebook's use of Google Proprietary Data**.  Facebook will not use Google Proprietary Data (including any derivatives of Google Proprietary Data) to: (a) bid or inform Facebook's bidding on any platform or channel other than the Program, or (b) reverse engineer or otherwise derive the underlying algorithms, strategies, models, or approach of generating Google Proprietary Data.  In addition, Facebook will not use Google Proprietary Data (including any derivatives of Google Proprietary Data) to retarget Publisher End Users on any other platforms or channels.  Notwithstanding anything to the contrary in this Agreement, starting on the Effective Date of this Agreement and continuing for 18 months thereafter, Facebook may use the data identified as bid_response_feedback.creative_status_code in Exhibit E to bid or inform Facebook bidding outside of the Program.  In addition, notwithstanding anything to the contrary in this Agreement, starting on the date on which Google begins providing such data and continuing for 6 months thereafter, Facebook may use the data identified as bid_response_feedback.competing_bid_value in Exhibit E to bid or inform Facebook bidding outside of the Program.  Facebook may retain Google Proprietary Data (including any derivatives of Google Proprietary Data), for no longer than 18 months, provided that, for clarity, Facebook may store, retain and use any bidding models specifically for the Program trained or optimized with Google User Data in accordance with this Section 6.7.

6.8.    **Restrictions on Facebook's use of Google Data**.  In addition to the other obligations in this Agreement related to the use of Google Data, Facebook will not use Google Data to build or enhance an equivalent product to DoubleClick for Publishers, AdX, or AdMob or sell, disclose, or transfer any Google Data to any third party (other than transfers or disclosures permitted under this Agreement); for clarity, (a) the foregoing does not restrict Facebook from developing or enhancing a product or service that competes with DoubleClick for Publishers, AdX, or AdMob without Google Data, (b) without limiting any other non-competing uses, Facebook will be permitted to use Google Platform Data to bid or inform Facebook's bidding on programs and channels other than the Program, and (c) without limiting any other non-competing uses, any bidding models (including technologies that implement such bidding models, e.g., Facebook's SDK) trained or optimized with Google Data (as long as such Google Data is used in accordance with this Agreement) will not deemed to be an equivalent product to DoubleClick for Publishers, AdX, or AdMob for purposes of this Agreement.  The disclosures or

21

GOOG-TEX-00144533



transfers permitted under Section 11 (Confidentiality) will also apply to Facebook's transfer or disclosure of Google Data.  Facebook may retain Google Data (excluding, Google User Data, which may not be stored or retained in accordance with Section 6.6 above) for no longer than 18 months, except for certain event-level Bid Request data (*e.g.*, publisher identity, auction clearing price, time stamp, etc.) which may be kept indefinitely as required by Facebook's reasonable and standard business practice solely for archival and record-keeping purposes (*e.g.*, financial reporting, audit purposes or dispute resolution).

6.9.    **Restrictions on Facebook's use of Publisher-Specific Data**.  Facebook will use Publisher-Specific Data solely for Ad categorization necessary for Facebook to participate in the Program, unless Facebook has obtained written consent from Publishers (including via its written agreement with Publishers) granting Facebook additional rights to use such Publisher-Specific Data (in which case, Facebook will only use such Publisher-Specific Data within the scope of such consent).  For clarity, until Facebook has obtained written consent (including via its written agreement with Publishers) granting Facebook additional rights to use Publisher-Specific Data, such data will be Google Proprietary Data.  Facebook may retain Publisher-Specific Data for no longer than 18 months, except for certain Publisher-Specific Data which may be kept indefinitely as required by Facebook's reasonable and standard business practice solely for archival and record-keeping purposes (e.g., financial reporting, audit purposes or dispute resolution).

6.10.   **Additional Data Disclosures**.  If Google discloses additional data to Facebook after the Effective Date, then Google may in its reasonable discretion (with reference to prior categorizations of similar data fields under Exhibit E of this Agreement) categorize such data as either Google User Data, Google Proprietary Data, Google Platform Data, or Publisher-Specific Data and the applicable provisions of this Agreement related to that data definition will apply to such additional disclosed data.  If Facebook objects to Google's categorization of such data, then both Parties' respective product teams will use commercially reasonable efforts to resolve the issue in a mutually agreeable manner.  If the Parties are unable to agree on a mutually agreeable categorization of such additional data after such discussions, then Google's categorization of such additional data will apply, **provided that**, if Facebook's monthly average Win Rate for Ad Inventory declines by more than 40% due to Google's categorization of such additional data (for example, Facebook's average Win Rate for Ad Inventory on a month-to-month basis declines from 10% to 6.0% due to such categorization), then Facebook has the right to initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then Facebook may immediately terminate the Agreement upon written notice to Google.   For clarity, Google may not re-categorize data that is defined as of the Effective Date as either Google User Data, Google Proprietary Data, Google Platform Data, or Publisher-Specific Data to a different category or definition.

22

HIGHLY CONFIDENTIAL



**7. Regulatory Cooperation.**

7.1.   To the extent permitted by applicable law, and subject to Section 7.2 below, each of Google and Facebook agrees to use its reasonable best efforts to:

(a)   cooperate and assist each other in responding to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority, and in defending the Agreement against any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority;

(b)   promptly and fully inform the other Party of any Governmental Communication relating to the Agreement (provided that, to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

(c)   allow the other Party a reasonable time to review and consider in good faith the views of the other with respect to any Governmental Communication (**provided that,** to the extent appropriate, any Party may designate such information as attorneys' or outside counsel only);

(d)   not advance arguments in connection with any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority (other than litigation between the Parties) over the objection of the other Party that would reasonably be likely to have a substantial adverse effect on that other Party; and

(e)   consult with the other Party in advance, to the extent practicable, and give the other Party and its counsel reasonable notice and, to the extent not prohibited by law or the relevant Governmental Authority, an opportunity to attend and participate in any meeting or discussion with any Governmental Authority relating to any Antitrust Action, Data Protection Action, or any inquiry or investigation relating to the Agreement by any Governmental Authority.

7.2.   The Parties will use reasonable best efforts to attempt to (a) reach an agreement with a Governmental Authority to reduce the scope of any Material Document Request such that the request or demand, in the receiving Party's reasonable and good faith judgment, would not cause or threaten to cause the receiving Party undue burden or material economic harm or (b) avoid or resolve an Antitrust Action or Data Protection Action that seeks to enjoin the Agreement or seeks related monetary damages, fines or penalties; **provided, however**, that reasonable best efforts in this Section 7.2 will not under any circumstances require either Party to propose, negotiate, agree to, commit to and/or effect, by consent decree, hold separate order or otherwise (i) the sale, license, divestiture, transfer, or other disposition of any assets or business; (ii) any modification to any agreement, policy or practice, or any limitation on its freedom of action with respect to any assets or business, except in

HIGHLY CONFIDENTIAL

GOOG-TEX-00144535



each case for a modification of the terms of the Agreement that does not materially alter the economics of the Agreement or result in a Material Adverse Regulatory Effect; or (iii) to make any monetary or in-kind payment, whether denominated as a fine, penalty, damages, compensation, costs, attorney's fees or otherwise.

7.3.   The foregoing obligations in this Section 7 will remain in effect after termination of the Agreement, until all Antitrust Actions, Data Protection Actions, and all inquiries or investigations relating to the Agreement by any Governmental Authority are concluded or become nonappealable and any relevant periods of limitation for the commencement of such actions have expired.

7.4.   Notwithstanding the foregoing, if only one Party is identified as a target, defendant or an addressee of an Antitrust Action, Data Protection Action, or inquiry or investigation by any Governmental Authority relating to the Agreement, the obligations in Sections 7.1(a) through 7.1(e) and 7.2 do not apply to the Party that is the target, defendant or an addressee, whereas the other Party will remain subject to those Sections.

8.   **Intellectual Property.**  Except to the extent expressly stated otherwise in the Agreement, neither Party will acquire any right, title or interest in any Intellectual Property Rights owned or licensed by the other Party.

9.   **Brand Features.**  Neither Party will use the other Party's Brand Features (including for marketing and promotional purposes) with respect to this Agreement without such Party's prior written approval.

10.   **Publicity or PR.**  Neither Party may make any public statement or issue any marketing or other materials regarding the Program or this Agreement without the other Party's prior written approval.  In addition, neither Party will issue presentations or other communications made generally available to Publishers regarding the Program without the other Party's prior written approval, **_provided that_**, the foregoing will not restrict either Party from communicating on a 1-on-1 basis with Publishers as necessary to operate or use the Program without needing to obtain approval from the other Party.  Each Party will only start communicating with Publishers regarding this Program on a mutually approved date, **_provided that_**, after either Party's first communication with any Publisher regarding this Program, the immediately preceding sentence will apply (i.e., no further approval will be necessary for 1-on-1 communications with Publishers as necessary to operate or use the Program).  Also, Facebook will not disclose to any Publisher any Fee charged by Google to Facebook that is less than the highest listed Fee in this Agreement (**_e.g._**, 10% as of the Effective Date) charged by Google.  Facebook may disclose to a Publisher the highest listed Fee in this Agreement charged by Google to Facebook, as long as such Publisher is under a non-disclosure agreement that protects the confidentiality of such disclosure with terms at least as restrictive as the terms set forth in this Agreement to protect Confidential Information.

11.   **Confidentiality.**  Other than as set forth in this Agreement, the Receiving Party will not disclose the Confidential Information of the Disclosing Party, except to Affiliates, employees, Subcontractors, or professional advisors of the Receiving Party who need to know it and who have agreed in writing (or in the case of professional advisors are

24

GOOG-TEX-00144536



otherwise bound) to keep it confidential.  The Receiving Party will ensure that those people and entities use the Confidential Information of the Disclosing Party only to exercise rights and fulfill obligations under the Agreement, and that they keep it confidential.  The Receiving Party may also disclose Confidential Information when required by law after giving reasonable notice to the Disclosing Party, if permitted by law.

12. **Beta Features.**  Google may provide Beta Features to Facebook in connection with the Program, as long as (a) Google notifies Facebook in writing (including via e-mail) prior to making the Beta Feature available for Facebook's use under the Program and (b) such Beta Features are not required to use the Program as contemplated under this Agreement. Google will have no liability under the Agreement (including any indemnification obligations) (excluding for clarity, Google's breach of Sections 2.1(b), 6.4, 6.5, 11 and 13(c)) arising out of or related to any use of Beta Features by Facebook, its Affiliates, or Advertisers.  Any use of Beta Features will be solely at Facebook's own risk and may be subject to additional requirements as specified by Google.  Google is not obligated to provide support for Beta Features and Google may cease providing Beta Features as part of the Program.  For clarity, Facebook is not required to use any Beta Features and such use is in Facebook's sole discretion.

13. **Representations and Warranties**.  Each Party represents and warrants that it (a) has all necessary rights and authority to enter into this Agreement, and perform its obligations hereunder and thereunder; (b) has obtained and maintains all rights, approvals, and consents from third parties necessary to enter into this Agreement and perform its obligations hereunder; and (c) will comply with applicable laws, rules, and regulations in (i) its performance of its obligations under this Agreement, and (ii) with respect to Google, its provision of the Program, and with respect to Facebook, its use of the Program. For clarity, reference to Section 13(c) of this Agreement refers to the compliance with laws, rules, and regulations provision set forth in the preceding sentence.

14. **Disclaimers.**  Except as expressly provided for in the Agreement and to the maximum extent permitted by applicable law, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND, WHETHER IMPLIED, STATUTORY, OR OTHERWISE, AND EACH PARTY DISCLAIMS, WITHOUT LIMITATION, ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE, AND NON-INFRINGEMENT.  THE PROGRAM AND THE AUDIENCE NETWORK SERVICE IS PROVIDED "AS IS" AND EXCEPT AS EXPRESSLY PROVIDED HEREIN, GOOGLE AND FACEBOOK, AND THEIR RESPECTIVE AFFILIATES AND ITS PUBLISHERS DO NOT MAKE ANY GUARANTEES IN CONNECTION WITH THE PROGRAM OR PROGRAM RESULTS, OR THE AUDIENCE NETWORK SERVICES, RESPECTIVELY.  IN ADDITION, NEITHER PARTY WILL HAVE ANY LIABILITY OR INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT ARISING OUT OF OR RELATED TO PUBLISHER(S) OR ANY PUBLISHER PROPER(TIES).

15. **Indemnification.**

   15.1.   Each Party (the "**Indemnifying Party**") will defend and indemnify the other Party and its officers, directors, employees and agents (each, an "**Indemnified Party**") from all third-party claims or liabilities (including reimbursement for reasonable

25

HIGHLY CONFIDENTIAL

GOOG-TEX-00144537



outside attorneys' fees and disbursements) arising out of or related to the Indemnifying Party's (or the Indemnifying Party's Subcontractors') breach or alleged breach of: (i) its obligations under this Agreement with respect to the use or non-use of data (including, for clarity, either Party's privacy obligations related to the use or non-use of data, cookies, or other identifiers), or (ii) Section 13(c) of the Agreement.  The Indemnifying Party will have no liability or obligation under this Section 15 with respect to any claim that is caused by the Indemnified Party's breach of its obligations under this Agreement.

15.2.    The Indemnified Party must (i) promptly notify the Indemnifying Party in writing of any third-party claims (except that failure of the Indemnified Party to promptly notify the Indemnifying Party will not relieve the Indemnifying Party of its indemnification obligations, except to the extent it has been damaged by the failure); (ii) reasonably cooperate with the Indemnifying Party in the defense of the matter and (iii) give the Indemnifying Party primary control of the defense of the matter and negotiations for its settlement.  The Indemnified Party may at its expense join in the defense with counsel of its choice.  The Indemnifying Party may enter into a settlement only if it (A) involves only the payment of money damages by the Indemnifying Party and (B) includes a complete release of the Indemnified Party; any other settlement will be subject to written consent of the Indemnified Party (not to be unreasonably withheld or delayed).

15.3.    If the Program (or technology used to provide the Program) becomes, or in Google's reasonable opinion is likely to become, the subject of an intellectual property infringement claim, then Google will promptly notify Facebook and, at its sole option and expense, may suspend provision of the Program (or technology used to provide the Program) and either: (x) procure the right to continue providing the Program as contemplated by this Agreement; (y) modify the Program to render it non-infringing without adversely affecting use of the Program; or (z) replace the Program with a functionally equivalent, non-infringing service.  If the above options are not commercially practicable, either Party may terminate this Agreement.

**16. Limitation of Liability**.

16.1.    EXCEPT FOR (A) INDEMNIFICATION AMOUNTS PAYABLE TO THIRD PARTIES UNDER THE AGREEMENT AND (B) BREACHES OF SECTION 11 (CONFIDENTIALITY) OF THIS AGREEMENT, TO THE FULLEST EXTENT PERMITTED BY LAW REGARDLESS OF THE THEORY OR TYPE OF CLAIM: (a) NO PARTY OR ITS AFFILIATES MAY BE HELD LIABLE UNDER THIS AGREEMENT OR ARISING OUT OF OR RELATED TO PERFORMANCE OF THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.

26

HIGHLY CONFIDENTIAL

GOOG-TEX-00144538



16.2.   EXCEPT FOR (A) INDEMNIFICATION AMOUNTS PAYABLE TO THIRD PARTIES UNDER THE AGREEMENT OR (B) AMOUNTS OWED AND PAYABLE UNDER THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY'S MAXIMUM AGGREGATE LIABILITY ARISING FROM OR RELATING TO THIS AGREEMENT EXCEED THE TOTAL AMOUNTS PAID TO GOOGLE UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE CIRCUMSTANCES THAT GAVE RISE TO THE CLAIM AT ISSUE.  THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE THIS LIMITATION.

16.3.   THE PARTIES AGREE THAT THE ABOVE PROVISIONS FAIRLY ALLOCATE THE PARTIES' RISKS AND ARE ESSENTIAL ELEMENTS OF THE BASIS OF THE BARGAIN.

17.   **Term.**  The term of this Agreement will begin on the Effective Date and continue for a period of four (4) years (the "**Initial Term**").  The Initial Term will automatically renew and continue until termination of this Agreement (the "**Renewal Term**"), unless a Party gives the other Party written notice of its intent not to renew the Agreement at least one hundred eighty (180) days prior to the end of the Initial Term, or unless terminated earlier as per this Agreement.  The Initial Term and the Renewal Term are collectively referred to as the "**Term.**"  If Google provides notice of non-renewal during the Initial Term in accordance with this Section 17, then Facebook will owe no Minimum Fee for the remainder of the fourth year of the Initial Term after Google has provided such notice; for clarity, if Facebook provides notice of non-renewal during the Initial Term in accordance with this Section 17, then the Minimum Fee will continue to apply.

18.   **Termination.**

18.1.   **Termination for Convenience.**  After the Initial Term, either Party may terminate the Agreement as follows:  (a) upon six (6) months' prior written notice to the other Party if Facebook's Gross Spend (as defined in Exhibit B) for the year of the Term immediately preceding when such notice has been provided was less than or equal to $1,000,000,000, (b) upon nine (9) months' prior written notice to the other Party if Facebook's Gross Spend for the year of the Term immediately preceding when such notice has been provided was between $1,000,000,001 to $1,500,000,000, (c) upon twelve (12) months' prior written notice to the other Party if Facebook's Gross Spend for the year of the Term immediately preceding when such notice has been provided was between $1,500,000,001 to $2,500,000,000, (d) upon eighteen (18) months' prior written notice to the other Party if Facebook's Gross Spend for the year of the Term immediately preceding when written notice has been provided was between $2,500,000,001 to $4,000,000,000, or (e) upon twenty-four (24) months' prior written notice to the other Party if Facebook's Gross Spend for the year of the Term immediately preceding when written notice has been provided was greater than $4,000,000,000.

27

GOOG-TEX-00144539



18.2. **Termination for Breach**.  Either party may terminate this Agreement if the other party: (a) fails to cure any material breach of this Agreement (excluding, for clarity, Exhibit A, which will be governed by 18.3) within sixty (60) days of the non-breaching party's written notice of such material breach; (b) ceases to do business in the ordinary course; or (c) seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against such party (and not dismissed within sixty (60) days).

18.3. **Termination for failure to comply with Program commitments**.  On an annual basis following the Effective Date until Phase 2, if either Party has failed to meet the commitments set forth in Exhibit A (Program Commitments), then the other Party may initiate the Structured Negotiation Process.  If the Parties are unable to resolve the issue following the Structured Negotiation Process, then either Party may terminate this Agreement following the Structured Negotiation Process, which termination will be effective upon 30 days' written notice.

18.4. **Termination due to Regulatory Inquiry**.  After first discussing with the other Party in good faith its concerns and potential alternatives to such termination, and only if a Party has otherwise taken all actions in compliance with the Agreement, either Party may terminate the Agreement:

(a) Within ninety calendar days of such Party receiving a Material Document Request from a Covered Governmental Authority in an investigation or inquiry substantially relating to the Agreement, **provided that**, prior to such termination pursuant to this Section 18.4(a), the terminating party will have first exhausted its reasonable best efforts obligation in Section 7.2(a) above and provided further that the terminating party will be entitled to one 30-day extension of the period provided for in this paragraph upon written notice to the other party that, while it has not yet exhausted its obligation under Section 7.2(a), it is continuing good faith efforts to do so;

(b) Within thirty calendar days of a Covered Governmental Authority commencing a formal inquiry or investigation (of which such party is a subject, target or respondent) (i) pursuant to an Antitrust Law or, in the case of a Covered Governmental Authority that is a national data protection authority, any national data protection law, and (ii) substantially relating to the Agreement;

(c) Within thirty calendar days of a Covered Governmental Authority initiating an Antitrust Action or Data Protection Action against such Party, **provided that**, prior to such termination pursuant to this provision, the Party will have first exhausted its reasonable best efforts obligations in Section 7.2(b) above (and given the other Party a reasonable opportunity to do so), and provided further that the terminating party will be entitled to up to two 30-day extensions of the period provided for in this paragraph upon written notice to the other party that, while it has not yet exhausted its obligation under Section 7.2(b) it is continuing good faith efforts to do so; or

28

GOOG-TEX-00144540



(d)     Immediately if either Party exhausted its right to appeal any court, tribunal or agency of competent jurisdiction enjoining or declaring the Agreement unlawful pursuant to the laws, rules, or regulations of that jurisdiction.

(e)     **Scope of Termination.**  Notwithstanding the above, if either party exercises its right to terminate pursuant to Sections 18.4(a) to 18.4(d), such termination will be geographically limited as set forth in this subsection (to the greatest extent technically practicable) and the Agreement will remain in force as to all other geographic regions, provided that any applicable minimum spend commitments will be prorated accordingly based on Facebook's Gross Spend in that region for the previous 12 months as a percentage of Facebook's total Gross Spend for the previous 12 months (for example, if Facebook spent $10,000,000 in a particular region for the previous 12 months and Facebook's Gross Spend was $100,000,000 for the previous 12 months, then Facebook's spend commitments would be prorated 10% (*i.e.*, $10,000,000/$100,000,000)), unless the terminating party reasonably and in good faith concludes that continuing operation of the Agreement in other geographic regions would be contrary to law, would have a Material Adverse Regulatory Effect, or would materially and adversely affect profitability of the Agreement as a whole to the terminating party:

(1)     In the case of any termination pursuant to Sections 18.4(a) – (c), the termination will have effect solely within the geographic jurisdiction of the Covered Governmental Authority whose action(s) provided the basis for the termination or, if smaller, the geographic region to which the Material Document Request, formal inquiry, investigation, Antitrust Action or Data Protection Action providing the basis for the termination relates;

(2)     In the case of any termination pursuant to Section 18.4(d), the termination will, to the greatest extent possible, be coterminous with the geographic scope of the relevant injunction or declaration of unlawfulness that provided the basis for the termination.

18.5.   **Notification of Termination.**  If this Agreement is terminated by either Party, either Party may notify impacted Publishers, **provided that**, such impacted Publishers have entered into a non-disclosure agreement protecting the confidentiality of all disclosed information.

18.6.   **Survival.** Notwithstanding termination or expiration of the Agreement, any provisions of the Agreement that by their nature are intended to survive, will survive termination including:  Sections 1 (Certain Definitions), 6 (Privacy and Data), 7 (Regulatory Cooperation), 8 (Intellectual Property), 10 (Publicity or PR), 11 (Confidentiality), 12 (Beta Features), 14 (Disclaimers), 15 (Indemnification), 16 (Limitation of Liability), 18.6 (Survival), and 19 (Miscellaneous).

**19.   Miscellaneous.**

29

HIGHLY CONFIDENTIAL

GOOG-TEX-00144541



19.1. **Assignment.**  Neither Party may assign this Agreement (in whole or in part) without the written consent of the other Party.

19.2. **Entire Agreement.**  This Agreement sets out all terms agreed between the Parties and supersedes all other agreements between the Parties relating to its subject matter. In entering into this Agreement neither Party has relied on, and neither Party will have any right or remedy based on, any statement, representation or warranty (whether made negligently or innocently), except those expressly set out in this Agreement.

19.3. **Governing Law.**  CALIFORNIA LAW, EXCLUDING CALIFORNIA'S CHOICE OF LAW RULES, WILL GOVERN ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROGRAM. ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROGRAM WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS IN SANTA CLARA COUNTY, CALIFORNIA, USA, AND THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

19.4. **Equitable Relief.**  Nothing in this Agreement will limit a Party's ability to seek equitable relief.

19.5. **Notices.**  All notices of termination or breach must be in writing and addressed to the other Party's Legal Department as well as the other party's primary contact. The e-mail address for notices being sent to Google's Legal Department is legal-notices@google.com.  The address for notices being sent to Facebook's Legal Department should be delivered to 1 Hacker Way, Menlo Park, CA 94025 with attention to Facebook Legal Department.  All other notices must be in writing and addressed to the other party's primary contact.  Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable).  These notice requirements do not apply to legal service of process, which is instead governed by applicable law.

19.6. **Amendments.**  All amendments must be agreed to by both Parties and expressly state that they are amending this Agreement.

19.7. **No Waiver.**  Neither Party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

19.8. **Severability.**  If any term (or part of a term) of the Agreement is invalid, illegal or unenforceable, the rest of the Agreement will remain in effect.

19.9. **No Third-Party Beneficiaries Unless Expressly Stated.**  Except as expressly stated in this Agreement, there are no third-party beneficiaries to this Agreement.

19.10. **No Agency.**  This Agreement does not create any agency, partnership, or joint venture among the Parties.  For clarity, this is not an exclusive agreement.

30

GOOG-TEX-00144542



19.11. **Subcontractors.** Either Party may subcontract any of its obligations under the Agreement, without the written consent of the other Party. Each Party is liable for the acts and omissions of its Subcontractors.

19.12. **Approvals.** The Parties agree that whenever the Agreement calls for written request or written approval to be provided by either Party, unless otherwise expressly stated that e-mail is not acceptable, such request or approval may be provided via e-mail. In addition, unless otherwise stated in this Agreement, any such approval will not be unreasonably withheld, delayed, or denied. For all instances in this Agreement where e-mail approval or e-mail agreement is permitted, such e-mail approval or e-mail agreement must be provided by a representative of each Party with either a title of Director or a title more senior than a Director.

19.13. **Force Majeure.** Except for payment obligations, no Party or its Affiliates is liable for inadequate performance to the extent caused by a condition that was beyond its reasonable control.

19.14. **Counterparts.** The Parties may execute this Agreement in counterparts, including facsimile, PDF, or other electronic copies, which taken together will constitute one instrument.

19.15. **Currency.** All dollar amounts referred to in this Agreement are in U.S. dollars.

19.16. **Authority.** Each Party represents that the individual signing this Agreement has the requisite legal authority to bind the Party on whose behalf he/she is signing.

Agreed and accepted as of the latest of the signature dates below (the "**Effective Date**"):

**GOOGLE LLC:**

By: ___

Name:

Title:

Date:

2018.09.27
14:10:04
-07'00'

Philipp Schindler
Authorized Signatory

**FACEBOOK, INC.:**



By: ▮▮▮▮▮▮

Name: ▮▮▮▮▮▮

Title: Chief Operating Officer

Date: September 24, 2018

**GOOGLE IRELAND LTD.:**

By: _____

Nam ▮▮▮▮▮▮

Title

Date ▮▮▮▮▮▮

Date:
2018.09.28
10:31:13
+01'00'

**FACEBOOK IRELAND LTD.:**

By: ▮▮▮▮▮▮

Name: ▮▮▮▮▮▮

Title: ▮▮▮▮▮▮

Date: September 24, 2018

31



HIGHLY CONFIDENTIAL



**EXHIBIT A**

**PROGRAM COMMITMENTS**

1. **Certain Definitions.**
   a. "**Match Rate**" means the number of Bid Requests sent where Facebook recognizes the End User (*e.g.,* via the encrypted blob on mobile app or hosted match data from cookie matching on web) divided by the number of Bid Requests sent by Google to Facebook, multiplied by 100.
   b. "**Bid Response Rate**" means the number of Bid Responses sent by Facebook divided by the number of Bid Requests sent by Google to Facebook, multiplied by 100.
   c. "**Win Rate**" means the number of Final Clearinghouse Auctions that Facebook wins divided by the number of Bid Responses sent by Facebook, multiplied by 100.

2. **Phase 1 Initial Roll-Out.**
   a. The Parties will roll-out the Program to Publishers with the intent of enabling at least fifty (50) Publishers for the Program and achieving the Match Rates, Bid Response Rates, and Win Rates set forth in this Exhibit A (the initial ramp-up period until at least fifty (50) Publishers are enabled for the Program and the Match Rates, Bid Response Rates and Win Rates set forth in Exhibit A are met is hereinafter referred to as "**Phase 1**").
   b. As Google makes batches of ten (10) Publishers available to bid against via the Program, Facebook will use commercially reasonable efforts to enable at least 80% of those Publishers (including entering into agreements with those Publishers) within three (3) months of Google making available the 10th publisher of that batch, until Facebook has enabled at least 50 of those Publishers, so that Facebook has the ability to bid against all such Publisher Ad Inventory via the Program.
   c. For example (a) if Google makes a batch of ten (10) Publishers available to bid against via the Program, Facebook will use commercially reasonable efforts to enable at least eight (8) of those Publishers within three (3) months of Google making available the tenth (10th) publisher, (b) if Google makes an additional batch of ten (10) publishers available to bid against via the Program, Facebook will use commercially reasonable efforts to enable at least sixteen (16) of the twenty (20) publishers that Google has made available within three (3) months of Google making available the twentieth (20th) publisher, (c) if Google makes a third batch of ten (10) Publishers available to bid against via the Program, Facebook will use commercially reasonable efforts to enable at least twenty-four (24) of the thirty (30) Publishers that Google has made available within three (3) months of Google making available the thirtieth (30th) Publisher, and so on. During the Program, Facebook may request that Google enable certain Publishers for the Program and Google will use commercially reasonable efforts to enable such Publishers, subject to (a) the terms and conditions of this Agreement and (b) such Publishers agreeing to the terms and conditions Facebook and Google require for publishers to participate in the Program.

3. **Match Rate.** Google will use commercially reasonable efforts to ensure that the Match Rate is at least 80% for mobile app and at least 60% for web (excluding Safari). For

32



example, for one hundred (100) Bid Requests, Google would use commercially reasonable efforts to ensure that Facebook will be able to identify the user on at least sixty (60) Bid Requests.  If other browser(s) prohibit or impose restrictions that are similar to Safari's restrictions on the use of third party cookies, then the Parties will use commercially reasonable efforts to adjust the Match Rate target level set forth in the first sentence of this section to account for such browser(s) in a mutually agreeable manner.

4. **Bid Response Rate.**  Facebook will use commercially reasonable efforts to ensure that the Bid Response Rate is no more than ten percent (10%) below the Match Rate.  For example, for one hundred (100) Bid Requests, if Facebook can identify the End User on at least sixty (60) Bid Requests, then Facebook will use commercially reasonable efforts to send a Bid Response on at least fifty-four (54) of the Bid Requests.

5. **Win Rate.**  For the duration of Phase 1 and Phase 2, Facebook will ensure that the Win Rate is at least 10%.  During Phase 3, Facebook will use commercially reasonable efforts to ensure that the Win Rate is at least 10%.  For example, for one hundred (100) Bid Requests, if Facebook can identify the End User on at least sixty (60) Bid Requests, and Facebook sends a Bid Response for fifty-four (54) of the Bid Requests, then Facebook should bid high enough to win the Final Clearinghouse Auctions on at least five and four tenths (5.4) Ad impressions.

6. **Post-Invoice Revenue Reconciliation.**  During Phase 1, the Parties will measure Google's revenue adjustment set forth in Section 5.1(d) of the Agreement and if either Party reasonably determines that such adjustment is material, then, before the Phase 1 Completion Date, the Parties will reach mutual agreement (including via e-mail) on how to mitigate such adjustment.

7. **Phase 1 Completion.**  Phase 1 will come to completion once (a) at least fifty (50) Publishers are participating in the Program, (b) the Match Rate, Bid Response Rate, and Win Rate have reached the levels set forth in this Exhibit A on average for 28 consecutive days, and (c) mutual agreement on the mitigation, if necessary, set forth in Section 6 of this Exhibit A (the "**Phase 1 Completion Date**"), <u>**provided that**</u>, Phase 2 will only begin on the first day of the first month of the Quarter immediately following the Phase 1 Completion Date (i.e., January 1, April 1, July 1, and October 1).

33

                                                                 GOOG-TEX-00144545



## EXHIBIT B

## FEE PAYMENTS

1.   **Certain Definitions.**
     a.   **"Annual Minimum Spend Commitment"** means the Gross Spend that Facebook will be required to spend on an annual basis (i.e., the 12-month period starting at the beginning of Phase 2). For clarity, the Annual Minimum Spend Commitment will not exceed $500,000,000.
     b.   **"Three-Month Minimum Spend Commitment"** means the Gross Spend that Facebook will be required to spend during each 3-month period during Phase 2 or Phase 3. For clarity, the Three-Month Spend Commitment will count towards the Annual Minimum Spend Commitment.
     c.   **"Fee"** means the amount owed to Google as a percentage of Facebook's Gross Spend, as further set forth in Exhibit B (with the Minimum Fee being the minimum amount owed to Google).
     d.   **"Gross Spend"** means the sum of all of Facebook's winning bid amounts that result in a billable event to fill Ad Inventory via the Program (for clarity, the Gross Spend is the total aggregate number of winning bids that resulted in a billable event before any fees payable to Google, Facebook, or any third party).

2.   **Phase 1.**
     a.   **Minimum Spend Commitment.** During Phase 1, Facebook will be required to spend a minimum of $20,000,000 ("**Phase 1 Minimum Spend Commitment**"). If Facebook fails to meet the Phase 1 Minimum Spend Commitment, Google will charge Facebook the applicable Fee multiplied by the Phase 1 Minimum Spend Commitment. For clarity, in the event that the Ad Inventory made available to Facebook does not allow for the $20,000,000 Phase 1 Minimum Spend Commitment, the Phase 1 Minimum Spend Commitment will need to be prorated accordingly. The foregoing proration will be calculated based on the assumption that 100,000,000,000 Bid Requests will be required during Phase 1 to reach the $20,000,000 Phase 1 Minimum Spend Commitment, so if Google sends less than 100,000,000,000 Bid Requests during Phase 1 (such as 80,000,000,000), then Facebook's Phase 1 Minimum Spend Commitment would be reduced to $16,000,000 (**e.g.**, 80,000,000,000/100,000,000,000 multiplied by $20,000,000).

3.   **Phase 2.**
     a.   **Phase 2.** Once Phase 1 is completed, as specified in Exhibit A, the Program will move into Phase 2 starting on the first day of the first month of the Quarter immediately following the Phase 1 Completion Date (for clarity, Phase 1 will continue until the Phase 2 Effective Date) ("**Phase 2 Effective Date**").
     b.   **Annual Minimum Spend Commitment.**

34



    **i.** **Initial Annual Minimum Spend Commitment.** Beginning on the first day of Phase 2, the Annual Minimum Spend Commitment for the first year of Phase 2 will be equal to the greater of (i) Facebook's average monthly spend for the three (3) months immediately preceding the beginning of Phase 2 multiplied by 12; or (ii) $20,000,000.

        1. For example, if Facebook's monthly average is $10,000,000 in Total Gross Spend for the 3-months preceding Phase 2, Facebook's initial Phase 2 Annual Minimum Spend Commitment would be $120,000,000.

    **ii.** **Annual Minimum Spend Commitment.** After the first year of Phase 2, and for each subsequent year during the Initial Term, the Annual Minimum Spend Commitment will be equal to the greater of (i) Facebook's average monthly spend for the six (6) months immediately preceding the start of such year multiplied by 12, or (ii) $20,000,000.

**c.** **Three-Month Spend Commitment.** During Phase 2, the Three-Month Spend Commitment will be equal to at least 20% of the applicable Annual Minimum Spend Commitment.

    **i.** For example, if Facebook's monthly average is $10,000,000 in Gross Spend for the 3 months preceding Phase 2, and Facebook's initial Annual Minimum Spend Commitment is $120,000,000, Facebook's Three-Month Spend Commitment would be 20% of $120,000,000, which is $24,000,000.

**d.** **Prorated Spend Commitment.** If there is not a full calendar year remaining before the end of the Initial Term, Facebook's Annual Minimum Spend Commitment and Three-Month Spend Commitment will be prorated accordingly on a monthly basis (for example, if there are six months remaining in the calendar year, Facebook's Annual Minimum Spend Commitment will be prorated by 50%).

**e.** **Minimum Fee.** If Facebook fails to meet the Three-Month Spend Commitment during any 3-month period, Facebook will be required to pay Google the applicable Fee multiplied by the Three-Month Spend Commitment. If Facebook fails to meet the Annual Minimum Spend Commitment, Google will charge Facebook the applicable Fee multiplied by the Annual Minimum Spend Commitment (such charges as set forth in the two immediately preceding sentences of this Section 3(e), the "**Minimum Fee**"). For clarity, any Three-Month Spend Commitment payment will count toward Facebook's Annual Minimum Spend Commitment.

    **i.** For example, if Facebook failed to meet a Three-Month Spend Commitment of $24,000,000, then the Minimum Fee would be equal to the 10% Fee (as set forth below) multiplied by $24,000,000, which is $2,400,000 for that 3-month period. For clarity, this Minimum Fee would count against Facebook's Annual Minimum Spend Commitment, so the Annual Minimum Spend Commitment would decrease from

35

GOOG-TEX-00144547



$120,000,000 to $96,000,000 (after Facebook paid Google the Minimum Fee).

4. **Phase 3.**

   a. **Phase 3.**  The final phase of the Program ("**Phase 3**") will begin on the first day of the fourth year of the Term ("**Phase 3 Effective Date**") and will continue for the remainder of the Term.

   b. **Annual Minimum Spend Commitment.**  As of the Phase 3 Effective Date and for each year of Phase 3, Facebook's Annual Minimum Spend Commitment will be $500,000,000.

   c. **Three-Month Spend Commitment.**  As of the Phase 3 Effective Date, Facebook's Three-Month Spend Commitment for Phase 3 will be $100,000,000.

   d. **Minimum Fee.**  In the event Facebook fails to meet either the Three-Month Spend Commitment or the Annual Spend Minimum Commitment during Phase 3, Facebook will be required to pay Google the Minimum Fee.  For clarity, any Minimum Fee during Phase 3 will be calculated in the same manner as any Minimum Fee is calculated during Phase 2, **provided that**, the applicable Fee for Phase 3 used to calculate the Minimum Fee will be as set forth in Section 5 of this Exhibit B below.

5. **Fee.**

**Phase 1 and Phase 2.**

The following Fee will be charged during Phase 1 and Phase 2:

| Gross Spend on Annual Basis | Fees (% of Gross Spend) |
| --- | --- |
| $0 - $500,000,000 | 10% |
| $500,000,001 + | 5% |

For clarity, the above rates are tiered (i.e., if Facebook spends $600,000,000, then Google will charge a 10% Fee against the first $500,000,000 of spend and a 5% Fee against the next $100,000,000 of spend).

**Phase 3.**

The following Fee will be charged during Phase 3.

36

GOOG-TEX-00144548



| Gross Spend on Annual Basis | Fee (% of Gross Spend) |
|---|---|
| $0 - $500,000,000 | 10% |
| $500,000,001 + | 5% |

For clarity, the above rates are tiered (i.e., if Facebook spends $600,000,000, then Google will charge a 10% Fee against the first $500,000,000 of spend and a 5% Fee against the next $100,000,000 of spend).

Notwithstanding the foregoing sentence and table, in Phase 3, if Facebook's Gross Spend is $375,000,000 in any Quarter, the next Quarter's Fee will be billed at a flat rate of 5% of Gross Spend; however, if Facebook fails to spend $375,000,000 in the following Quarter, the next Quarter's Fee will be billed at a flat rate of 10% of Gross Spend.  This will continue for the duration of the Term (e.g., during Phase 3, each Quarter's Fee will be adjusted based on Facebook's previous Quarter's Gross Spend).

37

GOOG-TEX-00144549



## EXHIBIT C - GOOGLE POLICIES

**Suspension for Non-Compliance**

If Facebook does not comply with this Exhibit C or Sections 6.1, 6.2, 6.6, 6.7, 6.8, 6.9, or 13(c) of the Agreement or if Facebook Ads fail to comply with the Common Advertiser Policies set forth in Exhibit D (the foregoing are hereinafter referred to as the "**Material Provisions**") and such non-compliance results in a Material Negative Event (as defined below), as reasonably determined by Google, then Google may suspend Facebook's use of the Program immediately until such non-compliance is remedied, as reasonably determined by Google, **provided that** (i) Google provides Facebook with written notice concurrent with such suspension and (ii) Google and Facebook use commercially reasonable efforts to work together to resolve such suspension within a forty-eight (48) hour period.  In all other instances, if Facebook does not comply with the Material Provisions, Google may suspend Facebook's use of the Program until such non-compliance is remedied, as reasonably determined by Google, **provided that**, (x) Google provides Facebook with five (5) days prior written notice of such suspension and (y) if Facebook fails to remedy any non-compliance by Facebook within such period, as reasonably determined by Google.  "**Material Negative Event**" means any event, or accumulation of more than one event, related to non-compliance with the Material Provisions that has, or could reasonably be expected to have, a material adverse effect on the business, financial condition, public relations, or operations of Google.

If any suspension lasts for at least sixty (60) days period and the Parties are unable to reach agreement on a resolution, then Facebook may initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then Facebook may terminate the Agreement immediately upon written notice.

**Prohibited Practices**

The Program must not be used in connection with the following:

| **Circumventing ad systems** |
| --- |
| <ul><li>Attempting to circumvent or interfere with Google's advertising systems and processes (e.g. cloaking).</li><li>Engaging in practices that attempt to artificially inflate impressions, conversions and/or clicks (e.g. pay-to-click schemes, click fraud).</li><li>Using systems that overlay ad space on a given property (e.g. site, page, app, or other property) without express permission of the property owner.</li></ul> |

**Privacy Requirements**

When using the Program, Facebook must comply with the following:

| **Identifying users and user consent** |
| --- |

38

GOOG-TEX-00144550



- Facebook must not pass any information to Google:
  - that Google could use or recognize as PII; or
  - that permanently identifies a particular device (such as a mobile phone's unique device identifier if such an identifier cannot be reset).
  - "**PII**" means information that could be used on its own to directly identify, contact or precisely locate an individual, including full names, email addresses, mailing addresses and phone numbers. For clarity, PII excludes pseudonymous cookie IDs, pseudonymous advertising IDs, IP addresses and other pseudonymous end user identifiers.
- Facebook must not use the Program to facilitate the merging of personally-identifiable information with information previously collected as non-personally identifiable information without robust notice of, and the user's prior affirmative (i.e. opt-in) consent to, that merger, **provided that** Google acknowledges and agrees that if Facebook obtains legally valid rights (including consents for Facebook Users located in any jurisdiction where such consents are required) from Facebook Users for such merger when such Facebook Users sign up to use Facebook owned-and-operated properties, the foregoing is sufficient for Facebook to comply with this obligation.
- Facebook must not set a cookie on Google's domains or modify, intercept or delete cookies set on Google's domains.
- Except for spam, fraud and security breach detection, Facebook must not use device fingerprints or locally shared objects (e.g. Flash cookies, Browser Helper Objects, HTML5 local storage) other than HTTP cookies, or user-resettable mobile device identifiers designed for use in advertising, in connection with the Program.

**Using location data**

- If in connection with the Program Facebook collects, processes or discloses information that identifies or can be used to infer an End User's precise geographic location, such as GPS, wifi or cell tower data Facebook will only send such information to Google in an encrypted state or via an encrypted channel.

**Personalized advertising**

- Facebook has obtained legally valid legal rights (including consents for Facebook Users located in any jurisdiction where such consents are required) from Facebook Users to select or target Personalized Advertising (including remarketing).  "**Facebook Users**" means End Users who have accepted the user terms and conditions for a Facebook owned-and-operated product or service.
- Facebook may select or target Personalized Advertising (including remarketing) to non-Facebook Users for purposes of promoting Facebook owned-and-operated products and services (e.g., Instagram, WhatsApp, etc.).
- Except as identified above, Facebook will not select or target Personalized Advertising (including remarketing) to non-Facebook Users, unless otherwise agreed to by Google in writing (including via e-mail).

39



- **"Personalized Advertising"** means Ads that include content and/or targeting customized on the basis of a personal characteristic (inferred or implied) of an End User.
  - Facebook must have all rights necessary to use Facebook Data and Google must have all rights necessary to use Google Data;
  - Both Parties must comply with the Self-Regulatory Principles for Online Behavioral Advertising of the Digital Advertising Alliance and IAB Europe's EU Framework for Online Behavioral Advertising).
  - For clarity, Personalized Advertising that is conducted outside of the Program will not use Google Data.

## PROGRAM GUIDELINES.

1. **Written Certification.**  No more than once every 3 years, a Party may request, in writing that the other Party provide a written certification signed by a director (or more senior member) of its Engineering team responsible for the, with respect to Google, operation of, and with respect to Facebook, use of, the Program ("**Written Certification**") stating that, after reasonable diligence, to that person's knowledge, it has complied with the terms and conditions of this Agreement.  The certifying Party will provide this Written Certification no later than 30 days after its receipt of the request. If the certifying Party has not provided Written Certification by such 30th day, then the requesting Party may initiate the Structured Negotiation Process and if the Parties are unable to resolve the issue following the Structured Negotiation Process, then, in addition to any other remedies the requesting Party may have, the requesting Party may immediately terminate the Agreement upon written notice to the other Party.

2. **Cookie Matching**

   (a) **Generally.** Subject to the Data Protection section (Section 4 of this Exhibit C) below, each Party may associate identifiers received from the cookie match service ("**Match Data**") with data such Party already owns, provided upon any User deletion of a cookie or reset of a mobile advertising identifier, such Party promptly dissociate any related data linked to the Match Data. The Parties must implement cookie matching as set forth in the sentence above as mutually agreed to by the Parties.

   (b) **Restrictions on Match Data.** Facebook and Google Demand are not permitted to use Match Data for (i) building, creating, or enhancing End User profiles, data lists, or advertising segments (except for purposes of implementing cookie matching between Facebook and Google as contemplated by this Agreement), or (ii) circumventing user identifier resets. "**Google Demand**" means DoubleClick Bid Manager or the Google Display Network when eligible to compete for the same query as Facebook under the Program.

40



GOOG-TEX-00144552



(c) **Requirements for Passing Ad Tags and Redirects.** Facebook is only permitted to redirect an ad match tag to fourth parties when the ad match is initiated by Facebook. Any such redirected ad match can only be used to associate two anonymous cookies for the subsequent purpose of enabling ad targeting and reporting for a given impression. For clarity, Facebook must own the root domain of any URL that Facebook provide to Google for use in ad matches initiated by Google.

(d) **End Users in the European Economic Area.** For End Users in the European Economic Area, Facebook will only initiate cookie matching in connection with this Program on site(s) or other web propert(ies) that are using Google publisher products.  For clarity, the Propert(ies) of any Publishers participating in the Program are deemed to be using Google publisher products.

3. **Interest-Based Advertising.**  In addition to the interest-based advertising policies included in this Exhibit C, Facebook must also comply with the following policies:

   (a) **In-Ads Notice.** Where technically feasible, Facebook will ensure that all Ads provided by Facebook or its Advertisers through the Program contain a notice that is visually distinct from the Ad Choices icon and clearly identifies Facebook or the Facebook Audience Network as the source of the Ad.  Where the foregoing is not technically feasible, then Facebook will (a) ensure that all Ads provided by provided by Facebook or its Advertisers through the Program contain the Ad Choices icon that links to a notice that identifies Facebook or the Facebook Audience Network (and not the Advertiser) as the source of the Ad, and (b) use commercially reasonable efforts to develop a solution that ensures that all Ads provided by Facebook or its Advertisers through the Program contain a notice that is visually distinct from the Ad Choices icon and clearly identifies Facebook or the Facebook Audience Network as the source of the Ad.

4. **Data Protection.**  If either Party accesses, uses, or processes personal information made available by the other that directly or indirectly identifies an individual and that originated in the European Economic Area ("**Personal Information**"), then that Party will:

   a.  comply with all privacy, data security, and data protection laws, directives, regulations, and rules in any applicable jurisdiction;
   b.  use or access Personal Information only for purposes consistent with the legal basis relied upon for the processing of that Personal Information relates;
   c.  implement appropriate organizational and technical measures to protect the Personal Information against loss, misuse, and unauthorized or unlawful access, disclosure, alteration and destruction;
   d.  and provide the same level of protection as is required by the EU-US Privacy Shield Principles.

41



GOOG-TEX-00144553



Both Parties will regularly monitor its compliance with this obligation and immediately notify the other Party in writing if such party can no longer meet this obligation, and in such cases such Party will either cease processing Personal Information or immediately take other reasonable and appropriate steps to remedy the failure to provide an adequate level of protection.

5. **Eligible Transactions in Network Bidding.**  Unless otherwise approved by Google, Facebook is not permitted to participate in the Program (i) for the purpose of buying solely on behalf of a single advertiser, including Facebook, or (ii) if Facebook uses an AdWords account to buy display or video advertising for any purpose other than to advertise Facebook's owned-and-operated products and services.

6. **No Sub-syndication Policy.**  Facebook may only purchase Ad Inventory through the Program for use directly by an Advertiser (or direct agent of an Advertiser, including third party service providers that buy Ad Inventory on behalf of an Advertiser as part of the Facebook Marketing Partner program (which excludes, for clarity, ad exchanges that are operating as ad exchanges to buy Ad Inventory on behalf of an Advertiser)) with which Facebook has a direct relationship. Reselling, distributing or otherwise sub-syndicating inventory to another indirect sales channel is prohibited. Facebook must not use the Program for buying Ad Inventory for which Facebook directly or indirectly pays or receives a share of revenues to or from an entity that would otherwise prevent the Ad Inventory from being monetized.

7. **Bidding.**  The "**Facebook Rendering Rate**" is the percentage calculated by dividing (i) the number of instances where Facebook wins the Final Clearinghouse Auction for Ad Inventory and succeeds to serve an Ad impression, resulting in a billable event, as measured by Google by (ii) the total number of Final Clearinghouse Auctions that Facebook has won on such Ad Inventory, as measured by Google.  The "**Average Rendering Rate**" is the percentage calculated by dividing (i) the number of instances where all buyers (including, for clarity, Facebook) win the Final Clearinghouse Auction for Ad Inventory and succeed to serve an Ad impression, resulting in a billable event, as measured by Google by (ii) the total number of Final Clearinghouse Auctions that all buyers (including, for clarity, Facebook) have won on such Ad Inventory, as measured by Google.  The "**Rendering Rate Ratio**" is the Average Rendering Rate divided by the Facebook Rendering Rate, **provided that** if such ratio is between .97 and 1.03, then Google will provide a Rendering Rate Ratio of 1.0.  For clarity, with respect to a Rendering Rate Ratio, the component Facebook Rendering Rate and Average Rendering Rate will each be measured over the same time period.  In each Bid Request, Google will provide Facebook the Rendering Rate Ratio and sufficient information for Facebook to calculate the Facebook Rendering Rate and Average Rendering Rate.  "**Competing Bid**" means Facebook's bid value on the applicable Ad Inventory in the Final Clearinghouse Auction.  "**Payment Bid**" means Facebook's bid value on the applicable Ad Inventory in the Final Clearinghouse Auction multiplied by the Rendering Rate Ratio.  For clarity, the Payment Bid divided by the Competing Bid must equal the

42

GOOG-TEX-00144554



Rendering Rate Ratio.  In each Bid Response, Facebook will provide Google with both the Competing Bid and the Payment Bid.  If Facebook omits either the Payment Bid and Competing Bid in the Bid Response or if the Payment Bid divided by the Competing Bid does not equal the Rendering Rate Ratio, then such Facebook bid is considered an invalid response and will not compete in the Final Clearinghouse Auction.  For clarity, (a) the foregoing process set forth in this Section 7 of Exhibit C is not considered a violation of Section 2.1(a) of the Agreement and (b) the Parties may agree, in writing, to a mutually agreeable alternative solution to the solution set forth in this Section 7 of Exhibit C (such agreement may be provided via e-mail).

HIGHLY CONFIDENTIAL

GOOG-TEX-00144555



**EXHIBIT D - COMMON ADVERTISER POLICIES**

The following is a subset of the Facebook Advertising Policies in effect as of the Effective Date:

**4. Prohibited Content**

**4.3 Discriminatory Practices.**  Ads must not discriminate or encourage discrimination against people based on personal attributes such as race, ethnicity, color, national origin, religion, age, sex, sexual orientation, gender identity, family status, disability, medical or genetic condition.

**4.6 Unsafe Supplements.**  Ads must not promote the sale or use of unsafe supplements, as determined by Facebook in its sole discretion.

**4.8 Adult Products or Services.**  Ads must not promote the sale or use of adult products or services, except for ads for family planning and contraception. Ads for contraceptives must focus on the contraceptive features of the product, and not on sexual pleasure or sexual enhancement, and must be targeted to people 18 years or older.

**4.9 Adult Content.**  Ads must not contain adult content. This includes nudity, depictions of people in explicit or suggestive positions, or activities that are overly suggestive or sexually provocative.

**4.12 Personal Attributes.**  Ads must not contain content that asserts or implies personal attributes. This includes direct or indirect assertions or implications about a person's race, ethnic origin, religion, beliefs, age, sexual orientation or practices, gender identity, disability, medical condition (including physical or mental health), financial status, membership in a trade union, criminal record, or name.

**5. Restricted Content**

**5.3 Real Money Gambling.**  Ads that promote or facilitate online real money gambling, real money games of skill or real money lotteries, including online real money casino, sports books, bingo, or poker, are only allowed with prior written permission. Authorized gambling, games of skill or lottery ads must target people 18 years or older who are in jurisdictions for which permission has been granted.

**5.11 Political Advertising.**  Advertisers can run political, election related and issue ads, provided the advertiser complies with all applicable laws and the authorization process required by Facebook.

44



GOOG-TEX-00144556



### 10. Lead Ads

**10.4 Government Issued Identifiers.**  Ads must not request government-issued identifiers, including Social Security numbers, passport numbers or driver's license numbers without our prior permission.

**10.8 Race or Ethnicity.**  Ads must not request information regarding race or ethnicity without our prior permission.

**10.12 Trade Union Membership.**  Ads must not request information regarding trade Union membership status without our prior permission.

45

GOOG-TEX-00144557



**EXHIBIT E – DATA CATEGORIES**

| Data Fields | Data Categories |
| --- | --- |
| Device.brand | Google User Data |
| Device.carrier_id | Google User Data |
| Device.device_type | Google User Data |
| Device.hardware_version | Google User Data |
| Device.model | Google User Data |
| Device.os_version | Google User Data |
| Device.platform | Google User Data |
| Device.screen_height | Google User Data |
| Device.screen_pixel_ratio_millis | Google User Data |
| Device.screen_width | Google User Data |
| geo_criteria_id | Google User Data |
| google_user_id | Google User Data |
| hyperlocal_set | Google User Data |
| ip | Google User Data |
| Mobile.advertising_id | Google User Data |
| Mobile.hashed_idfa | Google User Data |
| postal_code | Google User Data |
| postal_code_prefix | Google User Data |
| timezone_offset | Google User Data |
| user_agent | Google User Data |
| AdSlot.allowed_languages | Google Proprietary Data until launch of mutually agreed upon blocking functionality in accordance with Section 2.1(f), then Publisher-Specific Data |
| AdSlot.allowed_vendor_type | Google Proprietary Data until launch of mutually agreed upon blocking functionality in accordance with Section 2.1(f), then Publisher-Specific Data |
| AdSlot.excluded_attribute | Google Proprietary Data until launch of mutually agreed upon blocking functionality in accordance with Section 2.1(f), then Publisher-Specific Data |
| AdSlot.excluded_product_category | Google Proprietary Data until launch of mutually agreed upon blocking functionality |

46

GOOG-TEX-00144558



| | |
|---|---|
| | in accordance with Section 2.1(f), then Publisher-Specific Data |
| AdSlot.excluded_sensitive_category | Google Proprietary Data until launch of mutually agreed upon blocking functionality in accordance with Section 2.1(f), then Publisher-Specific Data |
| AdSlot.click_through_rate | Google Proprietary Data |
| AdSlot.dfp_ad_unit_code | Google Proprietary Data |
| AdSlot.ExchangeBidding.key_value | Google Proprietary Data |
| AdSlot.ExchangeBidding.publisher_parameter | Google Proprietary Data |
| AdSlot.MatchingAdData.minimum_cpm_micros | Google Proprietary Data |
| AdSlot.session_depth | Google Proprietary Data |
| AdSlot.slot_visibility | Google Proprietary Data |
| AdSlot.video_completion_rate | Google Proprietary Data |
| AdSlot.viewability | Google Proprietary Data |
| anonymous_id | Google Proprietary Data |
| bid_response_feedback.competing_bid_value | Google Proprietary Data |
| bid_response_feedback.creative_status_code | Google Proprietary Data |
| detected_content_label | Google Proprietary Data |
| detected_language | Google Proprietary Data |
| detected_vertical | Google Proprietary Data |
| Mobile.is_mobile_web_optimized | Google Proprietary Data |
| Video.content_attributes | Google Proprietary Data |
| Rendering Rate Ratio | Google Proprietary Data |
| Average Rendering Rate | Google Proprietary Data |
| Facebook Rendering Rate | Google Platform Data |
| AdSlot.ad_block_key | Google Platform Data |
| AdSlot.allowed_ad_types | Google Platform Data |
| AdSlot.amp_ad_requirement_type | Google Platform Data |
| AdSlot.buyer_generated_request_data | Google Platform Data |
| AdSlot.consented_providers_settings | Google Platform Data |
| AdSlot.height | Google Platform Data |
| Adslot.id | Google Platform Data |
| AdSlot.iframing_state | Google Platform Data |
| AdSlot.is_amp_page | Google Platform Data |
| AdSlot.is_rewarded | Google Platform Data |
| AdSlot.MatchingAdData.billing_id | Google Platform Data |

47

HIGHLY CONFIDENTIAL

GOOG-TEX-00144559



| | |
|---|---|
| AdSlot.NativeAdTemplate | Google Platform Data |
| AdSlot.regs_gdpr | Google Platform Data |
| AdSlot.renderer | Google Platform Data |
| AdSlot.sticky_settings | Google Platform Data |
| AdSlot.width | Google Platform Data |
| bid_response_feedback.buyer_creative_id | Google Platform Data |
| bid_response_feedback.event_notification_code | Google Platform Data |
| bid_response_feedback.request_id | Google Platform Data |
| hosted_match_data | Google Platform Data |
| Mobile.app_category_id | Google Platform Data |
| Mobile.app_category_ids | Google Platform Data |
| Mobile.app_id | Google Platform Data |
| Mobile.app_name | Google Platform Data |
| Mobile.app_rating | Google Platform Data |
| Mobile.is_app | Google Platform Data |
| publisher_country | Google Platform Data |
| publisher_id | Google Platform Data |
| Reporting (include API access, data transfer) | Google Platform Data |
| response_deadline_ms | Google Platform Data |
| url | Google Platform Data |
| user_data_treatment | Google Platform Data |
| Video.allowed_video_formats | Google Platform Data |
| Video.companion_slot* | Google Platform Data |
| Video.description_url | Google Platform Data |
| Video.end_cap_support | Google Platform Data |
| Video.max_ad_duration | Google Platform Data |
| Video.min_ad_duration | Google Platform Data |
| Video.placement | Google Platform Data |
| Video.playback_method | Google Platform Data |
| Video.protocols | Google Platform Data |
| Video.skippable_max_ad_duration | Google Platform Data |
| Video.video_ad_skippable | Google Platform Data |
| Video.videoad_start_delay | Google Platform Data |
| Match Data | Match Data |

48

HIGHLY CONFIDENTIAL

GOOG-TEX-00144560