M4JQgooC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE GOOGLE ADVERTISING
    ANTITRUST LITIGATION
4
                                      21 MDL 3010 (PKC)
5                                          Conference

6   ------------------------------x
                                      New York, N.Y.
7                                     April 19, 2022
                                      3:20 p.m.
8
    Before:
9
                        HON. P. KEVIN CASTEL
10
                                       District Judge
11
                           APPEARANCES
12  JASON ALLEN ZWEIG
         Attorney for State Plaintiffs
13
    LANIER LAW FIRM
14       Attorney for State Plaintiffs
    ZEKE DeROSE III
15
    GIRARD SHARP LLP
16       Attorneys for Plaintiff Advertisers
    JORDAN ELIAS
17
    AHDOOT & WOLFSON PC
18       Attorneys for Plaintiff Advertisers
    BRADLEY K. KING
19
    ZWERLING SCHACHTER & ZWERLING LLP
20       Attorneys for SPX/Skinny School Plaintiffs
    FRED TAYLOR ISQUITH
21

22  KELLOG HANSEN TODD FIGEL & FREDERICK PLLC
         Attorneys for Associated Newspapers
23  ERIC J. MAIER
    JOHN THORNE
24  SARAH MARGOLIS

25

M4JQgooC

1    APPEARANCES CONTINUED:

2

     HERMAN JONES LLP
3         Attorneys for Direct Action Newpaper Plaintiffs
     SERINA MARIE VASH

4

5    BOIES SCHILLER & FLEXNER
          Attorneys for Publisher Plaintiffs
6    DAVID BOIES

7    BERGER MONTAGUE PC
          Attorneys for Publisher Plaintiffs
8    CAITLIN GOLDWATER COSLETT

9    KOREIN TILLERY LLC
          Attorneys for Publisher Plaintiffs
10   GEORGE A. ZELES
     CRAVATH SWAINE & MOORE LLP
11        Attorneys for Defendant Meta
     KEVIN J. ORSINI

12

     FRESHFIELDS BRUCKHAUS DERINGER US LLP
13        Attorneys for Defendant Google LLC
     ERIC MAHR
14   ROBERT JOHN McCALLUM

15

16

17

18

19

20

21

22

23

24

25

M4JQgooC

```
 1          (In open court; case called)
 2          THE COURT:  This is In Re Google Digital Antitrust
 3   Litigation 21 MD 3010.  First of all, if you are fully
 4   vaccinated and three feet or more from the person next to you,
 5   you may take your face mask off or you may leave it on, as you
 6   wish.
 7          I will just do the roll call.  I have Mr. Zweig.
 8          MR. ZWEIG:  Right here.
 9          THE COURT:  Mr. DeRose.
10          MR. DeROSE:  Right here, your Honor.
11          THE COURT:  And Jordan Elias for the Plaintiff
12   Advertisers?
13          MR. ELIAS:  In the box.
14          THE COURT:  Thank you.
15          Bradley King for the Plaintiff Advertisers.
16          MR. KING:  Also in the box.
17          THE COURT:  Thank you.
18          Mr. Isquith, where are you?
19          (Raises his hand)
20          THE COURT:  Mr. Maier for Associated Newspapers.
21          (Indicating)
22          THE COURT:  Mr. Isquith is representing SPX/Skinny
23   School.
24          Mr. Thorne for Associated Newspapers.
25          MR. THORNE:  Your Honor.
```

M4JQgooC

```
1          THE COURT:  Ms. Margolis also for Associated
2    Newspapers.
3          (Indicating)
4          THE COURT:  Ms. Vash, where are you?
5          MR. VASH:  Right here.
6          THE COURT:  For the Direct Action Newspaper
7    Plaintiffs.
8          Mr. Boies, I see in the front row for the Publisher
9    Plaintiffs.
10         Ms. Coslett.  Thank you.
11         Mr. Zeles for Publisher Plaintiffs.
12         (Indicating)
13         Mr. Orsini for defendant Meta Defendant.
14         THE COURT:  And Mr. Mahr for Google.
15         MR. MAHR:  Right here.
16         THE COURT:  Where is Mr. Mahr?
17         So let me get something straight here from the outset
18   which should not be controversial.  Have the two million
19   documents that were produced in the state investigations and
20   were ordered produced in the Northern District of California
21   been produced to the plaintiffs in the civil cases that are
22   part of this MDL on the basis of the interim protective order,
23   all of them?
24         THE COURT:  I'm going to ask Google first and then
25   when you hear his answer, then raise your hand and maybe you
```

M4JQgooC

1    can contribute something.

2              Go ahead.

3              MR. MAHR:  Yes, your Honor.

4              THE COURT:  Yes, sir.

5              MR. MAIER:  I would just say we are still working to

6    make sure we have all of the documents.  Right now we have --

7    are showing about a 20,000 to 21,000 document deficit.  We are

8    working to figure out what those documents are, and then we

9    will reach out to Google.

10             THE COURT:  Let's just have good habits here.  Please

11   state your name every time you talk for the benefit of our

12   court reporter.

13             MR. MAIER:  Eric Maier for plaintiff Associated.

14             THE COURT:  Thank you.  So that at least is behind us.

15             I have to tell you this protective order is the worst

16   kind of overkill I've ever seen, and folks do business every

17   day of the week, and I realize this is not an

18   everyday-of-the-week case, but with serious confidential

19   information in MDLs with orders that are more clear that reduce

20   the likelihood of more disputes.  So this is just a hot mess as

21   far as I'm concerned.

22             I look on page 8, and I see references to the Texas

23   OAG order and the multistate confidentiality agreement and a

24   protective order in *Texas v. Google* and how they all relate to

25   this order.  I don't know that I have any of those documents.

M4JQgooC

```
1   I know that there is a view by Google that the state plaintiffs

2   should be bound by some of those documents, some of those

3   orders rather than by this protective order, right?  Isn't that

4   Google's position?

5           MR. MAHR:  No, your Honor.  We think that all the

6   parties to this case should be bound by the protective order

7   you're going to enter in this case.

8           THE COURT:  Including the state plaintiffs.

9           MR. MAHR:  Including the state plaintiffs.

10          THE COURT:  And the state plaintiffs agree with that?

11          MR. MAHR:  They'd have to speak for themselves.  I do

12  think, your Honor, that our third parties, however, whose

13  materials were produced under those previous protective orders

14  who are not a party to this case and who we therefore think

15  those protections should remain in place for.

16          MR. ZWEIG:  Your Honor, the state plaintiffs do agree

17  with that.  The only exception to that is how to treat the

18  investigation materials that were produced in our investigation

19  of Google.

20          THE COURT:  All right.  Now tell me about what they

21  are.

22          MR. ZWEIG:  So that's the 2 million documents that

23  your Honor just referenced.  We believe that when --

24          THE COURT:  Well, that's a pretty big carveout.  So

25  those two million documents, which I thought is the bulk of
```

M4JQgooC

what we're talking about today, you don't believe should be

under the proposed protective order that's being submitted in

this case but should remain under the prior protective order,

is that your position?

MR. ZWEIG:  No, your Honor.  We think the

investigation materials were essentially produced in this

litigation and are now essentially part of this MDL and should

be governed by the order that we're talking about today and

that we have the disputes on.

I think that's -- I'm sorry, your Honor.  That's

Google's position that the investigation materials should be

treated under the prior order only as to the state plaintiffs,

so they seem to want to have two different regimes.

THE COURT:  Is that accurate?

MR. MAHR:  No, your Honor.  For example, with respect

to clawbacks, we agree that whatever procedure the Court

decides on for clawbacks in this case should apply to all those

documents as well.  There is a dispute between the parties as

to whether -- and it's a bit of a technical question, but

whether those 2,200,000 documents should be viewed as deemed

produced in this case.  Our concern there is that the

plaintiffs will use that as a back door to then ask for a

privilege log that they didn't pursue during the investigation

and will try to do that now.  That's what they suggested in a

meet-and-confer.

M4JQgooC

1          THE COURT:  I have to tell you.  I think that's what

2     you're trying to do in this document, is resolve a lot of

3     issues down the road that don't go to the question of

4     protection of confidential information in this document.

5          All right.  Let's start with an easy one.  Let's go to

6     page 2, paragraph 1(b).  It sounds so reasonable when you read

7     it.  "Confidential information or confidential means

8     information (regardless of how it is generated, stored or

9     maintained) or tangible things that qualify for protection

10    under Federal Rule of Civil Procedure 26(c)."

11         How reasonable does that sound?  Okay.  So tell me

12    what the standard is under 26(c), Mr. Mahr.

13         MR. MAHR:  The standard under 26(c) addresses

14    documents that could humiliate, embarrass, or otherwise -- I

15    don't have it in front of me -- harm the interests of the

16    producing party.

17         THE COURT:  Well, let's see if that's quite what it

18    says.  So, it sets forth a regime where a party may seek

19    protection for certain documents.  So it tells you where you

20    may move for a protective order, and you may move for an order

21    forbidding the disclosure or discovery.

22         Does that have anything to do with this?

23         MR. MAHR:  With a protective order, no.

24         THE COURT:  Okay, so that's 26(c).  The next provision

25    is "specifying the terms including time and place or the

M4JQgooC

1    allocation of expenses for the discovery or disclosure."  This

2    is now 26(c) which you incorporate.

3              Does that have anything to do with this?

4              MR. MAHR:  I should first say I don't want to be

5    defending this.  This was plaintiff's suggestion to which we

6    agreed, but --

7              THE COURT:  Well, then you're on the hook.

8              MR. MAHR:  Sure.  And I think the idea was -- is it in

9    the last line.  I don't have 23(c) -- 26(c) in front of me,

10   unfortunately, but there's a list of reasons why --

11             THE COURT:  A through H.  Go ahead.

12             MR. MAHR:  Right before A through H, if I'm picturing

13   it correctly, it talks about harassment, embarrassment, and

14   those factors.  Those are the things I believe the parties

15   believed would be a basis for identifying something as

16   confidential information.

17             THE COURT:  So confidential information would be

18   information that if disclosed would present annoyance,

19   embarrassment, oppression or undue burden or expense.

20             So how do I apply that standard:  Undue burden or

21   expense?  What does that have do with the confidentiality of

22   the document?  The document request might be wildly overbroad,

23   and it may cost a king's ransom to produce it, but what does it

24   have to do with confidentiality?

25             MR. MAHR:  It doesn't, your Honor.

M4JQgooC

1          THE COURT:  So, you know, I pick this up, this isn't

2     even something in dispute.  This doesn't give a workable

3     standard of what's confidential.

4          I think where I'm headed on this is I'm going to issue

5     a confidentiality order in this case because I really think the

6     parties fell down on the job.  No one's -- everybody is acting

7     in the utmost good faith.  I am not suggesting otherwise.  But

8     this is not helpful.  This is the stuff that causes fights and

9     disputes and time-wasting and satellite litigations.

10          Now, we get to, I think, the first substantive dispute

11     is on page 3.  "Subject to the foregoing, highly confidential

12     information may include trade secrets, including algorithm and

13     source code."  And plaintiff wants to change that to algorithms

14     or source code.

15          Help me out here.  Maybe it's late in the afternoon,

16     but what is the intended meaning of that change, the *and* to an

17     *or*?

18          MR. ZWEIG:  I think it's not as much the *and* or the

19     *or*, your Honor, as it is the defined term source code.

20     Paragraph 1(u) -- proposed 1(u) on page 7 where source code is

21     defined, it's plaintiff's position that the protective order

22     that we've negotiated should govern source code.  Source code

23     is a complex area, obviously.  I have one of my co-counsel here

24     who just negotiated with Google.  It took one and a half years

25     to get a source code provision.  We think we should be doing it

M4JQgooC

1    now and get it done now while we're waiting on the motion to

2    dismiss.  We're not asking they produce source code.  We just

3    want to get this issue off the table.  So it's more of an issue

4    of the fact that we want to have that defined term source code

5    and have this protective order govern the production of source

6    code, and there's a dispute between the plaintiffs and Google

7    on that.

8              THE COURT:  All right.  So now help me out.  Somebody

9    help me out here.  If I agreed with the party who doesn't want

10   initial cap S and C source code, but wants lower S and C source

11   code, what would I be buying into if I went with the lower case

12   S and C rather than the upper case S and C?  What would be the

13   significance of this?  Can you explain this to me?  Because I

14   tried to spend some time with this, and I wasn't smart enough

15   to be able to figure it out.  Go ahead.

16             MR. MAHR:  Your Honor, Eric Mahr for Google.  I

17   apologize for the confusion.  I believe that the upper case

18   S and C imports into this protective order, and I think this is

19   one of the issues that you're raising, seven or eight pages on

20   the treatment of source code which were introduced into these

21   negotiations in December after we were going forward on them

22   for two months, and there were no source code provisions in the

23   Texas protective order.  There were not any in the Northern

24   District of California protective orders in this case, but

25   after two months while we were on the verge of being able to

M4JQgooC

present the issues that do exist to you in January, they were
introduced.

        We have tried to meet and confer on them.  We have
provided three pages of our comments and questions about the
proposed source codes, and we haven't got any engagement from
the plaintiffs on that.  We, therefore, think this issue should
be negotiated separately.  Source code, you can't overstate how
it's the crown jewels, courts have recognized this, of a
digital company.

        THE COURT:  I got it.  But let me ask you a question.
Google - I'm just taking a wild guess - has been involved in a
fair amount of litigation over its lifetime.  Are you telling
me that you've never entered into a confidentiality order
that's covered source code?

        MR. MAHR:  We have entered into those agreements, but
those agreements specifically addressed source code, typically
taking as the basis for them the model provided by the Northern
District of California on source code.  Plaintiffs said that
they used that as inspiration, but they apparently didn't find
it very inspiring because they have a number of really
significant departures from that model, and when we've asked
them about it in the three pages of questions that we appended
to our letter to you, they haven't engaged on it.  They just
said, we're at an impasse.  Let's see what happens when we go
to the Judge.

M4JQgooC

1          MR. ZWEIG:  Well, your Honor, you may not be surprised

2     to hear we don't agree with the presentation of the chronology

3     that Mr. Mahr presented.  We provided the first draft of a

4     protective order to Google on October -- and I still call it

5     Facebook.

6          THE COURT:  Got it.

7          MR. ZWEIG:  Google and Facebook on October 15.  We

8     used as a model the protective order that Judge Jordan entered

9     in the Eastern District of Texas that defined *highly*

10    *confidential information* as it is here when it had the lower

11    case source code.  Google then in their revisions carved that

12    out and said we'll negotiate source code at a later date.  That

13    was in mid-November.  We then said, well, why are they doing

14    that?  It takes a long time to --

15         THE COURT:  Let's get to the end of the story now.

16    There's a Northern District of California model source code

17    protection, okay.  It's reported that you found your

18    inspiration from that.  You could admit or deny, but assuming

19    you did, what's the problem?  Google has entered into a number

20    of protective orders governing source code.

21         Mr. Mahr, I assume you're not unwilling to produce

22    three exemplars of protective orders for source code that

23    Google has signed onto?

24         MR. MAHR:  We certainly can do that, your Honor.

25         THE COURT:  Okay.  Let's get that.  See whether you

M4JQgooC

1   can live with it.

2          MR. ZWEIG:  That's fine with us, your Honor.  We just

3   wanted to negotiate the source code protocol, that's it, and we

4   have been on -- they still get to respond.

5          THE COURT:  You've got to be creative.  If you have an

6   obstacle like that, why not say to the other guy exactly as

7   I've said, let me see what you've done in another court.

8          MR. ZWEIG:  I'm sorry.  Just so it's clear, your

9   Honor, we when we provided them with our first draft of source

10  code provisions, yes, the Northern District of California one

11  was used, but we also used two other ones that Google had

12  signed onto in other cases, so it was an amalgam of all three

13  documents, but that wasn't sufficient for Google.

14         THE COURT:  Well, you know what?  To some extent the

15  perfect is going to be the enemy of the good here, and so

16  presumably Google would be in an awkward spot before me if you

17  looked at the three of them and so there's A, B and C.  A said,

18  well, as plaintiff's lawyer, I like B the best.  A and C may be

19  okay, but I like B the best.  We agree to B.  And Google says

20  no.  That's a tough spot for them to be in if they agreed to it

21  in another case.  Why does everybody have to reinvent wheels

22  here?

23         Mr. Boies, you wanted to make a comment.

24         MR. BOIES:  No, I think the Court actually just said

25  what I was going to say.  I think that the right way to proceed

M4JQgooC

```
1    is for them to give us protective orders that they've entered

2    into in the past, and we can give them a choice and see if they

3    accept it.

4            THE COURT:  Okay.  And this order is going to have to

5    have a very clear designation of what is confidential

6    information.

7            MR. BOIES:  Yes.

8            THE COURT:  That's for sure.

9            MR. MAIER:  Your Honor?

10           THE COURT:  Yes.

11           MR. MAIER:  Eric Maier for Associated Newspapers.  I

12   just want to be clear about one thing.  We sort of are in the

13   position that you just laid out where Google is objecting to a

14   source code protocol that they entered into just 12 days ago,

15   actually, in another antitrust MDL where Google is the

16   defendant.  Google agreed to accept 12 of the 16,

17   three-quarters of the 16 things, that they objected to in the

18   letter to your Honor, and that was just a day after they

19   responded to -- or submitted their letter in this case.

20           THE COURT:  I choose to be an optimist, and I think

21   maybe they're going to rethink it, okay?

22           Okay, I'll bite.  On page 5(k), what are we trying to

23   capture there?  I understand what "governed by the terms of

24   this order" means.  I do understand that, and I would have

25   thought that I understood "deemed to have been produced in
```

1    these actions."  What are you all disputing and fighting about

2    there?

3              MR. ZWEIG:  Want me to go first, your Honor?

4              And I apologize to the court reporter.  I forgot to

5    announce my name at the beginning.  Jason Zweig.

6              I think that goes back to the first issue your Honor

7    raised about how to deal with the investigation materials.  I

8    think we all agree that this confidentiality order once entered

9    will govern the parties, all parties going forward, but what do

10   we do about the materials that were produced in our

11   investigation.  And I think that implicates two issues:  How do

12   you treat clawbacks of the investigation materials and

13   privilege logs.  That's really the two issues.

14             Google has said that they did not believe that these

15   documents were produced in this MDL; that those are -- at least

16   as to the state plaintiffs, those are materials that were

17   produced in a state investigation, and so issues such as like

18   clawbacks, for example, Mr. Mahr said that this order should

19   govern clawbacks for even the investigation materials.  That's

20   the first time we've heard that.  Because in meet-and-confers

21   they've taken the position that, at least as to the state

22   plaintiffs, clawbacks need to be litigated in all the different

23   state courts for all of the different state plaintiffs, and we

24   said that's ridiculous.  Judge Castel has this MDL, you know,

25   to the extent we have an issue on those, we can talk to the

M4JQgooC

1   Judge about that.

2          THE COURT:  Are you talking about privileged

3   clawbacks?

4          MR. ZWEIG:  Yes.

5          THE COURT:  All right.  What I don't understand, and I

6   don't know, maybe this is Google's position, but is there any

7   dispute -- put the state plaintiffs aside.  Take the publisher

8   class, the advertising class, the individual actions.  Is there

9   any dispute that the two million documents that have now been

10  produced, albeit under an interim confidentiality order, were

11  produced in this action?

12         MR. MAHR:  Well, we don't have an objection to the

13  plain meanings of the word.  I think Mr. Zweig just suggested--

14         THE COURT:  No.  No.  Answer my question.

15         MR. MAHR:  No, there isn't.

16         THE COURT:  So they were produced in this action.

17         MR. MAHR:  They were provided in this action.  I

18  think -- they were not produced to the extent they were

19  produced to discovery requests that were tailored to the needs

20  of this case and tailored to the relevant actions subject to

21  the action.

22         THE COURT:  That may be true, but they were produced

23  in this action as an order of this Court, not in any of the

24  standalone state actions.

25         MR. MAHR:  Yes.  Yes, your Honor.

M4JQgooC

```
1          THE COURT:  So those documents are intended to be

2   governed vis-a-vis, let's say, Mr. Boies' client, under this

3   protective order.  Right?

4          MR. MAHR:  Correct.  And if we have a clawback

5   request, we'll do it under this protective order under the

6   procedure you --

7          THE COURT:  But, however, if the state plaintiffs --

8   as to the state plaintiffs, your position is they're not.

9          MR. MAHR:  No.  Same clawback provisions regardless

10  whether -- who it is from.  We'll be clawing the document back

11  from everyone, and, therefore, it should be it same procedure

12  for clawing it back.  We wouldn't just claw it back from one

13  party and not another.

14         THE COURT:  Again, maybe my lawyering skills are

15  fading, but I'm not gathering the distinction between "governed

16  by the terms of this order" or "deemed to have been produced in

17  these actions" which would have the effect of it being governed

18  by this order.  So what am I missing here?

19         Maybe Mr. Boies can explain this to me.

20         MR. BOIES:  I think your Honor is exactly correct;

21  that if it's deemed to have been produced in these actions, it

22  will by definition be governed by the terms of this order.

23         Now, what I think maybe is not being performed as

24  correctly as it might as to why Google cares about this, what

25  Googling thinks is that if these documents are not produced in
```

M4JQgooC

1    this action, that they somehow -- we just got them out of Texas

2    without a court order, without them being produced in this

3    action, then they don't have to respond to, for example, a

4    request for a privilege log for alleged privileged documents

5    that they withheld.  This is to some extent, I think, another

6    issue of trying to solve problems down the road in the

7    protective order.

8           THE COURT:  Well, I have a little bit of sympathy if

9    that's what Google is saying, there may be another way to deal

10   with this from the standpoint of a -- forget the state

11   plaintiffs for a moment.  State plaintiffs got these through a

12   lawful means in the state investigation and the state action.

13   That's done.  But I don't think it's appropriate for the

14   private plaintiffs to turn around and say, well, go back and

15   look at what caused you to produce this to the state in the

16   state investigative phase and tell me what you didn't produce

17   to them because it was privileged.

18           I'll tell you what would be fair, is if you want to

19   frame a proper Rule 34 request and the Rule 34 request sweeps

20   in documents as to which the attorney/client privilege applies,

21   then that's a different story, and it may very well be fair and

22   appropriate that Google produce a log.  All right?

23           I imagine, I don't know, people can be very creative

24   with their Rule 34 requests, but I'm going to take a wild guess

25   that a very high percentage of the documents that a reasonable

M4JQgooC

1    Rule 34 request would reach, Google is going to say it's

2    already in the documents you have.  But there are some

3    documents that are responsive to this Rule 34 request which you

4    crafted in 2022 that Google is going to say, no, we don't plan

5    to give you that.  We haven't given it to you as part of the

6    two million, and we don't plan to because they're privileged,

7    and in that instance, the rules of the road are you produce a

8    privilege log.

9            And I see counsel for Google pretty much nodding in

10   agreement.

11           MR. MAHR:  Yes, your Honor.  If I may, Eric Mahr for

12   Google.  You put your finger on it, and I'm sorry it wasn't

13   clear on the face of it.  "Deemed produce in this action" seems

14   like innocent words, but through the meet and confer it was

15   made clear that that was viewed as a way to get a privilege log

16   looking backwards.  We're happy to do Rule 34 discovery when

17   your Honor lifts the stay, and at that point if there's a

18   privilege log required, then we would comply with order at that

19   point, but not going back to two years in the state court

20   investigation.

21           THE COURT:  Yeah.  And actually this is not even

22   really an issue that affects the state.  I don't know.  I guess

23   the state could still issue a Rule 34 demand and trigger the

24   obligation.

25           MR. ZWEIG:  Yeah, your Honor.  If I may, the

M4JQgooC

1    discussion you just had with Mr. Boies I think was qualified as

2    to the private plaintiffs.

3            THE COURT:  I know.  And I want to hear about it.

4            MR. ZWEIG:  So, in fact, in Judge Jordan's court while

5    discovery was ongoing before the MDL, we did issue Rule 34

6    requests requesting that they produce the documents that they

7    produced in the investigation in this case.  They objected to

8    those requests.  I am pleased that this has already been

9    productive because it sounds like we've eliminated an issue as

10   to clawbacks.  Those will be governed by, as Mr. Mahr clearly

11   said, this Court.  We do still have though the outstanding

12   issue of privilege logs.  Google had promised us privilege logs

13   with respect to the documents that they produced, and we're

14   meeting and conferring with them now on it.

15           THE COURT:  Everybody is going to have to accept my

16   advance apology for interrupting, but I'm going to try to keep

17   this all moving, that's why I interrupt.

18           MR. ZWEIG:  I understand.

19           THE COURT:  But if your Rule 34 requests describe

20   categories of documents, that's one thing.  If it's one Rule 34

21   request that says, "Pursuant to Rule 34, give me everything you

22   gave in the civil investigative stage," that's not going to

23   work with me.  That's not going to trigger an obligation to

24   produce a privilege log.

25           So as far as I'm concerned, what I said about

1    Mr. Boies can apply to you as well.  I wanted to test it first

2    with the private plaintiff, but that can also work for you.  So

3    it seems to me that this gets resolved with "governed by the

4    terms of this order."  And I'm telling you, we have a

5    transcript of this.  My intent here is, I think you're going to

6    wind up getting approximately to the same place, but

7    conceptually it's not "Give me a privilege log for anything the

8    states ask for that you didn't produce."  No.  It's going to

9    be, you serve a Rule 34 request.  The defendant comes back and

10   says, "I've produced everything that's non-privileged that

11   falls within that request," and that triggers their obligation

12   with regard to a log.

13          Now, we've all had experience with logs.  Sometimes

14   common sense prevails, and you spare your judge, and you say,

15   "Well, no, I'm not going to make you log things since the

16   institution of this action your memo to files last week because

17   I don't want to have to do that when you serve a document

18   request."  There will be a ton of those things where common

19   sense will prevail.  And if they don't, then we're going to

20   have a very unhappy afternoon together, but, you know, so that

21   seems like it's governed by the terms of this order.

22          As to the source code, we're going to get a source

23   code provision in here.

24          Now, I don't know what paragraph three means.  I mean,

25   I really have to stay up late at night working on this one.

M4JQgooC

1    "Except as explicitly provided herein," and it seems like a lot

2    is explicitly provided herein. "Nothing this order purports to

3    alter the protections previously afforded to investigative

4    materials, including under the Texas OAG order and the

5    multistate confidentiality agreement," which, as I pointed out

6    at the outset, I don't have.  I don't even know what this would

7    mean if it were included.

8           Why do you need this?

9           MR. MAHR:  Eric Mahr for Google.  Your Honor, we put

10   this in -- the first and easiest reason is that there are third

11   parties out there who produced documents under those, and that

12   those protections should remain in place for those third

13   parties who aren't a party to this.

14          THE COURT:  Let's pause on that, on your "first of

15   all."  Let's pause on that.  They wouldn't be in the two

16   million documents though.

17          MR. MAHR:  Correct.

18          THE COURT:  Right?

19          MR. MAHR:  That's correct.  They are in the definition

20   of investigation materials though.

21          THE COURT:  All right.  I'm almost wondering – and

22   maybe I'm agreeing with you – why is this even being discussed

23   in here?  They haven't been produced in this action.  If no

24   reference was made to them, this wouldn't even come up.  How

25   does it come up?

M4JQgooC

1          MR. MAHR:  I think it's addressed by your previous

2     resolution of the whole "deemed to be produced" issue.

3          THE COURT:  All right.

4          MR. ZWEIG:  Your Honor?

5          THE COURT:  Yes.

6          MR. ZWEIG:  Sorry to interrupt, but if we're going to

7     move on, this issue also implicates on page 1, there's some

8     language in footnote 1 that I think relates to this.

9          THE COURT:  Right.

10          MR. ZWEIG:  We had language that basically says this

11     confidentiality order would supersede the two orders, the Texas

12     order and the agreement which, by the way, your Honor, for your

13     information, is attached as exhibits to our April 6 letter at

14     document 274.

15          THE COURT:  I must have missed that.

16          MR. ZWEIG:  No worries.  So we just wanted to make

17     clear again sort of going back to the issue we've been

18     discussing, this order supersedes those as to the state

19     plaintiffs.

20          THE COURT:  But the problem I have is these are third

21     parties who produced documents to the state, right?  I assume.

22     That's what we're talking about:  Third parties who you

23     legitimately asked for documents from, correct?  No?

24          MR. ZWEIG:  Correct.  Yes, sir.

25          THE COURT:  And you entered into some sort of a

M4JQgooC

confidentiality agreement with them, right?  I don't know

whether it was so ordered by a judge or it's under the

authority of the attorney general to do that, but all of that

is fine.  But whatever you got, you didn't get in this lawsuit,

and I'm not in a position to modify the protections that relate

to these third parties.  I don't know whether they like those

protections better than they like this order, or less well.  I

suspect they like the existing protections better.  I don't

know.

          MR. ZWEIG:  I understand.

          THE COURT:  But it's not something that I should be

addressing in here in the absence of these third parties.

          MR. ZWEIG:  Your Honor, paragraph three does extend

whatever protections were designated by the third party.

Obviously, Google's documents are also part of the

investigation materials, but they're here to speak for

themselves.  Paragraph three does extend whatever

confidentiality designations the third party made, but your

Honor's point about whether the third party would want to be

bound by this, I understand.

          MR. BOIES:  The only thing I would ask to be sure

we're clarifying is this is relating to third parties.  The

language here is not limited to third parties.  It would be

inclusive of anybody, including Google.

          THE COURT:  Well, that should be -- that should be

M4JQgooC

1    modified.

2              MR. BOIES:  Yes.

3              THE COURT:  That should be modified.  It should be if

4    a third party produced it, then it's not produced in -- if it

5    produced it to the state AGs before litigation was commenced,

6    they didn't produce it in this action.

7              MR. ZWEIG:  Your Honor, I'm sorry to interrupt again,

8    but my co-counsel, Mr. DeRose, reminded me that in the Eastern

9    District of Texas as to those third-party materials, they were

10   essentially by virtue of Judge Jordan's order brought into and

11   covered by that order, which this order would extend to by

12   virtue of paragraph three.

13             Am I saying that right, Mr. DeRose?

14             MR. DeROSE:  Zeke DeRose for the states.  When Judge

15   Jordan's protective order was entered, the third parties had an

16   opportunity to r designate the confidentiality provisions, and

17   that was done so within 60 days of that order being returned.

18             THE COURT:  Now, listen, there are a lot of moving

19   parts.  I'm not faulting anybody, but now I'm learning

20   something new.  The claim is made that the third-party

21   documents were produced in an action which is a constituent

22   member of this MDL.

23             MR. DeROSE:  I think that's correct.  Eric Mahr I

24   think was involved in that.  Is that how you recall?

25             MR. MAHR:  They were produced to us as part of the

M4JQgooC

1    state's production of the investigative record in the case.

2            MR. DeROSE:  My understanding is that the third-party

3    documents were governed by Judge Jordan's protective order.  I

4    think what the states were hoping to do is reduce ambiguity and

5    say there's going to be one protective order that governs any

6    complaints if there's a violation, and that's going to be Judge

7    Castel's protective order.

8            THE COURT:  Yes.  Go ahead.

9            MR. MAHR:  Eric Mahr for Google.  I sense you're not

10   going to give us another shot at this.  If you did, we could

11   try to clarify this because there's another issue, for example,

12   the multistate confidentiality agreement.  Now all the states

13   to whom Google produced the materials under the multistate

14   confidentiality agreement subsequently agreed to participate in

15   the lawsuit, so we want the protections of that agreement to

16   stay in place as to those other states.

17           THE COURT:  Who disagrees with that?  Anybody?

18           MR. ZWEIG:  No, your Honor.  In fact, that's dealt

19   with in footnote 1.  Anyone who is not a party is still bound

20   by those.

21           THE COURT:  So you have that, Mr. Mahr.

22           Now, doesn't mean that somebody can't make a new Rule

23   34 demand or get documents.  It doesn't insulate anything.

24   It's just not part of the MDL.  That's governed by whatever

25   that preexisting agreement is.  But if documents are

M4JQgooC

legitimately produced in a constituent case in an MDL, for

example, before it arrived here, then those documents should be

governed by this order and can be legitimately governed by this

order.

          What is an overlay file?

          MR. ZWEIG:  I can give you my best explanation, your

Honor.  It is a file that is produced when a document

production is made, and, for example, if there's a clawback,

the party clawing back the material would produce a new file

that the receiving party can put into their databases, and it

would essentially include all of the meta data, revised meta

data, revised documents that are being produced pursuant to the

clawback request, sort of to displace those documents that have

been clawed back.

          That's my best understanding, but maybe there's a

technical wizard that can do better.

          THE COURT:  This all relates to what if anybody wakes

up and discovers that a document they produced was privileged?

Is that under that umbrella heading?

          MR. ZWEIG:  I think privileged or I think it could

apply if they change the confidentiality designation and need

to reproduce the documents as another scenario.  It deals with

the reproduction of documents, which could encompass at least

both of those scenarios.

          THE COURT:  Now let me hear from Meta on page 14.

M4JQgooC

1          MR. ORSINI:  Yes, your Honor.  Thank you.  Kevin

2     Orsini for Meta.

3          Our position on this, I think, your Honor, is fairly

4     straightforward.  There are a lot of constituent actions that

5     if put into this MDL, how exactly those all shake out once the

6     court rules on the motion to dismiss to the Texas complaint

7     remains to be seen, but at least as we stand here right now,

8     there are a number of cases that have absolutely nothing to do

9     with my client.  They don't include allegations related to the

10    GNBA or anything else concerning Meta.  And our basic view,

11    your Honor, is just because they're part of an MDL doesn't mean

12    though ought to get discovery.  That wouldn't on its face

13    satisfy the basic rule that you only get discovery in your

14    action of documents that are reasonably likely to lead to

15    relevant and admissible material.

16         THE COURT:  This is a situation where I'm quite sure

17    we're getting ahead of ourselves because certainly reading the

18    submissions on lead plaintiff, or what do we call it, lead

19    counsel for the advertiser class, one of the, I guess the

20    successful designee said, look, I filed one of the first class

21    actions here, and at that moment in time I did not know about

22    the agreement with Facebook and did not include that in my

23    allegations because the would-be lead counsel said, oh, pick

24    me, Judge, because I have that in my complaint.  And the folks

25    who filed the first action who had been designated by Judge

M4JQgooC

1   Freeman said, well, Judge, don't really hold that too much

2   against us, because as soon as the stay is lifted and we get a

3   ruling on the motion to dismiss, if that survives, we sure as

4   heck plan to include that.  So this is going to be -- I know

5   you just used that as an example, but this is going to be a

6   largely academic point.

7            MR. ORSINI:  It may or may not, your Honor.  Again,

8   Kevin Orsini for Meta.  We have a pending motion before the

9   JPML to bring another action into the MDL.

10           THE COURT:  I saw it.

11           MR. ORSINI:  Which if it comes will have allegations

12   that have nothing to do with any of the other claims.  I guess,

13   your Honor, what I would say is, I don't know what I don't know

14   with respect to how these cases are going to shake out, so I

15   take the Court's point on that.  We're perfectly happy to table

16   this issue.  We just want it to be clear that nothing in this

17   order automatically would override the notion that if there are

18   constituent actions that have nothing to do with Meta and

19   therefore shouldn't be getting access to our discovery

20   material, that we can take that issue up later and make sure

21   they don't get access.

22           THE COURT:  That's fine.  If the plaintiffs make the

23   call and a rational plaintiff may make the call not to get into

24   this arena, then it seems to me that you have a point there,

25   and there should be a way that we can accommodate that.

M4JQgooC

1          MR. ORSINI:  I think that makes a lot of sense, your

2     Honor.

3          THE COURT:  Okay.  I'm not even going to -- I'm going

4     to table the -- well, let's find out here.  I know that there

5     is a sad tale of woe.  I've read the sad tale of woe, and I

6     don't mean to belittle it in any way, shape or form.  There

7     were apparent leaks, and so I understand why Google is paranoid

8     about this, but why isn't this a matter -- this is pages 16 and

9     17 regarding forensic investigations and forensic

10    investigators.  Why isn't this a down-the-road issue where, you

11    know, there's no telling what I might -- I might get the U.S.

12    Attorney's Office involved.  So why get into this now?  Why

13    isn't this a down-the-road?  And I'll say it, if there are

14    leaks, I reserve the right to order forensic investigations of

15    computers, lawyers' computers.  All right?  Doing it in a

16    responsible fashion that preserves the privilege but gets to

17    the bottom of where the leaks are.

18         So, you know, anybody reading this transcript should

19    understand that this is not a license to abuse the protective

20    order.  It's just that carving out that future circumstance I

21    don't think is needed in this order.  If I'm dealing with a

22    real situation, I probably will be more inclined to be more

23    expansive in what I'm going to allow than I might if I'm

24    dealing with an abstraction.  So that's tabled

25         MR. MAHR:  Eric Mahr for Google.  May I respond to one

M4JQgooC

```
1    thing?
2              THE COURT:  Yes.
3              MR. MAHR:  Given your statement, I don't think we need
4    the two paragraphs that you just referred to.  The relevant
5    issue is though in the acknowledgment at the end with respect
6    to those who get access to highly confidential or confidential
7    information, and to make sure on the theory that all of those
8    won't read the transcript to this hearing --
9              THE COURT:  Send them a copy of the transcript.  Let's
10   not lard up the protective order.
11             MR. MAHR:  This is just the acknowledgment. It won't
12   be the protective order.
13             THE COURT:  I understand.  I understand.  You want it
14   for the in terrorem effect.
15             MR. MAHR:  Absolutely.
16             THE COURT:  I fully understand that, but you're
17   getting the in terrorem effect from this transcript.  So, be my
18   guest.  Everybody who signs the protective order gets a copy of
19   the transcript if you'd like or the excerpts from the
20   transcript.
21             Okay.  Page 18, the bottom there, it's not -- is it
22   either/or or is it either and?  Is it the Google proposal, or
23   is the plaintiff's proposal the Google proposal but
24   substituting this additional language?
25             MR. ZWEIG:  I think it's an or, your Honor.
```

M4JQgooC

1          THE COURT:  It's an *or*?

2          MR. ZWEIG:  It's an á la carte; pick one or the other.

3          MR. MAHR:  Eric Mahr for Google.  We agree that it's

4    an either/or, and that's because the plaintiff's provision adds

5    something that's not in the federal rules.  Our provision is

6    based on the basic idea that if a document is clawed back, you

7    destroy it or you return it, and then it's logged, and you can

8    challenge it.

9          We also added in there from the case law that if

10   there's information in your head from having read that

11   document, you don't have to -- it's impossible to --

12         THE COURT:  Where do you find it in the federal rules?

13   Let's see whether we can get this as close as possible to the

14   federal rules.

15         MR. MAHR:  Well, it is in 26(b)(5), and the word we

16   left out was *sequester*.  And the reason we left out the word

17   sequester is because during the meet-and-confer the plaintiffs

18   told us they had what we believe is a creative and incorrect

19   definition of sequester, a definition that would allow them,

20   when we identify a document to be clawed back, to take that

21   document, to utilize it by sharing it with the other members of

22   the joint plaintiffs group so that they could come to a

23   consensus as to whether as a group they should challenge the

24   clawback or not.  We think that is exactly what should not

25   happen; that instead -- we don't have any objection to the use

M4JQgooC

1    of sequester in the way it's been used in common English

2    language or in the federal rules, which means put it away

3    somewhere where nobody will see it.

4            THE COURT:  Put it in a sealed envelope and keep it on

5    the side of your desk, right?

6            MR. MAHR:  A locked cabinet would be better.

7            THE COURT:  Yeah.

8            MR. MAHR:  But they told us that in order to get

9    consensus among a group of many stakeholders that they would

10   have to circulate the document in order to get input.  This

11   could be a document, for example, say we make a production on a

12   Monday, and on Wednesday we realize there are ten privilege

13   documents in it.  We tell them, "There are ten privilege

14   documents in there.  Send them back."

15           THE COURT:  You know what?  I think you ought to

16   rewrite it, use the word sequester and define it.  And no one

17   is going to get hurt because if it's sequestered, and there's a

18   big fight about it, the document is going to come to me, and

19   I'm going to open the envelope, and I'm going to look at it.

20           MR. MAHR:  Yes, your Honor.  We just want to ensure

21   that it doesn't -- having been identified as a clawback to mean

22   it's then going to be circulated among 30 law firms.

23           THE COURT:  I understand.  It's the lawyer -- well,

24   you have to figure out what are you going to write into this as

25   to the protocol.  You've got to write in somebody.  It's going

M4JQgooC

to be the third-year associate who happens to have it on their

desk or a paralegal, and they're the sequestering party?  It's

got to be a little more flexible than that.

MR. MAHR:  We're happy for the plaintiffs to identify

one person or firm to do that but not 40.

THE COURT:  Yeah, I think that makes sense.  You

identify -- this would transcend the various groups, so maybe

one designated lawyer by the state plaintiffs, the publisher

class action, the advertiser class actions, and collectively

individual actions have to pick a person, something like that,

and they can have access, but it doesn't get circulated

generally because somebody other than a paralegal or a

second-year associate has to be able to frame the arguments.

MR. MAHR:  Understood, but I believe that the

plaintiffs also put the word utilize the document for purposes

of challenging the privileged designation, and I don't think

that's contemplated by the rules.  That normally happens if you

identify it.  It hasn't been read by anyone; we've identified

it.

THE COURT:  Listen, I've agreed with you on the

sequester point.  So it's going to be sequestered, meaning that

they're not going to quote it verbatim or attach it to their

position.  They will say we honored the sequester.  We have it,

but we believe it was sent beyond a reasonable group of

addressees and to third parties.  It was sent to third parties

M4JQgooC

 1    and any privilege that may have existed is gone.

 2              MR. MAHR:  If I may, if they create a clean team like

 3    the government does to do that so those people aren't involved.

 4              THE COURT:  No, we aren't doing that.

 5              MR. MAHR:  Then the case is by identifying ten

 6    privilege documents in a production that they might not even

 7    have seen yet, they're now going to pool those.  Instead of

 8    just sending them back to us or destroying them, they're now

 9    going to read them all and say, "Oh, yeah, we agree, this is a

10    privileged document."

11              THE COURT:  Listen, I started where I think I'm going

12    to end, which is, get as close as you can to the language in

13    Rule 26 because then when you fight about what that means, we

14    can look at what other judges have said it means.  And I'm

15    allowing a bit of an exception for defining the word sequester.

16              MR. MAHR:  Understood.

17              THE COURT:  But the reality is, it's never good when

18    you have to clawback.  It's suboptimal.  You don't want to have

19    to do that.  I know you don't.  And that's legitimate, but

20    there has been some milk spilled when that happens.  And that's

21    the way it is.  Otherwise, you have something else that is

22    unworkable, which is what I described as the lower-level person

23    being the only one who could have a discussion with you or take

24    a position on it.  How can that be right?

25              MR. MAHR:  They will still have the virtue of our log

M4JQgooC

1    and be able to challenge it as they would challenge any other

2    privileged document on the basis of the log.  In other words,

3    they shouldn't -- I think the law in this circuit focuses on

4    the protection of the privilege, and the fact that an

5    inadvertent production, especially in a case as large as this

6    with as many documents going back and forth as this, they

7    shouldn't get a benefit out of our having to claw it back by

8    being able to read a privileged document and then say, oh yeah,

9    you're right, here it is.

10           THE COURT:  Listen, the rule controls, but before the

11   rules, there were debates.  There was the one approach that, my

12   goodness, if my adversary says this document is privileged, I

13   shall not look at it.  I'm going to seal it right now and put

14   it in the safe.  It used to be, you know, bar association

15   panels on it.  The other school of thought was, my goodness, I

16   have a fiduciary duty to my client.  I don't have the luxury of

17   doing that.  Plus, which this system promotes a world of

18   fibbers.  Let's me just take a peek.  Oh, it's just a little

19   peek, you know.  So there were debates about this, and there

20   was not unanimity, and it's wonderful that there is something

21   in the rules on clawback.  Let's get it as close as to the

22   rules are and leave it at that.

23           MR. MAHR:  Understood, your Honor.  Thank you.

24           THE COURT:  Listen, now we're getting into another big

25   area that's going to surface at some point here.  I don't know

M4JQgooC

1    what this order is talking about with, you know, "or up to five

2    days before trial, whichever is sooner."  I don't know what the

3    order is talking about when it's saying "seal first and then

4    litigate later."

5         You know, my individual practices only have one

6    requirement on a confidentiality order, and that's the one

7    thing that neither side wants to comply with.  We've had bad

8    experiences in this district where a provision was inserted in

9    a confidentiality order that granted the right to file a

10   document as sealed just solely on the decision to stamp it as

11   confidential or highly confidential.  And for that reason, my

12   individual practices say -- the first sentence is all I need to

13   get into.  "Notwithstanding any other provision, no document

14   may be filed with the clerk under seal without a further order

15   of this Court addressing the specific documents or portion of

16   documents to be sealed."  That's to reduce the practice.

17        If you think you're going to have summary judgment

18   decisions in this case, if we get that far, that are going to

19   have sealed materials and sealed portions of the judge's

20   decision, you're wrong.  I think you can look -- I don't think

21   I have ever done that, and I have never once had a trial, and I

22   hope never to have a trial, where there is sealed evidence.  I

23   don't even know how that's done.  I saw something in here that

24   says, oh, we'll talk about that later.  what do you want to do?

25   You want to clear the courtroom during the testimony or the

M4JQgooC

playing of a deposition?  No.  We're not doing that.  This is a

public courtroom.  Nor am I going to impose requirements on

jurors as to what they can and cannot say when they're

discharged as a juror.

           Now, fortunately, I've never had to deal with the

Coca-Cola formula.  And I get it.  You know, if you have to

have testimony on something about your source code -- first of

all, I can't imagine in an antitrust case, yeah, it's in your

source code, but you're going to be describing what the source

code does, not how you do the source code.  You're not going to

lay out the formula in the algorithm.  You're going to have

testimony that describes what the algorithm does, and that --

you know, it's part of the unpleasant consequences of being a

party to a lawsuit.  And you may have good arguments as to why

the discovery should be narrowed, et cetera, but I just don't

see this as a case where I'm going to allow you to file any old

thing that somebody in somebody's shop designated as highly

confidential, file it as a sealed document.  Oh, but wait,

Judge, we wrote in here that then you have to justify it after

the fact.  No, don't justify it after the fact.  Justify it

before the fact.

           MR. ZWEIG:  Your Honor, if I may?

           THE COURT:  Yes.

           MR. ZWEIG:  I think I could speak to this.  I should

also say I've seen the Coca-Cola formula in the high fructose

M4JQgooC

```
1    corn syrup case.  It was interesting.

2              THE COURT:  All right.

3              MR. ZWEIG:  But I think this provision you are

4    speaking about, your Honor, largely came from the plaintiffs.

5    In the investigation materials, the two million documents,

6    nearly every single one was marked, as you might expect, highly

7    confidential.  And so we're in a situation where we as

8    plaintiffs under the judge's -- your Honor's individual

9    practices need, I think, to in 14 days in advance notify the

10   defendants about which documents we plan to use.

11             THE COURT:  So you want to modify the 14 days to

12   something less than that or you want some modification?  That's

13   fine.  But the answer is not that you're going to file the

14   document under seal and then, what?  I looked very carefully.

15   What happens?  Oh, it stays sealed, I think, until the judge

16   gets around to ruling on the sealing, right?  Is that right?

17             MR. ZWEIG:  That is correct, your Honor.

18             THE COURT:  No, I want you to think of what that

19   means.  So I have criminal cases.  I have civil rights cases.

20   I have commercial cases of all different variety.  And nothing

21   can happen, and this remains sealed, until I find time to write

22   an opinion; not just an order, write an opinion under *Lugosch*.

23   Go read *Lugosch* and its progeny to see what kind of a regime we

24   operate under now.

25             And, by the way, I happen to agree with it.  But it's
```

M4JQgooC

1   a time-consuming document-by-document process.  Go look at the

2   orders on sealing.  And if you think that what I'm going to do

3   is just spend hundreds of chamber hours just figuring out the

4   sealing before we get to the merits of it, it's not happening.

5          MR. ZWEIG:  And I sympathize with the Court.  I think

6   the question for us was under your Honor's individual

7   practices, if we're not the ones -- we agree with the Court.

8   We don't want all of this stuff sealed.  We'd like to have it

9   in open court, but we're not the ones to make that decision.

10  And so what ends up happening under your Honor's individual

11  practices is the burden, even though it's Google that marks

12  everything highly confidential, including press releases and

13  everything else, we're the ones that have to make the motion to

14  seal.  We don't want to make the motion.  We don't agree with

15  the designations in the first place.

16          THE COURT:  But I have it in here, and you're allowed

17  to not like my days.  I'm not sure I even like my days.  But

18  it's "Unless otherwise ordered, a party seeking to file an

19  opposing party's confidential information shall so advise the

20  opposing party 14 days in advance specifying the precise

21  portion of the information the party seeks to use, the general

22  purpose thereof and any redactions to which the party does not

23  object.  Within 7 days thereafter, the party whose confidential

24  information is sought to be used may make an application to

25  seal in accordance with the first paragraph of this order,

M4JQgooC

1    et cetera, et cetera.

2              So, in that instance, the monkey will not be on your

3    back except to give them notice, and then they're the ones who

4    have to meet the *Lugosch* standard.  And the answer is, you

5    know, there are a lot of documents where you're interested in

6    the first and the third paragraph.  That's where you're making

7    your point.  But the second paragraph has something that's

8    arguably highly confidential and maybe should be sealed.  Well,

9    if you say I really only want the first and the third

10   paragraph, you moot out this thing.  And so you file it

11   redacted.  I'm a grownup.  I can ask for the unredacted version

12   if I need it.  That's the goal here is to, you know, cut back

13   on the froufrou.

14             This is not going to go well as a case if the name of

15   the game is to see whether the Court can be worn down with

16   satellite disputes.  There are a lot of tools at a Court's

17   disposal to make sure that doesn't happen.  Even with parties

18   who do not give a hoot about monetary sanctions; you don't have

19   a monetary sanction that could have an impact on them.  There

20   are a lot of other remedies open to a judge, and I don't want

21   to play that role.  I've done very well.  This is I think my

22   fourth MDL, you know, and the discovery disputes have been

23   nonexistent.  Go look at the docket in the *Bank of America*, the

24   *Sun Edison*, the *Time Warner Cable* litigation.  In all of them,

25   you can count the discovery disputes on one hand.  I think in

M4JQgooC

1    the Bank of America there was one dispute.  It was whether

2    Bernanke was going to have to appear for his deposition.  So

3    the judge said, I'll tell you what, take the depositions of the

4    first reports and then get back to me if you can't get the

5    information from them, and then we'll decide the issue.  Never

6    heard from them again.  So, I'm all in favor of parties being

7    vigorous advocates on the merits.  Save your energy for the

8    merits, for the stuff that counts.  I'm all ears, but not on

9    the collateral nonsense.

10            MR. BOIES:  Your Honor, can I address the sealing

11   issue?

12            THE COURT:  Yes.

13            MR. BOIES:  I understand and agree exactly what the

14   Court has said, but there's a practical issue here, and, that

15   is, that given the volume of materials that are stamped or

16   designated as confidential or highly confidential, what it

17   means is that we have to know 14 days in advance.

18            THE COURT:  So I said I'm flexible on the days.  So if

19   14 days does not work for you, work that out.  You can put in

20   language, and if you say, five days, three days, whatever, come

21   up with something reasonable.  But the point is you don't seal

22   first and then somebody justifies it later.  We're not doing

23   that.  We're not doing that.

24            MR. BOIES:  I appreciate that.

25            THE COURT:  And there's got to be -- this forces a

M4JQgooC

discussion before it comes in and where is this going to come

up?  What are you going to be needing to file with the Court?

I hope we're not all anticipating, well, our weekly discovery

fight, Judge, what do you think?  How else are we going to have

weekly discovery fights if we don't want to submit highly

confidential documents here?  Or, you know, the 5,000 documents

that will support our summary judgment motion.  That's

ridiculous.  If you need 5,000 documents to support or oppose

summary judgment, you're in trouble in the first place,

whichever side that may be.  You know?

          This may be an enormous case, but, people wiser than I

am have often said that the most complex boil down to about ten

documents, you know.  There may be terabytes produced, and I've

certainly had trials where the trial evidence has been two

terabytes of not videos or audios but of physical documents,

and we've managed it, but we are not going to have unnecessary

filings.  When you have a real discovery dispute, if you have

one, I'm happy to be all ears; but if we're just going to play

games and, you know, grown ups can't resolve it, it's going to

get unpleasant quickly.

          MR. ZWEIG:  The Court's guidance is helpful, your

Honor.  We'll discuss the time period and other issues with the

other side.

          THE COURT:  Yes.  I'm going to just say it right now.

If testimony is important enough to be heard by a trier of fact

M4JQgooC

1    or to be considered on summary judgment, then the likelihood is

2    that it doesn't belong being under seal.  I went through this

3    with the, I don't know if it was the third amended complaint,

4    second amended complaint, or maybe a little bit with both of

5    them.  Yeah, sure, let's protect individuals' privacy so that

6    they don't get flooded with emails late at night from people

7    with time on their hands who are reading dockets, but short of

8    that, there's not a heck of a lot that belongs in a complaint

9    that needs to be a state secret.

10           What else?

11           MR. BOIES:  Your Honor I don't want to go backwards,

12   but --

13           THE COURT:  No, go ahead.

14           MR. BOIES:  There was an issue on page 11 that I don't

15   think we addressed.

16           THE COURT:  Okay.

17           MR. BOIES:  That's at the top where Google is

18   requesting a provision that essentially says that, "any portion

19   of a transcript or deposition exhibit is confidential without

20   having to make any designations."

21           THE COURT:  And why would that be?  That's a question

22   for Google.

23           MR. MAHR:  Well, your Honor, we don't think the burden

24   of making confidentiality designations of a deposition is worth

25   the candle.  Highly confidential information in this case is a

M4JQgooC

1    strict standard.  It has to be material and significant to

2    competitive commercial harm.  On the other end, if anything is

3    going to be publicly used, we go to *Lugosch*, which is a

4    different standard.

5         In the middle -- and part of this might be remedied by

6    a tightened version of confidential information, but we believe

7    that a case in which we have to go through every deposition and

8    determine on the broad standard that previously existed that we

9    are going to fix to figure out what may or may not be

10   confidential, it doesn't serve a purpose because there's not

11   going to be any use -- it doesn't affect the use of the

12   information in the case, and the information is not going to be

13   used outside the case unless it passes *Lugosch*.

14        THE COURT:  Well, I don't know that -- if I understood

15   you correctly, I don't know that I'm agreeing with that.  So

16   this is a deposition, and the deposition is not being

17   designated as highly confidential.  Is that the circumstance

18   we're dealing with here?

19        MR. MAHR:  After the deposition is over, Google has a

20   certain amount of time to designate portions that are highly

21   confidential.

22        THE COURT:  Right.

23        MR. MAHR:  Because that will affect the use of the

24   deposition in other parts of the case.  Whether things are

25   identified as confidential information or not doesn't have a

M4JQgooC

```
1    lot of ramifications for the litigation, the rest of the
2    litigation.  That's why Judge Jordan viewed it as:  Just leave
3    it all confidential; we're not going to be putting these
4    depositions out into the public anyway, and the only examples
5    of possible -- of information that the plaintiffs provided was
6    the background, for example, of the deponent.  That's not
7    information that should be going out into the public anyway.
8    So we don't see a purpose in requiring Google -- and it's a
9    one-way requirement -- to go through all these depositions and
10   identify confidential material when there's no purpose for that
11   identification.
12            THE COURT:  Well, but, see, this goes back to when we
13   first started at the beginning of the afternoon, the definition
14   of confidential was so loosie that it's like, well, if it's --
15   I hope you're not saying if it's not public and we have not
16   made it public, then it's per se confidential.
17            MR. BOIES:  That's what he's saying, your Honor.
18            MR. MAHR:  That's not what I'm saying.
19            THE COURT:  Listen, I know sometimes taking it to the
20   absurd isn't always fair to people, but I assume the cafeteria
21   menu is not public either, but it's not confidential.  That's
22   not the standard.  Certainly, if it is public, then it can't be
23   confidential, but it seems to me that this should not be
24   reflexive.
25            MR. MAHR:  Your Honor, our point is what's the
```

M4JQgooC

1    difference for the litigation to our designating something

2    confidential or not unless the idea is that the plaintiffs want

3    to publicize something about a deposition.  There's no First

4    Amendment right to take discovery materials and try the case in

5    the public.  So we don't see any practical value of imposing an

6    extra set of work on Google, mainly Google, because we're the

7    ones that have the information, without any kind of rhyme or

8    reason.

9              MS. VASH:  Your Honor?

10             MR. BOIES:  Your Honor, David Boies.

11             THE COURT:  And then Ms. Vash.

12             MR. BOIES:  I'm sorry.

13             THE COURT:  Go ahead.

14             MR. BOIES:  We've just gone through the sealing issue.

15   If something is confidential, we can't use it in our papers

16   unless we go through -- whether it's three days, five days, 14

17   days -- this process of presenting it to them, them responding

18   and then bringing it to the Court if they object.

19             THE COURT:  Well, just let me challenge that or ask

20   that, I -- Mr. Boies, I assume you've read this more carefully

21   than I have.  I thought that only applied to highly

22   confidential.

23             MR. BOIES:  No, if you look at page 30, 24(a).

24             THE COURT:  24(a).

25             MR. BOIES:  At the top of the page, it says,

M4JQgooC

 1 | "Notwithstanding the Court's individual practices, unless

 2 | otherwise ordered, a party's filing containing or" --

 3 |            THE COURT:  Yeah.  No, I get it.  I get it.  I stand

 4 | corrected.  That's a real problem.  Yeah.  Nope.  If you want

 5 | that provision in, you want any variation on that theme, yeah,

 6 | you're going to have to designate it, and there's going to

 7 | be -- you're going to have an uphill battle under *Lugosch*.

 8 | It's not going to be enough to simply say, oh, well, this is

 9 | conclusory fashion; this is valuable, important to our business

10 | and could provide a competitive advantage to somebody.  Just

11 | those conclusory terms are not going to carry the day.  And so

12 | if that's going to trigger the obligations and the mechanism

13 | for sealing applications, then let me impose the requirement on

14 | you to designate exactly the page and line that you think is

15 | confidential and be prepared to justify it.

16 |            Ms. Vash.

17 |            MR. VASH:  Thank you, your Honor.

18 |            Just as your Honor just said, don't justify it after

19 | the fact, let's justify it before the fact.  Rule 26 requires

20 | just that.  Rule 26(c) says that the Court may, for good cause,

21 | issue an order to protect a party or person from annoyance,

22 | embarrassment, oppression, or undue burden or expense,

23 | including one of the following, requiring that a deposition be

24 | sealed and opened only to the Court order.

25 |            Google is required under Rule 26(c) to make that

M4JQgooC

1   showing before the Court before they get a blanket designation

2   of confidentiality.  That's in the rule, and that's what the

3   case law says, and so that's why we believe that they do need

4   to make that showing.

5         THE COURT:  Well, I'm open to allowing Google to

6   designate something as confidential.  They will have to

7   designate it and the fight will come when somebody wants to

8   file it, but I am hoping that this will be at the summary

9   judgment stage, if there is one, and, I don't know, maybe it

10  could come up with in limine motions, I don't know, but I don't

11  expect it to be an everyday thing.  And even in in limine

12  motions, you can make an in limine motion that all evidence of

13  what we're doing in the following four continents should be

14  excluded from trial evidence.  You don't need to annex a lot of

15  documents on that.  You can say there are documents that deal

16  with what we're doing in Antarctica, and that has nothing to do

17  with this case and your Honor should not allow that kind of

18  evidence in.  Nobody really needs confidential information for

19  that.

20        MR. ELIAS:  Jordan Elias for the advertisers.  If I

21  may be heard briefly on this?

22        THE COURT:  Sure.

23        MR. ELIAS:  I think this issue might also arise in

24  connection with class certification proceedings where we

25  typically file a few dozen exhibits in support of our requests.

M4JQgooC

1    I guess my concern has to do with the burden on the Court under

2    this protocol.

3            If we must disclose the exhibits that have been

4    designated as confidential or highly confidential by Google 14

5    days in advance, they must make their particularized showing

6    within a week before our filing date, it seems to me that that

7    places a burden on the Court to rule almost instantaneously on

8    these potential sets of --

9            THE COURT:  I have a way around that.  You can file

10   your papers in unredacted -- not file it.  You can deliver it

11   to chambers and I'll have it, okay?  And I don't have to

12   resolve it instantaneously; you won't be in default on your

13   filing.  You can deliver it to chambers in whatever form while

14   the sealing motion is on, and that's not going to slow me down.

15   I'll have the motion papers.

16           MR. ELIAS:  I see.  Thank you.

17           THE COURT:  We may have some bellwether rulings on

18   confidentiality and highly confidential early on in this case

19   that may make things easier.  That may be the answer.

20           What else?  When do you want to get me a revised

21   draft?

22           Yes?

23           MR. ORSINI:  Your Honor, Kevin Orsini for Meta.

24           THE COURT:  Yes.

25           MR. ORSINI:  I'm glad Mr. Boies went back to page 11

M4JQgooC

because I didn't want to be the one to have to go backwards.

One other issue is on page 22, your Honor, which I think can be

addressed quickly.  This is the question of which employees of

Meta or Google can be shown documents at depositions produced

by the particular company.  Obviously, these are very, very

large institutions with many employees.  It is exceedingly

common in such entities not to share all of the most highly

confidential information with every single one of those

employees.  Our position is simply that just because you're

deposing a Meta employee doesn't mean that you can show them

any Meta document, including our most highly confidential

documents, such as a memo draft by Mr. Zuckerberg.  We've left

open -- and, of course, with executive officers, you can show

them whatever you want.  A 30(b)(6) witness, you can show them

whatever you want.  But any Meta witness or any Google witness

should not be able to be shown each and every Meta document or

Google document, as it may be, regardless of whether it's

something that has anything to do with their day job.

THE COURT:  Well, what do you do when a senior

official says:  This is our policy.  This is how we ought to be

doing this.  This is what people should be doing.  And now

you're going below the upper level, maybe deep in the

organization.  What's the problem with asking that person

whether this is in fact the practice that was followed?

MR. ORSINI:  So if it's a policies, those are policies

M4JQgooC

1    that would be available to all employees.  What I'm focused on

2    are -- let's say Mr. Zuckerberg is debating with Ms. Sandberg

3    some highly confidential business plan, and they want to show

4    it to some very low-level Meta employee to discuss that highly

5    confidential business plan with them at a deposition.

6              THE COURT:  Well, if that happens, that's insanity,

7    and I suspect you're going to be on the phone to me.  Never

8    mind the document, the questioning is insane.

9              MR. ORSINI:  Well, I agree with that, your Honor,

10   which is why we're looking to this provision to minimize

11   getting you on the phone because I'm not one to instruct, for

12   obvious reasons, on relevance, a witness not to answer a

13   question.  What we're trying to have is some ground rules that

14   provide guardrails here, and it's something that, frankly, I'm

15   more concerned about, because they won't agree to it, than I

16   might otherwise be.

17             THE COURT:  Well, I think both of you are wisely --

18   and members of the bar are great at this, and I understand,

19   judges do it too:  The *what ifs*.  They have their *what ifs*; you

20   have your *what ifs*.  Your *what if* is a good *what if*.  Do you

21   want to give me a *what if* on the other side?

22             MR. ZWEIG:  I'd love to, your Honor.  In fact, I

23   created one using St. John's basketball players.

24             THE COURT:  All right.

25             MR. ZWEIG:  But, no, in all seriousness, your Honor,

M4JQgooC

an example in terms of why we need these provisions.  If you
have Google employee A communicating in an email with Google
employee B, or a Meta employee, substitute whichever one you
want, saying, hey, we've developed this great algorithm to
really screw over the publishers, but we need to talk to our
supervisor C, who is not an executive but just a Google
employee; and the email chain then picks up and says, a Google
employee says, hey, I spoke to C.  He says it's a go, she says
it's a go, and let's implement it.  If we wanted to take that
email chain and show it to Google employee C, the protective
order wouldn't currently allow for that unless we had the
provisions that we had asked for.

            THE COURT:  Well, you know, you're going to have to be
very selective in who your ten deponents are.  It's ten
depositions a side under the federal rules.  So I can referee
ten depositions.

            MR. ZWEIG:  Your Honor is absolutely right.  We do
have to be selective, which is why we'd like to have the
flexibility to figure out and be able to take the depositions
that we want to take.  In the scenario I just laid out, it may
be that we want to do C, and not A and B, so -- since that was
the person that made the decision.

            THE COURT:  Yeah.

            MR. ORSINI:  One point, your Honor, just for the
record.

M4JQgooC

1          THE COURT:  Yes.

2          MR. ORSINI:  In fact, he would be permitted to do what

3    he just described under the protective order.

4          THE COURT:  I thought so.  It sounded that way to me.

5          MR. ORSINI:  It's paragraph (h) on page 22.  "Any

6    person who the highly confidential information itself

7    indicates, or who the receiving party has a good-faith basis to

8    believe, had access to the document or highly confidential

9    information," right?  An email saying he talked to employee C

10   and he's on board, that fits.

11         MR. ZWEIG:  May I make one other point.

12         THE COURT:  Yeah.

13         MR. ZWEIG:  Your Honor, there are sort of three

14   provisions here.  Being able to show documents to current

15   employees.  That's a provision that Google agreed to in the

16   search case, the *U.S. v. Google* search case.  They actually

17   asked for and had to go back to the court and say, Judge,

18   sometimes it's not clear which employee had access or

19   knowledge, so we just think it's better to minimize disputes

20   before the Court to just allow a depos -- you know, the person

21   deposing the producing party to show documents on that

22   producing party to any current employee.  It minimized

23   disputes.  Google actually went and asked for that.  That's one

24   of the provisions that we're asking for.

25         THE COURT:  I'm inclined to go with the plaintiff on

M4JQgooC

1    this.  Listen, it's foreseeable that there are going to be

2    instances where you're going to wistfully say, "Judge, I told

3    you this was going to come up, and it's come up and this is a

4    problem."  And I may agree with you and may say, "Okay, we're

5    going to shut this down."  But my goal here is to get this

6    simplified and get it done.  So what do you need?  You all are

7    going to have to figure out how you want to handle this.  But

8    is it unreasonable to ask you to get this back to me after

9    you've negotiated, and the drafts have been exchanged, and

10   you've fought with each other, and you've emailed and

11   counter-emailed and what have you, that I get something in 21

12   days.  Is that reasonable?

13              MR. BOIES:  That's entirely reasonable, your Honor.

14              THE COURT:  All right.  So somebody is going to have

15   to figure out who is going to do what first, and I think that

16   burden sounds to me like it's going to logically fall on Google

17   because Google's interest transcend the different groups of

18   plaintiffs.  And perhaps you can circulate it to Meta's counsel

19   and then get it out to the plaintiffs to comment on.  You know,

20   again, I said the perfect is the enemy of the good, and so

21   let's get something and have that accomplished.

22              Anything else from the plaintiffs?

23              MR. ZWEIG:  Your Honor, two quick items, and I

24   apologize, I didn't get to this in the beginning.

25              As we indicated in our letter last week, our lead

M4JQgooC

1    counsel Mark Lanier and Ashley Keller couldn't make it and

2    apologize for that, but you got the guy with the better

3    haircut.

4           The other thing we raised with the Court previously,

5    although not by application, is we proposed a few dates for

6    hearings on motions to dismiss, and I know Google has requested

7    a hearing on their motion to dismiss as well.  We proposed

8    May 24, 25th or 26th.

9           THE COURT:  I'll reach out to you guys when I want you

10   to come in.

11          MR. ZWEIG:  Understood, your Honor.

12          MR. BOIES:  Thank you, your Honor.

13          MR. ELIAS:  Your Honor, one final point.  Jordan

14   Elias.

15          THE COURT:  By the way, I think there's a rule in New

16   York, you have to do it after the summer associates arrive.

17   Anyway, but go ahead.

18          MR. ELIAS:  With respect to the issue of ten

19   depositions a side, the advertisers recognize that's in the

20   federal rules.  We favor efficient proceedings.  However, this

21   is something that parties in complex litigation regularly

22   stipulate around it.

23          THE COURT:  Well, guess what?  Guess what?  I was

24   pulling your leg.  I will tell you that.  Maybe I shouldn't

25   have told you that, but, but, parties are not going to

M4JQgooC

1    stipulate around it.  No blank checks.  You're going to have to

2    persuade me why you need who you need when you're going above

3    the limits.  That's the what it's going to be.  I've been in

4    these cases and counsel will say, oh, 25 a side.  Well, where

5    does that come from?  How do you know you need 25?  You're just

6    throwing out a number.  No, we're not going to do that.  You're

7    going to justify -- you're going to get what you need and not

8    anything more than you need.

9            MR. ELIAS:  Very good.  I did have a number in mind,

10   but I do --

11           THE COURT:  Well, I don't want to hear the number.

12   That's not going to work, so -- and, you know, surprise reveal,

13   these are going to be -- a witness is going to sit for their

14   deposition once in the various cases.  And so if it's a Google

15   witness, the plaintiffs bar is going to have to figure out how

16   they're going to divide this up, and you can use all your great

17   negotiating skills and oral advocacy on your fellow plaintiffs'

18   lawyers to figure out how that will be sorted out because the

19   last thing you want is the judge telling you how it's going to

20   be sorted out.  That's never a good plan.  But I appreciate

21   your raising that point.

22           MR. ELIAS:  Thank you, your Honor.

23           THE COURT:  What else?

24           MR. MAHR:  Nothing from Google.

25           MR. ZWEIG:  Nothing from us, your Honor.

M4JQgooC

1          THE COURT:  Thanks for coming in.  I certainly

2     understand, I wanted to get this done, get the ball rolling on

3     this.

4          MR. ZWEIG:  We appreciate the Court's expediency.

5     Thank you.

6          THE COURT:  All right.  Thanks.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25