UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 21-MD-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| THE STATE OF TEXAS, *et al.*,<br><br>      *Plaintiffs,*<br><br>   -against-<br><br> GOOGLE LLC,<br><br>      *Defendant.* | No. 21-CV-6841 (PKC) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF GOOGLE LLC'S MOTION TO DISMISS COUNTS I THROUGH IV OF STATE PLAINTIFFS' THIRD AMENDED COMPLAINT

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Fax: (202) 777-4555

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Fax: (415) 947-2099

*Counsel for Defendant Google LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

TABLE OF ABBREVIATIONS ...................................................................................... xii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.      STATE PLAINTIFFS FAIL TO ALLEGE THAT THE NETWORK BIDDING
AGREEMENT VIOLATES THE SHERMAN ACT. ............................................ 3

      A.     State Plaintiffs Fail to Allege a Plausible Agreement Not to Support
Header Bidding. ...................................................................................... 3

      B.     State Plaintiffs Fail to Allege an Agreement to Allocate Auction
Inventory. ................................................................................................ 5

            1.     The "Win Rate" Provisions Are Not Per Se Illegal. ...................... 6

            2.     The "Win Rate" Provisions Do Not Violate the Rule of Reason. .. 8

      C.     The NBA Does Not Support a Section 2 Claim. ....................................... 9

II.     STATE PLAINTIFFS' CLAIMS ARE LARGELY UNTIMELY. ........................ 9

      A.     State Plaintiffs' Claims Are Subject to Laches. ........................................ 9

      B.     State Plaintiffs Fail to Overcome the Presumption that Laches
Applies. ................................................................................................. 11

      C.     State Plaintiffs Cannot Obtain an Injunction Against Completed
Conduct. ................................................................................................ 14

      D.     Claims Based on Privacy Sandbox Are Not Ripe. .................................. 14

      E.     Untimely Claims Should Be Dismissed. ................................................. 15

III.    STATE PLAINTIFFS FAIL TO ALLEGE THAT GOOGLE ENGAGED IN
ANTICOMPETITIVE CONDUCT. ................................................................... 16

      A.     State Plaintiffs Fail to Allege Unlawful Refusals to Deal. ....................... 16

      B.     State Plaintiffs Fail to Allege Coercive Product Design Changes. ........... 21

      C.     State Plaintiffs Fail to Allege Anticompetitive Deception. ...................... 25

      D.     State Plaintiffs' Monopoly Broth Theory Cannot Salvage Their
Claims. .................................................................................................. 27

IV.    STATE PLAINTIFFS FAIL TO PLEAD A TYING CLAIM. ............................. 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*2238 Victory Corp. v. Fjallraven USA Retail, LLC,*
  2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ...................................................................6

*3Shape Trios A/S v. Align Tech., Inc.,*
  2019 WL 3824209 (D. Del. Aug. 15, 2019) .............................................................17

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.,*
  881 F.2d 1396 (7th Cir. 1989) .................................................................................24

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC,*
  56 F. Supp. 3d 436 (S.D.N.Y. 2014).........................................................................6

*In re Adderall XR Antitrust Litig.,*
  754 F.3d 128 (2d Cir. 2014)....................................................................................17

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
  836 F.3d 1171 (9th Cir. 2016) .................................................................................29

*Affinity LLC v. GfK Mediamark Rsch. & Intel., LLC,*
  547 F. App'x 54 (2d Cir. 2013) ...............................................................................26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982)................................................................................................10

*Allen v. Dairy Farmers of Am., Inc.,*
  748 F. Supp. 2d 323 (D. Vt. 2010)..........................................................................13

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
  592 F.3d 991 (9th Cir. 2010) ..................................................................................22

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
  343 F. Supp. 3d 94 (E.D.N.Y. 2018) .......................................................................15

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.,*
  2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) .................................................................16

*In re Auction Houses Antitrust Litig.,*
  193 F.R.D. 162 (S.D.N.Y. 2000) .............................................................................24

*BBL, Inc. v. City of Angola,*
  809 F.3d 317 (7th Cir. 2015) ..................................................................................15

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................................8

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)..................................................................22, 26

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004).........................................................................4

*Brown v. Showtime Networks, Inc.*,
394 F. Supp. 3d 418 (S.D.N.Y. 2019)...........................................................14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....................................................................................7

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*,
2008 WL 1007634 (S.D.N.Y. Apr. 9, 2008)...................................................14

*In re Buspirone Patent Litig.*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002)...........................................................20

*Caldera, Inc. v. Microsoft Corp.*,
87 F. Supp. 2d 1244 (D. Utah 1999).............................................................19

*California v. American Stores Co.*,
495 U.S. 271 (1990)...................................................................................10

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986)...................................................................................23

*Carson Optical Inc. v. eBay Inc.*,
202 F. Supp. 3d 247 (E.D.N.Y. 2016)...........................................................30

*Cenedella v. Metro. Museum of Art*,
348 F. Supp. 3d 346 (S.D.N.Y. 2018)............................................................7

*Church & Dwight Co. v. Mayer Labs., Inc.*,
2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)...................................................20

*City of Groton v. Conn. Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981)........................................................................27

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
465 F. Supp. 3d 416 (S.D.N.Y. 2020)...........................................................23

*Coalition for ICANN Transparency v. VeriSign*,
611 F.3d 495 (9th Cir. 2010)..................................................................20, 21

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996)....................................................................11, 13

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)................................................................27

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ............................................18, 19

*In re Credit Default Swaps Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)............................24

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)..................................................20

*Del. & Hudson Ry. Co. v. Consol. Rail Corp.*,
    654 F. Supp. 1195 (N.D.N.Y. 1987) .......................................13

*Dial Corp. v. News Corp.*
    165 F. Supp. 3d 25 (S.D.N.Y. 2016)......................................20

*Discon Inc. v. NYNEX Corp.*,
    86 F. Supp. 2d 154 (W.D.N.Y. 2000) .....................................23

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)......................................................9

*Eastman Kodak v. Image Tech. Servs.*,
    504 U.S. 451 (1992)...............................................................30

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*,
    826 F. Supp. 2d 705 (S.D.N.Y. 2011)...............................27, 28

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997)..................................................6, 9

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)....................................................17

*Eon Labs Mfg. Inc. v. Watson Pharms., Inc.*,
    164 F. Supp. 2d 350 (S.D.N.Y. 2001).....................................26

*Esposito v. Mister Softee, Inc.*,
    1979 WL 1733 (E.D.N.Y. Dec. 14, 1979) ...............................28

*Frame-Wilson v. Amazon.com, Inc.*,
    2022 WL 741878 (W.D. Wash. Mar. 11, 2022) .......................23

*FTC v. Facebook, Inc.*,
    2022 WL 103308 (D.D.C. Jan. 11, 2022)...........................15, 16

*FTC v. Mylan Labs.*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ........................................................................20

*FTC v. Vyera*,
    479 F. Supp. 3d 31 (S.D.N.Y. 2020) ..................................................................20

*GEICO Corp. v. Autoliv, Inc.*,
    345 F. Supp. 3d 799 (E.D. Mich. 2018) ............................................................13

*In re Google Digital Advertising Antitrust Litig.*,
    2021 WL 2021990 (N.D. Cal. May 13, 2021) ....................................................12

*Gordon v. Amadeus IT Grp., S.A.*,
    194 F. Supp. 3d 236 (S.D.N.Y. 2016) ................................................................12

*Growers 1-7 v. Ocean Spray Cranberries, Inc.*,
    2015 WL 13649090 (D. Mass. May 14, 2015) ..................................................24

*Guaranty Trust Co. of New York v. United States*,
    304 U.S. 126 (1938) ..........................................................................................10

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989) ..............................................................................9

*Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*,
    906 F. Supp. 2d 96 (E.D.N.Y. 2012) ................................................................13

*Illinois v. Kentucky*,
    500 U.S. 380 (1991) ..........................................................................................10

*In re Inclusive Access Course Materials Antitrust Litig.*,
    2021 WL 2419528 (S.D.N.Y. June 14, 2021) ....................................................9

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..............................................................24

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018) ..............................................................24

*Johnson & Johnson v. Am. Nat'l Red Cross*,
    528 F. Supp. 2d 462 (S.D.N.Y. 2008) ..............................................................18

*KASP, Inc. v. Adesa Lexington, LLC*,
    2006 WL 385310 (E.D. Ky. Feb. 17, 2006) ......................................................24

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ..............................................................................28

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) .......................................................................20

*Klein v. Facebook, Inc.*,
  2022 WL 141561 (N.D. Cal. Jan. 14, 2022) .............................................................13

*In re Lantus Direct Purchaser Antitrust Litig.*,
  950 F.3d 1 (1st Cir. 2020) ...................................................................................20, 21

*Le v. Zuffa*,
  216 F. Supp. 3d 1154 (D. Nev. 2016) ......................................................................20

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) .....................................................................................20

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951) ..................................................................................................19

*Loren Data Corp. v. GXS, Inc.*,
  501 F. App'x 275 (4th Cir. 2012) ...............................................................................4

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
  2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) .....................................................11, 13

*Massachusetts ex rel. Bellotti v. Russell Stover Candies*, *Inc.*,
  541 F. Supp. 143 (D. Mass. 1982) ............................................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ....................................................................................................4

*Merced Irrigation Dist. v. Barclays Bank PLC*,
  165 F. Supp. 3d 122 (S.D.N.Y. 2016) ......................................................................23

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
  517 F. Supp. 2d 662 (S.D.N.Y. 2007) ......................................................................14

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*,
  795 F. Supp. 639 (S.D.N.Y. 1992) ...........................................................................26

*MiniFrame Ltd. v. Microsoft Corp.*,
  2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) ..........................................................17

*Moore v. James H. Matthews & Co.*,
  550 F.2d 1207 (9th Cir. 1977) ..................................................................................28

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
  850 F.2d 904 (2d Cir. 1988) .....................................................................................26

*Nat'l Grp. for Commc'ns & Computs. Ltd. v. Lucent Techs. Inc.,*
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ........................................................................12

*New York v. Facebook, Inc.,*
    549 F. Supp. 3d 6 (D.D.C. 2021) .................................................................10, 14, 19

*New York v. Kraft Gen. Foods, Inc.,*
    862 F. Supp. 1030 (S.D.N.Y. 1993) ...........................................................................10

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015) ...............................................................................21, 22

*Northrop Corp. v. McDonnell Douglas Corp.,*
    705 F.2d 1030 (9th Cir. 1983) .....................................................................................6

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) ...........................................................................18, 19

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998) ..................................................................................................23

*O'Brien v. Nat'l Prop. Analysts Partners,*
    719 F. Supp. 222 (S.D.N.Y. 1989) ............................................................................25

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.,*
    797 F.2d 370 (7th Cir. 1986) .....................................................................................24

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009) ..................................................................................................28

*PepsiCo, Inc. v. Coca-Cola Co.,*
    1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ..............................................................19

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc,*
    351 F. Supp. 462 (E.D. Pa. 1972) .............................................................................20

*Porrazzo v. Bumble Bee Foods, LLC,*
    822 F. Supp. 2d 406 (S.D.N.Y. 2011) .......................................................................18

*Pro Music Rights, LLC v. Apple, Inc.,*
    2020 WL 7406062 (D. Conn. Dec. 16, 2020) ..............................................................4

*Puerto Rico v. Carpenter Co.,*
    442 F. Supp. 3d 464 (D.P.R. 2020) ...........................................................................10

*Rambus Inc. v. FTC,*
    522 F.3d 456 (D.C. Cir. 2008) ..................................................................................25

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000) .................................................................3

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
    2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) ...............................................15

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1202 (S.D. Tex. 2009) .........................................................23

*RxUSA Wholesale Inc. v. Alcon Labs.*,
    391 F. App'x 59 (2d Cir. 2010) .....................................................................9

*Schwartz v. Eaton*,
    264 F.2d 195 (2d Cir. 1959) ..........................................................................15

*Smith v. eBay Corp.*,
    2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ......................................................24

*Solent Freight Servs., Ltd. v. Alberty*,
    914 F. Supp. 2d 312 (E.D.N.Y. 2012) ...........................................................25

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018) ..........................................................................25

*State ex rel. Condon v. City of Columbia*,
    528 S.E.2d 408 (S.C. 2000) ...........................................................................14

*Stenehjem ex rel. State v. Nat'l Audubon Soc'y, Inc.*,
    844 N.W.2d 892 (N.D. 2014) .........................................................................14

*Sturm v. Rasmussen*,
    2019 WL 626167 (S.D. Cal. Feb. 14, 2019) ..................................................14

*Teladoc, Inc. v. Tex. Med. Bd.*,
    2015 WL 8773509 (W.D. Tex. Dec. 14, 2015) .............................................13

*In re Tether & Bitfinex Crypto Asset Litig.*,
    2021 WL 4452181 (S.D.N.Y. Sept. 28, 2021) ...............................................23

*In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*,
    2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) ...................................................29

*Tromblee v. New York*,
    2021 WL 981847 (N.D.N.Y. Mar. 16, 2021) ................................................15

*trueEX, LLC v. MarkitSERV Ltd.*,
    266 F. Supp. 3d 705 (S.D.N.Y. 2017) ...........................................................17

*Ulrich v. Moody's Corp.*,
  2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) ........................................................12

*Unijax, Inc. v. Champion Int'l, Inc.*,
  683 F.2d 678 (2d Cir. 1982)...................................................................................28

*United Shoe Mach. Corp. v. United States*,
  258 U.S. 451 (1922)..............................................................................................19

*United States v. Bensinger Co.*,
  430 F.2d 584 (8th Cir. 1970) ...................................................................................7

*United States v. Blue Cross Blue Shield of Mich.*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011)................................................................23

*United States v. Container Corp. of Am.*,
  393 U.S. 333 (1969)..............................................................................................24

*United States v. Joyce*,
  895 F.3d 673 (9th Cir. 2018) ...................................................................................7

*United States v. Letter from Alexander Hamilton to Marquis de Lafayette
  Dated July 21, 1780*,
  15 F.4th 515 (1st Cir. 2021)..................................................................................10

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................................21

*United States v. Mottolo*,
  605 F. Supp. 898 (D.N.H. 1985)...........................................................................10

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)................................................................................................7

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)..........................................................27

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..............................................................................................16

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ...........................................................................28, 30

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
  328 F. App'x 695 (2d Cir. 2009) ...........................................................................12

*Yentsch v. Texaco, Inc.*,
  630 F.2d 46 (2d Cir. 1980).....................................................................................28

**Statutes**

15 U.S.C. § 15b............................................................................................................11

15 U.S.C. § 26................................................................................................................9

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................................................12, 26

Fed. R. Civ. P. 12(b)(6)................................................................................................14

## TABLE OF ABBREVIATIONS

| Term | Definition |
|------|------------|
| AdX | Google's Ad Exchange |
| AMP | Accelerated Mobile Pages |
| DFP | DoubleClick for Publishers |
| DA | Dynamic Allocation |
| DRS | Dynamic Revenue Share |
| EDA | Enhanced Dynamic Allocation |
| Google | Google LLC |
| MBTW | Minimum Bid to Win |
| MDL | *In re Google Digital Advertising Antitrust Litigation,* No. 21-MD-3010 |
| MTD | Defendant Google LLC's Memorandum of Law in Support of its Motion to Dismiss Counts I Through IV of State Plaintiffs' Third Amended Complaint, MDL ECF No. 218 |
| NBA | 2018 Network Bidding Agreement between Google and Facebook, Exhibit A to the Declaration of Andrew J. Ewalt in Support of Google LLC's Motion to Dismiss Counts I Through IV of State Plaintiffs' Third Amended Complaint, MDL ECF No. 221-1, GOOG-TEX-00144513 |
| Opp. | State Plaintiffs' Opposition to Defendant Google LLC's Motion to Dismiss Counts I Through IV of State Plaintiffs' Third Amended Complaint, MDL ECF No. 264 |
| Pub. | Joint Amicus Brief of Publisher Plaintiffs in Opposition to Defendant Google LLC's Motion to Dismiss the States' Third Amended Complaint, MDL ECF No. 267-3, Exhibit A |
| Publisher Plaintiffs | The "Publisher Class Plaintiffs" (Genius Media Group, Inc.; The Nation Company, L.P.; The Progressive, Inc.; and Sterling International Consulting Group), the "Direct Newspaper Plaintiffs" (AIM Media Indiana Operating, LLC; AIM Media Midwest Operating, LLC; AIM Media Texas Operating, LLC; Brown County Publishing Company, Inc. and Multi Media Channels, LLC; Clarksburg Publishing Company, d/b/a WV News; Coastal Point LLC; Eagle Printing Company; Ecent Corporation; Emmerich Newspapers, Incorporated; J.O. Emmerich & Associates, Inc.; Delta Democrat Publishing Company; Commonwealth Publishing Company, Inc.; Delta Press Publishing Company, Inc.; |

| | |
|---|---|
| | Newton County Appeal Inc.; Marion Publishing, Company; Yazoo Newspaper, Co., Inc.; Sunland Publishing, Company, Inc.; Simpson Publishing Co., Inc.; Montgomery Publishing Co., Inc.; Franklinton Publishing Co., Inc.; Charleston Publishing Co., Inc.; Clarion Publishing Company, Inc.; Scott Publishing, Inc.; Clarke Publishing, Inc.; Hattiesburg Publishing, Inc.; Tallulah Publishing, Inc.; Louisville Publishing, Inc.; Kosciusko Star-Herald, Inc.; Enterprise-Tocsin, Inc.; Grenada Star, Inc.; Tate Record Inc.; Flag Publications, Inc.; Gale Force Media, LLC; HD Media Company, LLC; Journal Inc.; Robinson Communications, Inc.; Something Extra Publishing, Inc.; Rome News Media, LLC; Times Journal, Inc.; Neighbor Newspapers; Savannah Publishing Co., Inc.; Gould Enterprises, Inc.; Union City Daily Messenger, Inc.; Weakley County Press, Inc.; and Southern Community Newspapers, Inc.), and the "Daily Mail Plaintiffs" (Associated Newspaper Ltd. and Mail Media Inc.) |
| RPO | Reserve Price Optimization |
| State Plaintiffs | States of Texas, Alaska, Arkansas, Florida, Idaho, Indiana, Louisiana, Mississippi, Missouri, Montana, Nevada, North Dakota, South Carolina, South Dakota, and Utah, and the Commonwealths of Kentucky and Puerto Rico |
| TAC | Third Amended Complaint, MDL ECF No. 195 |
| UPR | Unified Pricing Rules |

## INTRODUCTION

The federal antitrust claims in State Plaintiffs' Third Amended Complaint ("TAC") should be dismissed in their entirety and with prejudice. Those claims depend on the misguided view that U.S. antitrust law compels Google to share its data and to design its products to prop up its competitors, and they rely on a host of inconsistent, conclusory, and stale allegations. Unable to refute these defects, State Plaintiffs instead try to evade them with overblown rhetoric and inapposite citations.

The clearest illustration of State Plaintiffs' strategy is their misrepresentation of Google's Network Bidding Agreement ("NBA") with Facebook as an agreement to "kill" header bidding and allocate auction wins. Now that Google has provided the Court with a copy of the NBA, and State Plaintiffs are confronted with its actual terms, they try to wish them away as "formalisms" and "technicalities." Opp. 30. But they simply have no answer to the fact that the NBA expressly preserves Facebook's freedom to support header bidding (and other Google competitors), and they cannot identify any part of the NBA in which Google guaranteed that Facebook would win any auctions. Because the NBA contradicts their claims, State Plaintiffs now posit a separate, unwritten agreement. But that new and implausible conspiracy theory is not supported by well-pleaded, non-conclusory factual allegations, and it ignores the TAC's allegations showing that Google and Facebook each had independent reasons for entering the NBA, whether or not Facebook continued to support header bidding.

The claims based on much of the remaining conduct are untimely. While State Plaintiffs feign surprise that Google's motion would lead with laches, it should come as no surprise that claims based on well-known conduct that the state attorneys general ignored for years (until it became politically expedient) are now time-barred. The real surprise is that State Plaintiffs never justify why they are only now bringing claims based on conduct that began more than a decade

ago.  Instead, they claim immunity from laches by relying on an inapt case from 1938 and ignoring the contrary (and more recent) Supreme Court precedent interpreting the very statute under which they are proceeding.  As a fallback, State Plaintiffs invert the burden of proof to argue that *Google* has failed to establish its laches defense, even though Second Circuit authority places the burden on *plaintiffs* to show that laches should not apply to claims brought outside the limitations period.

Issues of timing aside, the monopolization claims should be dismissed because State Plaintiffs fail to allege that Google engaged in anticompetitive conduct.  Indeed, State Plaintiffs all but concede that they cannot meet the standards applicable to refusal-to-deal and product-design claims and protest that applying those well-established tests here would somehow allow Google to "skirt the Sherman Act," Opp. 12, as if it would be appropriate to ignore the law whenever it hurts their cause.  And in relying on a theory of "synergistic effect," Opp. 14, State Plaintiffs disregard this Court's prior decision that blending one deficient claim with another cannot sustain a claim where the individual allegations of anticompetitive conduct are meritless.

State Plaintiffs' tying claim fails because the TAC does not allege facts showing that Google coerced publishers to use DFP.  Despite arguing that a potential "economic blow" can be coercive, Opp. 8, State Plaintiffs cite no case endorsing such a theory.  And for good reason:  the so-called "economic blow" on which their claim depends—Google's alleged refusal to give rival ad servers access to live, competitive bids from AdX—reveals that State Plaintiffs are really just making yet another refusal-to-deal claim, this time dressed up as tying.

None of these flaws can be corrected through further amendment.  The TAC represents State Plaintiffs' fourth attempt to state a claim, and after seeing Google's motion, they have already declined the Court's invitation to try for a fifth time.  *See* MDL ECF No. 144, at 2.  Having had all of those opportunities, and with access to mountains of material amassed during an expansive

pre-suit investigation, *see* MDL ECF No. 55, at 2, State Plaintiffs' federal antitrust claims should be dismissed with prejudice.

## ARGUMENT

### I.   STATE PLAINTIFFS FAIL TO ALLEGE THAT THE NETWORK BIDDING AGREEMENT VIOLATES THE SHERMAN ACT.

#### A.   State Plaintiffs Fail to Allege a Plausible Agreement Not to Support Header Bidding.

State Plaintiffs fail to allege any facts suggesting that Google and Facebook agreed to "kill" header bidding.  MTD 31-35.  While they argue that Google and Facebook had a "classic quid pro quo" in which "Google offered Facebook auction advantages and price cuts" in exchange for Facebook "abandon[ing] header bidding," Opp. 24, Google submitted the NBA so the Court could see for itself that there was no "quo."[1]  Rather than requiring Facebook to "abandon" header bidding, the NBA explicitly "does not restrict Facebook from developing or enhancing a product or service that competes with [Google's Open Bidding] Program," NBA at -526-27 (§ 2.4(e)), and "is not an exclusive agreement," *id.* at -542 (§ 19.10).  The TAC admits that Facebook has used its freedom to support Google's competitors by entering "a number of network bidding agreements with other mediation tools."  TAC ¶ 446.

Conceding that there is no direct evidence of an agreement not to support header bidding, State Plaintiffs pivot to asking the Court to "infer[]" a covert, unwritten one from their allegations.  Opp. 23-26.  There are two reasons why that conspiracy theory is implausible.  First, the written NBA directly contradicts any claim that Facebook promised not to support header bidding.  *See Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184-87 (S.D.N.Y. 2000) (explaining that

---

[1] State Plaintiffs gripe that Google submitted an "outdated version of the contract."  Opp. 26.  But Google provided the original September 2018 version challenged in their complaint, *see* TAC ¶ 424, and State Plaintiffs insist that subsequent amendments would not alter their theory, *see id.* ¶ 450 ("[E]ven if Google and Facebook were to strike the bid and win rate terms from their contract tomorrow, their prior meeting of the minds would hardly disappear.").  Nevertheless, if the Court would like to review the amendments, Google is prepared to submit them.

plaintiffs' "decision not to attach" key documents to the complaint "puzzles and concerns this Court" and dismissing claims because "the documents contradict Plaintiffs' allegations").[2]

Second, the TAC's remaining allegations show that Google and Facebook each had their own independent reasons to enter the NBA and refute State Plaintiffs' argument that "both parties took actions against their own self interests." Opp. 25. According to the TAC, Google benefits from the fees that Facebook pays to participate in its auctions and from the ability to market the auctions as one-stop shops for developers looking to reach both advertisers using Google and those using Facebook. *See* MTD 33-34 (citing TAC ¶¶ 428, 448). In light of these benefits, and regardless of whether Facebook also worked with Google's competitors, Google had a good reason to offer Facebook "bidding advantages and price cuts": to compete with header bidding and other rivals for Facebook's valuable business. *See* Opp. 25; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition."). Facebook likewise benefits because, as the TAC alleges, the NBA allowed Facebook to bid on publisher inventory without incurring the substantial costs of building its own platform. *See* MTD 33 (citing TAC ¶ 422); *see also Pro Music Rights, LLC v. Apple, Inc.*, 2020 WL 7406062, at *4 (D. Conn. Dec. 16, 2020) (dismissing claim where allegations showed "facially valid reasons of saving costs" that were "as consistent with each defendant's individual and independent self-interest as . . . with a plan for defendants to act collectively").

In an effort to raise unwarranted suspicions, State Plaintiffs claim that Facebook "abandon[ed] a technology that it had already invested in and very publicly promised to support

---

[2] *See also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (noting that attachments properly considered on motion to dismiss "belied" inference otherwise supported by allegations in complaint); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 281 (4th Cir. 2012) (affirming dismissal of Section 1 claim where alleged conspiracy is "difficult, if not impossible, to reconcile" with a "full examination of the terms" of the document).

just a year earlier," Opp. 25, but their own allegations undermine that contention. The TAC alleges that, in March 2017, Facebook "publicly announced" that it would rely on "partnerships with technology providers" and use *their* "header bidding code librar[ies]," TAC ¶ 414, not that Facebook invested in its own technology. And contrary to State Plaintiffs' latest spin, the TAC alleges that Facebook saw bidding into Google's auction as an *alternative* to making "huge [engineering] and services investment." *Id.* ¶ 422 (alteration in original).

## B. State Plaintiffs Fail to Allege an Agreement to Allocate Auction Inventory.

The NBA's plain terms also contradict State Plaintiffs' "central" claim of "an agreement that Facebook will win at least 7.2 percent of all in-app impressions sold by developers in Google-run auctions." Opp. 26. In the NBA's "Win Rate" provisions, Facebook agreed to use "commercially reasonable efforts" to win "at least" a specified percentage of auctions. NBA at -545 (§ 5). But nothing stopped Facebook from competing more often, and Google did not agree to let Facebook win *any* auctions. MTD 36-37. State Plaintiffs try to dismiss the actual terms of the NBA as "formalisms" and "technicalities," Opp. 30, but that empty rhetoric implicitly concedes that they have mischaracterized the agreement.

Scrambling to find any part of the NBA to support their claim, State Plaintiffs reach for Section 6.10—a provision that the TAC never mentions—and assert that it "penalize[s]" Google if Facebook "fail[s] to obtain its promised win rate." Opp. 31. But Section 6.10 applies only if Facebook's win rate declines "due to Google's categorization" of certain data. NBA at -534 (§ 6.10). Facebook cannot invoke that provision if its win rate declines because Google outbids it in more auctions, so it imposes no "penalty" on Google for bidding competitively.

Setting aside State Plaintiffs' bluster, it is clear that the "Win Rate" provisions do not violate Section 1, whether analyzed under the per se rule or the rule of reason.

### 1.     The "Win Rate" Provisions Are Not Per Se Illegal.

State Plaintiffs insist that the NBA is a horizontal agreement and must be condemned as a per se violation because Facebook and Google compete.  Opp. 27-28.  But in doing so, they gloss over the vertical aspect of the companies' relationship arising from Google running the "auction house" in which Facebook bids.  TAC ¶¶ 441, 445.  Although State Plaintiffs claim that "Google does not sell [impressions] to Facebook," Opp. 28, the TAC alleges that Google sells Facebook something else—auction mediation services.  *See* TAC ¶¶ 428-34 (NBA's pricing and service provisions).  In addition, State Plaintiffs ignore that Facebook did not compete in Google's auctions until the NBA took effect and that the NBA *created* the very competition that State Plaintiffs claim it restrains (though Facebook and Google competed in other ways before and since).[3]  As part of the agreement establishing and governing the vertical aspects of the companies' relationship, the "Win Rate" provisions should be judged under the rule of reason, just like all other vertical arrangements, even ones involving parties with mixed relationships.  *See* MTD 36 n.12; *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997); *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *5-6 (S.D.N.Y. Jan. 8, 2021) (Castel, J.); *see also Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 448 (S.D.N.Y. 2014) ("[T]he presence of even [a] significant horizontal dimension, alongside a vertical one, does not trigger *per se* review[.]" (alteration in original) (citation omitted)).

State Plaintiffs miss the point in trying to distinguish cases involving "manufacturers competing with their own distributors" on the basis that "Google and Facebook do not manufacture or own any of the impressions for sale in the affected auctions."  Opp. 27.  All "[e]conomic

---

[3] *See* TAC ¶ 427 (alleging that NBA was intended to "induce Facebook to shift . . . to routing bids through Google[]"); NBA at -513 ("This Agreement governs Facebook's participation in the Network Bidding Pilot program and any successor services."); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050-54 (9th Cir. 1983) (declining to apply per se rule where "there would be no competition but for the agreements").

arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical,'" regardless of whether either firm manufactures or takes title to the products. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). Here, the TAC alleges that Google supplies auction mediation services to Facebook and that Facebook pays for them, TAC ¶¶ 428, 441, 445, so their relationship is not purely horizontal. *See Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018) (agreements between art museums and auction houses (and other parties) are vertical and thus not per se unlawful).

Even if the NBA were deemed a horizontal agreement, it would not be subject to the per se rule as an agreement to "allocat[e] market share." Opp. 29. No matter how many times State Plaintiffs mischaracterize the NBA as "providing that Facebook will win a predetermined percentage of developers' auctions" or "establishing a minimum share of sales volume that 'belongs' to Facebook," Opp. 28-29, the actual terms of the agreement do not guarantee Facebook anything. *See supra* page 5; *see also* MTD 36-37. State Plaintiffs also argue that the NBA "is a *per se* violation of Section 1 for the same reasons that apply whenever bidders suppress or inflate prices by manipulating auctions" or "retailers agree to allocate territory or customers," Opp. 29, but their cases involve only classic bid-rigging or market allocation—not anything like the conduct alleged in the TAC or described in the NBA.[4]

Finally, the per se rule does not apply because the "Win Rate" provisions have the procompetitive benefit of increasing the intensity of the competition in Google's auctions by ensuring that Facebook bids high enough to win at least some of them. MTD 37-38. State

---

[4] *Cf. United States v. Joyce*, 895 F.3d 673, 676-77 (9th Cir. 2018) (defendant "and his coconspirators agreed to suppress competition by refraining from bidding against each other at public auctions," which was "classic bid rigging"); *United States v. Bensinger Co.*, 430 F.2d 584, 589 (8th Cir. 1970) ("The agreement in question was that Almar would not submit a bid lower than that of Bensinger," a "price-fixing agreement of the simplest kind"); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (an "agreement between competitors at the same level of the market structure to allocate territories" is a "classic example" of a per se violation).

Plaintiffs' glib response—that "[e]very bid-rigger in history could say the same thing," Opp. 30—makes no sense.  A real bid-rigging agreement suppresses competitive bidding, while the "Win Rate" provisions require Facebook to compete, without limiting Google's ability or incentive to bid.  State Plaintiffs also ignore that Google would want assurances that Facebook would actually participate in Open Bidding auctions if Google were going to make the investment required to expand the program to enable Facebook's participation.  *See* NBA at -525 (§ 2.2(c)) (agreement to "build a product solution").

### 2.     The "Win Rate" Provisions Do Not Violate the Rule of Reason.

State Plaintiffs' brief highlights three reasons why their rule-of-reason claim fails.  First, the claim rests on the flawed premise that the "Win Rate" provisions "set boundaries" on Google's and Facebook's bidding, Opp. 31, when nothing in the NBA limits either company's ability to bid.  *Supra* page 5.  Second, despite State Plaintiffs asserting that the "Win Rate" provisions "will soften bidding and reduce prices across *every* auction," Opp. 32, they offer no plausible explanation for why conduct allegedly affecting one auction would necessarily affect *any* other auction, much less the market as a whole.  *Cf.* MTD 39-40 (showing that the "Win Rate" provisions cover at most 4.32 percent of in-app impressions).  They also ignore that requiring Facebook to use commercially reasonable efforts to win at least some auctions can only make the auctions more competitive.  Finally, State Plaintiffs cannot rebut Google's contention that they fail to allege market power in the allegedly restrained in-app networks market.  MTD 39 n.14, 40.  Instead, State Plaintiffs cite allegations about a *different* market for in-app mediation tools, Opp. 33 (citing TAC ¶¶ 227-31), and then, with respect to in-app networks, assert only that Google and Facebook have "the power to exclude rival networks and raise . . . prices," TAC ¶ 445.  But such "a formulaic recitation of the elements of a cause of action" does not suffice, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), especially when contradicted by specific factual allegations about how many firms

compete in the in-app networks market, *see* TAC ¶¶ 89, 232.

### C.     The NBA Does Not Support a Section 2 Claim.

Contrary to State Plaintiffs' wishful thinking that Google "does not challenge" their Section 2 claim based on the NBA, Opp. 2, Google moved to dismiss Counts I and II in their entirety, MTD 4, and the portions of their Section 2 claims based on the NBA fail for essentially the same reasons as the Section 1 claim.  First, State Plaintiffs fail to allege facts showing that Google has monopoly power (or a dangerous probability of achieving it) in the market for in-app networks.[5]  *See* MTD 40; *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *13-14 (S.D.N.Y. June 14, 2021) (dismissing Section 2 claim for failure to allege monopoly power).  Second, State Plaintiffs' failure to allege plausible harm to competition requires dismissal equally under Sections 1 and 2.  *See* MTD 38-40; *Elecs. Commc'ns Corp.*, 129 F.3d at 246 (affirming dismissal of Section 1 and 2 claims for failure to allege harm to competition); *see also E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (same).[6]

## II.     STATE PLAINTIFFS' CLAIMS ARE LARGELY UNTIMELY.

### A.     State Plaintiffs' Claims Are Subject to Laches.

Despite relying heavily on allegations of conduct that began more than a decade ago and occurred in full public view, MTD 13, State Plaintiffs attempt to escape the clear staleness of their claims by arguing that they are immune from a laches defense.  Opp. 33-35.  But State Plaintiffs are proceeding under Section 16 of the Clayton Act, 15 U.S.C. § 26; TAC ¶ 31—a statute that

---

[5] State Plaintiffs cannot rely on the conclusory allegation that Google and Facebook together have the power to "exclude rival networks and raise . . . prices," TAC ¶ 445, because their Section 2 claim requires factual allegations showing that Google has monopoly power on its own.  *See H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (concluding that two defendants' market shares "could not be aggregated" when assessing monopoly power); *RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d Cir. 2010) (affirming dismissal where plaintiff "has not alleged that any individual [defendant] has a monopoly").

[6] Despite arguing that the NBA denied header bidding "the scale necessary" to compete with Google, Opp. 21; *see also* Pub. 11, neither State Plaintiffs nor Publisher Plaintiffs point to factual allegations showing that the NBA prevents Facebook from supporting header bidding and Open Bidding at the same time, *see* MTD 32.

authorizes "[a]ny person" to enforce the federal antitrust laws, without distinguishing between states and private plaintiffs. In construing Section 16 in a case brought by California, the Supreme Court repeatedly referred to the suit as a "private action" and emphasized that "equitable defenses such as laches . . . may protect consummated transactions from belated attacks by private parties" under Section 16. *See California v. American Stores Co.*, 495 U.S. 271, 278, 281, 284, 295-96 (1990). Since then, district courts have confirmed what was implicit in *American Stores*: laches applies to states' Section 16 claims. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 38-40 (D.D.C. 2021); *Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 473-75 (D.P.R. 2020).[7]

State Plaintiffs criticize these decisions as "legally unsound," Opp. 34, but then build their counter-argument on dicta from a case that (i) did not involve Section 16; (ii) did not involve any state government; (iii) was decided half a century before *American Stores*; and (iv) held that foreign sovereigns are *not exempt* from statute-of-limitations defenses. *See Guaranty Trust Co. of New York v. United States*, 304 U.S. 126 (1938). Their other cases are similarly far afield. Each involved a state asserting its own state sovereign interests,[8] which are distinct from the "quasi-sovereign interests" that states assert when they, as here, bring *parens patriae* claims under federal law. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982) (explaining that quasi-sovereign interests "are not sovereign interests"). State Plaintiffs also make a policy argument that they should be exempt from laches because "resource constraints and the

---

[7] *See also New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y. 1993) ("Although the State of New York is a governmental actor, it is considered a private party when seeking an injunction pursuant to the Clayton Act."). The only contrary antitrust case pre-dates the Supreme Court's decision in *American Stores* and was not brought under Section 16. *See Massachusetts ex rel. Bellotti v. Russell Stover Candies, Inc.*, 541 F. Supp. 143, 144, (D. Mass. 1982) (state brought case under 15 U.S.C. § 15c(a)(1) to obtain "treble damages in addition to declaratory and injunctive relief").

[8] *See* Opp. 34 n.13; *Illinois v. Kentucky*, 500 U.S. 380, 382 (1991) (interstate boundary dispute); *United States v. Letter from Alexander Hamilton to Marquis de Lafayette Dated July 21, 1780*, 15 F.4th 515, 521-26 (1st Cir. 2021) (ownership of document under Massachusetts public records law); *United States v. Mottolo*, 605 F. Supp. 898, 909 (D.N.H. 1985) (CERCLA claim brought by New Hampshire "in its sovereign capacity").

difficulty of detecting unlawful conduct will render some delays unavoidable," Opp. 33, but Congress implicitly rejected that position when it subjected states' antitrust damages claims to a four-year statute of limitations, *see* 15 U.S.C. § 15b.

### B.   State Plaintiffs Fail to Overcome the Presumption that Laches Applies.

State Plaintiffs claim that "Google would need" to prove that laches applies here, Opp. 35, but "once the analogous statute has run, a *presumption* of laches will apply and *plaintiff* must show why the laches defense ought not be applied in the case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (emphasis added); *see also Madison Square Garden, L.P. v. Nat'l Hockey League*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) [hereinafter *MSG*] ("[W]here the conduct . . . occurs outside of the analogous statute of limitations period, the doctrine of laches presumptively bars a plaintiff's claims absent a showing that delay was excusable and caused no prejudice to the defendant.").   Although Google highlighted *Conopco* and *MSG* in its motion, MTD 12, State Plaintiffs' brief never mentions either case.   Nor do they dispute that much of the conduct identified in Counts I and II and all of the conduct at issue in Count III allegedly began well before December 2016, outside the Clayton Act's four-year statute of limitations.   MTD 13. Nor do they provide any explanation for their delay in suing.   Instead, State Plaintiffs offer only three legal arguments why laches should not bar their claims.

First, State Plaintiffs contend that their cause of action did not accrue until a "'plaintiff feels the adverse impact' of the unlawful conduct," Opp. 36, but that rule applies to some suits for damages—not to this suit seeking only injunctive relief, MTD 14.   And it is beside the point that, in other cases, harms "often materialize[] long after the conduct began," Opp. 36; the TAC alleges that the effects of the conduct at issue here were quick, dramatic, and apparent to all.[9]

---

[9] *See* TAC ¶¶ 258 (advertisers were no longer "[]able to receive and utilize . . . user IDs'" when Google began encrypting them), 247, 249 (Google "coerced" publishers into using DFP in 2010 and its "share of the publisher ad

Second, State Plaintiffs accuse Google of fraudulent concealment.  Opp. 36.  Although that doctrine requires allegations that they "did not know, and could not have known, about their causes of action . . . due to [Google's] [alleged] fraudulent concealment," *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 251 (S.D.N.Y. 2016), State Plaintiffs do not allege that any of Google's statements prevented them from discovering their claims, and they come nowhere close to doing so with the particularity required by Rule 9(b).  *See* Opp. 36 (citing TAC ¶¶ 278-79, 291, 313, 327-28, 338, 341-47, 385-86, 466); *see also World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (no fraudulent concealment where conduct "was open and notorious, and a reasonable person—especially a sophisticated party such as plaintiff—would have investigated and brought suit within the statute of limitations period"); *Nat'l Grp. for Commc'ns & Computs. Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006) (explaining that plaintiff must plead fraudulent concealment "with particularity as required by Rule 9(b)"); *In re Google Digital Advertising Antitrust Litig.*, 2021 WL 2021990, at *4 (N.D. Cal. May 13, 2021) ("[F]or Plaintiffs' fraudulent concealment theory to survive, they must meet the lofty pleading standards set forth in Fed. R. Civ. P. 9(b)."); *infra* Part III.C.

Third, State Plaintiffs cannot avail themselves of continuing violation arguments because that doctrine is "heavily disfavored in the Second Circuit and courts [are] loath to apply it absent a showing of compelling circumstances."  *Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *29 (S.D.N.Y. Mar. 31, 2014) (internal quotation marks and citation omitted); *see also* MTD 14.  State Plaintiffs point to no such "compelling circumstances" because they identify no "new and

---

server market skyrocketed as a result of [the alleged AdX-DFP tie]"), 281 ("Dynamic Allocation propelled Google's AdX exchange to the top of the market by 2013"), 159, 330, 514 ("[c]ompeting exchanges couldn't compete against [DRS]," resulting in their exiting the market through 2016), 286 (EDA resulted in "advertisers wishing to purchase from the new pool of high-value impressions . . . ha[ving] to purchase through AdX"), 345 (advertiser complained about RPO "just rais[ing] the price" for them), 370 (Exchange Bidding "requir[ed] publishers to route their inventory through AdX, even if they d[id] not want to").

independent act that is *not merely a reaffirmation of a previous act*," much less one that "inflict[s] new and accumulating injury." *MSG*, 2008 WL 4547518, at *10. While State Plaintiffs rely on cases involving independent acts occurring within the limitations period,[10] their brief confirms that the TAC alleges only that the stale conduct "continue[d]" or was "reinforced . . . over time."[11] *See* Opp. 37; *see also MSG*, 2008 WL 4547518, at *10 ("renewal," "enforcement," and "confirm[ation]" of pre-existing policies do not constitute new overt acts).

In addition, State Plaintiffs have failed to carry their burden of "showing [their] delay . . . caused no prejudice" to Google. *See MSG*, 2008 WL 4547518, at *10. Had they aired their grievances sooner, Google could have deployed its resources differently and could have avoided needing to rely on potentially stale recollections of decision-makers (some of whom may have moved on to other companies) to mount its defense. *See Conopco*, 95 F.3d at 192 (affirming finding of prejudice where defendant "committed massive resources" to its strategy and plaintiff's delay "precluded the possibility that [defendant] could effectively adopt an alternative" strategy); *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 138-39 (E.D.N.Y. 2012) (describing prejudice from "deleterious effects of time on the memories of witnesses"). Despite State Plaintiffs' claim that Google would not be "prejudiced by facing federal antitrust claims when it must answer . . . parallel state law antitrust claims" under Texas and Mississippi

---

[10] *See* Opp. 37 & n.15; *see also Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 654 F. Supp. 1195, 1204-05 (N.D.N.Y. 1987) ("Timely acts of Conrail might have contributed to the damages associated with pre-limitations acts."); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 351 (D. Vt. 2010) ("The creation of GNEMMA and the injuries it allegedly inflicted upon Plaintiffs took place within the limitations period and thus may be considered an overt act."); *Teladoc, Inc. v. Tex. Med. Bd.*, 2015 WL 8773509, at *2-5 (W.D. Tex. Dec. 14, 2015) (medical board's actions during limitations period were part of a "continuous course of conduct" with earlier actions, where all actions used same method of re-defining "proper physician-patient relationship" to exclude doctors who did not examine patients "face-to-face"); *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 837 (E.D. Mich. 2018) (in price-fixing case seeking damages, defendants "committed an overt act in furtherance of the conspiracies each time they sold an Auto Part"); *Klein v. Facebook, Inc.*, 2022 WL 141561, at *33 (N.D. Cal. Jan. 14, 2022) ("at least two false representations" to the public alleged within limitations period).

[11] State Plaintiffs claim to have alleged that Google "launched [a] new version of RPO," Opp. 37, but the TAC states only that "RPO continues in some form," TAC ¶ 348.

law, Opp. 38, other states bar untimely government claims,[12] and Google would be prejudiced by having to litigate over conduct allegedly affecting those states.

### C.     State Plaintiffs Cannot Obtain an Injunction Against Completed Conduct.

State Plaintiffs concede that Google ended DA and DRS in 2019.  MTD 15.  No injunction—whether framed as "retrospective," "prospective," or "structural," Opp. 39—could remedy past injuries allegedly caused by DA or DRS, and State Plaintiffs do not allege that either program has continuing, adverse effects or that Google is likely to re-institute either one.  MTD 15; *see also New York v. Facebook,* 549 F. Supp. 3d at 29-30 (dismissing Section 16 claim where injunction "would have no remedial effect whatsoever on the continuing injury" (citation and alterations omitted)).  Because an injunction related to DA and DRS would serve no purpose, and an injunction is the only remedy that State Plaintiffs seek, the allegations concerning DA and DRS fail to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).[13]

### D.     Claims Based on Privacy Sandbox Are Not Ripe.

State Plaintiffs contend that they have shown that Privacy Sandbox "may have a real impact on present affairs" with allegations that Google will make "new tracking mechanisms available only through Google's ad buying tools," Opp. 40, but the TAC nowhere alleges that the new tracking mechanisms will be unavailable to rival buying tools, *see* TAC ¶¶ 474, 479.  Indeed, it

---

[12] *See Stenehjem ex rel. State v. Nat'l Audubon Soc'y, Inc.*, 844 N.W.2d 892, 900-01 (N.D. 2014) (concluding that "equitable defense of laches against the government is not absolutely barred as a matter of law"); *State ex rel. Condon v. City of Columbia*, 528 S.E.2d 408, 415 (S.C. 2000) (explaining that the "State, like any private individual, must comply with time limits set forth in the statute").

[13] State Plaintiffs' contrary arguments find no support in the cases they cite.  *See* Opp. 38-39.  *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008), denied a motion to dismiss because "the fact that some relief may be warranted is sufficient to preclude dismissal under Rule 12(b)(6)," but here State Plaintiffs fail to show that *any* of the relief that they seek would address the alleged harms from DA and DRS.  In *Sturm v. Rasmussen*, 2019 WL 626167, at *4 (S.D. Cal. Feb. 14, 2019), the defendant—unlike Google—"d[id] not contend" that the requested remedy was "precluded as a matter of law."  And the other cases came out the defendants' way.  *See Brown v. Showtime Networks, Inc.*, 394 F. Supp. 3d 418, 443-45 (S.D.N.Y. 2019) (dismissing all counts); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 517 F. Supp. 2d 662, 666-67 (S.D.N.Y. 2007) (converting motion for summary judgment to motion in limine and precluding argument and evidence on punitive damages).

14

provides no details whatsoever about the new tracking mechanisms or Google's other Privacy Sandbox plans.  *See* TAC ¶¶ 474, 479.  Nor does the allegation that advertisers are "preparing" for Privacy Sandbox show that those preparations are having any present anticompetitive effects.  *See* TAC ¶ 523.  With so many unknowns, the Privacy Sandbox claims are not ripe for adjudication and should be dismissed.  MTD 16.

### E.    Untimely Claims Should Be Dismissed.

Google is seeking dismissal of Count III in its entirety, MTD 15, so State Plaintiffs' arguments around "piecemeal" dismissal have no bearing on their tying claim.  Opp. 33.  Nor can State Plaintiffs avoid dismissal of stale conduct pertaining to Counts I and II by conflating *claims* with *counts*.  A claim or cause of action is "a set of facts giving rise to one or more legal rights." *Schwartz v. Eaton*, 264 F.2d 195, 196 (2d Cir. 1959).  "No matter how a complaint is organized, one cause of action exists for each 'different set of facts underpinning each effective count.'"  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018).  As a result, State Plaintiffs "bringing multiple claims under one legal cause of action cannot simply collapse all of [their] distinct claims into one central [monopolization] 'count,' thereby proofing [their] complaint from a partial motion to dismiss."  *Id.*; *see also Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593, at *9-10 (M.D. Fla. Mar. 8, 2021) (granting partial motion to dismiss).[14]  Even if they could, the Court should still analyze each subpart of the monopolization

---

[14] State Plaintiffs note that "Google's [laches] arguments are not directed to the entirety of the[ir] Section 2 claims (Counts I and II)," Opp. 33, but Google has moved to dismiss the Section 2 claims in full, *see* MTD 40, based not only on laches, but also on State Plaintiffs' failure to allege exclusionary conduct, *see id.* 12-27; *see also supra* Part I.C; *infra* Part III.  Unlike here, State Plaintiffs' cited cases involved motions to dismiss only parts of claims, while conceding that other parts would survive.  *See Tromblee v. New York*, 2021 WL 981847, at *11 (N.D.N.Y. Mar. 16, 2021) ("By the State Defendants' framing, they do not move to dismiss Plaintiff's retaliation claim as a whole."); *FTC v. Facebook, Inc.*, 2022 WL 103308, at *17 (D.D.C. Jan. 11, 2022) ("Since the allegations relating to Facebook's acquisitions state a plausible claim for relief, even though the Platform-policy ones do not, Count II should not be dismissed."); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 323 (7th Cir. 2015) (defendant's motion to dismiss directed at "*certain elements* of the doctrinal test applicable to the First Amendment claim").

counts individually and bar discovery concerning any legally defective allegations.  *See FTC v. Facebook, Inc.*, 2022 WL 103308, at *16-17 (D.D.C. Jan. 11, 2022) (declining to permit plaintiffs a "discovery windfall" as to allegations that failed to state a claim).

### III.    STATE PLAINTIFFS FAIL TO ALLEGE THAT GOOGLE ENGAGED IN ANTICOMPETITIVE CONDUCT.

State Plaintiffs' monopolization and attempted monopolization claims (Counts I and II) require an "element of anticompetitive *conduct*."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  In addition to the allegations concerning the NBA, which are deficient for the reasons described in Part I.C, the TAC bases its Section 2 claims on a variety of other types of alleged conduct, but all of those allegations describe Google either lawfully refusing to share data or lawfully changing how its products work.  While State Plaintiffs' brief also points to allegedly deceptive statements, the TAC does not treat those allegations as grounds for Section 2 liability, and even if it had, they would fail to state a monopolization claim.

#### A.    State Plaintiffs Fail to Allege Unlawful Refusals to Deal.

State Plaintiffs' allegations about Google not sharing unencrypted user IDs, unredacted auction reports, and "Minimum Bid to Win" ("MBTW") data fail to meet the stringent standards for refusal-to-deal claims.  Courts have recognized that monopolists may have a duty to deal with *rivals* in narrow circumstances, *see* MTD 17-19, but State Plaintiffs readily concede that they "do not allege such conduct," arguing instead that Google must share its data with *customers*—without citing any supporting cases, *see* Opp. 11.  Courts also require plaintiffs to plead facts showing that an alleged refusal to deal involved a sacrifice of short-term profits, but State Plaintiffs allege the opposite:  that not sharing data would have increased Google's profits.[15]  *See Apotex Corp. v.*

---

[15] The TAC alleges that encrypting user IDs led "advertisers . . . to redirect spend . . . toward Google's buying tools," TAC ¶ 266; redacting auction reports obscured "when a header bidding exchange outperformed AdX," *id.* ¶ 387; and

*Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *4 (S.D.N.Y. Jan. 6, 2020) (dismissing *Aspen Skiing* claim where plaintiff "affirmatively allege[d]" that defendant acted "in pursuit of competitive profits"). Unable to make out a refusal-to-deal claim, State Plaintiffs try three strategies to stave off dismissal.

First, State Plaintiffs assert that they need not allege profit sacrifice "[a]t the pleading stage" and accuse Google of "cit[ing] no cases to the contrary." Opp. 16 n.5. But they ignore *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134-36 (2d Cir. 2014) (cited at MTD 18), and other cases dismissing refusal-to-deal claims that lacked allegations of profit sacrifice,[16] and they cite no decision denying a motion to dismiss where the plaintiff failed to allege profit sacrifice.[17]

Second, State Plaintiffs and Publisher Plaintiffs assert without foundation that the data at issue is owned by Google's customers, rather than Google itself. *See*, *e.g.*, Opp. 12 (referring to "interfere[nce] with customers' use of their *own information*"); *see also* Pub. 7 ("Google uses its ad server to prevent publishers from sharing their own transactional data . . . ."). The TAC, however, alleges that *Google* generated that data and provides no plausible basis to infer that the data belongs to Google's customers. For example, the TAC states that Google's ad server "assigns each user a unique user ID," TAC ¶ 51, and refers to them as "DFP ad server user IDs," *id.* ¶ 257.

---

limiting distribution of MBTW data allowed Google to "trad[e] ahead of exchanges returning bids through header bidding and underpay[] for publishers' impressions," *id.* ¶ 380.

[16] *See MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *5 (S.D.N.Y. Mar. 28, 2013) (dismissing in part because "the Complaint nowhere states facts averring that [defendant] relinquished short-term profits" in terminating prior course of dealing with customers), *aff'd*, 551 F. App'x 1 (2d Cir. 2013); *3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, at *8 (D. Del. Aug. 15, 2019) (rejecting inference that defendant's "termination of . . . agreement was economically irrational, as required by *Aspen*" because it was "equally consistent with an inference that [defendant] wanted to increase [its own] sales").

[17] *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52-54 (2d Cir. 2007) (affirming dismissal for failure to allege prior course of dealing without reaching whether profit sacrifice was adequately pled, and recognizing the importance of "a willingness to forsake short-term profits to achieve an anticompetitive end") (internal quotation marks and citation omitted); *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 718-22 (S.D.N.Y. 2017) (analyzing motion for preliminary injunction, rather than motion to dismiss).

The TAC likewise recognizes that "DFP provided auction records" to publishers, *id.* ¶ 387, and "DFP began sharing . . . [MBTW] data," *id.* ¶ 380. There are no allegations that customers create any of this data or that it would exist at all if not for Google.[18]

Third, State Plaintiffs and Publisher Plaintiffs draw flawed analogies to several lines of cases where courts have found Section 2 violations. Beginning with *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), they liken Google to U.S. Tobacco because both allegedly abused an intermediary position to harm rivals. Opp. 12, 15; Pub. 7-8. Specifically, U.S. Tobacco had a "pervasive practice of destroying [a smaller rival's display] racks and POS [point-of-sale] materials," which the rival had installed at third-party retailers. *See Conwood*, 290 F.3d at 788.[19] For that case to be remotely relevant here, the TAC would have had to allege that Google took affirmative steps to destroy its rivals' systems so that they could no longer serve their customers. But State Plaintiffs allege only that Google refused to share its own data, not that it affirmatively interfered with its rivals' operations. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078-79 (10th Cir. 2013) (Gorsuch, J.) (rejecting plaintiff's attempt to "recast [defendant's]

---

[18] The TAC's partial quotations from Google's statement to Congress and the FTC's statement about Google cannot cure this defect because the full statements show that Google and the FTC were referring to data that Google *collected* from customers, while Google *created* the data at issue here. *See* TAC ¶ 264 (quoting *An Examination of the Google-DoubleClick Merger and the Online Advertising Industry: What are the Risks for Competition and Privacy?: Hearing Before the Subcomm. on Antitrust, Competition Policy and Consumer Rights*, 110 Cong. 29 (2007) (Testimony of David Drummond), https://www.govinfo.gov/content/pkg/CHRG-110shrg39015/pdf/CHRG-110shrg39015.pdf ("Again, no control over the advertising, no ownership of the data that comes with that that is *collected* in the process of the advertising. That data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it.") (emphasis added); *Statement of Federal Trade Commission Concerning Google/Doubleclick*, FTC-071-0170, 12 (2007), https://www.ftc.gov/system/files/documents/public_statements/418081/071220googledc-commstmt.pdf ("[T]he customer and competitor information that DoubleClick *collects* currently belongs to publishers, not DoubleClick.") (emphasis added)). The Court may take judicial notice of the full statements. *See Johnson & Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462, 464 n.1 (S.D.N.Y. 2008) (finding Congressional hearing testimony "constitutes a public record of which the Court can take judicial notice" on a motion to dismiss); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) (taking judicial notice of documents published by a federal agency because "courts may take judicial notice of publicly available documents on a motion to dismiss").

[19] U.S. Tobacco also "reduc[ed] the number of [the rival's] facings through exclusive agreements with and misrepresentations to retailers," *Conwood*, 290 F.3d at 788, but State Plaintiffs do not allege that Google entered any exclusive agreements and do not base their Section 2 claims on actionable misrepresentations. *See infra* Part III.C.

conduct as an 'affirmative' act of interference with a rival rather than a 'unilateral' refusal to deal").[20]   Further, unlike the rival's display racks in *Conwood*, the data at issue here were created by Google, not its customers or rivals.   *See* TAC ¶¶ 51, 257, 380, 387.

Next, State Plaintiffs and Publisher Plaintiffs trot out *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), to argue that certain refusals to deal with customers can be unlawful.  Opp. 12; *see also* Pub. 13-14.  In *Lorain Journal*, a dominant newspaper refused to deal with advertisers that also dealt with a rival radio station, 342 U.S. at 148, but State Plaintiffs do not allege that Google refused to deal with customers that also dealt with its rivals.  According to the TAC, Google does not share unencrypted user IDs or unredacted auction reports with *any* publisher customers, regardless of whether they also do business with competitors.[21]  TAC ¶¶ 257, 387; *see New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 32 (D.D.C. 2021) ("For the *Lorain Journal* principle . . . to apply to this case, . . . [plaintiffs] would thus have to allege that [the defendant] conditioned access to its [product] on [customers] agreeing not to deal with [competitors].").

Publisher Plaintiffs accuse Google of "lock[ing] up a key input . . . publishers' *own* transactional data."  Pub. 9.  But their cases are distinguishable because they involved defendants

---

[20] State Plaintiffs cite other cases where defendants' "affirmative acts . . . interfere[d] with customers' [ability] to transact with rival firms," and Publisher Plaintiffs characterize those cases as involving defendants that "punish[ed] their customers" for dealing with rivals.  *See* Opp. 12; Pub. 13; *see also United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456-57 (1922) (defendant restricted customers from also using machinery made by rivals); *PepsiCo, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *3 (S.D.N.Y. Aug. 27, 1998) (defendant refused to deal with distributors that even "showed an interest" in distributing rival products); *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249-51 (D. Utah 1999) (defendant required customers to pay royalties to defendant even when running competitors' operating systems, which had "practical effect" of forcing customers to deal exclusively with defendant).  Unlike in all of those cases, however, the TAC does not allege that Google affirmatively blocked customers from or punished customers for dealing with rivals.  State Plaintiffs allege only that Google declined to share its own data, and "a monopolist is much more likely to be held liable for failing to leave its rivals alone than for failing to come to their aid."  *Novell*, 731 F.3d at 1072.

[21] Allegations that Google provided MBTW data to exchanges participating in Exchange Bidding, but not to header bidding exchanges, fail to state a *Lorain Journal* claim because State Plaintiffs do not allege that header bidding exchanges were ever Google customers.  Instead, the TAC alleges only that, when Google began providing MBTW data in 2019, it made that data available exclusively to its customers (i.e., exchanges participating in Exchange Bidding).  TAC ¶ 380.  That would be like a newspaper providing circulation statistics to its advertiser customers, but declining to share them with the general public.

that used exclusive dealing arrangements to block competitors from acquiring the "key input" *from other sellers.*[22] By contrast, Google had no exclusive arrangements, created the data at issue itself, and did not prevent other sellers from supplying publishers with whatever data those sellers have.

Publisher Plaintiffs also try to bootstrap the tying claim into a broader monopolization claim by arguing that, because Google allegedly "secured its gatekeeping position as the dominant ad server through an illicit tie, antitrust law bars Google from using even theoretically lawful refusals to deal." Pub. 6. Neither *Coalition for ICANN Transparency v. VeriSign*, 611 F.3d 495 (9th Cir. 2010), nor *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020), support that argument because both involved companies that were not alleged to have obtained their monopolies unlawfully; the defendants were accused of engaging in exclusionary conduct to *maintain* their positions.[23] Publisher Plaintiffs also flagrantly mischaracterize the defendants'

---

[22] *See Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc*, 351 F. Supp. 462, 504-08 (E.D. Pa. 1972) (defendant's exclusive arrangements with hockey players prevented rival hockey leagues from contracting with players); *FTC v. Mylan Labs.*, 62 F. Supp. 2d 25, 33-34 (D.D.C. 1999) (defendant's exclusive contract with supplier of active ingredient foreclosed rival drug manufacturers from acquiring the ingredient); *Dial Corp. v. News Corp.* 165 F. Supp. 3d 25, 29, 33 (S.D.N.Y. 2016) (defendant's exclusive dealing arrangements prevented rivals from accessing needed retailers); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (defendant's exclusive arrangements blocked rivals from distribution channels and suppliers); *Le v. Zuffa*, 216 F. Supp. 3d 1154, 1167-69 (D. Nev. 2016) (defendant's exclusive contracts prevented potential rivals from contracting with the MMA fighters they needed to hold competing bouts); *see also* Opp. 12 n.4 (citing *FTC v. Vyera*, 479 F. Supp. 3d 31, 39-40 (S.D.N.Y. 2020) (defendant used exclusive contracts and other practices to prevent rival drug manufacturers from obtaining active ingredient)); Pub. 7 (citing *Church & Dwight Co. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *10, *15 (N.D. Cal. Apr. 1, 2011) (explaining allegations that "it is the exclusive display space that [defendant] 'buys' through the rebates, as well as the exploitation of the category captain positions and exclusive dealing arrangements, that harms competition" and that "allegations regarding the category captain arrangements are not specific enough to establish . . . anticompetitive/exclusionary conduct")).

[23] *See ICANN*, 611 F.3d at 505-07 (analyzing 2006 contract extension without considering whether VeriSign lawfully obtained its position as "sole operator" of .com domain names in 2001, and concluding that it was exclusionary for VeriSign to engage in conduct "aimed at coercing ICANN to *perpetuate* VeriSign's role as exclusive regulator of the .com domain name market" (emphasis added); *Lantus*, 950 F.3d at 7-10 (analyzing 2013 listing of '864 patent in Orange Book without considering whether defendant lawfully obtained its exclusive right to market drug in 2000, and stating that the analysis "turns on whether the complaint plausibly alleges that . . . submitting the '864 patent for listing in the Orange Book, was an 'improper means' of *maintaining* [monopoly] power.") (emphasis added). The other cases on which Publisher Plaintiffs rely all involved fraud in obtaining pharmaceutical patents and then enforcing those fraudulent patents, conduct bearing no resemblance to Google's alleged refusals to share data and product design decisions. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 694 (2d Cir. 2009) (defendant brought sham litigation to enforce fraudulently obtained patent); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 272-73 (3d Cir. 2017) (same); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 375 (S.D.N.Y. 2002) (same).

alleged conduct in those cases.  They describe *ICANN* as holding that the defendant could not "refuse to license services to rivals on fair terms," Pub. 6, when the defendant was not accused of any refusal to deal.  *See ICANN*, 611 F.3d at 505.  And contrary to their claim that *Lantus* prohibited the defendant from "impos[ing] anticompetitive royalty agreements on rivals," Pub. 6, the court focused on "whether [the defendant] improperly submitted a patent for listing in the Orange Book," not the terms of royalty agreements.  *See Lantus*, 950 F.3d at 3, 6-14.  Moreover, even if Publisher Plaintiffs were not misreading their cases, their theory would not prohibit Google from refusing to share its data because the TAC fails to allege facts showing that Google implemented an unlawful tying arrangement in the first place.  *See infra* Part IV.

**B.   State Plaintiffs Fail to Allege Coercive Product Design Changes.**

Although State Plaintiffs protest that their allegations should not be "pigeonhole[d]" into product design case law, Opp. 14, they fail to explain why cases analyzing product design changes should not apply to their allegations challenging changes to the design of Google's products.  Their refrain that Google should not be able to "skirt the Sherman Act . . . through lines of code" both confirms that they are in fact challenging how Google has designed the "lines of code" in its products and betrays that they cannot meet the standards applicable to product-design claims.  *See* Opp. 12; *see also id.* at 2 (rejecting "immun[ity]" for conduct involving "lines of code").  In the end, State Plaintiffs embrace the same principles that Google described in its opening brief:  there cannot be Section 2 liability "unless a challenged product design—combined with some other associated conduct—had 'the overall effect of . . . coerc[ing] consumers rather than persuad[ing] them on the merits.'"  MTD 20 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015)); Opp. 13 (same).[24]

---

[24] State Plaintiffs also quote the D.C. Circuit's general statement that conduct cannot violate Section 2 unless it "harm[s] the competitive *process* and thereby harm[s] consumers."  Opp. 13, 14 (quoting *United States v. Microsoft*

As Google's opening brief explained, product design changes are not coercive as long as alternatives to the redesigned product remain available and consumers are free to use them.  MTD 20-21.  For example, the Second Circuit has distinguished between the coercive "combination of introducing [a new product] into the market and effectively withdrawing [an old one]" (a "hard switch") from lawfully seeking "to persuade [customers] to switch from [an old product] to [a new one] while both were on the market" (a "soft switch").  *Actavis*, 787 F.3d at 654-55.  In another case, the Second Circuit concluded that Kodak did not coerce consumers to purchase a new kind of film because "Kodak did not remove any other films from the market when it introduced the new one," while allowing that "the situation might be completely different if, upon the introduction of the [new film], Kodak had ceased producing [older films]."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 & n.39 (2d Cir. 1979).  Similarly, the Ninth Circuit held that, because consumers had competitive "alternatives," a medical equipment manufacturer "did not force consumers to purchase" its new product by "discontinuing its support" for an older model.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010); *see also* MTD 20-21 (citing cases).

State Plaintiffs cannot escape these precedents, and they do not even attempt to address them.  Nor do State Plaintiffs identify any allegations in their complaint that Google's product design changes prevented customers from doing business with rivals.  *See* MTD 21-26.[25]  Indeed, despite having the benefit of extensive pre-complaint discovery, they do not identify even a single publisher or advertiser that Google allegedly coerced.  To be sure, State Plaintiffs argue that

---

*Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)).  But consistent with *Microsoft*, the Second Circuit has made clear that "product redesign is anticompetitive when it coerces consumers *and* impedes competition," *Actavis*, 787 F.3d at 652 (emphasis added), so a plaintiff cannot state a product-design claim without alleging customer coercion.

[25] In not bothering to respond to Google's arguments about Exchange Bidding, State Plaintiffs concede that those allegations fail to state a claim.  *See* MTD 22-23.

Google's product designs helped Google win more business at the expense of competitors, Opp. 16-17 (discussing DA, EDA, and UPR), but that is competition at work, not evidence of an anticompetitive effect.[26]  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) ("The kind of competition that [plaintiff] alleges here, competition for increased market share, is not activity forbidden by the antitrust laws.  It is simply . . . vigorous competition.").

For the design changes that they claim "manipulat[e] exchange auctions themselves" (i.e., Project Bernanke, DRS, and RPO), State Plaintiffs assert that "'product design' deference" should not apply and that other legal standards should control.  Opp. 18-20.  But their principal cases do not involve auctions, much less allegations of anticompetitive auction design,[27] and those cases also fail to appreciate that Section 2 prohibits only conduct that affects market structure by excluding competitors and does not reach every type of conduct that affects prices.[28]  State

---

[26] While State Plaintiffs and Publisher Plaintiffs argue that UPR puts rival exchanges and buyers at a price disadvantage, Opp. 17-18, Pub. 12, the TAC alleges that UPR requires publishers to "set the *same* price floor for different exchanges and . . . buyers" and that any price difference exists only because Google charges rival exchanges for using Google's tools, TAC ¶¶ 460-61 (emphasis added).  State Plaintiffs and Publisher Plaintiffs do not and cannot cite any case requiring Google to give rivals access to its tools free of charge, and the cases on which they rely involved defendants requiring customers to charge prices at least as high as the defendants' prices even on transactions in which the defendants were not involved.  *See United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 669 (E.D. Mich. 2011) (Blue Cross required hospitals to "provide hospital services to Blue Cross' competitors either at higher prices than Blue Cross pays or at prices no less than Blue Cross pays"); *Frame-Wilson v. Amazon.com, Inc.*, 2022 WL 741878, at *11 (W.D. Wash. Mar. 11, 2022) (Amazon required "sellers to add Amazon's fees to the cost of their products when they sell them on all external platforms").  By contrast, the TAC does not allege that Google's conduct affects the pricing of transactions in which it plays no role.

[27] *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 141 (S.D.N.Y. 2016) (defendant allegedly manipulated markets by "engaging in large quantities of money-losing purchases and sales in the daily markets to reap profits from its swap contracts"); *In re Tether & Bitfinex Crypto Asset Litig.*, 2021 WL 4452181, at *7 (S.D.N.Y. Sept. 28, 2021) (explaining that the "crux" of the complaint involved allegations that defendants "fraudulently issued between $1 and $3 billion worth of the crypto-asset USDT" in order to manipulate prices).

[28] *See City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 446-47 & n.163 (S.D.N.Y. 2020) (disagreeing with *Merced* and holding that "market manipulation . . . derived from strategically timed trades" was not anticompetitive conduct), *aff'd*, 2021 WL 5754295 (2d Cir. 2021); *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136, 139-40 (1998) (explaining that "consumer injury" did not amount to antitrust violation when it "flowed not so much from a less competitive market . . . , as from the exercise of market power that is *lawfully* in the hands of a monopolist . . . combined with a deception"); *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 164 (W.D.N.Y. 2000) (applying Supreme Court's reasoning to both Section 1 and 2 claims); *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1211-12 (S.D. Tex. 2009) (dismissing Section 2 claim that defendant "creat[ed] an artificial and manipulated market" because plaintiff failed "to allege predatory pricing or other actionable exclusionary conduct").

Plaintiffs' other cases concern defendants accused of anticompetitive conduct unrelated to how "they *designed* the machinations of their auctions." *See* Opp. 18 & n.6 (emphasis added).[29] Publisher Plaintiffs likewise argue that Google violated Section 2 by "manipulat[ing] advertising auctions," but their cases all involved collusive conduct alleged to violate Section 1, rather than unilateral design changes to a company's own products. *See* Pub. 9-10.[30]

Finally, State Plaintiffs inexplicably contend that Google "completely ignores [their] Section 2 claims" based on an alleged "multi-year campaign to 'kill' header bidding," Opp. 20, when Google showed that none of the conduct allegedly targeting header bidding was exclusionary, alone or in combination. *See* MTD 17-19 & n.6 (redacted auction reports and MBTW data), 23-24 (capping line items, Projects Poirot and Elmo, AMP), 26-27 (monopoly broth); *see also supra* Part I.C (NBA). Further, their "kill header bidding" theory fails to recognize that a "desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition," *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989), and that even an alleged monopolist has no duty to "pull[] its competitive punches," *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) (Posner, J.).

In addition, State Plaintiffs fail to allege facts showing that Google's supposed scheme actually succeeded in killing header bidding. As State Plaintiffs concede, intent is "not an element

---

[29] *See Growers 1-7 v. Ocean Spray Cranberries, Inc.*, 2015 WL 13649090 (D. Mass. May 14, 2015) (price-fixing and predatory pricing in setting starting price for auctions); *KASP, Inc. v. Adesa Lexington, LLC*, 2006 WL 385310 (E.D. Ky. Feb. 17, 2006) (predatory pricing of fees paid to auctioneers); *Smith v. eBay Corp.*, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012) (tying online payment services to online auction services); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000) (certifying class in case alleging price fixing of auction commissions).

[30] *See In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) (allowing Section 1 claim for agreements to restrict sharing of real-time pricing data to proceed and dismissing Section 2 conspiracy-to-monopolize claim based on same conduct for failure to allege exclusion of rivals); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018) (no Section 2 claim brought where defendants colluded to restrict distribution of pricing data); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017) (no Section 2 claim brought where defendants colluded to inhibit and boycott trading platforms); *see also United States v. Container Corp. of Am.*, 393 U.S. 333 (1969) (no Section 2 claim brought where defendants colluded to exchange pricing information).

of a monopolization claim," Opp. 13, and they must allege facts showing that the challenged conduct had harmed competition. *See Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 323-24 (E.D.N.Y. 2012) (dismissing claim for "fail[ure] to allege harm to competition"). The TAC, however, contains only boilerplate assertions that Google's conduct "substantially suppressed the competitive threat posed by header bidding," TAC ¶ 375, and "significantly excluded competition," *id.* ¶ 412, perhaps because State Plaintiffs know full well that header bidding continues to thrive today. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (conclusory allegations "will not suffice to state anticompetitive effect" where plaintiffs "cite no examples, data, or other facts to support their assertion").

### C.     State Plaintiffs Fail to Allege Anticompetitive Deception.

Unable to meet the standards for refusal to deal and product design claims, State Plaintiffs wrongly assert that "Google does not dispute that [they] have sufficiently alleged anticompetitive deceptive conduct." Opp. 22. Google had no reason to address alleged deception in its opening brief because the state deceptive trade practice claims (Count VI) have been stayed and State Plaintiffs dropped deception from the monopolization counts in the TAC (Counts I and II). *See* MDL ECF No. 142, at 10:13-22; *compare* TAC ¶¶ 529, 534 (not listing deception among types of allegedly anticompetitive conduct), *with* Second Amended Complaint, MDL ECF No. 152 ¶¶ 311, 320 (alleging "dece[ption of] publishers to encourage them to disable header bidding"). To the extent that State Plaintiffs now seek to resurrect deception as a ground for Section 2 liability, "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

Even if the TAC had incorporated the alleged deception into the Section 2 counts, "[d]eceptive conduct—like any other kind—must have an anticompetitive effect in order to form the basis of a monopolization claim," *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008),

and the Second Circuit "require[s] the plaintiff to overcome a presumption that the effect on competition . . . was [d]e minimis," *see Berkey Photo*, 603 F.2d at 288 n.41. Here, despite offering a laundry list of supposedly deceptive statements, State Plaintiffs cite no factual allegations connecting any of Google's statements to an effect on competition. *See* Opp. 22 (citing TAC ¶¶ 278-79, 291, 313, 327-28, 338, 341-47, 385-86, 466).[31]

Further, many of the cited allegations lack the particularity required under Rule 9(b), as they fail to "specify the time, place, speaker and content of the alleged misrepresentations." *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 649 (S.D.N.Y. 1992); *see, e.g.*, TAC ¶¶ 278 (failing to allege date, place, and speaker), 291 (same), 338 (same), 466 (same, and also failing to allege particularities of allegedly false statement). And nearly all of the allegations mentioning dates concern statements from more than four years before this case was filed, *see id.* ¶¶ 313 (quoting statement alleged in ¶ 300 to have been made in 2009 or shortly after), 327 ("the summer of 2016"), 341 (March 5, 2015), 343-45 (May 12, 2016), so claims based on them are barred by laches, *see* MTD 12-15; *supra* Part II. Although State Plaintiffs point to one statement allegedly made within the limitations period, that statement cannot overcome the de minimis presumption because it was allegedly made to a single publisher. *See* TAC ¶¶ 385-86.

In addition to being vague and stale, many of the allegations also fail to supply facts showing that the statements were false. First, the TAC alleges that Google described DRS as a "revenue share-based optimization," TAC ¶ 327, which is entirely consistent with how the TAC itself describes the program, *see id.* ¶ 320 (alleging that DRS "lower[ed] Google's exchange fee"

---

[31] Contrary to State Plaintiffs' argument, Opp. 22 n.7, allegations of false or misleading statements do not suffice to prevent dismissal of a Section 2 claim. *See Affinity LLC v. GfK Mediamark Rsch. & Intel., LLC*, 547 F. App'x 54, 57 (2d Cir. 2013) (dismissal despite allegation of false and misleading statements); *Eon Labs Mfg. Inc. v. Watson Pharms., Inc.*, 164 F. Supp. 2d 350, 361 (S.D.N.Y. 2001) (same). Indeed, the de minimis presumption exists precisely to control the "social cost in litigation over [deception]" by requiring more than mere allegations of false or misleading statements. *See Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).

from 20 percent to 5 percent).  Second, the TAC alleges that Google denied that it "planned to adjust price floors based on *publishers'* use of Google's DFP ad server," *id.* ¶ 341 (emphasis added), but that is also completely consistent with other allegations that RPO works by adjusting floors based on *advertisers'* bid history, *see id.* ¶ 335 (RPO "generated unique and custom per-buyer floors depending on what a buyer had bid in the past.").  Third, the TAC alleges that Google claimed it would "monitor [optimized pricing's] performance to ensure advertisers continue[d] to get great ROI," *id.* ¶ 345 (alterations in original), which is not inconsistent with the allegations that RPO "forced advertisers to pay more than they otherwise would," *id.* ¶ 335, because even paying more could still result in a "great ROI."  Fourth, the TAC alleges that Google stated that RPO would "give programmatic buyers greater access to premium inventory," *id.* ¶ 345, but the TAC fails to allege that RPO had any contrary effect.  Fifth, the TAC alleges that Google "falsely" told a publisher that header bidding put "a strain on servers," *id.* ¶ 386, without alleging any facts to support the conclusory characterization that such a statement would be untrue.

### D.   State Plaintiffs' Monopoly Broth Theory Cannot Salvage Their Claims.

Relying on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), State Plaintiffs fault Google for "isolat[ing] the various, interrelated conduct alleged in the TAC." Opp. 14; *see also* Pub. 15-16.  But courts "must" analyze the issues "individually" even when they are "interrelated and interdependent."  *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981).  And "*Continental Ore* does not stand for the unworkable proposition that business conduct that does not offend the antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct."  *Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012); *see also Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (Castel, J.) ("If the evidence underlying each form of alleged anticompetitive conduct is 'utterly

lacking,' there can be no synergistic effect." (citation omitted)).  Having failed to show that any

part of Google's conduct violated Section 2, State Plaintiffs' plea to consider all of the conduct

together cannot save them from dismissal.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555

U.S. 438, 457 (2009) ("Two wrong claims do not make one that is right."); *Eatoni*, 826 F. Supp.

2d at 710 ("[T]he sum of zero and zero is zero.").

## IV.    STATE PLAINTIFFS FAIL TO PLEAD A TYING CLAIM.

Google showed that the tying claim (Count III) should be dismissed for failing to allege

that Google coerces publishers into using its DFP ad server to obtain access to its AdX exchange.

MTD 27-30.  In response, State Plaintiffs concede that they "do not allege that Google coerced

publishers through bundled discounts," Opp. 8 n.2, the only theory of economic coercion

recognized in the case law, MTD 28-29.  Instead, they argue that publishers were coerced to use

DFP because Google "only allow[s] publishers that license Google's ad server to receive live,

competitive bids from its exchange" and "losing competitive bids from AdX would have been an

'untenable' economic blow."  Opp. 8 (quoting TAC ¶¶ 246-47).  But that claim only underscores

that publishers benefit from how well AdX and DFP work together and exemplifies the "countless

tie-ins of physically separate products that benefit consumers and pose little, if any, risk of

anticompetitive harm."  *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016).

State Plaintiffs cite no cases holding that an "economic blow" amounted to coercion.  Some

of their cases found no coercion.  *See id.* at 145; *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678,

685-86 (2d Cir. 1982).  Others found coercion based on explicit requirements that customers

purchase the tied product to obtain the tying product,[32] which the TAC does not allege.  Rather,

---

[32] *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 470 (7th Cir. 2020) ("Ample evidence shows that Comcast conditioned MVPDs' access to the Interconnects on hiring Comcast as their ad rep."); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 57 (2d Cir. 1980) ("[E]vidence supported a finding that [plaintiff] . . . w[as] successfully coerced by [defendant] into buying the tied products"); *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977) (customers required to buy memorials and installation services to obtain cemetery lots); *Esposito v. Mister Softee,*

State Plaintiffs concede that publishers using AdX may "choose[] not to license Google's ad server."  TAC ¶ 250; *see also In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, 2010 WL 882989, at *5 (S.D.N.Y. Mar. 5, 2010) (Castel, J.) ("[W]here the buyer is free to take either product by itself there is no tying problem." (internal quotation marks omitted)).

The Ninth Circuit considered—and rejected—a theory much like State Plaintiffs' "economic blow" theory.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016).   In that case, the plaintiff claimed that Honeywell tied service to replacement parts by "constraining the flow of parts to independent servicers" and "withholding . . . technical information needed to complete repairs," but the court held that an "economic imperative" theory was "too attenuated to support liability for tying."  *Id.* at 1179-80.  Although State Plaintiffs try to downplay *Aerotec* as a case in which the defendant merely made rivals' services "less desirable to purchase," Opp. 9, their theory is exactly the same:  that Google made rival ad servers less desirable because live, competitive bids from AdX were available only through DFP.

Apart from their unsupported "economic blow" theory, State Plaintiffs' only other effort at showing coercion comes as a passing reference to their allegation that, beginning in 2018, Google required publishers to "sign a combined contract."  Opp. 8 (citing TAC ¶ 251).  That allegation is insufficient to plead coercion for three reasons.  First, it does not say that publishers were required to *purchase* both products.  *See* MTD 27-28.  Second, it is contradicted by State Plaintiffs' allegation that, even after 2018, Google allowed publishers who use AdX to "choose[]

_____

*Inc.*, 1979 WL 1733, at *8 (E.D.N.Y. Dec. 14, 1979) (defendants "condition[ed] [plaintiffs'] right to use the trademark of Mister Softee upon [plaintiffs'] purchasing of all their supplies from a designated supplier").  Publisher Plaintiffs claim that these cases show that customers' mere "*understanding* that the tied and tying products must be purchased together to function appropriately is sufficiently coercive to constitute tying," Pub. 2-3, but customers understood that there were tying arrangements in those cases because the defendants actually required them to buy the tied product if they wanted to purchase the tying product. Publisher Plaintiffs point to no cases where coercion was found based on a customer's misunderstanding about whether a tie existed.

not to license Google's ad server."  TAC ¶ 250; *see also Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) (explaining that, when a "plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true" (citation omitted)).  Third, it relates only to conduct occurring since 2018 and thus fails to show that the alleged "99 percent of large publishers" already using DFP by 2018 were coerced into doing so.  *See* TAC ¶ 114.

At its core, State Plaintiffs' tying claim is really nothing more than an assertion that Google should be required to give rival ad servers the same access to live AdX bids as its own DFP.  MTD 29.  Rather than try to satisfy the standards for such a refusal-to-deal claim (which they cannot, *see id.* at 29-30), State Plaintiffs argue that *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), and *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992), prevent the Court from dismissing their deficient claim until "a later juncture."  Opp. 9.  Not so.  *Viamedia* and *Kodak* say only that a viable tying claim should not be dismissed.  *See Viamedia*, 951 F.3d at 470-71; *Kodak*, 504 U.S. at 463 & n.8.  Unlike the plaintiffs in *Viamedia* and *Kodak*, which showed that defendants explicitly tied two products,[33] State Plaintiffs do not allege that Google required publishers to purchase one product to get the other.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss Counts I through IV of State Plaintiffs' Third Amended Complaint in full and with prejudice.

Dated: May 5, 2022                                    Respectfully Submitted,

                                                     */s/ Eric Mahr*
                                                     Eric Mahr

---

[33] *See Viamedia*, 951 F.3d at 470 ("Ample evidence shows that Comcast conditioned MVPDs' access to the Interconnects on hiring Comcast as their ad rep."); *Kodak*, 504 U.S. at 463 ("The record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's.").

Julie Elmer
Andrew J. Ewalt (admitted *pro hac vice*)
Jan Rybnicek (admitted *pro hac vice*)
Lauren Kaplin
Robert J. McCallum
FRESHFIELDS BRUCKHAUS
    DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
jan.rybnicek@freshfields.com
lauren.kaplin@freshfields.com
rob.mccallum@freshfields.com


Justina Sessions
Jonathan Jacobson
Jessica Lonergan
Mikaela Evans-Aziz
Vadim Egoul
WILSON SONSINI GOODRICH &
    ROSATI
Professional Corporation
One Market Plaza, Spear Tower
Suite 3300
San Francisco, CA 94105
(415) 947-2000
jsessions@wsgr.com
jjacobson@wsgr.com
jlonergan@wsgr.com
mevansaziz@wsgr.com
vegoul@wsgr.com


John Harkrider
Daniel Bitton
Bradley Justus (admitted *pro hac vice*)
Koren Wong-Ervin (admitted *pro hac vice*)
AXINN VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
jharkrider@axinn.com

31

dbitton@axinn.com
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*